IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

LAREDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CASE NO. 5:22-CR-822 |
| | § | LAREDO, TEXAS |
| VERSUS | § | WEDNESDAY, |
| | § | FEBRUARY 1, 2023 |
| JOSE ALONSO SALDAÑA-ALANIZ | § | 8:43 A.M. TO 6:32 P.M. |

**<u>SUPPRESSION HEARING - DAY ONE</u>**

BEFORE THE HONORABLE JOHN A. KAZEN
UNITED STATES MAGISTRATE JUDGE

| | |
|---|---|
| APPEARANCES: | SEE NEXT PAGE |
| CASE MANAGER: | JESSICA RODRIGUEZ |
| COURTROOM ERO: | ANABEL POTTIN |

<u>TRANSCRIPTION SERVICE BY</u>:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:


FOR THE UNITED STATES OF        OFFICE OF THE US ATTORNEY
AMERICA:                        Jose Homero Ramirez, Esq.
                                11204 McPherson Road
                                Suite 100A
                                Laredo, TX 78045
                                956-794-2101

FOR DEFENDANT JOSE ALONSO       FEDERAL PUBLIC DEFENDERS OFC
SALDAÑA-ALANIZ:                 Sara A. Martinez, Esq.
                                Raul Guerra, Esq.
                                1202 Houston Street
                                Laredo, TX 78040
                                956-753-5313

ALSO PRESENT:                   Susan Buckley, Interpreter
                                Janis Palma, Interpreter
                                Doug Heimlich, USM

<u>INDEX</u>

| WITNESSES: | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> |
|---|---|---|---|---|
| MICHAEL GONZALEZ | | | | |
| By Mr. Ramirez | 27 | . | 155 | . |
| By Mr. Guerra | . | 89 | . | . |
| RAMIRO RESENDEZ | | | | |
| By Ms. Martinez | 162 | . | . | . |
| By Mr. Ramirez | . | 166 | . | . |
| EDUARDO GARZA | | | | |
| By Ms. Martinez | 175 | . | . | . |
| By Mr. Ramirez | . | 207 | . | . |
| JORGE ALBERTO MARTINEZ, JR. | | | | |
| By Mr. Ramirez | 219 | . | . | . |
| By Mr. Guerra | . | 236 | . | . |
| ROBERTO AYALA | | | | |
| By Mr. Ramirez | 292 | . | . | . |
| By Mr. Guerra | . | 318 | . | . |
| DANA PAULA SARQUIZ | | | | |
| By Mr. Ramirez | 341 | . | 412 | . |
| By Mr. Guerra | . | 380 | . | 418 |

| EXHIBITS: | <u>Marked</u> | <u>Offered</u> | <u>Admitted</u> |
|---|---|---|---|
| Government's Exhibits 1 - 8 | 8 | 8 | 8 |
| Defendant's Exhibits 1 - 24 | 8 | 8 | 9 |
| Defendant's Exhibit 25 | 125 | 125 | 125 |
| Defendant's Exhibit 26 | 142 | 142 | 142 |

★★★

1    **LAREDO, TEXAS; WEDNESDAY, FEBRUARY 1, 2023, 8:43 A.M.**

2              (Official Interpreter utilized for translation.)

3                   COURT SECURITY OFFICER:  All rise.

4                   THE CASE MANAGER:  Hear ye, hear ye, hear ye.  The

5    United States District Court for the Southern District of

6    Texas holding session in Laredo, the Honorable Magistrate

7    Judge John A. Kazen, presiding, is now open pursuant to

8    adjournment.

9                   God save these United States and this Honorable

10   Court.

11                  THE COURT:  Good morning everybody.  Have a seat.

12                  All right.  We are here in Case Number 5:22-CR-822,

13   the matter of the United States of America versus Jose Alonso

14   Saldaña-Alaniz.  We are here for a hearing on Defendant's

15   opposed motion to suppress evidence, Docket Number 24.

16                  Is -- first can I get an announcement on behalf of

17   Defendant?

18                  MS. MARTINEZ:  Good morning, Your Honor.  Sara

19   Martinez and Raul Guerra for the Defendant.

20                  THE COURT:  Okay.  And your client is here.

21   Correct?

22                  MS. MARTINEZ:  Yes, he's present in the courtroom,

23   Your Honor.

24                  THE COURT:  All right.  Thank you.

25                  And -- oh, well, excuse me, Ms. Martinez, are you

1    ready to proceed?

2         MS. MARTINEZ:  Yes, we're ready to proceed, Your

3    Honor.

4         THE COURT:  Okay.  Thank you.

5         All right.  On behalf of the Government?

6         MR. RAMIREZ:  Good morning, Your Honor.  Homero

7    Rodriguez for the United States.  And along with me is the

8    case agent who will be the agency representative, Jose

9    Morales, Task Force Officer with ATF.  And my witnesses are

10   all in the courtroom.

11        THE COURT:  Okay.  All right.  Welcome, Mr. Morales.

12        All right.  And, Mr. Ramirez, are you ready to

13   proceed?

14        MR. RAMIREZ:  Yes, sir.

15        THE COURT:  Okay.  All right.

16        MS. MARTINEZ:  Your Honor, if I may make an

17   announcement?  Our witnesses are not here yet, but we're ready

18   to proceed with the Government's witnesses at this time.

19        THE COURT:  Okay.  Are you anticipating that they

20   will be here within a certain time frame or --

21        MS. MARTINEZ:  We hope so, Your Honor.

22        THE COURT:  Okay.  You don't -- I mean, you know,

23   maybe for example if a subpoena said 9:00 a.m. or something.

24        MS. MARTINEZ:  Yeah, but they're not -- they're

25   not -- to my knowledge they're not here yet, Your Honor, so

1    we're hoping they -- they knew to be here so we're hoping that

2    they show up this morning.

3              THE COURT:  Okay.

4              MS. MARTINEZ:  Otherwise I --

5              THE COURT:  Well, we can -- we'll --

6              MS. MARTINEZ:   -- we can work around it through the

7    witnesses, the agents' testimony.

8              THE COURT:  Okay.  But we'll -- keep me updated and

9    we'll -- I'll -- you know, we'll figure out how to address

10   that.  But thank you for letting me know.

11             MS. MARTINEZ:  Thank you.

12             THE COURT:  All right.

13             MR. RAMIREZ:  One thing, Your Honor, if we could, we

14   have an agreement with respect to the witness -- to the

15   exhibits.  The Government -- we had discussed that in order to

16   not have duplicate exhibits --

17             THE COURT:  Okay.

18             MR. RAMIREZ:   -- that we would be relying on each

19   other's exhibits, so we tried to minimize the number.  And so

20   we've agreed -- all of her exhibits I have no objection to

21   their admission, and I believe we have a reciprocal

22   announcement --

23             MS. MARTINEZ:  That's correct --

24             MR. RAMIREZ:   -- with respect to the Government's.

25             MS. MARTINEZ:   -- that's correct, Your Honor.  I

1  know that the Government -- is that the amended one or --

2         MR. RAMIREZ:  No.

3         MS. MARTINEZ:   -- okay, then we have --

4         MR. RAMIREZ:  Only 1 through 8.

5         MS. MARTINEZ:   -- we have no objection to

6  Government's 1 through 8.

7         THE COURT:  Okay.  So then let's start with -- I

8  know, we'll start with the Government -- let me get this on

9  the Record, make sure I have accurate -- well, do you -- well,

10  let me figure it out.  Mr. Ramirez, do you want to hand me --

11  do you want proffer the exhibits and then we'll -- I'll walk

12  through them, I'm going to name them and make sure we get it

13  on the Record clearly and I'll ask for -- if there is any

14  objections.  But if you want to -- if you have those exhibits,

15  I understand it's Government's Exhibits 1 through 8.  Is that

16  correct?

17         MR. RAMIREZ:  That is correct, Your Honor.  And --

18         THE COURT:  Okay.  And I'll -- just so -- I've got

19  the Government's exhibit list in front of me, Exhibit Number 1

20  is a photo showing an open door and open door gate; Exhibit 2,

21  photo showing lower portion of shower stall; Number 3, photo

22  showing upper portion of shower stall; Number 4, photo showing

23  lower portion of shower stall -- and I'm abbreviating, I mean

24  paraphrasing -- Number 5, photo showing ammunition boxes;

25  Number 6, photo showing close-up of black bin; Number 7, copy

1    of signed rights, advisement in Spanish; 8, copy of voluntary

2    statement.

3          (Government's Exhibit Nos. 1 through 8 identified.)

4                THE COURT:  So those are the exhibits the Government

5    is proffering at this time?

6                MR. RAMIREZ:  Yes, Your Honor, and we tender into

7    evidence now.

8                THE COURT:  Okay.

9                MR. RAMIREZ:  Or proffer.

10                THE COURT:  And is there any objection from

11   Defendant?

12                MR. RAMIREZ:  No objection, Your Honor.

13                THE COURT:  Okay.  Those -- Government's Exhibits 1

14   through 8 will be admitted without objection.

15         (Government's Exhibit Nos. 1 through 8 received in

16   evidence.)

17                THE COURT:  Now, conversely for Defendant, Defendant

18   is offering -- is it 24 exhibits?  Is that correct,

19   Ms. Martinez?

20                MS. MARTINEZ:  That's correct, Your Honor.

21                THE COURT:  All right.  And I'm not going to read

22   all those but I've got Defendant's exhibit list here in front

23   of me, and copies of the exhibits.  But, okay, so the

24   Defendant is offering Defendant's Exhibits 1 through 24.

25         (Defendant's Exhibit Nos. 1 through 24 identified.)

1          THE COURT:  Mr. Ramirez, on behalf of the Government

2     is there any objection?

3          MR. RAMIREZ:  No objection, Your Honor.

4          THE COURT:  Okay.

5          MR. RAMIREZ:  And we agree to their admission.

6          THE COURT:  All right.  Then Defendant's Exhibits 1

7     through 24 are admitted without objection.

8       (Defendant's Exhibit Nos. 1 through 24 received into

9     evidence.)

10          THE COURT:  Okay.  And you have the official

11    copies --

12          MS. MARTINEZ:  Yes.

13          THE COURT:   -- Ms. Martinez, you want to tender?

14          MS. MARTINEZ:  Yes, Your Honor.

15       (Pause in the proceedings.)

16          MS. MARTINEZ:  And, Your Honor, our witnesses are

17    present in the courtroom today.

18          THE COURT:  Okay.  All right.  Good.  That's --

19          Okay.  So let me first I guess summarize.  You know,

20    I debated whether or not to have you all do opening

21    statements, but of course I have your briefing.  I guess let

22    me do it this way and then you can tell me if there's anything

23    you want to further elaborate on, but let me give -- let me

24    discuss my overview of what I think the issues are to make

25    sure that we're on the same page and we'll -- you know,

1    anyway, just to frame the issues, and then I'll probably just

2    let you all proceed to present evidence.

3            But so this is a motion to suppress evidence that

4    was found by the Government, or discovered by the Government

5    on, I forget the date, of June -- no, let's see --

6            MR. RAMIREZ:  June 1, Your Honor.

7            THE COURT:   -- June 1, 2022, and it was

8    discovered -- the evidence was found -- the physical evidence

9    was found in the efficiency apartment, but I'm calling it the

10   efficiency, of the Defendant, Mr. Saldaña-Alaniz.  But let

11   me -- so I guess I want to start with the clarification that

12   on the date in question there are 2 -- arguably 2 premises

13   involved, and I say arguably because I don't know to what

14   extent, you know, each of these issues is disputed or not, but

15   there are arguably 2 premises involved.  The first premises

16   I've been calling internally Apartment Number 1 belonging to a

17   Mr. Eduardo Garza.  Is that -- it's Apartment 1, not Apartment

18   A or anything, it's Apartment Number 1?

19           MS. MARTINEZ:  Apartment 1, that's correct, Your

20   Honor.

21           THE COURT:  Okay.  Belonging to Mr. Garza, or as has

22   been called in the briefing in different places, the shirtless

23   man.  Then there's a question -- then there's the separate, or

24   again, arguably separate premises of the -- what's been

25   referred to as an efficiency belonging to Defendant

1    Mr. Saldaña-Alaniz.  Okay.  So that -- I'm referring to one of

2    them as Apartment Number 1 and another one as Efficiency.

3         I want to say that up front because as evidence

4    starts to be presented or questioning or everything, I, you

5    know, could start using -- people could use interchangeably

6    apartment or whatever, so I'm referring to -- I'm thinking in

7    my head, and I want to keep that straight, one of them is

8    Apartment Number 1 and the other one is the Efficiency.  Okay.

9    And understanding Efficiency is the one that I understand

10   there may be evidence that Mr.  -- the Defendant was leasing

11   the Efficiency from the landlord in the building.

12        All right.  Now -- okay, now again, just as an

13   overview, and I'm not saying regardless of -- you know, if I

14   ask you, well, what is contested or what isn't, I'm not saying

15   that you shouldn't introduce evidence on any of these issues

16   or, you know, to establish them, present whatever evidence you

17   think you need to present.  But I want to have an overview of

18   these positions.

19        So, Mr. Ramirez, it's Government's position that the

20   officers' entry into Apartment Number 1 was -- it was a

21   warrantless search.  Correct?  I mean of the apartment and the

22   efficiency, is it agreed, everybody agrees it was a

23   warrantless search and entry into both of those premises?  Is

24   that correct?

25        MR. RAMIREZ:  The first time.  Yes, Your Honor.

There were two searches and it might be easier to clarify --

THE COURT: That’s where I was going.

MR. RAMIREZ: -- there were 2 searches. Yes. The first --

THE COURT: But --

MR. RAMIREZ: -- was warrantless.

THE COURT: -- but for both searches there was no warrant.

MR. RAMIREZ: The first search was warrantless, the second we’re contending was consensual.

THE COURT: Well -- but no warrant.

MR. RAMIREZ: Oh, that’s right, I’m sorry, yes.

THE COURT: I understand. And I’m going there, but no warrant. They were both --

MR. RAMIREZ: You’re right.

THE COURT: -- warrantless. Okay. So, and that’s exactly where I was going but -- so you got a little ahead of me, but we’re getting there. So, but as far as the officers’ entry into Apartment Number 1, which is the premises that I understand was leased by Mr. Garza, or the shirtless man. It is the Government’s position that the entry into that apartment was justified by exigent circumstances. Correct?

MR. RAMIREZ: That’s correct, Your Honor.

THE COURT: Okay. And specifically of course there’s multiple types of exigent circumstances, categories of

1    exigent circumstances.  Which one -- what exigent
2    circumstances would you identify as the category as applying
3    that the Government is --
4              MR. RAMIREZ:  Welfare --
5              THE COURT:   -- asserting?
6              MR. RAMIREZ:  Welfare search, Your Honor.  The
7    second search --
8              THE COURT:  A welfare search or otherwise called
9    emergency --
10             MR. RAMIREZ:  Emergency --
11             THE COURT:   -- existence?
12             MR. RAMIREZ:   Yes, sir.
13             THE COURT:  Okay.  Is Defendant -- just right there,
14    the officers' entry into Apartment Number 1 leased by
15    Mr. Garza, does Defendant dispute whether or not the officers'
16    entry into that apartment was justified?
17             MS. MARTINEZ:  Your Honor, we don't have a position
18    on that because I don't feel we have standing to even raise
19    that issue, the entry into Mr. Garza's apartment.  Our issue
20    is the entry into our client's efficiency through Mr. Garza's
21    apartment.
22             THE COURT:  Of course.  Okay.  But -- okay, I'm
23    telling you now, just for everybody's purpose, I do believe
24    that the -- that an analysis of the officers' entry into
25    Apartment Number 1 is relevant.  I mean whether or not it's

1    outcome determinative or not, but I think it's relevant of why

2    they were in the Apartment Number 1 in the first place.  So

3    just FYI.

4              MS. MARTINEZ:  And if I may just say this, Your

5    Honor, if I had standing on that issue, I would argue that a

6    SWAT team was not necessary to do a welfare check on some

7    children.

8              THE COURT:  Okay.

9              MS. MARTINEZ:  So that would be our position.

10             THE COURT:  All right.  So, but again, officers go

11   into Apartment Number 1 and the Government's position is that

12   was justified by exigent circumstances, specifically welfare

13   check or emergency assistance.  Is that correct, Mr. Ramirez?

14             MR. RAMIREZ:  Yes, sir.

15             THE COURT:  Okay.  Again, I'm just framing the

16   issues to make sure, you know, I understand them and I know

17   what the evidence is relevant to.

18             Okay.  Then the -- I expect that the evidence --

19   there's going to be evidence that the officers then enter the

20   efficiency.

21             MR. RAMIREZ:  Correct, Your Honor.

22             THE COURT:  Okay.  And there were two different --

23   as I understand it at least, the parties were characterizing I

24   think generally that there were two different separate entries

25   into the Efficiency.  Fair to say?

1          MR. RAMIREZ:  Yes, Your Honor.  We are -- the

2     Government's position is that there was one entry from Unit 1

3     that was consistent with the exigent circumstances which is

4     why it is relevant, and secondly the second entry was through

5     the front door after consent was obtained from the Defendant.

6          THE COURT:  Okay.  And this is Government's

7     position.  But as to the first entry that was through the

8     connecting door between Apartment Number 1 and the Efficiency,

9     I mean it's the -- correct me if I'm wrong, Mr. Ramirez, but I

10    understand that the Government is saying, Well, okay, the

11    officers -- at some point you -- do you concede or agree now

12    that the Efficiency was a separately leased premises of the

13    Defendant, separate from Apartment Number 1, of Mr. Garza's

14    premises?

15         MR. RAMIREZ:  Legally, yes.  In other words, yes.

16         THE COURT:  Regardless of what the officers knew at

17    the time.

18         MR. RAMIREZ:  Yes.

19         THE COURT:  At this point as -- in reality  they

20    were separate premises?

21         MR. RAMIREZ:  Yes.

22         THE COURT:  Okay.  And is it the Government's

23    position that the officers' entry the first time they entered

24    the Efficiency through the connecting door between Apartment

25    Number 1 and the Efficiency that that was, what, a good faith

1    exception or good faith belief at the time that they weren't

2    aware that the premises were separate?

3                MR. RAMIREZ:  Correct, Your Honor.  A continuation

4    of the reasons why they went into Unit 1 in the first place.

5                THE COURT:  Okay.  And again, this is not -- I'm

6    not -- I'm not making conclusions right now, I'm not -- but

7    this -- I'm just understanding the Government's position at

8    this time, and what I expect the evidence to be presented

9    about.

10               Okay.  And then I do have some questions about that,

11   but I can save that until after, or as the evidence is

12   presented, but the -- well, what -- Mr. Ramirez, what do you

13   expect the evidence to be as to what the officers saw during

14   that what I'm referring to as the first entry into Defendant's

15   efficiency, what, if any, illegal substances or contraband or

16   anything did they see upon entry into Defendant's Efficiency

17   on the first entry.

18               MR. RAMIREZ:  Based on the -- what has been told to

19   me by the witness who went in, which is the lead Deputy

20   Sheriff, he only saw a jar containing marijuana on his way

21   back out after he suspected that it was a separately -- a

22   separate domicile.  But no ammunition, no boxes, not the bag

23   of 28 pounds of marijuana.

24               THE COURT:  Okay.  And as I understand, again, as

25   the briefing seems to indicate, that the Government expects

1    that the evidence will be that at some point then the officers

2    thought or concluded that the Efficiency was a separate

3    premises and they, you know, for lack of a better word,

4    evacuated the Efficiency back through the door into the

5    Apartment.

6              MR. RAMIREZ:  Yes, Your Honor.

7              THE COURT:  And then there I think -- you know, I

8    expect the evidence will be that then they mad contact with

9    the Defendant and then there's a disagreement about whether or

10   not Defendant then gave consent for the officers to enter the

11   Apartment and they made what I'm thinking of as the second

12   entry through the outside door, to the exterior, you know,

13   outside into the Efficiency.

14             MR. RAMIREZ:  That's correct, Your Honor.  But

15   before speaking to -- before obtaining consent from the

16   Defendant, the officers did speak to the -- it's out

17   contention they spoke to the -- then spoke to the lessee of

18   Unit 1, Mr. Garza, or the shirtless man, confirm that that

19   separate area was not part of his lease, and then spoke --

20   also spoke to the landlord who confirmed that he had a lease

21   with the Defendant, and that was not part of the -- that

22   Efficiency was not part of the lease to Unit 1, Mr. Garza.

23             THE COURT:  Okay.  So, all right, so then, again, I

24   understand it's disputed whether or not Defendant did give

25   consent for the second entry, the officers did, you know, then

1    enter, again, I expect evidence that will be presented about

2    whether then the officers did make entry back into Defendant's

3    Efficiency.  Okay.  And, you know, so whatever that evidence

4    is that's presented.

5          I understand then that the Defendant, you know,

6    maybe made some -- there will be evidence about whether or not

7    Defendant made some statements there at the scene, but I

8    also -- it's been represented that then the Defendant was

9    questioned later and I think it's the Government's position

10   that he volunteered -- waived his Miranda rights and gave a

11   voluntary statement later at the police station, or some law

12   enforcement --

13         MR. RAMIREZ:  At the Sheriff's Department

14   substation.

15         THE COURT:  Okay.  The Sheriff's Department

16   substation.

17         Okay.  Ms. Martinez, first of all, up to this point

18   is there anything you want to clarify or --

19         MS. MARTINEZ:  Yes, Your Honor.  The first thing I

20   want to clarify is the first entry into my client's Efficiency

21   we expect to present evidence through Mr. Garza, who's present

22   in the courtroom, that the -- Mr. Garza told law enforcement

23   prior to that accidental entry, That does not belong to me,

24   that's someone else that lives there.  And we expect the

25   evidence will show that they disregarded that information and

1    moved -- by the way, there was a sofa blocking the door and so

2    if there was an exigency, we don't think there's a good faith

3    exception to moving a sofa and opening a door under that

4    circumstance.

5           But it's two things, one, they were told prior to

6    entry that that's off limits and they still did it; and in the

7    alternative the exigency did not rise to the level of having

8    to move a couch and open a door.

9           THE COURT:  All right.  Okay.  And I understand

10   that, yeah.  So, okay, now, Ms. Martinez, in terms of the

11   evidence that Defendant -- that are moving for Defendant to

12   exclude I understand that would, to me, you know, obviously

13   include the physical evidence that was found in his

14   efficiency, the ammo and the -- the ammunition and the drugs.

15          MS. MARTINEZ:  Correct, Your Honor.

16          THE COURT:  Correct?

17          MS. MARTINEZ:  But we also moved to suppress all the

18   subsequent statements as fruit of the poisonous tree, Your

19   Honor.

20          THE COURT:  Okay.  So that's what I wanted to

21   clarify then.  What -- well, so I mean I guess we'll see what

22   the evidence is about that, but I mean can you give -- so was

23   there questioning or statements, you know, just so I

24   understand like where to expect the -- in the chronology of

25   what statement, you know, either that when he was questioned

1       or he said something at the scene versus later when he's at

2       the Webb County Sheriff's substation?

3              MS. MARTINEZ:  To my knowledge, Your Honor, I don't

4       believe he made any incriminating statements at the scene.  I

5       think any and all incriminating statements were made until he

6       was taken to the station.  But again --

7              THE COURT:  Okay.

8              MS. MARTINEZ:   -- it's our position that from the

9       inception his rights were violated so any and all evidence

10      obtained after, whether it be at the station or there are

11      all -- should all be suppressed.

12             THE COURT:  Okay.  And that it was not cured by any

13      voluntary, you know, waiver of Miranda rights.

14             MS. MARTINEZ:  Correct, Your Honor.

15             THE COURT:  Okay.  So that's a disputed issue

16      about -- regarding whether or not the statements he made are

17      fruit of the poisonous tree and should be excluded.

18             MS. MARTINEZ:  Correct, Your Honor.

19             THE COURT:  And was that cured --

20             MS. MARTINEZ:  Well, because, Your Honor, it would

21      also amount to an unlawful detention as well.  It -- they

22      should have never done things the way they did, they should

23      have never arrested him and then the statements as well

24      shouldn't be admissible.

25             THE COURT:  Okay.  Understood.  But, yeah, I wanted

1    to make sure to clarify that in my mind so I could focus on

2    that.

3            Okay.  Are we picking up, Ms. Martinez, on the

4    audio?

5            THE ELECTRONIC RECORDING OFFICER:  Yes.

6            THE COURT:  She's coming out clearly?  Okay.  I just

7    want to make sure we're picking it up.

8            THE ELECTRONIC RECORDING OFFICER:  She is.

9            MS. MARTINEZ:  I'm a little hoarse this morning,

10    sorry, Your Honor.  I hope my voice gets better.

11            THE COURT:  Okay.  All right.  Anything else

12    preliminarily, Ms. Martinez, that you want to get -- I mean

13    just to say before we begin the presentation of evidence?

14            MS. MARTINEZ:  No, Your Honor, other than we're

15    invoking the Rule at this time.

16            THE COURT:  Okay.  I was actually going to ask about

17    that.

18            Okay.  Mr. Ramirez, any objection to the --

19            MR. RAMIREZ:  No, Your Honor.

20            THE COURT:   -- invoking the Rule?  Are you asking

21    for that on both sides?

22            MR. RAMIREZ:  Asked for both sides, Your Honor.

23    There's one exception, after conferring with counsel

24    apparently they -- I shouldn't say apparently, that sounds

25    weird -- but I've agreed at their request to permit their

1          investigator to remain in the courtroom.

2                    MS. MARTINEZ:  Mr. Soto.

3                    MR. RAMIREZ:  Mr. Ramiro Soto, who is -- who was

4          involved in their investigation.

5                    THE COURT:  Okay.  All right.  So --

6                    MS. MARTINEZ:  And may be a rebuttal witness as

7          well, Your Honor, perhaps.

8                    THE COURT:  Okay.  But they won't be in the -- oh,

9          you -- Mr. Soto --

10                   MS. MARTINEZ:  Mr. Soto --

11                   THE COURT:   -- may be a rebuttal witness?

12                   MS. MARTINEZ:  Yes, Your Honor.

13                   THE COURT:  Okay.  All right.  But you're aware of

14         that, Mr. Ramirez?

15                   MR. RAMIREZ:  Yes.  Yes, Your Honor.

16                   THE COURT:  Okay.  Then as to -- for all of the

17         witnesses in the courtroom, you are -- you will be excused

18         from the courtroom at this time.  You are instructed, the

19         counsel and the parties are instructed that they are not to

20         talk to you about the evidence that is presented, the

21         testimony that's given here in court.  You are not to talk to

22         witnesses when they come off the stand, or they've testified,

23         they come out, you're not to talk to them about, What did you

24         say, What was the, you know, what was the evidence that was

25         presented.

1            You're not to talk to each other about the case

2     until you are -- until you're discharged from the case.  But

3     even after being discharged as a witness, excused as a

4     witness, you are not to talk to the other witnesses until

5     after the hearing is concluded.  So again, don't talk to each

6     other.  You'll be -- the purpose -- we'll have you wait

7     outside and don't talk about the evidence or what the

8     testimony is or what you said in court or what anybody else

9     said in court.

10            So at this time then the witnesses are excused, and

11     this is with the exception of Mr. Soto.  And the case manager

12     of course -- the case agent.

13            (Pause in the proceedings.)

14            MS. MARTINEZ:  Your Honor, may I just make sure that

15     my witnesses know that they can't be -- let them know --

16            THE COURT:  Oh, they're supposed to -- yeah --

17            MS. MARTINEZ:   -- let them know --

18            THE COURT:   -- well, let me tell the Marshals I

19     mean to make sure -- our CSO -- to make sure that they

20     understand they are not -- they're not to leave the building,

21     they're just to wait outside.

22            MS. MARTINEZ:  My witnesses.

23            THE COURT:  They're not excused.

24            MR. RAMIREZ:  I've already spoken to my witnesses,

25     Your Honor, they're going to remain here and they understand

1  what the rule means and not to talk to each other about

2  whatever --

3          THE COURT:  Yeah.

4          MR. RAMIREZ:   -- they -- if they come testify, they

5  can't tell that, or what they observe, see or hear happening

6  here.  They can only speak to me.

7          MS. MARTINEZ:  Your Honor, and may I have permission

8  to allow my witnesses to wait in the little room outside?

9          THE COURT:  Yes, that's fine.  Yeah, sure.

10         MS. MARTINEZ:  Thank you.

11     (Pause in the proceedings.)

12         THE COURT:  Okay.  Let's wait a minute for

13  Ms. Martinez to come back.

14     (Pause in the proceedings.)

15         THE COURT:  Okay.  So honestly it's been a while

16  since I've done a motion to suppress.  Standard, do we agree,

17  is the -- if the Government has the burden -- or the Defendant

18  has the burden to establish that there was a 4th Amendment

19  violation of warrantless entry, but the Government has then

20  the burden to prove that the entry was -- that the --

21         MR. RAMIREZ:  Lawful.

22         THE COURT:   -- violation was justified or there was

23  an exception to the rule.  But I don't remember, is the

24  Government -- honestly, parties, what's your expectation as to

25  who would proceed first?

1          MS. MARTINEZ:  The Government could go first.

2          THE COURT:  That's --

3          MR. RAMIREZ:  According to the rules the Defendant

4     should take the stand and present his -- to establish *prima*

5     *facie*, but typically what occurs is the Government probably

6     goes first.

7          THE COURT:  Yeah, and that's what I -- that's why I

8     was thinking about that, but the -- I don't know that -- yeah,

9     I guess that's why I started with I think everybody agrees,

10    the Government agrees that there was a warrantless search, not

11    that you're maybe stipulating that there was a 4th Amendment

12    violation, but to the extent that it's the Government's burden

13    to prove the exception to the rule.  Then so are we in

14    agreement then --

15         MR. RAMIREZ:  We're prepared to go first.

16         THE COURT:   -- the Government will proceed to

17    present --

18         MR. RAMIREZ:  Yes, Your Honor.

19         THE COURT:   -- its witnesses, its evidence.  All

20    right.  Then anything else preliminarily before you call your

21    first witness, Mr. Ramirez?

22         MR. RAMIREZ:  I can't think of anything else.

23         MR. GUERRA:  I'm sorry, what's that, Your Honor?

24         THE COURT:  Just I was asking is there anything else

25    before he presents his first witness.

1    MR. GUERRA:  No, Your Honor.

2    THE COURT:  Anything on your part?  No?

3    MR. GUERRA:  No, Your Honor.

4    THE COURT:  The Defendant's part?

5    MS. MARTINEZ:  No, Your Honor.

6    THE COURT:  Okay.  All right.  Then, Mr. Ramirez,

7  you can call your first witness.

8    MR. RAMIREZ:  Thank you, Your Honor.  The first

9  witness is Sgt. Michael Gonzalez.  And --

10    THE COURT:  Yes, go ahead and bring him in.

11    MR. RAMIREZ:   -- I don't think they've been sworn

12  in yet.

13    THE COURT:  No, we didn't.  I was going to do that

14  and I forgot so.

15       (Pause in the proceedings.)

16    THE CLERK:  Good morning, Sgt. Gonzalez.

17    SGT. GONZALEZ:  Good morning.

18    THE CLERK:  Please raise your right hand to be

19  sworn.

20       (Witness sworn.)

21    THE CLERK:  Thank you.  You can be seated.

22    THE COURT:  All right.  Sgt. Gonzalez, welcome.  You

23  know, be sure to speak into -- you can get the microphone

24  adjusted as you need to.  Please speak clearly into the

25  microphone and listen carefully to the questions that are

1    asked and, you know, you use your best efforts to answer the

2    questions clearly and directly.

3              Go ahead, Mr. Ramirez.

4              MR. RAMIREZ:  Thank you, Your Honor.

5              DIRECT EXAMINATION OF MICHAEL ANTHONY GONZALEZ

6    BY MR. RAMIREZ:

7    Q    Good morning, Sergeant.  What is -- state your full name

8    and your title and what agency you work with.

9    A    My name I Michael Anthony Gonzalez, my title is sergeant,

10   narcotics supervisor.  I'm with the Webb County Sheriff's

11   Office.

12   Q    What are your duties with the Sheriff's Office?

13   A    My duties are work with the Narcotics Unit, I'm also the

14   SWAT commander.

15   Q    What were your duties back on June 1, 2022?

16   A    I was the supervisor on scene.

17   Q    Okay.  Now let me ask you a little bit about yourself.

18   How long have you been with the Sheriff's Department?

19   A    I've been with the Sheriff's Office going on 8 years.

20   Q    And during those 8 years have you held the same position,

21   the same title, the same responsibilities?

22   A    Not the lawyers.

23   Q    What did -- before your current assignment what did you

24   do with the Sheriff's Department?

25   A    So when I started with the Sheriff's Office I started off

1    in Patrol, was in Patrol for 2 years.  From there I got moved

2    to CID, was there for 1 year.  And then from there I went to

3    Narcotics, I was there for about 2 years and then promoted to

4    sergeant, went back up to Patrol, the supervisor in Patrol,

5    and then I've gotten back to Narcotics as a supervisor,

6    currently supervisor in Narcotics going on 8 years -- I mean,

7    correction, 8 months.

8    Q    What does CID stand for?

9    A    Criminal Investigation Division.

10   Q    What qualified you for that?

11   A    Recommendations from supervisors, my patrol supers.

12   Q    And did you go to any classes or any training in

13   particular for that position?

14   A    It was like basic investigation, like interrogation

15   techniques, crime scene evidence collection, stuff like that.

16   Q    And where did you get that training?

17   A    I don't recall the training we had.

18   Q    When you became a -- I'm sure you're -- what do you --

19   how do you refer to your credentials, it's TCLS or something

20   like that.

21   A    TCLS, yes, sir.

22   Q    Texas Commission of Law Enforcement Standards, something

23   like that?

24   A    Correct.

25   Q    Law enforcement officer standards.  How long have you had

1   that certification?

2   A     Probably about 9 years.  9 years because before the

3   Sheriff's Office I was with the constables office for about a

4   few months, like 6 months, 7 months.

5   Q     Which constable did you work with?

6   A     For Precinct 4.

7   Q     Who was the constable then?

8   A     Harold Devally.

9   Q     What did you do while a constable, deputy constable,

10  excuse me.

11  A     Serving papers, court security with the Precinct 4 judge,

12  that's basically it.

13  Q     Why did you go from the constables office to the

14  Sheriff's Office?

15  A     There was an opening in the Patrol that had a grant for

16  veterans, and I took the grant.  I hired with the Sheriff's

17  Office on a veteran grant.

18  Q     What kind of grant?

19  A     For veterans, a grant for veterans.

20  Q     And what did that entail?

21  A     So usually when you start with the Sheriff's Office you

22  usually start at the Jail Division, because the grant entailed

23  that you're a veteran, you went straight out to Patrol.  It

24  was a grant the Sheriff was offering specifically only for

25  military veterans.

1    Q    So that means you're a military veteran?

2    A    Correct.

3    Q    Tell me about your military experience.

4    A    I was in the Army from 2010 to 2013, my job was infantry

5    and I deployed to Afghanistan from 2011 to I think 2012, April

6    2011 to April 2012.

7    Q    What's the highest rank you achieved while with the Army?

8    A    E-4 Specialist.

9    Q    Did you have any leadership or supervision

10   responsibilities while you were in the Army?

11   A    Yes.

12   Q    Tell me about that, please.

13   A    In the middle of my deployment my team leader got injured

14   and I was the next in line so I made team leader mid-

15   deployment.

16   Q    What does it mean to be a team leader in the Army, or

17   your unit?

18   A    You oversee 3 other soldiers who are privates, and

19   they're just less experienced so lower rank than you are so

20   you oversee them.

21   Q    Would that be like a squad, is that what that's referred

22   to?

23   A    It's referred to a fire team.

24   Q    Fire team.  Okay.  Let's go to June 1, 2022, you know,

25   it's last year.  So at some point during the day you ended up

1    at, you yourself, at 3104 Flores in Laredo, Texas.  Is that

2    right?

3    A    Yes.  Yes.

4    Q    Why were you there?

5            MS. MARTINEZ:  Your Honor, we couldn't hear the

6    address.

7            THE COURT:  Couldn't hear the what?

8            MS. MARTINEZ:  The address.

9            THE COURT:  The address.

10           MR. RAMIREZ:  Oh, I'm sorry.  3104 Flores Avenue in

11   Laredo.  I apologize.

12           So we'll both have to be sure to speak clear, slower

13   into the mic.

14           THE WITNESS:  Yes, sir.

15           MR. RAMIREZ:  I'll do that too.

16           THE COURT:  Go ahead, Mr. Ramirez.

17   BY MR. RAMIREZ:

18   Q    So why were you at 3104 Flores?

19   A    One of the investigators I supervise, Investigator Cpl.

20   Dana Sarquiz, she received information that at that address

21   there was ammunition and narcotics being stashed at that

22   address.  So we set up surveillance at the address --

23   Q    Let me -- let me interrupt and take you step-by-step if

24   you don't mind.

25   A    Yes, sir.

1   Q    So where did that information come from?

2   A    That information came from the Sheriff directly to her.

3   Q    Who was the Sheriff?

4   A    Sheriff Martin Cuellar.

5   Q    So he told her and she told you.

6   A    Correct.

7   Q    But this -- it was in the nature of a tip?

8   A    Yes, sir, a tip that went straight to the Sheriff,

9   someone called the Sheriff.

10  Q    Somebody called the Sheriff directly.

11  A    Correct.

12  Q    And what location was described as being where the

13  ammo -- ammunition and drugs were stashed?

14  A    It was supposed to be like a white apartment complex,

15  brick with a door, like a -- I don't know how to say it, maybe

16  there's a deadlock door there, a metal gate facing the street.

17  That's the address that was supposed to have the --

18  Q    Can I --

19  A    -- drugs and ammo.

20  Q    I'm sorry.

21          MR. RAMIREZ:  I'm going to -- do I just switched

22  over?

23          THE CASE MANAGER:  Yes, you're going to project from

24  your laptop?

25          MR. RAMIREZ:  Yes, please.

1      (Pause in the proceedings.)

2      BY MR. RAMIREZ:

3      Q   Okay.  On your screen you should see in front of you

4      Defendant's Exhibit Number 1, and can you tell me -- can you

5      identify that location?  Is that where you went where you were

6      conducting surveillance?

7      A   Correct.

8      Q   Okay.  So what was the target of the -- in your mind what

9      was the target of the target location specifically?

10     A   We were -- at the time we believed it could -- it was

11     that door, the one, the only door you could see on this

12     screen.

13     Q   Okay.  Hold on, please, I'm going to call up another

14     exhibit.  No, not that one, sorry.

15          MR. RAMIREZ:  Sorry, Your Honor, I'm trying to go up

16     instead of to the side.

17          (Pause in the proceedings.)

18          MR. RAMIREZ:  I'll go back to my exhibits.

19          (Pause in the proceedings.)

20     BY MR. RAMIREZ:

21     Q   Look at -- I'm showing you on your screen Exhibit --

22     Government Exhibit Number 1.   More specifically is that a

23     close-up but it's an open door, is that a close-up of the

24     target apartment you were looking at?

25     A   Yes.

1    Q    Okay.  Tell me what stash means.

2    A    It's usually a term used like when someone is either

3    stockpiling or holding large amounts of narcotics or illegal

4    substances in their residence.  It's usually referred to as a

5    stash house, or also --

6    Q    That's when they're --

7    A     -- used for like illegals, illegal aliens.

8    Q    Did you have any specifics about what was being -- how

9    many -- what type of ammunition, what type of drugs, firearms

10   or anything?

11   A    Yes, we -- I don't remember the exact numbers that Cpl.

12   Sarquiz had told me but I remember there was a pound -- or she

13   had mentioned there's a certain amount of pounds inside this

14   residence and gave a ballpark number of the ammunition also.

15   Q    Was it a small amount or a large amount?  You don't

16   remember how much though.

17   A    I don't remember how much.

18   Q    Was it sizeable in your mind?

19   A    Sizeable?  Yes.

20   Q    Okay.  So what did you do after -- how did you receive

21   that -- how was that tip communicated to you?

22   A    Through Investigator Sarquiz.

23   Q    So she told you about the tip?

24   A    Correct.

25   Q    What else did she tell you?

1    A    She told me that some of the information we had she told
2    me that the -- also the amount of ammo, the possible amount of
3    drugs, and that it was this door that was facing the street.
4    Q    Well, you didn't have a picture of the door, or did you?
5    A    Negative.  It wasn't until we set up surveillance that we
6    established that that's possibly our target location.
7    Q    So before you headed out to the scene did you contact any
8    other persons or personnel in your -- in the Narcotics
9    Division?
10    A    I did because -- so Investigator -- I pretty much told
11    everyone to make it out there, ones that I supervise, everyone
12    in Narcotics --
13    Q    Can you speak a little slower, I didn't catch it.
14    A    I pretty much told everybody that is on the Narcotics
15    Unit to make it out there to that location, which is -- at the
16    time it was Dana Sarquiz and Investigator Rosinda Ramirez.  I
17    also had made a call to DEA to see if they can assist us just
18    for manpower and they could make it out also.
19    Q    Who did you call at DEA?
20    A    I called Zach --
21    Q    Do you remember the last name?
22    A    Agent Schlup.
23    Q    Schlup, would it be --
24    A    Schlup.
25    Q     -- Schlup?  Okay.  And what did you ask him to do?

1      A    I told him the information that I had, exactly what

2      Investigator Sarquiz had mentioned to me, I asked him if he

3      could help us with surveillance.  I met with him at -- I don't

4      remember which gas station it was, so I could give him a

5      radio, and from then on they set up surveillance.  He was back

6      and forth because they had something else going on in the

7      area, close by.  So they broke off after a while doing

8      surveillance, they were -- he was doing mostly scene activity

9      at the house.  I let him know --

10     Q    Okay.  I don't want to talk about being at the house yet.

11     A    Okay.

12     Q    I'm talking about discussions you had before -- the

13     preparation -- I want to talk about the preparation that went

14     into getting your whatever you -- whoever you needed to

15     assemble to get there and what information you had.

16     A    Yes, sir.

17     Q    So --

18     A    So that conversation was just I told Zach exactly what

19     Dana had told me and that's pretty much the only information

20     that I had to give him.

21     Q    I'm assuming this is over a cell phone or telephone?

22     A    It was over the phone at first, then when I met him to

23     give him the radio we briefly discussed it again and that was

24     it.

25     Q    Before you headed out to the scene did you have any kind

1    of -- any photos or any diagrams of the location?

2    A    No.  No, sir.

3    Q    Did you have a floor plan of the apartment complex or

4    the --

5    A    No, sir.

6    Q    -- apartment?  Did you -- was there -- so at about what

7    time did you arrive at the scene with your team?

8    A    I don't remember the times.

9    Q    Was it in the morning, the afternoon?

10   A    It was in the -- it was in the afternoon.

11   Q    Did you -- now you're also involved with SWAT, aren't

12   you?

13   A    Correct.

14   Q    What's your -- what do you do with SWAT?

15   A    I'm the SWAT -- I'm in charge of the SWAT team.

16   Q    For the entire Sheriff's Department?

17   A    Correct.

18   Q    Did you take your SWAT team members with you?

19   A    It wasn't a full active -- not during surveillance, that

20   was later, later on.  But it wasn't a full SWAT activation, it

21   was just trying to rally up whoever was available to help out.

22   Q    So now when you were going to the scene who was in charge

23   of the -- were you in charge of the overall operation or was

24   it somebody else?

25   A    I was in charge.

1    Q    What was the role of DEA?

2    A    Just to assist with manpower.

3    Q    By doing what?

4    A    Helping with surveillance, that's pretty much -- at that

5    time that's pretty much it.

6    Q    So there were -- so there were quite a few officers,

7    deputies and some members of DEA who arrived --

8    A    Correct.

9    Q     -- to conduct surveillance.  How far were you from

10   this -- looking at Defendant's Exhibit Number 1 how far were

11   you from the gate that's here and the apartment --

12   A    It kind of --

13   Q     -- building.

14   A     -- kind of curved -- so on --

15   Q    Yeah, go ahead.

16   A     -- SWAT didn't help us with surveillance, SWAT showed up

17   once we decided that we were going to approach.  The only

18   people that were assisting with surveillance was myself,

19   another 2 narcotics officers from Webb County and Zach and I'm

20   not sure how many guys he had with him.  But it was only

21   Narcotics and DEA that were doing surveillance.

22   Q    And what was your purpose in conducting surveillance?

23   A    We were trying to see -- establish probable cause or try

24   to see what was going on, try to investigate the information

25   that Dana had received.

1    Q    So because you didn't have more details you didn't rush

2    into the place.

3    A    Correct.

4    Q    So you're maintaining surveillance, and is that part of

5    your protocol or standard operating procedure?

6    A    Correct.

7    Q    So what were you -- what did you observe while you were

8    there?

9    A    While we were doing surveillance we observed -- the first

10   thing that happened was we observed a white in color Dodge

11   Charger arrive at the location, then the Charger maybe

12   spent --

13   Q    Excuse me a second.  I think the Defendant may be having

14   a problem.

15         (Pause in the proceedings.)

16             THE COURT:  Okay.  Just for clarification with the

17   headset, he's --

18             MR. RAMIREZ:  With the headset.

19             THE COURT:   -- with the headset to be able to hear

20   the interpreter.

21             Okay.  Are we good?

22             MR. GUERRA:  Yes, Your Honor.

23             THE COURT:  Okay.  Mr. Saldaña, he's -- you can

24   hear?

25             DEFENDANT SALDAÑA-ALANIZ:  Yes.

1          THE COURT:  Okay.  All right.  Go ahead and

2     continue, Mr. Ramirez.

3          MR. RAMIREZ:  Thank you.

4     BY MR. RAMIREZ:

5     Q    So the photograph that's on your screen which is

6     Defendant's Exhibit Number 1 is not the way the scene was when

7     you arrived.  This is a photograph -- and I'll represent to

8     you this is a photograph taken by defense's investigative team

9     after the fact.  So when you arrived there were cars in the

10    area, parked in there?

11    A    Yes.

12    Q    Was the gate, this gate open or closed?

13    A    When we arrived, when we went in there --

14    Q    When you arrived.  No, when you arrived.

15    A    When we arrived to do surveillance the gate was open.

16    Q    And by open, looking at Defendant's Exhibit Number 1,

17    there's a white metal gate that appears to -- it's not clear

18    to me whether it slides left and right or opens back and

19    forth.  Can you tell us how it opens and closes?  If you

20    remember.

21    A    I'm not 100 percent, I'm not --

22    Q    But it would have been open for cars to be going in and

23    out.

24    A    Yes.

25    Q    And so what was the -- when you arrived -- so at some

1    point you decided to make an approach.  Am I right?

2    A    Yes.

3    Q    What made you decide to make an approach towards the

4    apartment complex?

5    A    Prior to making that decision during surveillance a white

6    Dodge Charger arrived there on scene, spent about -- I want to

7    say about 10 minutes there and then left.  As the Charger was

8    leaving we had these -- I don't recall who exactly it was, DEA

9    or my narcotics agents officers, that followed the vehicle.

10   No, wait, it was Cpl. Sarquiz, I'm sorry, Cpl. Sarquiz ended

11   up following that vehicle, calling out the vehicle to our

12   patrol deputies.

13        Once our patrol deputies were able to catch up to

14   the vehicle, to establish probable cause they attempted to

15   traffic stop that vehicle.  That vehicle -- it ended in a

16   pursuit, we ended up losing that vehicle, we never found the

17   vehicle.  So that was our first kind of incident or red flag

18   about this location.

19        The second incident that occurred that led to me

20   making the decision to go ahead and approach the apartment was

21   another vehicle showed up, there was a male subject driving.

22   The male subject was just -- surveillance called out that

23   there was a male without -- a shirtless male making contact

24   with him.  And to me in my head I didn't want it to end up in

25   another pursuit or have, you know, our deputies attempt to

1    traffic stop him and end up in another pursuit.

2              And now I'm thinking, you know, you know what

3    there's probably stuff in there and they're trying to get rid

4    of the evidence.  So that's when a phone call was made to see

5    who -- what SWAT operators were available and we gathered up

6    and that's when the decision was made to make the approach.

7    Q    On your screen is Defendant's Exhibit Number 12.  Now

8    what does that depict?

9    A    This is after the -- this looks like it was after the

10   approach was made.

11   Q    Defendant's Exhibit Number 12 is a view of the apartment

12   from the street.

13   A    Right.

14   Q    And it shows several vehicles inside the parking lot,

15   several uniformed officers which appear to be Deputy Sheriffs,

16   there's also someone that appears to have a vest and a cap and

17   may be SWAT, and some individuals on the left, and the 2

18   vehicles are from left to right, it looks like a large white

19   SUV, a gray sedan, and to the right barely visible is another

20   SUV which looks like a Chevrolet Suburban or Tahoe, I can't

21   tell.

22   A    Correct.

23   Q    And then there's an individual that's leaning on the --

24   on some appliance on the left side of the frame, it looks like

25   an old stove or something, and he's wearing some basketball --

1    black basketball pants, may be barefoot and has a gray shirt

2    on.  Do you know who that is?

3    A    That's Mr. Garza.

4    Q    Okay.  So that's a scene after you'd already gone into

5    the apartment and the efficiency.

6    A    Correct.

7    Q    Okay.  But that's more a descriptive of the scene as it

8    looked rather than the earlier Exhibit Number 1, Government

9    Exhibit Number 1.  Right?

10   A    Correct.

11   Q    Or was it Defendant Number 1?  Defendant Number 1.

12   Right.  Okay.  So and also just another point, and this has

13   been made -- raised by defense, is that what I'm showing you

14   now, Defendant Exhibit Number 1, there's a -- from the long

15   distance view it appears -- there appears to be a sofa that is

16   against the building facing the street, it's brown vinyl and

17   torn in different places.  And their assertion is that that

18   was in the apartment.

19        I'm not going to get into that right now but looking

20   at Defendant's Number 12 it would have been in the area that's

21   blocked by the gray car that is a little to the right of the

22   middle of the screen.  But was there a sofa there outside?

23   A    I don't remember.

24   Q    Okay.  In looking at the photos it doesn't appear there

25   is, but I didn't know if you remembered or not.  Okay.  So

1    then you made a comment about how you were concerned about

2    cars coming in and out and something about the contraband.

3    But what specifically were you concerned that those -- the

4    persons in the vehicle were doing, or might have been doing?

5    A    The vehicle that showed up, that gray vehicle?

6    Q    The different vehicles that were going in and out.

7    A    I was under the impression that they might be -- so the

8    pursuit that just happened, that they might be getting rid of

9    the evidence that we were informed about that was inside the

10   apartment.

11   Q    So at this point you had not confirmed that there was

12   any -- any of that contraband that Cpl. Sarquiz -- corporal,

13   is that her --

14   A    Yes.

15   Q    -- Cpl. Sarquiz had given you a tip about from the

16   Sheriff, but you had a suspicion and that's what you're

17   describing now.  Right?

18   A    Correct.  Yes.

19   Q    Okay.  So then -- so having that vehicle abscond so to

20   speak caused you a concern.  And what was that concern that

21   made you decide to do an approach?

22   A    That they were -- that they were getting rid of evidence,

23   I determined that they were trying to -- they were getting rid

24   of evidence.  I thought this would be a good -- I just showed

25   up, I was going to be doing the same thing that the --

1    possibly doing the same thing that the Charger was doing.

2    Q    This gray vehicle in Defendant Exhibit Number 12?

3    A    Correct.

4    Q    And how do you suppose they might have been doing that?

5    A    By possibly loading up the vehicles and taking some --

6    taking the evidence somewhere else.

7    Q    Were you anywhere near the gate when you were conducting

8    surveillance?

9    A    No.

10   Q    Or was it -- was it covert surveillance, or was it overt?

11   A    It was covert surveillance.

12   Q    So you did what you could not to be seen by anyone.

13   A    Correct.

14   Q    Especially the persons who you were targeting.

15   A    Correct.

16   Q    Or the location you were targeting.

17   A    Correct.

18   Q    Then what else did you see going on that arose your --

19   what happened -- let me -- let me withdraw that question.

20   After that report came in, I imagine you got the report over

21   the radio that there was a vehicle that refused to stop and

22   kept on going?

23   A    Correct.

24   Q    And you weren't able -- your -- the patrol officers were

25   not able to make contact with that vehicle.

1    A    Correct.

2    Q    Did that vehicle originate from the apartment complex?

3    A    Yes.

4    Q    So what happened after that, after you got the report

5    that that vehicle had absconded what did you see happen in the

6    interior of this building -- of this --

7    A    Surveillance ended up calling out over the radio that

8    Mr. Garza, who we didn't know his name at the time but they

9    later on identified him as Mr. Garza, was approaching the

10   gate, closing the gate on his cell phone and looking up and

11   down the street, which raised more suspicion.

12   Q    Okay.  Just to clarify he was physically closing the gate

13   and he had -- he was on the cell phone --

14   A    Correct.

15   Q    -- speaking on the cell phone.  One point to clarify on

16   Defendant Exhibit Number 1, you said that the individual in

17   the gray t-shirt and the black basketball shorts is Mr. Garza?

18   A    Correct.

19   Q    He's wearing a t-shirt here, he's not shirtless.

20   A    This was -- well, actually this picture was taken way

21   after everything, after the scene, so we ended up putting a

22   shirt on him just because we don't like to have people outside

23   without clothes.

24   Q    Okay.  I wanted to clarify that.

25              THE COURT:  Which -- I'm sorry, can you identify --

1    this is -- you're referring to Defendant's Exhibit Number 12.

2              MR. RAMIREZ:  Yes, sir.

3              THE COURT:  Can you point to where -- Mr. Garza?

4    Okay.  That's him standing over there in a grayish shirt to

5    the left side, you know, against a white appliance.  Is that

6    correct?

7              MR. RAMIREZ:  Yes, Your Honor.

8              THE COURT:  Okay.  All right.  So that's him.  All

9    right.

10             MR. RAMIREZ:  With your -- Your Honor, I can have

11   the witness circle the individual using the screen if that

12   would help for other purposes, and then we can print that out

13   and mark it 12A.

14             THE COURT:  That's --

15             MR. RAMIREZ:  If you'd like --

16             THE COURT:   -- up to you, if you'd like to.  I

17   don't -- I mean I just wanted to clarify that I make sure --

18             MR. RAMIREZ:  No, that's fine.

19             THE COURT:   -- who he was but I --

20             MR. RAMIREZ:  Thank you, Your Honor.

21   BY MR. RAMIREZ:

22   Q   Okay.  So maybe that -- I just zoomed out a little bit,

23   or zoomed in a little bit, and I have my cursor going to the

24   individual that His Honor was referring to.  An individual

25   that's not facing the -- facing away from the camera, or at

1    least a quarter turn or so from the camera and he's leaning on
2    the appliance, on a white appliance, and he's wearing a gray
3    t-shirt and black pants.  This is the same Mr. Garza you're
4    referring to?
5    A    Yes.
6    Q    And so is he the individual who came out and was closing
7    the gate?
8    A    Yes.
9    Q    And on the cell phone?
10   A    Yes.
11   Q    And it happened -- you said it happened right after the
12   chase?
13   A    Correct.
14   Q    Okay.  And what crossed your mind at that point?
15   A    At that point more suspicion was being raised in all of
16   our heads that there's more than likely going to be some
17   illegal activity happening at this residence.
18   Q    In your later conversations with Mr. Garza, and we'll get
19   to all that later, did he tell you why he was closing the
20   gate, or what authority he had to close the gate?
21   A    He did not.
22   Q    Did you ask him?
23   A    I don't recall asking him.
24   Q    Okay.  Because going back to Exhibit -- Defendant's
25   Number 1 it looks like if he closes the gate, no one can go in

or out, and there's a little -- in the center of the -- on the
gate that's on the right hand side, I'm going to zoom a little
bit, it looks like there's a padlock.  So he -- the gate was
not locked by him, was it?

A    I don't believe it was.

Q    Okay.  Because you were able to approach.

A    Right.  When we approached it was open, we didn't have to
open the gate.

Q    Was it open like this, or open -- or unlocked, what do
you mean by open?

A    It was open all the way to where a car could fit in.

Q    Okay.  So he started closing it when you approached.

A    So if I could -- so he closed -- surveillance called --
after the pursuit, he came out started closing the gate.
That's when I left surveillance, started to meet up with the
SWAT team and rally everybody up because I was already getting
those suspicions that we need to make an approach or do a
knock-and-talk, see what's going on.

       While we were gathering up that's when the other
vehicle shows up.  So as we're gathering up, rallying up,
talking about how we're going to approach, that other vehicle
shows up.  Harry and I were together and that's when I told
the everybody, Let's go make contact.  So while we were
rallying up at some point in that time he had to open that
gate to let that vehicle in, because when we approached that

1    vehicle was there, the gray -- this gray vehicle was there and

2    we were able just to walk right into the gate.

3    Q    So do you know if he opened the gate to let the gray

4    vehicle in?

5    A    I'm not sure.

6    Q    Okay.  So let's talk about what you were preparing to do,

7    first by asking you were you wearing your SWAT gear, your full

8    gear?

9    A    My gear, yes, uniform, no.

10   Q    Okay.  Tell the Court what being fully -- in full gear,

11   in full SWAT gear means and what you would be wearing.

12   A    Okay.  So correction, we're not wearing full SWAT gear.

13   Full SWAT gear would be helmet, vest, our belt, the vest

14   contains 3 magazines depending on the operator, the belt has

15   your rifle -- I mean your side arm, your magazines to your

16   side arm.  Many of these have lethal weapon like OC or

17   handcuffs and a medical pouch that's what your basic SWAT load

18   out would be.

19   Q    What did you call that again, SWAT load --

20   A    Load out.

21   Q    Out?

22   A    Load out.

23   Q    Load out.

24   A    Yes, sir.

25   Q    Was anyone loaded out like that?

A    The only thing that -- mostly everybody was but every --
nobody had their helmet on, everyone was in a ball cap like
that's what you see in the picture.  He's -- everyone just had
a cap.

Q    So by that person in the picture -- we're looking at
Defendant's Exhibit Number 12, and there's a person in a black
t-shirt it looks like with a gray -- I'm sorry, with -- I
guess it would be what they call a coyote brown vest and a
black hat and it looks like he's wearing something to cover
his face also.

A    That's not the SWAT officer.

Q    Oh, that's not.  Which one is --

A    The SWAT officer is going to be to the right of the
vehicle, that one right there.

Q    Oh, okay.  So I'm going to zoom out -- zoom in a little
bit more.  So there's a person standing to the right of the
vehicle as we're looking at Defendant's Exhibit Number 12, and
it's a person in green who has some gear wearing a baseball --
what looks like a baseball cap or a cap of some kind, a patrol
cap let's call it that, and that is full gear.  Is that full
gear, load up?

A    That's full gear minus the helmet, I mean he's just
missing his helmet.

Q    Does have a shield with him?

A    No.

1    Q    Does he do -- would he also be carrying a semiautomatic

2    rifle of some kind?

3    A    Yes.  I'm not sure if he's carrying it on him right now,

4    I can't tell in the picture, but that's our primary weapon

5    when we're in the SWAT role.

6    Q    What does that primary weapon refer to, what's it called?

7    A    It's an AR-15.

8    Q    AR-15 is a civilian version of the --

9    A    For an M4.

10   Q    The M4 is the fully automatic version.  Right?

11   A    Yes.

12   Q    It's selectable.

13   A    Correct.

14   Q    Fully automatic, semiautomatic, that means -- and fully

15   automatic means when you press -- pull the trigger it'll fire

16   continuously until the ammunition is spent from magazine.

17   Right?

18   A    Correct.

19   Q    And semiautomatic is you pull the trigger once, one shot

20   fires only.

21   A    Correct.

22   Q    Does it have a selecter -- it doesn't matter -- 3-shot

23   burst also?

24   A    Our weapons are not fully automatic.

25   Q    They're not?

1    A    They're not.

2    Q    Okay.

3    A    They're semi.

4    Q    Thank you for clarifying that.  And don't hesitate to

5    correct me.  Okay.  So -- and the ammunition that the M4 fires

6    is what?

7    A    5.56 caliber.

8    Q    5.56 millimeter caliber ?

9    A    Yes.

10   Q    Which is the same kind of ammunition you found in that

11   efficiency.  Correct?

12   A    Yes, sir.

13   Q    Okay.  Now we'll discuss that later, the significance.

14   But so I have a comment in my reply -- or my response that you

15   were not -- you and your team were not dressed in your typical

16   riot and SWAT gear, that you were on a ceremony later that

17   evening dressed in street clothes.  Is that accurate or not

18   accurate?

19   A    It's not -- it's not accurate.

20   Q    Okay.

21   A    I mean me, since I work with -- I work in Narcotics, I

22   wear some everyday -- that's how I go to work everyday, I'm in

23   street clothes.  But when we have to gear up I just put the

24   gear on over my -- over the clothes that I'm wearing.  The

25   SWAT officers that were there they were coming from -- we have

1    SWAT school going on that week, so they were coming from the

2    SWAT school, they were training the new guys that were going

3    through the academy through the SWAT school.  So I called

4    them, they were available and they were -- those are the guys

5    that responded.

6    Q    And they were geared up?

7    A    They were geared up because they were coming from that

8    training.

9    Q    How about you, were you geared up?

10   A    I was not geared up.

11   Q    What were you wearing?

12   A    I was wearing civilian clothes, then once we started

13   getting close to having to go approach the house I did throw

14   on my vest.

15   Q    Did you throw on anything else, the 3 magazines, the belt

16   with the magazine, the medical kit --

17   A    I don't remember --

18   Q     -- the shield and all that?

19   A     -- I don't remember if I had my belt on, I do know I had

20   my vest and my side arm, and the vest does come with the 3

21   magazines already on it, so I had those on me also.

22   Q    The magazines are, what, in the front?

23   A    In the front pouches, yes, sir.

24   Q    Is there anything emblazoned or printed on the vest

25   you're wearing and members of the SWAT team, like SWAT, police

1    or anything?

2    A    Yes, sir, all of our -- all the SWAT operators have --

3    our vests have Sheriff and SWAT under it as an identifier on

4    the chest.

5    Q    All right.  So then when you approached did you encounter

6    anyone?

7    A    Yes.

8    Q    And let me go back before the approach.  When you went to

9    approach you used the phrase knock-and-talk.  What do you mean

10   by that?

11   A    We use that phrase most of the time for consensual,

12   consensual encounters when we go -- when we suspect that

13   there's illegal activity, we'll go and knock on the door, try

14   to make contact with the owner, see what's going on, ask for

15   consent, or ask them, you know, Hey, you know, we have this

16   information, you know, is it true or not, try to just

17   investigate that way, or gain consent into the residence.

18   Q    Did you encounter any persons at the -- did you

19   encounter -- your report says, which has been submitted as

20   part of an exhibit by the defense to the Court, you -- it says

21   here that you identified 2 persons standing in the parking

22   area as you approached.

23   A    Correct.

24   Q    And one of them was Eduardo Garza?

25   A    Correct.

1    Q    The same person who is in the gray t-shirt here --

2    A    Yes.

3    Q    -- but he wasn't wearing a t-shirt at the time.

4    Correct?

5    A    Correct.

6             THE COURT:  Mr. Ramirez, will you please identify by

7    number --

8             MR. RAMIREZ:  I'm sorry.

9             THE COURT:   -- the Defendant's exhibits that you're

10   referring to?

11            MR. RAMIREZ:  Yes.  I'm referring to Defendant's

12   Exhibit Number 12.

13            THE COURT:  All right.  Thank you.

14            MR. RAMIREZ:  Thank you.  I'm sorry, Your Honor.

15            THE COURT:  No.

16            MR. RAMIREZ:  And so --

17            THE COURT:  No, you're -- Defendant's Exhibit Number

18   12 is a photo.

19            MR. RAMIREZ:  Yes, Exhibit Number 12 is a photo.

20            THE COURT:  I thought you were referring to a

21   report.

22            MR. RAMIREZ:  Oh no, the report is -- it was -- I

23   was asking about his report --

24            THE COURT:  Which you said that --

25            MR. RAMIREZ:   -- which was filed --

1          THE COURT:   -- Defendant has a --

2          MR. RAMIREZ:   -- as a sealed exhibit as part of

3     Defendant's supplemental briefing exhibit.

4          THE COURT:  Okay.  All right.  That's what you were

5     referring to.  All right.  Thank you.

6          MR. RAMIREZ:  Sorry about that, Your Honor.

7          THE COURT:  Go ahead.  And just then that's

8     appropriate clarification.  Thank you.

9          MR. RAMIREZ:  And I don't remember the exhibit.  I

10    think it's Exhibit A.

11        (Pause in the proceedings.)

12         MR. RAMIREZ:  No, it's not A.

13         THE COURT:  That's okay, you don't need to -- I can

14    find it.  I mean I was just clarifying.  I thought you were

15    referring to an exhibit that's been admitted and is here.  But

16    so go ahead.

17         MR. RAMIREZ:  Thank you, Your Honor.

18    BY MR. RAMIREZ:

19    Q    So when you encountered the individuals what were they

20    doing?

21    A    When we walked up to them they were smoking marijuana.

22         MR. RAMIREZ:  Sealed Exhibit F, Your Honor.

23         THE COURT:  All right.

24    BY MR. RAMIREZ:

25    Q    So is that legal to be doing in the city of Laredo?

1    A    It's not.

2    Q    Did you think about arresting them for a crime?

3    A    Yes.

4    Q    What crime would it be?

5    A    Possession of marijuana.

6    Q    What level crime would that be?

7    A    Class B.

8    Q    Class B misdemeanor.

9    A    Correct.

10   Q    And you have authority to make that -- do you have

11   discretion on whether to arrest or not arrest?

12   A    We do.

13   Q    And you exercised your discretion not to arrest, or did

14   you arrest them at that point?

15   A    We did not arrest them.

16   Q    Okay.  So at some point you handcuffed both of them.

17   A    Correct.

18   Q    Is that correct?  Tell me about your conversation with

19   Mr. Garza when you first encountered him.

20   A    When I -- as soon as we walked up -- as soon as we walked

21   to them, I personally did not place handcuffs on either one of

22   them, one of the SWAT guys behind me did.  As soon as we

23   walked up to them we smelled that they were smoking marijuana.

24   Mr. Garza was placed in handcuffs immediately.  As soon as he

25   was being placed in handcuffs I guess he assumed that we were

going to be taking him or he was being arrested, so he told

us, Hey, my kids are inside, they're alone, and that's when I

told him that -- that's when I told him that we're going to go

ahead and go inside, take your kids -- get your kids and bring

them outside to you.  And he said, Okay.

Q     Did he say where he -- which apartment he lived at?

A     I don't remember if he told me exactly which one he lived

in.

Q     Okay.  When he -- when you -- when you told him that you

were going to go -- something about the kids, get his kids

out, did he tell you how old the kids were?

A     No, I don't remember him saying that either.

Q     Did he -- okay.  So and why did you feel the need to go

and get the children out?

A     Because his father was outside smoking, doing drugs

outside in the front, I just needed to check -- I wanted to

check the welfare of the kids, check their status.

Q     So the only reason you decided to go into that -- his

apartment for the children is because he was smoking marijuana

outside.

A     Because they were alone, left unattended inside the

apartment.

Q     Anything else about the circumstances that caused you

to --

A     The information that we had previously had, the pursuit

1    that just occurred from this apartment.

2    Q    So you sense an element of dangerousness and suspicion

3    and so forth.

4    A    Correct.

5    Q    So did he tell you where he lived?  I think you said you

6    can't remember.

7    A    I don't remember.

8    Q    When you made entry -- and so you made entry into his

9    apartment.

10   A    Correct.

11   Q    Did he say you could go in or did you just -- just took

12   it on yourself to go in?

13   A    It was kind of just -- I told him, you know, get your

14   kids -- I'm going to go get your kids, I'm going to bring them

15   back outside to you, and he said, Okay.  That was the only

16   thing that was said.

17   Q    When you -- and we'll get to photos of the door in a

18   moment in the proffered exhibits, but when you arrived at the

19   door did you have to break the door or did he let you in, did

20   he give you the key?

21   A    No, he --

22   Q    How did -- was the door open?

23   A     -- the door was unlocked, the door was open.

24   Q    The door -- was it open or unlocked, or both?

25   A    It was unlocked.

1   Q    Okay.  So is this his apartment?

2   A    No --

3   Q    I'm looking at Defendant Exhibit Number 12, it's the door

4   that's facing the street that's open, that's not the door you

5   went in through.

6   A    No.

7   Q    Now there's -- I'm looking at Defendant -- we're looking

8   now at Defendant Exhibit Number 3, and this a view of --

9   now going back to 12, under the stairway, which I'm showing

10  with the cursor, there are 2 apartments.  There's -- I'm going

11  back to Defendant Exhibit Number 3, there is a door that has a

12  number 1 on it and then over to the -- beyond it going further

13  to the left of this exhibit in the photo there is another door

14  that has a gate on it.  Which door did you go in through?

15  A    Through this one, Number 1.

16  Q    On Defendant's Exhibit Number 3 you went into Number 1,

17  Apartment Number 1.

18  A    Correct.

19  Q    I'm going to show you Defendant Exhibit Number 10 on the

20  screen -- and I'm going to try to rotate it, it should be

21  counter-clockwise, there we go -- which I have rotated --

22          UNIDENTIFIED SPEAKER:  It's backwards.

23          MR. RAMIREZ:  Yeah, it is.  Right.  Let me rotate

24  again.

25          (Pause in the proceedings.)

1   BY MR. RAMIREZ:

2   Q    Okay.  So the stairs would be here -- I'm looking -- in

3   looking at Defendant Exhibit Number 10, which is inverted, at

4   the very bottom of the page over this exhibit you see the

5   words Parking Lot written at the bottom.  So and it shows

6   where the cursor is to the left side of the exhibit, I can't

7   make out what that is, entrance Apartment 1.  Do you see that?

8   A    Yes.

9   Q    The writing?  There is an Apartment 1 which is described

10  in more detail and it has -- it shows Apartment 1, a kitchen,

11  a living room, the efficiency, the bedroom and then there's a

12  bathroom which is drawn in.  And what's been represented to us

13  and filed with documents with the Court is that this was drawn

14  by the landlord, Mr. Resendez, and provided to defense.  So

15  without going into details about whether you remember things

16  being -- the scale, the accuracy and all that, but just simply

17  does --  is that the door that you went in to secure, or try

18  to secure the children?

19  A    Yes.

20  Q    Now when you walked in and you see there's this room

21  called efficiency room, and then the bedroom, were the doors

22  open?  Do the doors open the way they're indicated here on

23  Exhibit Number 10, open into -- and the efficiency opens out

24  into -- appears to open out into Apartment Number 1.

25  A    Right.

1    Q    As if you have to open -- if you have to be in Apartment

2    1 to open the door in to go in, or you push the door -- if

3    you're the efficiency room you push the door out to go into

4    Apartment 1.  Right?  Is that accurate?

5    A    Yes.

6    Q    I'm not talking about the scale or the size or anything

7    like that but just simply the mechanics of getting in and out

8    from Apartment 1.  Right.

9    A    Yeah, you know what, I don't, I don't recall that that

10   door opens out like the way it is there to this -- on this

11   drawing.  I don't remember if you had to pull or push from the

12   living room.

13   Q    Well, there was a sofa there, wasn't there?

14   A    Yes.

15   Q    And so I think you had said that -- and what I

16   represented based on what you've told me in the writings that

17   I've filed is that you did move the sofa, or someone moved the

18   sofa --

19   A    Correct.

20   Q     -- and the door was pulled open.  Is that accurate or

21   you don't remember now?

22   A    Yes.

23   Q    Do you remember or you don't remember?

24   A    Yes, I do remember.

25   Q    Okay.

1    A    Yes.

2    Q    So let me show you, this is Defendant Exhibit Number 4 --

3    Number 5, which is a photograph taken by defense and the door

4    at the -- almost at the center is purported to be the door

5    that leads to the outside, which would be the door that has

6    the number 1 on the outside.  And this door to the left that

7    opens into the apartment is the door to the efficiency, or is

8    that not right?

9    A    That's accurate.

10   Q    Does that ring a bell?

11   A    The bed wasn't there.

12   Q    Right.

13   A    But, yes.

14   Q    No, these photos were taken after.

15   A    Okay.

16   Q    They were taken by the defense team some time way after

17   the fact.

18   A    Okay.

19   Q    But nevertheless it's still an accurate representation of

20   where the doors were and the interior of Apartment Number 1,

21   at least that little corner area when you come in.  Correct?

22   A    Yes.  Yes.

23   Q    Now was there anything that was blocking the door?

24   A    The couch.  The couch.

25   Q    Do you remember what kind of couch it was, or sofa?

1   A    I don't.

2   Q    Who moved it aside?

3   A    I don't remember who -- I want to say it was me.

4   Q    Okay.  So --

5   A    Yes, it was me, I was the first one to go into that room.

6   Q    And then there's another -- according to the floor plan

7   there's another bedroom, so in your mind when you saw -- were

8   the doors open or closed by the way to these two -- to the

9   efficiency room and the bedroom?

10  A    The efficiency was --

11  Q    On Exhibit Number 10, excuse me.

12  A    The efficiency room was closed when we made entry, and

13  the bedroom was also closed.

14  Q    So when you walked in did all of you go to one area and

15  then the other, or tell me how you proceeded.

16  A    We split up.  As soon as I made entry, I took a hard

17  right towards the efficiency and I'm not sure who started

18  going towards the -- like bypassing me up and going towards

19  the hallway where the kids were at.

20  Q    So I'm going back to Defendant Exhibit Number 5 on the

21  screen.  So you walked in through that door that's at about

22  the center --

23  A    Uh-huh.

24  Q     -- that's the door from the outside, into the main

25  Apartment, Number 1, and then you took a hard right, that's

1    what you mean by that because the door on the left side of

2    Defendant Exhibit Number 5, the door leads to the efficiency

3    which had the sofa was right by the -- is right by the -- by

4    the entrance basically.

5    A     Correct.

6    Q     And when you saw that door had you received an

7    instruction or warning from the -- from Mr. Garza or from

8    anyone that that was somebody else's apartment, apartment or

9    efficiency?

10   A     No.

11   Q     Well, you spoke to Mr. Garza about getting the children

12   from his apartment did he tell you that you can't -- did he

13   give you any limitations on where you could go and couldn't

14   go?

15   A     No.

16   Q     Did he tell you about there being another resident in the

17   efficiency area?

18   A     No.

19   Q     So going back to the -- Defendant Exhibit Number 10, the

20   layout, so several of you -- you and others went into the

21   efficiency and others went to the bedroom, or towards it.  Who

22   walked in -- so after you move the couch you -- tell me what

23   you did then.

24   A     Like I moved the couch and I opened the door and started

25   walking through down into the -- into that room, the

1    efficiency.

2    Q    Who walked in with you?

3    A    Cpl. Ayala was behind me.

4    Q    Did he walk in with you all the way in?

5    A    He did not.

6    Q    So you walked in and then what did you see?

7    A    As soon as I walked in I saw a couch to my left, then I

8    saw a door straight ahead.  I walked towards that door and to

9    my left was like a shower, and then I opened that -- I opened

10   the door, and then as soon as I opened the door agents and

11   myself we all -- I noticed that I was opening the door to the

12   outside, it was really to the parking lot to where the cars

13   parked.

14        So there's agents there and I startled -- I remember

15   startling one of the SWAT guys and I yelled, Blue, blue, blue,

16   let them know it was friendly opening the door.  And that's

17   when I realized -- I started thinking in my head like, hey, I

18   think this is a different -- someone lives here.  So that's

19   when I closed the door, Cpl. Ayala was coming in behind me, I

20   told Cpl. Ayala, Hey, you all, lets get out, I think this is

21   another like apartment or another -- someone else lives here.

22        As we were walking out I saw a jar of marijuana on

23   the ground, and then we walked out and got out of the

24   efficiency.

25   Q    Okay.  Let me go to my exhibits.  So going to Government

Exhibit Number 1 which shows an open door with a -- the door appears to have a letter on it.  Can you tell what letter that is?

A    It looks like an M.

Q    Do you see any of the numbers or identifying marks on there?

A    There's something under it, I can't tell what it is.

Q    Okay.  Government Exhibit Number 2, can you tell us what that is?  Let me shrink it.

A    That's the shower near the -- where the ammo and narcotics were located.

Q    Did you see the ammo and the narcotics when you went into the efficiency?

A    No, I did not.

Q    Now, and this is inside -- is this inside the efficiency or some other place?

A    That's inside the efficiency.

Q    And Government Number 3 is a different view but is that the same -- describing the same view of Number -- as in Number 2 but from a different perspective?

A    Correct.

Q    Can you see ammo cans from here, from -- in that photo?

A    I cannot.

Q    Or the marijuana?

A    No.

1    Q    Number 4, now Number 4 shows -- Government Exhibit Number

2    4 shows what looks like would have been Exhibit Number 2 but

3    without the -- without some of the cushions and other matters.

4    So I have cushions and the blanket had been removed?

5    A    Yes.

6    Q    Did you or anyone place these blankets and cushions here

7    to make it seem like they were not visible?

8    A    No.

9    Q    When you first walked in?

10   A    No.

11   Q    So this is how you saw them when you walked in.

12   A    Correct.

13   Q    And this, does it draw your attention in any way when you

14   saw this, or you didn't really notice it?

15   A    Not necessarily, no.

16   Q    Okay.  And let me show you -- let me ask you about

17   something here.  It's not too visible, but on Government

18   Exhibit Number 4 towards the left side, I have the cursor on

19   something.  Do you know what that is?  Where I have the

20   cursor?

21   A    Is that the couch?  I'm really not -- not sure.

22   Q    Was there a -- was there a sofa in that efficiency?

23   A    Yes.

24   Q    A different kind of sofa than the one that was in the

25   Unit 1.

1    A    Correct.

2    Q    And so that's a sofa.  And looking at Defendant Number 15

3    we have a view of -- can you tell me what that is showing, or

4    where the location is?

5    A    This is the door that we walked -- we walked in through

6    into the efficiency, and this is the way that the Defendant

7    had his living area set up, the TV on top of a -- on the

8    refrigerator and there's arcade games there.

9    Q    When you walked -- so just for clarification, see where

10    my cursor is at the very top?  There's a door.

11    A    Correct.

12    Q    And that door opens into the apartment.  Do you know what

13    that -- is that a door to the outside that has the Unit 1 on

14    it?

15    A    Yes.

16    Q    And then this door -- then next to it there appears to be

17    another door that's kind of brownish, bronze-ish with some

18    rubbing on it that has a -- what appears to be a deadbolt and

19    a door, a regular door knob.  And we know that they both --

20    they both have keys for locking.

21    A    Correct.

22    Q    And there's a photo that I'll show you for that.  So is

23    this the door that you opened from inside the apartment --

24    A    Yes.

25    Q     -- to come in?

1    A    Yes.

2    Q    And when you walked in you were saying there was a sofa

3    inside here.

4    A    Correct.

5    Q    What is -- we're right above the Defendant exhibit

6    sticker that says 15, what is that that I'm pointing to?  Is

7    that the sofa?

8    A    That is -- I'm not sure, it was like the blanket that was

9    leaning -- like coming off the sofa or that's the reclining

10   seat on the sofa.

11   Q    The recliner --

12   A    The sofa was --

13   Q     -- where he would be watching -- could watch TV or

14   something?

15   A    Correct.  But that is the sofa that's right here, it's in

16   that area right there where that -- where your pointing.

17   Q    Okay.  And next to the sofa, to where the Defendant

18   exhibit sticker 15 is, further on down if we had had a longer

19   shot, you would see the shower stall.  Is that correct?

20   A    Behind like this person, was it behind --

21   Q    Down --

22   A     -- this person taking the picture?

23   Q    Down here, yes.

24   A    Yes.

25   Q    Okay.  So -- I keep getting my cursor confused -- so did

1   this shower stall, Exhibits 2, 3, 4, 5, 6 what -- all this was

2   in the shower stall in that room, and you're saying because

3   they were covered by the blankets and the cushions you didn't

4   see them.

5   A    Correct.

6   Q    But you can see the outline of a -- or you can make out a

7   garbage bag here.

8   A    Right.

9   Q    Did you see that?

10  A    I don't remember.

11  Q    Now when you walked in, what was your state of mind when

12  you walked into the apartment, the efficiency?

13  A    I was still -- I was still looking for kids, I was -- my

14  whole thing was to find the kids and --

15  Q    Aside from the kids did you have any other concerns --

16  A    Just the fact that we had --

17  Q     -- for the kids, yourselves or anybody?

18  A     -- just the fact that we had that info about the ammo,

19  it was a safety concern.

20  Q    So you say that at some point you decided -- well, I'll

21  let you finish what you -- so you walked in through here, you

22  didn't see the -- you didn't see the -- any ammo --

23  A    Correct.

24  Q     -- you didn't see any marijuana except -- what did you

25  see with respect to marijuana?

1    A    The jar of marijuana on the floor.

2    Q    Which would have been -- I'm going to Defendant's Exhibit

3    Number 10, which would have been right by the door like where

4    the cursor is right now?

5    A    Yes.

6    Q    Could you -- yeah, so it's right by where the word Room

7    is and the sofa would be next to where it says AC?

8    A    Correct.

9    Q    This area here that I'm drawing at the bottom?

10             MR. GUERRA:  Your Honor --

11             THE COURT:  Yes.

12             MR. GUERRA:   -- may I ask Mr.  --

13             THE COURT:  Ramirez.

14             MR. GUERRA:   -- Ramirez --

15             MR. RAMIREZ:  Ramirez.

16             MR. GUERRA:   -- to clarify -- sorry, I don't know

17    why I was having trouble remembering your last name -- to

18    clarify, you were asking him -- you put the cursor and you

19    were asking him --

20             MR. RAMIREZ:  Yeah.

21             MR. GUERRA:   -- exactly and I missed something.

22             MR. RAMIREZ:  Sure.

23             MR. GUERRA:  But --

24             MR. RAMIREZ:  Let me go back.  What I'm going to

25    do -- thank you --

1          THE COURT:  Just repeat the question.

2          MR. RAMIREZ:   -- I'm going to enlarge the exhibit

3    and --

4          THE COURT:  You're referring to Exhibit --

5          MR. RAMIREZ:  Number 10.

6          THE COURT:  Defendant's Exhibit?

7          MR. RAMIREZ:  Defendant's Exhibit Number 10.  Thank

8    you, Your Honor.  Sorry.

9    BY MR. RAMIREZ:

10   Q    And which shows the Apartment Number 1 and the efficiency

11   and the other bedroom.  So you went in through the -- this

12   door where the cursor is which is the door that leads into the

13   efficiency from the living area, or the living room in

14   Apartment 1.  Is that right?

15   A    Correct.

16   Q    And then you walked all the way to the far door which

17   leads to the parking lot.

18   A    Correct.

19   Q    And when you opened it that's when you saw officers and

20   you said, Blue, blue, blue.

21   A    Correct.

22   Q    And blue is shorthand for what?

23   A    For friendly, like --

24   Q    Meaning?

25   A     -- we're on the same -- we're --

1    Q    Uh-huh.

2    A    -- not bad guys.

3    Q    So then when you reached this area and you -- was this

4    door locked from the inside, or did you unlock it, the wooden

5    door?  Meaning this door that would be on a different exhibit,

6    Number 1.

7    A    I don't remember if I had to unlock it to open the door.

8    Q    Okay.  And the gate -- the gate door I guess was --

9    A    The gate -- when I opened that door, I did not open the

10   gate door.  I just saw the other officers, called out blue and

11   then I closed the door.

12   Q    Got it.  Thank you.  All right.  So then what I was --

13   I'm going to ask you to clarify, going back to Exhibit Number

14   10, and I have zoomed into just the apartment and the

15   efficiency sketch.  When you reached that door and you decided

16   to retreat and go back out, did you see any officer, Ayala or

17   anyone else, behind you in the efficiency room?

18   A    No, he made it to about -- like you go past the threshold

19   of the first door that I had already come in through, that's

20   when I stopped him and made him back up.

21   Q    And what did you -- did you tell him anything?

22   A    No, I just told him -- yeah, I told him, I think this

23   might be someone else's apartment, or someone else stays here,

24   let's get out.  And I just made contact with Dana, see what

25   she has over there, and we made it back to the living room.

1    Q    And on your way out --

2    A    That's --

3    Q    -- this is what I was going to clarify, you said you

4    saw -- what did you see?

5    A    The jar of marijuana.

6    Q    So you passed by the shower stall again, but you didn't

7    take notice of it except that there were cushions and

8    blankets?

9    A    Correct.

10   Q    And when you got there approximately where did you see

11   a -- you said a jar of marijuana --

12   A    Yes, and --

13   Q    -- on the floor.

14   A    Correct.  I remember it being around the refrigerator

15   area, like on the floor.

16          (Pause in the proceedings.)

17             MR. RAMIREZ:  Oh, I'm looking in the wrong place,

18   I'm sorry.

19          (Pause in the proceedings.)

20   BY MR. RAMIREZ:

21   Q    So not this door, and I'm showing you Defendant --

22   Government Exhibit Number 1, not that door, so it would be

23   closer to this door, Defendant Exhibit Number 5 which shows

24   the --

25             THE COURT:  15.

1    BY MR. RAMIREZ:

2    Q    -- the refrigerator, like a mini refrigerator, with a

3    television on top.  And --

4             THE COURT:  For clarification you said, Mr. Ramirez,

5    that you were referring to Defendant's Exhibit Number 5 but --

6             MR. RAMIREZ:  I'm sorry.

7             THE COURT:  -- for clarification it's Number 15.

8             MR. RAMIREZ:  Yes.  Sorry.  Thank you.

9    BY MR. RAMIREZ:

10   Q    Where was the marijuana jar?

11   A    I remember it being somewhere around where the sticker

12   is, the Defendant exhibit, around in that area.

13   Q    In this area somewhere around where the Defendant sticker

14   is.

15   A    Yes.

16   Q    You don't remember exactly?

17   A    No, I don't.

18   Q    Okay.  So then when you walked out --

19            THE COURT:  Mr.  -- hold on, Mr. Ramirez, let me do

20   this here --

21            MR. RAMIREZ:  Yes.

22            THE COURT:   -- because I was confused by something

23   and I guess let me -- since we're showing Defendant's Exhibit

24   Number 15 at this time let me go ahead and address it here to

25   make sure this is clear and, you know, everybody has a chance

1    to talk about it.  So I -- the Defendant's Exhibit Number 15

2    it shows -- it's the view of -- it's got a refrigerator there,

3    there's some video games against the wall on the left hand

4    side, and it shows a view -- Mr. Ramirez, you had asked this

5    witness, Sgt. Gonzalez, about, Oh, there's some doors that you

6    see through this view on Exhibit Number 15, I want to be clear

7    because it's confused me.

8         And once I was trying to reconcile it with the

9    written diagram of these -- of the two apartments and how they

10   relate to each other, that view when you look through there on

11   Exhibit Number 15 where you see an open door, what appears to

12   be an open door and then a door through that door, you know,

13   passed it both on the left hand side, that open door is a door

14   that is opening into -- it's opening -- this photo was taken

15   from inside the efficiency, Mr. Gonzalez -- Sgt. Gonzalez,

16   excuse me, is that correct?  This photo, Exhibit Number 15, is

17   taken from inside the efficiency.  Is that correct?

18             THE WITNESS:  Yes.  Yes.

19             THE COURT:  Okay.  And that view where it's

20   showing -- the view it's showing is that going into the

21   apartment?

22             THE WITNESS:  Correct.

23             THE COURT:  Okay.  So that first door closest to the

24   photographer it's an open door going from the efficiency into

25   the -- Mr. Garza's apartment.  Correct?

1    THE WITNESS:  Correct.

2    THE COURT:  And then that door that you see passed

3    it that is closed is the apartment exterior door going to the

4    outside.  Is that correct?

5    THE WITNESS:  Correct.

6    THE COURT:  So that second door furthest from the

7    photographer of Defendant's Exhibit 15 that's actually the

8    door that you first entered the apartment into.  Correct?

9    THE WITNESS:  Yes, sir.

10    THE COURT:  Okay.  Because I misunderstood based on

11    the original discussion of what that view was of Defendant's

12    Exhibit Number 15.  So I just put that out there.

13    Anyway, while you were showing it again,

14    Mr. Ramirez, I thought I would address that.  But, okay, so

15    that's my clarification of Defendant's Exhibit Number 15.  Go

16    ahead, Mr. Ramirez, you --

17    MR. RAMIREZ:  Thank you, Your Honor.

18    THE COURT:   -- can continue.

19    BY MR. RAMIREZ:

20    Q    So when you walked out did you encounter anyone else,

21    when you walked out of this efficiency, Defendant's Exhibit

22    Number 15, when you walked out through that door into the

23    living area of Unit Number 1 did you encounter anyone else, or

24    see anyone else?

25    A    No, it was just -- no one else.  I --

1   Q    No, I meant with respect to your team.

2   A    My team, yes, I saw Dana and I -- they had the kids, they

3   had found the kids, so that's when we realized, all right, the

4   kids are safe.  They were taking the kids outside.

5   Q    Who's Dana?  Can you give me her complete name?

6   A    I'm sorry, Cpl. Sarquiz, Investigator Sarquiz.

7   Q    And did you see how many children she had with her?

8   A    I remember two, I remember two little ones, two like

9   little toddlers.

10  Q    And the --

11           THE COURT:  Let me stop there just for --

12           MR. RAMIREZ:  Yes.

13           THE COURT:   -- clarification.  When you first

14  referred to the person as Dana and you said, Oh, it's

15  Investigator Sarquiz, can you go ahead and spell that for the

16  Record?

17           THE WITNESS:  Yes, her last name is -- well, Dana is

18  D-A-N-A, and then Sarquiz is S-A-R-Q-U-I-Z.

19           THE COURT:  All right.  Thank you.

20           Go ahead.

21           MR. RAMIREZ:  Thank you, Your Honor.  And for

22  reference, well, it's --

23           THE COURT:  And I know they're listed in the exhibit

24  list -- the witness list also, the --

25           MR. RAMIREZ:  Thank you.

1    BY MR. RAMIREZ:

2    Q    Okay.  So then you saw them in the living area, Sarquiz

3    and someone else, you don't remember who that other person

4    was, and they had the children.

5    A    Correct.

6    Q    Where were they headed, or going to?

7    A    They were walking out to -- they were about to go

8    outside, back outside through the door that we had originally

9    come in through.

10   Q    Okay.  Go back to -- I'm sorry.

11        (Pause in the proceedings.)

12   BY MR. RAMIREZ:

13   Q    So were they walking towards this door, Unit 1, the front

14   door?

15   A    Yes.

16   Q    And did you stay in the living area with any of the

17   officers and do anything or say anything?

18   A    No, at that time we had all already started -- once the

19   kids were found we started making our way out, I made my way

20   out also.

21   Q    Okay.  Did you give any instructions relating to that

22   efficiency?

23   A    I told everybody not to go in that room.

24   Q    Did you tell them why, why they couldn't go in?

25   A    No, I don't think so.

1    Q    You just said, Don't -- nobody go in?

2    A    Yeah, don't go in there.

3    Q    Okay.  Then your report says you then went to speak to

4    Sgt. -- I'm sorry, to subject Garza.

5    A    Yes.

6    Q    And did you speak with him?

7    A    Yes.

8    Q    Or what did he tell you and how did he tell you?

9    A    I attempted to talk to him outside but he didn't -- he

10   didn't really want to talk because his -- he kept looking up

11   like towards the cameras, the surveillance cameras that are up

12   there, and so that's when I realized he was trying to give me

13   like a sign.  But -- and then we went to -- I told him, I

14   said, You know what, can you talk inside your apartment, and

15   he said, Yes.

16        So we went to -- we stayed around in his door area

17   to talk, and that's when he whispered to me that he -- that

18   the cameras could be -- could be recording audio, he doesn't

19   know the involvement of his landlord and his landlord has the

20   access to these cameras.  So that's when I was, Okay, I was

21   like, Can we go -- can I talk to you inside your apartment,

22   and that's when we moved deeper into the apartment and he was

23   like, You know what, he goes, I don't -- let me talk -- let me

24   wait until my wife gets here, that's when we can talk.

25   Q    So --

1    A    Yes.

2    Q    Go ahead.

3    A    We waited about 10 minutes and the wife got there, and

4    we -- she went inside the living room with us and, you know,

5    that's when we started asking him like, Hey, who -- what's the

6    living situation here, who lives in that apartment.  He

7    started explaining that some guy named -- by the name of Flaco

8    lives in that -- in that efficiency.  And he was upset because

9    the landlord -- that room was supposed to be part of his

10   lease --

11   Q    Okay.  Let me back up a little bit.

12   A    Yes.

13   Q    So who was with you when you spoke to Mr. Garza?

14   A    Investigator Rosinda Ramirez.

15   Q    And was his wife also present, Mr. Garza's wife present?

16   A    Yes.

17   Q    And where were the children?

18   A    The children.  I remember one of them was like real

19   attached to the mom so she was telling her that she had to be

20   with her.  So one of them she had the children with her, the

21   other one -- the grandmother had arrived on the scene to take

22   care of the kids while our investigation was going on and the

23   other one was outside with the kids -- with the grandma.

24   Q    All right.  So you spoke with Mr. Garza inside his

25   apartment at his invitation.

1     A    Correct.

2     Q    Or his insistence is what you're saying.

3     A    Right.

4     Q    And so he told you about this person, Flaco, and later

5 who did you understand Flaco to be?

6     A    Later we learned that Flaco was Defendant Saldaña.

7     Q    Okay.  What did -- so Mr. Garza said that he was upset

8 with his landlord?

9     A    Correct, yeah.

10    Q    Why was he upset with him?

11    A    Because something about that efficiency was originally

12 supposed to be part of Mr. Garza's lease, so he -- but he was

13 leasing it, he was giving it out, or he was allowing

14 Mr. Saldaña to stay there.  I didn't get too much into detail

15 with him about the whole lease agreement thing, but it was

16 something having to do with that.

17    Q    Did he tell you anything about the door that led to the

18 efficiency from his apartment?

19    A    Yeah, he just -- he kept saying -- he did say -- after we

20 had already searched the whole area he did say -- because when

21 I asked him about that apartment, he goes, Oh, that belongs to

22 Flaco.  He --

23    Q    Wait, let me back up.  Sorry.  What do you mean by after

24 you had searched the whole area?

25    A    Like after we had already looked -- found the kids and

1    then our initial entry, found the kids and then got out, he

2    mentioned to us that, Oh, that area belongs to Flaco.  Like I

3    don't know, he -- I don't remember exactly what he said but

4    making it seem like, Oh, I don't have anything to do with

5    that, whatever's in there, or whatever.

6    Q    And so you're testifying that that's the first time that

7    he ever told you anything about that apartment.

8    A    Correct, yes.

9         THE COURT:  And, excuse me, and just to make sure

10   we're clear on the Record --

11        MR. RAMIREZ:  I'm sorry.

12        THE COURT:   -- when you said, Mr. Ramirez, the

13   first time that Mr. Garza said anything about the apartment,

14   you're referring to the efficiency.  Correct?

15        MR. RAMIREZ:  Efficiency, yes, Your Honor.

16        THE COURT:  Okay.

17        MR. RAMIREZ:  Thank you --

18        THE COURT:  Just to be consistent.

19        MR. RAMIREZ:   -- for the clarification.

20   BY MR. RAMIREZ:

21   Q    And just to go over to Government Exhibit Number 8, after

22   everything was -- all the ammunition, marijuana, everything

23   was done and you had obtained consent and so forth, and we're

24   going to take that in steps, Mr. Garza filled out this

25   statement which is Government Exhibit Number 8.  And was it --

1    whose idea was it to do this statement?

2    A    It was Mr. Garza's.

3    Q    And this statement was done at approximately 8:32 in the

4    evening.  And did you tell him that you needed a statement,

5    did anyone from your team as far as you know tell him that he

6    needed a statement?

7    A    No.

8    Q    Why did he want to write out a statement?

9    A    He wanted to -- he was -- as we were leaving already he

10   was already -- we told him he was good to go and he could

11   leave, he stopped and he told me that he would like to do a

12   statement because he wanted to like remove himself from any

13   involvement having to do with that room.

14   Q    Did you discuss anything about the sofa and the lock and

15   the door -- I'm sorry, the door?

16   A    No.

17   Q    Locking the efficiency?  No?

18   A    No.

19            THE COURT:  Mr. Ramirez, just to clarify, is that --

20   you're referring -- the written statement by Mr. Garza you're

21   referring to Government's Exhibit Number 8.  Correct?

22            MR. RAMIREZ:  Yes, Your Honor.

23            THE COURT:  Is that a one-page document?

24            MR. RAMIREZ:  Yes, sir, it is.

25            THE COURT:  Okay.  Mr. Guerra, did you --

1    MR. GUERRA:  Your Honor, I just want to clarify that

2    last question.  I did not catch what he asked, so I want to

3    make sure that I understand the question that he just asked

4    and that he just answered.

5    MR. RAMIREZ:  I had to many hims in there, I'm going

6    to rephrase, Your Honor.

7    THE COURT:  Okay.  Rephrase the question.

8    BY MR. RAMIREZ:

9    Q    So you didn't have any discussion with him about --

10   with -- you did not have -- or did you have any discussion

11   with Mr. Garza while in his apartment about a concern you may

12   have had or any concerns you may have had about the door, the

13   door lock or the sofa?

14   A    No, sir.

15   Q    Why he had the sofa blocking the door?  Okay.  And then -

16   - so what do you remember happening next?

17   A    While we were in there talking with Mr. Garza I

18   remember -- so a female from upstairs had told one of the

19   officers that was standing outside that -- something along the

20   lines of, Hey, there's someone in my apartment that you guys

21   want to -- might want to take a look at.  Then I was given

22   that information and myself and Cpl. Ayala, Investigator

23   Sarquiz went upstairs to that apartment where that girl lives

24   and attempted to make contact with Mr. Saldaña where we did

25   find him in that room -- in that apartment.

1   Q    That would be an other apartment in the apartment -- same

2   apartment complex.

3   A    It was upstairs, yes.

4   Q    So --

5            THE COURT:  Mr. Ramirez, let's do this, this may be

6   as good a stopping point to take a break as any.

7            MR. RAMIREZ:  Yes, Your Honor.

8            THE COURT:  Unless there was some just -- it's a

9   good point to stop for you so you can transition into the

10  next --

11           MR. RAMIREZ:  Yes, Your Honor, and I'm about --

12           THE COURT:   -- facts?

13           MR. RAMIREZ:   -- to go into something else.

14           THE COURT:  Okay.  Then let's go ahead and take a 10

15  minute break.  We've been going for more than an hour and a

16  half.  And we'll take a 10 minute break and then be back.

17           You are -- you're still under oath and still on the

18  witness stand, Mr. Gonzalez, but you can -- obviously excused

19  to stretch your legs.

20           THE WITNESS:  Yes, sir.

21           COURT SECURITY OFFICER:  All rise.

22           THE COURT:  But you'll be back on the witness stand.

23           THE WITNESS:  Yes, sir.

24           THE COURT:  All right.  Take a break.

25           (Recess taken from 10:31 a.m. to 10:42 a.m.)

1    AFTER RECESS

2    THE COURT:  All right, go ahead and have a seat.

3    Sergeant Gonzales, go ahead and take the stand.

4    Defense ready to proceed?

5    MR. GUERRA:  Yes, Your Honor.  Well oh, our clients.

6    THE COURT:  All right, we're not quite.  All right.

7    (Pause in the proceeding.)

8    THE COURT:  Okay, are you ready for defense?

9    MS. MARTINEZ:  Yes, Your Honor.

10    THE COURT:  All right, then Mr. Guerra.

11    CROSS-EXAMINATION OF MICHAEL ANTHONY GONZALEZ

12    BY MR. GUERRA:

13    Q    Before I move on to another matter, just wanted to

14    clarify one point about your conversation with Mr. Garza. You

15    made a comment to me about and to the Court in one of your

16    answers that Mr. Garza had concerns about the Landlord because

17    of cameras and so forth.  Can you expand on that?  What

18    exactly did you mean?

19    A    Yeah, from what I was -- from what Mr. Garza was telling

20    me was that he didn't want to speak outside because there was

21    a camera right above his -- right above Mr. Garza's like door.

22    So you see where on this picture there's his door and it

23    turns into a hallway.  Right over that hallway over the last

24    step is Mr. Garza's door.

25    Q    I'm now going to Exhibit Number 3.

1    A    So like right here on the top corner --

2    Q    Right there?

3    A    Above that door, right there, the door in front of the

4    one --

5    Q    Oh, over here.

6    A    -- more on top of number one, there's a camera there.

7    Q    Oh there is, okay.

8    A    And what I remember if there was a camera there, he

9    didn't want to speak because he didn't know if that was being

10   monitoring or not.

11   Q    And when -- and did he express any other concerns about

12   the Landlord?

13   A    He didn't want to give too many details as to why he was

14   concerned about that specific deal.  He was concerned about

15   the (indiscernible).

16   Q    Because your report says something about -- did not know

17   the extent of the landlord's involvement.  What do you mean by

18   that?

19   A    That he didn't -- so his concern was that he didn't know

20   if -- that was his concern was that he didn't know if the

21   landlord was involved with what was found.  That's what he

22   told me.  I'm nor sure what he meant by that exactly.

23   Q    But at this point you haven't found anything?

24   A    Correct.

25   Q    Except a little bit of charred marijuana.  Or had you

1    already found something?

2    A    No, we hadn't.

3    Q    But it is a general suspicion on Mr. Garza's part?

4    A    Mr. Garza -- I don't know what he thought that we had

5    found yet, but he -- at that point we hadn't found anything.

6    But that's something that he did say.

7    Q    Okay, all right.  So, let's move on to another item.  So

8    at that point yo found out for the first time, you had said

9    that there was a little efficiency that was bedroom -- just to

10   recap -- that Mr. Garza said should have been his or was

11   really part of his lease, but was being leased out to the

12   Defendant or to someone named Flaco?

13   A    Correct.

14   Q    Did you have a discussion with him about and did he say

15   why he had a -- did he say anything about his concerns he had

16   about Flaco?

17   A    He just said that he had -- he understand that he had

18   some (indiscernible).  There was a few times that he had to

19   give him food because he didn't have money.

20   Q    And -- so -- and was a sofa there because any reason like

21   he wanted to keep Garza out or he wanted to the kids to stay

22   our or any other reason?  Anything about the locks?  He didn't

23   tell you anything about that?

24   A    I don't remember him saying anything about that.

25   Q    Okay.  Oh, I see that's not your report.  Sorry about

1    that.  Okay.  So then -- now you reviewed other reports,

2    right?

3    A    Correct.

4    Q    The other officer's reports and so who spoke to the

5    landlord eventually?  Did you make contact with the landlord,

6    you meaning you generally you or any of the persons you

7    supervised make contact with the landlord, Mr. Ramiro

8    Resendez?

9    A    Resendez -- Mr. Ramiro Resendez.  He's the one that was

10   talking the landlord.

11   Q    And what was he able to confirm, if anything, concerning

12   the efficiency?

13   A    That was rented out to somebody else other than like not

14   Mr. Garza.

15   Q    And did you -- he provided a lease document or three

16   pages of it and did you get to see that lease?

17   A    I have not seen that before.

18   Q    Well, you haven't seen it.  I'm sure your Government

19   Exhibit -- I'm sorry, defense exhibit no. --

20             THE COURT:  Mr. Ramirez I just want to let the --

21   let me just say it now.  We need to move this proceeding

22   along.  It is taking longer than I was hoping.

23             MR. RAMIREZ:  I will, Your Honor.

24             THE COURT:  And I don't know if this witness needs

25   to review the lease if he's never seen it before.  So, I'm

1    just going to say that, but.

2            MR. RAMIREZ:  No, I was going to ask him if he's

3    seen it and that was it.

4            THE COURT:  All right.

5    BY MR. RAMIREZ:

6    Q    Have you ever seen this before?

7    A    I haven not seen that.

8    Q    Okay.  So, let's move on to -- you said that the lady

9    from another apartment came down to alert you to something.

10   What did she tell you?

11   A    She had told one of the officers that was standing

12   outside that she -- she told someone in my apartment that

13   (indiscernible).  Those were her words.

14           So that kind of caused a red flag and -- caused her

15   question or what does she mean?  She didn't want to give too

16   much information but at the same time she was trying to give

17   us information.

18           So we ended up going upstairs to her apartment where we

19   located Mr. Saldana sitting on the couch.

20   Q    So, who went up?  You and?

21   A    Corporal Ayala.

22   Q    You went upstairs to her apartment.  She lived upstairs,

23   correct?

24   A    Correct.

25   Q    Went to her apartment and he happened to be doing what?

1    Was he -- what was he doing?

2    A    He was sitting on the couch.

3    Q    Okay.  And did you have a conversation with him?

4    A    Yes.  We just asked him who he was, id'd him.  I know I

5    read the name exactly as he gave us.  At that point we called

6    up Deputy Garcia as he had conducted a traffic stop prior to

7    him earlier on him and had already id'd him.  So we told him

8    that he was giving us this name, is this who you stopped

9    earlier?  And he -- Garcia it was an alias.  Actually his name

10   is this.

11        So at that point, we knew he was a lying about his

12   identity.

13   Q    What did Garcia say that his name was?

14   A    Jose Alaniz

15   Q    So he provided you the Defendant's name?

16   A    Correct, yes.

17   Q    And what happened after that occurred?  Did it happen in

18   front of -- I'm sorry.  Let me ask a different question.

19        Did it happen in front of the Defendant upstairs?

20   A    Yes.

21   Q    And what happened then?

22   A    That's when we realized that he had been -- that's when

23   we realized he was lying about his ID, identity and we brought

24   him.  Oh, we started asking him about the efficiency

25   downstairs.

1     We started asking about the efficiency downstairs and
2     right away he got real -- I mean, he did tell us that he
3     stayed in that efficiency downstairs.  Sergeant got verbal
4     consent right off the bat and then we -- I told him that we
5     were just going to go down there and check that.
6          We walked down there with him.  We had him open the -- I
7     had him open that screen, gate with his key.  He opened it.
8     Q    Looking at the Defendant's Exhibit No. 1.
9     A    He opened that gate for us and that's when we made entry
10    into that efficiency.
11    Q    And at what point did he give you written consent or was
12    it to you or someone else?
13    A    I believe -- I don't remember at what point that was.  It
14    wasn't to me.  It was to someone else, but I don't remember
15    when.
16    Q    But you're saying that he gave you verbal consent?
17    A    Correct.
18    Q    When he was upstairs?
19    A    Yes.
20    Q    Now, when he was upstairs and you were having this
21    conversation, what was his mood, his demeanor, his attitude?
22    A    You could tell that he was trying to be deceitful.
23    Especially he had just lied to us about his name.  He was
24    being more deceitful about his identity than anything.  He
25    gave us two different names.  He would give us a partial name,

1   not give us his full name until finally we were able to get to

2   the bottom of it.

3        But it was just being real deceitful, but at the same

4   time trying to cooperate by giving us, you know, consent right

5   off the bat before we asked him.  And that he's just a

6   suspicious person.

7   Q    So, tell me about how you got to -- how you and he and

8   the rest of your group that was with him got down to his

9   apartment, his efficiency -- and I'm showing it to you on

10  Defendant's Exhibit No. 1.  How did you get there?  You walk

11  down the stairs?

12  A    Yes.

13  Q    And who lead the way?

14  A    He did.  I took those officers -- well, I know for me he

15  was walking in front of me.

16  Q    He was what?

17  A    He was walking in front of me.

18  Q    Okay.

19  A    I don't know if those other officers were walking in

20  front of him.  But I was walking behind him.  So I was

21  following him to his -- letting him lead me to his apartment.

22  Q    Had he given you the key before you got there?

23  A    No.

24  Q    So how did you get in?  Who had the key?

25  A    He opened the -- he had the key.

1    Q    Where did he have the key?

2    A    In his pocket.

3    Q    And so he was able to get his key from his pocket and

4    unlock the door -- the gate?

5    A    Yes.

6    Q    Okay.  And after doing so, who walked into the

7    apartment -- into the efficiency, excuse me?

8    A    It was myself, I believe DEA Agent Frank Mosely walked in

9    behind me.

10   Q    Okay.

11        (Pause in the proceeding.)

12   Q    So is that the -- I'm showing you Government's Exhibit

13   No. 1 -- that's how it looked after he opened the door for you

14   and he opened the door?

15   A    Correct.

16   Q    You opened the wooden door?

17   A    Correct.

18   Q    And what did you find?

19   A    We searched the efficiency.  We had shower, we ended up

20   finding the bag of marijuana and all the ammo.

21   Q    I'm going through -- so Government Exhibit No. 2, tell us

22   what that is and is that how you found the scene?

23   A    So this is the shower.  This is the shower that's inside

24   the efficiency.  This is how we -- I believe this is how we

25   originally found it.  And to be able to -- I'm sorry, those

1    items the cushions and the blanket.  And under that was the

2    narcotics and the ammo getting under the cushions.

3    Q    Number four -- Government Exhibit No. 4, there's a

4    plastic bag.  Is that where the marijuana was?

5    A    Yes.

6    Q    And what is that -- there's a black bin with a yellow

7    top.  All this was the way, after you moved the blanket, and

8    then No. 5, what does that demonstrate?

9    A    No. 5?

10   Q    Government Exhibit No. 5.

11   A    It's the ammo cans with the 50 cal.  And then the

12   cardboard boxes that contained --

13   Q    Ammunition?

14   A    Ammunition, yes.

15   Q    And is this what was under all the cushions and the

16   blankets?

17   A    Correct.

18   Q    Government No. 6 is showing what was inside the bin,

19   basically, right?

20   A    Yes.

21   Q    And finally, let's see.  I'm showing you now Defendant's

22   Exhibit No. 20.  Is -- when did that -- what is that and when

23   did that take place?

24   A    This is after we found all the ammo that was inside the

25   shower, under the cushions and the blankets.  We had already

1        taken everything out to process the evidence.

2            (Pause in the proceeding.)

3    Q    Is there any -- what other involvement did you have in

4    the case after the ammunition was brought out from the

5    efficiency and the marijuana?  What did you do in connection

6    with the case, anything else at the scene?

7    A    Yes, it was -- we turned it over to -- since there was

8    this ammo, there was a like under cardboard boxes, there was

9    addresses and stuff that it was coming from.  So provided that

10   information to ATF to see if they wanted to do any kind of

11   follow-up on it.

12   Q    At what point, if at all, was the Defendant handcuffed

13   before or after or during consent -- the verbal consent?

14   A    You know, I don't remember when he was handcuffed.

15   Q    So, -- and so in looking at Defendant's Exhibit No. 11.

16   That purports to be a written consent signed by the Defendant.

17   It has your name here or a reference to you.  It says,

18   Sergeant Gonzalez and it's in Spanish.  Jose Alonso Saldana-

19   Alaniz.  Basically consent to search and Sergeant Gonzalez and

20   he refers to Apartment No. 1.  But I don't think he wrote

21   that, right is that somebody else?  You don't know?

22   A    That's not my handwriting.  I don't remember.

23   Q    Okay.  So the consent was given in writing at 7:24 p.m.

24   Do you remember if that was before or after you made entry

25   into his apartment?

1    A    I don't remember.

2    Q    Because he gave you verbal and were you -- before hand?

3    A    Yes.

4    Q    Did Mr. Saldana Alaniz tell you anything after the

5    ammunition was found or while he was waiting outside?  No.

6    A    No.

7              MR. RAMIREZ:  I'll pass the witness, Your Honor.

8              THE COURT:  All right, Mr. Guerra or who's going to

9    take?

10             MR. GUERRA:  Yes, Your Honor, I'm going to be asking

11   the questions.  And I was thinking with the Court's permission

12   if I could move somewhere because I don't know if he can see

13   and I know that I'm having trouble seeing him because of this

14   screen.

15             THE COURT:  Sure.  The podium over here if you'd

16   like, we could put that by the overhead projector or.

17             MR. GUERRA:  That's a good idea, Your Honor. I think

18   that'll be better.  So he can see me and I can see him.

19             THE COURT:  Okay.  No, you stay where you are.

20        (Pause in the proceeding.)

21             THE COURT:  All right, Mr. Guerra, you have the

22   podium.

23             MR. GUERRA:  Thank you, Your Honor.

24             MS. MARTINEZ:  And, Your Honor, if we can connect my

25   laptop to the screen.

1          THE COURT:  Okay.

2      (Pause in the proceeding.)

3        CROSS-EXAMINATION OF MICHAEL GONZALEZ (CONT'D)

4  BY MR. GUERRA:

5  Q   Mr. Gonzalez, I'm -- Sergeant Gonzalez, I'm sorry.  I'm

6  Raul Guerra, I'm going to be asking you some questions.  And I

7  want to apologize right off the bat.  I've got a cough drop in

8  my mouth right now.  As you can tell, I've been coughing and

9  so just bare with me because I'm recovering from illness and

10 so apparently when I speak a lot, I -- the cough just kind of

11 comes and I start coughing a lot.

12      So, you were -- when Mr. Ramirez was questioning you, you

13 said that you had been with the Sheriff's Office for eight

14 years.  And you said that you went through some training,

15 correct?

16 A   Yes, sir.

17 Q   Now let me make sure I understand this correctly.  He

18 asked you a question about the specific training that you had

19 and -- excuse me.  I want to make sure that I understand your

20 response.  Because you said I don't recall, is what I have in

21 my notes.

22      And so, do you not recall getting training or do you not

23 recall where you went to training?  I want the record to be

24 clear.

25 A   I don't recall where I went, sir.

1    Q    Okay.  So you -- but you do admit that you received

2    training as an investigator because you were at one time

3    signed to CID, which is a criminal investigation division of

4    the Webb County Sheriff's Office.

5         You received training to be an investigator, right?

6    A    Yes.

7    Q    Part of that training is report writing?

8    A    Sure.

9    Q    And that training is very important because -- for the

10   very specific reason -- well, one of the many reasons why

11   we're here because you have to write what happened after you

12   have -- you respond to a certain scene, you're involved in a

13   certain police action.  You have to write, document what you

14   did and what others did, correct?

15   A    Correct.

16   Q    And that has to be accurate because that's very important

17   because it's suppose to truthfully reflect what occurred,

18   correct?

19   A    Correct.

20   Q    Okay.  And so you did have the training and you do know

21   that, I'm sure -- Mr. Ramirez didn't ask you this, but I'm

22   sure there's a Webb County Sheriff's office policy that

23   dictates that you have to write reports, you have to do it

24   within a certain period of time, they have to be reviewed by a

25   supervisor, they have to be accurate -- accurately depict

1     whatever happened at that particular event, correct?

2     A    That's correct.

3     Q    And you would agree me that you -- because you are a

4     sworn officer of Webb County, you are going to follow the

5     procedures and policies that are implemented by the Sheriff as

6     your overall boss, right?

7     A    Correct.

8     Q    So, let me ask you another question about that.  So,

9     before you write the report, when you're at a scene of an

10    event, do you take notes while you're there?

11    A    Yes.

12    Q    Okay.  And then, so you use those notes to write the

13    report, right?

14    A    Yes.

15    Q    Do you have those notes with you right now?

16    A    No.

17    Q    Okay.  Why did you not bring them?

18    A    Because I just as a reference to write -- whenever I

19    write the report.

20    Q    Okay. So you didn't think it was important to bring them

21    today, but you have those available for review?

22    A    I'm not sure if I do. Like I said I'd have to check.

23    Q    Okay.  Why would you not be sure whether they're

24    available for review?

25    A    Because just scratch notes that I take on scene for

1   myself to write a report.

2   Q    Can you -- and are you telling the Court that you do not

3   preserve those notes?

4   A    I mean, sometimes my notebooks get full and I just put it

5   aside, go to the notebook, so I don't have -- I don't

6   purposely throw them away, but I'd have to look for it.

7   Q    Okay.  I guess I want to make sure I understand.  Webb

8   County Sheriff's Office does not have a policy for you to

9   preserve those notes?  Is that your understanding?

10  A    I'm not sure.

11  Q    You don't know if there's a policy to preserve the notes

12  that you use to write your report, correct?

13          MR. RAMIREZ:  Asked and answered, Your Honor.

14          MR. GUERRA:  Okay, I'll go on.

15  BY MR. GUERRA:

16  Q    So this particular, you use those -- is it fair to say

17  you use those notes to prepare this report for this particular

18  case?

19  A    Yes.

20  Q    Okay.  And you're telling this Court that that report

21  accurately reflects what happened on June 1st, 2022 when you

22  and your fellow officers conducted this operation at 0104

23  Flores in Loren, Texas?

24  A    Correct.

25  Q    Okay.  Now, that is not correct.  Is that, I mean, you

1    just said it's correct, but you're going to agree with me that

2    that statement is not correct and I'm going to tell you why

3    you're going to agree with me.

4         You just told in direct examination that -- told the

5    Court that there was a couch before you entered the

6    efficiency.  You had to move a couch -- can we put that up?

7         It's Exhibit -- it's either our Defense Exhibit 1 or

8    Government's Exhibit 1.  No take it back.  That's not the one.

9         (Pause in the proceeding.)

10   Q    Okay, there.  So I'm -- she just put up Defendant's

11   Exhibit No. 5.  This is, as it was made clear earlier, this is

12   not what was in the room when you entered the room.  This was

13   taken by our investigator when we went to look at the scene

14   weeks later, okay.

15              THE COURT:  And Mr. Guerra, just for clarification,

16   when you say "the room", Exhibit No. 5 is showing the interior

17   of the apartment, Mr. Garza's apartment?

18              MR. GUERRA:  That is correct, Your Honor.

19   Mr. Garza's apartment number on, which has been referred to as

20   apartment number one.  I apologize.  I should have put that on

21   the record.

22   BY MR. GUERRA:

23   Q    So, this is apartment number one.  Again, not when you

24   entered it, but you did verify that that is the room that you

25   entered.  And so, you see the door -- the front door of the

1    exhibit identified and that's the entry door.

2         And to the -- as you're coming in, I guess to the

3    immediately right, if I'm correct, there's another door that

4    opens into that particular room, which is a living room of

5    apartment one, is that correct?

6    A    Yes.

7    Q    Okay.  And so you testified earlier that there was a

8    couch there blocking that door, right?

9    A    Yes, sir.

10   Q    Okay.  And so was it -- it was blocking the door and you

11   had to move it out of the way to be able to open that door and

12   gain entry into the efficiency?

13   A    Yes, that's our apartment.

14   Q    That's what you said, right?

15   A    Yes.

16   Q    Now, did you move it yourself or did you get help?

17   A    I don't remember.

18   Q    You don't remember if you got help.  Okay.  But back to

19   what I told you that you would agree with me that when you

20   said that your report was accurate and included everything

21   that happened.  That is not in your report, that you had to

22   move -- that there was a couch blocking the door and that you

23   had to move it.

24        You would agree with me, that is not in your report?

25   A    That is not in my report.

1    Q    You did not include that in your report?

2    A    Correct.

3    Q    Okay so when you stated earlier that your report

4    accurately reflects what happened, that is not true because

5    that particular information is not in your report?

6    A    Correct, that is not in my report.

7    Q    Okay.  So -- but let's back up.  How many -- you told the

8    Court you did surveillance.  You had your unit, your narcotics

9    unit.  I believe you testified you had the DEA -- some DEA

10   agents involved.

11       But let's talk -- if you can tell the Court how many

12   officers were involved in this operation?  When you actually

13   went in to this apartment complex, as I believe you said, you

14   had a rallying meeting, you talked about what you were going

15   to do and then you said you called your SWAT team members and

16   whoever is available, you said come on down, right?

17   A    Correct.

18   Q    How many total officers were involved?

19   A    I don't have an accurate number --

20   Q    You don't know.

21   A    No.

22   Q    Okay.  Does about 21 people sound right to you?  And this

23   could be another witness, I'm sure somebody will remember.

24   But does that number sound about right to you, about 21

25   officers responding?

1    A    Yes, sir.

2         MR. GUERRA:  Can you put up the one that -- where

3    the ammo scene on the -- I forget the Exhibit numbers, I

4    apologize.

5         (Pause in the proceeding.)

6    BY MR. GUERRA:

7    Q    That one.  So this is Defendant's Exhibit No. 20.  So you

8    can see one agent or officer with a cap on the right, I guess,

9    squatting.  And then you see a lot of people.  There's another

10   person, another officer with a vest that says, "Police" that's

11   kneeling.

12        There's immediately in front of that person, there's

13   another officer, which looks to be full gear.  Would you agree

14   with that with that statement?

15   A    Yes.

16   Q    Is that one of your SWAT team members?

17   A    Which one is that?  The one on the left?

18   Q    That one that the pointer is at right now?

19   A    Yes.

20   Q    Okay, who is that, if you know?  I know you can't see the

21   face, but I mean --

22   A    I believe I know who I believe it is.  Who I think it is.

23   Q    Okay, well you know that's fine.  I don't want you to

24   speculate.  So, but there's at least, let's see one, two,

25   three, four, five, six, seven and there might be another one

1  next to the white car that we barely see right where the

2  pointer is.  So just in this particular picture we see about

3  eight officers, would you agree with me?  Approximately eight

4  officers.

5  A    Approximately eight officers.

6  Q    Okay.  And so -- but let's go back.  So you said your

7  unit was yourself, Investigator Sarqiz.  Who was the other

8  person?

9  A    (Indiscernible) Ramirez.

10  Q    And then who else was in your unit?

11  A    That's it.

12  Q    That's it.  So there's three narcotics officers.  How

13  many DEA agents have responded?  You mentioned Agent Schlup

14  apart from and I believe Agent Mosely?

15  A    Sure.

16  Q    Any other DEA agents apart from those two?

17  A    Agent Kyle Hunchford (phonetic), Derick Clark.

18  Q    Who else?

19  A    Joel Athea (phonetic).

20  Q    Who else?

21  A    And that's all that I can remember.

22  Q    You don't recall TFO Officer Herberto Arredondo

23  (phonetic) that's assigned to DEA being involved?

24  A    Yes, I do.

25  Q    Okay, so that's another DEA agent.  So that -- I didn't

1    keep count, but that's more than five people that you

2    mentioned from DEA.  Probably about seven.

3    A    Correct.

4    Q    So and then how many SWAT team members came to assist

5    you?

6    A    I don't have an exact number.  Five.

7    Q    Five SWAT team members in full.  I believe you said, with

8    the exception of the helmets they were in full gear including

9    the AR15's, correct?

10   A    Some of them had their vests.

11   Q    Some of them, okay.  And then they had the three, you

12   know, they had the full vests with those three pouches.  Now

13   those pouches are for 30 mag, 5.56 AR15 rounds, right?

14        Those are not for side arm, not whatever the standard

15   issue -- standard issue side arm for the Sheriff's office is,

16   those are 30 round magazine clips?

17   A    Correct.

18   Q    Right.  Okay.  And obviously when they responded with --

19   I would imagine when they respond the AR15 is -- they're not

20   going to respond without it having a mag and being fully

21   loaded and ready to engage if it's necessary, correct?

22        I mean, you wouldn't be SWAT if you're not ready to

23   engage, right?

24   A    Correct.

25   Q    So, anybody else that I've missed?  I think you said DEA,

1    you said you're unit, your SWAT -- about five SWAT people.

2    Who else that I may have forgotten to mention is involved do

3    you recall?

4    A    Couple of patrolmen.  Maybe three patrolmen.

5    Q    Three patrolmen, okay.  And these are the people that

6    were being used to stop people?

7    A    Correct.

8    Q    Okay.  So, about the stops.  How many people did you-all

9    stop?

10   A    We stopped -- there was one actual traffic stop.  The

11   other one got us in pursuit got away.

12   Q    Are you sure it was only one?  You said you reviewed

13   everybody else's reports, right?  At least over at county, I

14   imagine.

15   A    I know that there were Corporal Garcia.  He did one, he

16   got one traffic stop.  That's when he ID the Defendant.

17   Q    Right, that's one. And then you mentioned --

18   A    There was two.  He stopped the wife of the landlord.

19   Q    That's what I was getting at.

20   A    Yes.

21   Q    So, one of the stops you actually stopped the wife of the

22   landlord, right?

23   A    Yes.

24   Q    Okay, so you did at least three traffic stops and then

25   you attempted -- you attempted another one and I believe you

1  said the person did not stop or something.

2  A     There was two traffic stops and one got away.

3  Q     And one got away.  So you did three -- or two and

4  attempted a third?

5  A     Correct.

6  Q     This is all before you actually moved into the apartment

7  complex?

8  A     Correct.

9  Q     Okay.  So, now before you said you met with everybody

10  before you -- and by everybody I mean DEA and whoever else was

11  going to be responding.  You met with them and then you

12  responded.

13      The first thing that you-all did is you handcuffed

14  Mr. Garcia and another gentlemen by the last of Anaya

15  (phonetic); is that correct?

16  A     Correct.

17  Q     And they were handcuffed immediately and they were

18  outside for a long time before you went into -- started going

19  into the units, correct?

20  A     There were -- not a long time.  It was right away.

21  Q     Right away?

22  A     Yes.

23  Q     Okay.  Okay, so now let me ask you this question because

24  you said you had gotten information -- the Sheriff had gotten

25  information and you proceeded to do everything you testified

1   here because of that information.  But you never attempted to

2   get a warrant.

3        Now the Judge has mentioned that a couple of times.  I

4   was, you know, asking Mr. Ramirez, there's no warrant, there's

5   no warrant.

6        You never attempted to get a warrant?

7   A    No, because I didn't have enough for one.

8   Q    That's what I was getting at.  So you did not have

9   sufficient information to get a stare or federal warrant, for

10  that matter, that's why you never applied for a warrant?

11  A    Correct.

12  Q    Okay.  And I think one of the questions you said you were

13  attempting to -- the officers were attempting to develop

14  probable cause.  You were looking to try to find something?

15  A    Yes.

16  Q    Okay.  And so, by the time you got into the unit, the

17  SWAT was there and everybody went in there with you, right?

18  A    Correct.

19  Q    Okay.  Now, you mentioned that Mr. Garcia was immediately

20  handcuffed because of the suspicious activity prior to you-all

21  going in.  But isn't it true that you -- you basically saw him

22  as a target based on -- you said he supposedly gay, he was

23  looking this way and that way.  He basically was a target,

24  right?  You would agree with me that?

25       He was suspicious enough that you considered him a

1    target?

2    A    No.  He was handcuffed because he was smoking marijuana.

3    Q    Okay.  But that's not my question.  Did you consider him

4    a target because of all the suspicious activity you had

5    observed before?

6    A    We suspected him to be involved.

7    Q    You did?

8    A    Yes.  (Indiscernible).

9    Q    Okay.  So now you said that you were going to do a knock-

10    and-talk.  But you would agree with me that law enforcement

11    doing a knock-and-talk usually don't bring a SWAT team to do a

12    knock-and-talk.  SWAT is not there to do a knock-and-talk,

13    right?

14    A    Right.

15    Q    SWAT is down to break down doors and there's no knocking

16    and there's no talking, correct?

17    A    Correct.

18    Q    Okay.  So, now you said that you went into the room

19    because you were interested in getting the kids, right?

20        So, that Mr. -- can you put the lay up, set up of

21    Mr. Garza's apartment, please.

22        You would agree with me that apartment is a very small

23    apartment, apartment 1.

24    A    Correct.

25    Q    You agree with me?

1    A    Yes, sir.

2    Q    As you saw it -- as we saw it, she's about to put it up

3    in the exhibit, --

4              MS. MARTINEZ:  Which one are you looking for?

5              MR. GUERRA:  The actual sketch that Mr. Resendez

6    made.

7              MS. MARTINEZ:  Oh, okay.

8         (Pause in the proceeding.)

9              MR. GUERRA:  Now, so I believe -- is that

10   Defendant's 10, 7?

11             MS. MARTINEZ:  Yes.

12             MR. GUERRA:  I can't make it out with the glare.

13   BY MR. GUERRA:

14   Q    So that shows that that unit has a small living room,

15   kitchen, -- living kitchen combo basically and a bedroom and a

16   bathroom.  So, it's a very very small unit.  You walk in and

17   you're already pretty much half way through the living room.

18        And you see immediately to your right, if I remember

19   correctly, you see the bedroom.  At least the door into the

20   bedroom, right?  It's a tiny little place. It's going to take

21   you a couple of seconds to go in and out because you don't --

22   I mean, there's not an walking you need to do, correct?

23   A    Correct.

24   Q    So how many people when you went in there, how many

25   people went in there with you?  You said Sarquiz -- I remember

1       Sarquiz and you said Sarquiz and I then I believe you

2       mentioned somebody else went in there with you.

3       A    And so when we first made entrance of the apartment?

4       Q    Uh-huh.

5       A    It was about, you know, I don't remember the exact

6       number.  There was at least four to five squad officers and

7       then Sarquiz was at the end.

8       Q    Okay.  So four to five squad officers go in there and

9       Sarquiz also?

10      A    Yes.

11      Q    Okay.  You took in four to five SWAT officers to go look

12      for kids?

13      A    Yes.

14      Q    Okay.  And Sarquiz also.  So all of you -- and who went

15      in first?  You went in first?

16      A    I did.

17      Q    You did.  Who went in after you?

18      A    I don't remember.

19      Q    You don't remember.  Okay.  But eventually Sarquiz --

20      because you testified earlier that Sarquiz went to the

21      bedroom, right?

22      A    Correct.

23      Q    Okay.  So now you also said you moved the couch and you

24      don't remember if somebody helped you to move the couches.

25      It's a pretty big couch, right.  You saw the picture, Mr. --

1    let me just put it up.  And you saw it's for three or four

2    people can sit on it, right?  It's pretty big couch.

3         And I'm not trying to say that you're not a strong man,

4    but I mean, usually you need some help sometimes to move some

5    stuff, right?

6    A    Uh-huh.

7    Q    And you don't remember if somebody helped you move it or

8    not?

9    A    I don't remember.

10   Q    Okay.  So that would have taken a little bit of time to

11   actually move it, move it out of the way.  And then that door

12   shows a deadbolt and the actual entry lock set, correct?

13   A    Correct.

14   Q    Okay.  Not the one that we have on the -- put it on

15   please so that we can be sure and be accurate exhibit.

16        (Pause in the proceeding.)

17   Q    So we're showing you -- I can't make out the number.  Is

18   that seven?

19        MS. MARTINEZ:  I'm sorry, I'm not very good at this

20   computer.  That's number seven.

21   BY MR. GUERRA:

22   Q    Okay.  I believe that's Defendant's seven we're showing

23   you.  It shows a deadbolt on top and then the actual regular

24   lock set on the bottom.

25        So, and -- so the other people went to the bedroom to go

1    look at the kids.  They had to open a door.  The report says

2    the kids were there.  You had to move a couch either by

3    yourself or with help and then figure out how to open that

4    door because its got a deadbolt.  Unless you already knew it

5    was unlocked, right?

6        And then you went into that bedroom.  That's your

7    testimony, right?

8    A   I mean, it's not that hard to figure out that door.  I

9    just hoped that I didn't have to unlock it.  I didn't ask

10   anyone if it was open.  We moved the couch right of way.

11      When you clear a room you have to make entry -- I'm the

12   first one.  I took first right assuming the SWAT guy behind me

13   took a left and we all started shuffling in.  I ended up at

14   that door and that was the only thing I was focused on.  I

15   took the right.  I'm pretty sure someone ended up right behind

16   me.

17      The couch was moved, we made entry.

18   Q   Okay.  And so you're telling this Court that even though

19   there was a couch blocking that door, you thought the kids

20   somehow, I guess, moved the couch and opened that door and got

21   in there and then put that couch back against the door?

22   A   I mean --

23   Q   Is that what you're saying?

24   A   That's not what I'm saying.

25   Q   Is that what you thought might have happened?

1    A    No. I was -- is that the father's already been reckless

2    outside smoking marijuana.

3    Q    But that's not what I'm asking you.  I'm not asking what

4    the father had done --

5         MR. RAMIREZ:  Your Honor, Your Honor, he's

6    interrupting the witness as he's answering the question.

7         MR. GUERRA:  I apologize, I let him -- I apologize.

8         THE WITNESS:  So, my thought process was just -- his

9    father has already been reckless outside smoking marijuana.

10   We've already gone to pursue the vehicle leaving his house.

11   He's already acted suspicious on the phone acting as a scout.

12   Who knows if this dad put the kids in there so that their

13   physical activities can be inside house -- on the couch.

14        So that's why I went in there.

15   BY MR. GUERRA:

16   Q    Okay.  Fair enough sir.  Now one the thing --

17        MR. GUERRA:  can we put the one -- I apologize I

18   don't remember the number.  But, where the door already open

19   going into the efficiency?

20        (Pause in the proceeding.)

21        MR. GUERRA:  No, not that one another one.  Where

22   they're showing the door actually open or the efficiency into

23   apartment one.

24        (Pause in the proceeding.)

25        MR. GUERRA:  Okay, that one.

1    BY MR. GUERRA:

2    Q    Okay, so I'm showing Defendant's Exhibit No. 14.

3              MR. GUERRA:  Can you focus on the mirror on the

4    floor where the -- there you go.  Can you focus on the mirror?

5    Just where the cursor, okay right there.

6    BY MR. GUERRA:

7    Q    So you see that.  What is that on the floor there Mr.  --

8    Sergeant Gonzalez?

9    A    I'm not sure, sir.

10   Q    Does it appear to you to be a mirror, one of those --

11   A    Long ones?

12   Q    -- long ones, right.  And it's on the floor.  How did it

13   get on the floor, do you know?

14   A    I don't remember how it got on the floor.

15   Q    Okay.  Would it surprise you to learn that that mirror

16   was against a door and it fell and it broke when that door was

17   opened?  Do you remember hearing the mirror fall?  Do you

18   remember hearing things break?

19   A    No, I don't.

20   Q    You don't remember that, okay.  And so you see the fridge

21   there with the TV.  Is it your testimony that exactly the way

22   it's depicted in Defendant's Exhibit 15 is -- which by the way

23   this a Government.  We got this from the Government.  Of

24   course it's labeled Defendant's Exhibit.

25             This is a picture you-all took.  I'm not saying somebody

1    from your team, but is it your testimony that that fridge and

2    that tv were exactly where they're at right there and you did

3    not move that all to get in -- to gain entry into that room?

4    Is that your testimony?

5    A    I honestly don't remember.  All I remember is walking

6    into that room and just seeing that door across by the shower.

7    Q    Right, that's what I'm asking, sir.  You do not remember

8    having to move that fridge to be able to walk through that

9    tiny little space that looks like, I don't know.  It looks

10   like those are 12 by 12 tiles.  It looks it's a little more

11   than a foot.

12   A    I don't remember.

13   Q    You don't remember if you had to move anything?

14   A    No.

15   Q    So you could have actually moved something is what you're

16   telling the Court.  You just don't remember.

17   A    Correct.

18   Q    Okay.  So now that efficiency is tiny.  You would with me

19   with that -- about that, right?

20   A    Yes.

21   Q    You basically -- if I was saying that apartment one is

22   small, this is efficiency is a minuscule little spot compared

23   to the apartment, right?

24   A    Uh-huh.

25   Q    I mean literally you walk in there and you walk, you

1    know, you can count the steps and you're at the front door,
2    right?
3         And so in your report, you wrote -- and the Court has
4    this as Exhibit F --
5              MR. GUERRA:  Mr. -- is that correct?  I believe
6    that's what you said earlier.  Just for the Court reference --
7              MR. RAMIREZ:  Yes.
8              MR. GUERRA:  -- Your Honor, I'm referencing to
9    Exhibit F from this -- my thing says --
10             MS. MARTINEZ:  The sealed --
11             MR. GUERRA:  The sealed --
12             MR. RAMIREZ:  The sealed.
13             MR. GUERRA:  -- supplemental brief that she filed,
14   Your Honor.
15   BY MR. GUERRA:
16   Q    But in this report, Mr. Gonzalez or Sergeant Gonzalez,
17   I'm going to read you a portion of this.  Well, actually --
18             THE COURT:  Refer to the docket number of that
19   exhibit or that document that you're referring to.
20             MR. GUERRA:  The document that I'm referring to,
21   Your Honor, is his -- is Sergeant Gonzalez' report.  It's
22   title Webb County Sheriff's office -- Webb County Sheriff's
23   Office Incident 2022-00094.
24             THE COURT:  Right.  But do you have -- you don't
25   have a CMECF marking of that?  It's represented that it was

1    attached some of the briefing in this case.

2              MS. MARTINEZ:  Your Honor, because it was a sealed

3    document we're unable say the time -- the stamp of what pages

4    it is.

5              THE COURT:  So let me say this, actually this is an

6    issue that the Court is already concerned about.  There's

7    already been multiple references to, I guess, what is that

8    report that you're referring to.

9              That document is not in evidence.  It is attached to

10   some of the briefing.  I was going to clarify with you-all at

11   some point about are we intending to have that marked and

12   introduced as an exhibit in this hearing?

13             MR. GUERRA:  Yes, Your Honor.

14             THE COURT:  So, because otherwise I was actually

15   just -- before you even mentioned that I was going back to try

16   and find it.  But I wasn't able to make -- I think maybe

17   Mr. Ramirez had mentioned the kick -- the exhibit number as

18   attached to one of the filings in the case.

19             But, anyway, if we -- I think it might be cleaner if

20   we keep referring to talking about -- just marking it as an

21   exhibit.

22             MR. GUERRA:  I agree, Your Honor.  And unless

23   Mr. Ramirez isn't objection, we'll label a clean copy because

24   mine, unfortunately, I marked it, so.

25             MS. MARTINEZ:  Would the Court want it to have a new

1    exhibit number or do we just --

2              THE COURT:  No, a new exhibit number for this

3    hearing, yes would be my preference.

4              (Pause in the proceeding.)

5              MR. GUERRA:  Your Honor, I've tendered it to

6    Mr. Ramirez with what has been marked as Defendant's Exhibit

7    No. 25, which is -- and first all Mr. -- Sergeant Gonzalez

8    this is a report.

9              But subject to his -- may I approach the witness,

10   Your Honor?

11             THE COURT:  Yes.

12   BY MR. GUERRA:

13   Q    Sergeant, can you take a look at that then I'll ask you a

14   question.

15             (Pause in the proceeding.)

16   Q    All right, have you had enough time to look at it sir?

17   A    Yes.

18   Q    Is that a copy your full report?  I'm not saying Webb

19   County Sheriff's report, but your full report that you

20   prepared for this particular case?

21   A    Yes.

22             MR. GUERRA:  And may I approach, Your Honor?

23             THE COURT:  Yes.

24             MR. GUERRA:  So, Your Honor, we'd offer Defense

25   Exhibit No. 25.

1          THE COURT:  Okay, any objection from the Government?

2          MR. RAMIREZ:  No, Your Honor.

3          THE COURT:  All right, Defendant's Exhibit 25 will

4     be admitted without objection.

5          (Defendant's Exhibit 25 is received into evidence.)

6     BY MR. GUERRA:

7     Q    So, I guess --

8          MR. GUERRA:  May I approach again, Your Honor, so I

9     can tender it to him so he can look at it?

10    BY MR. GUERRA:

11    Q    Sergeant, in your report, Defense Exhibit no. 25, there

12    is a section that I want you to look at personally and then

13    I'll ask you about it.

14         And it starts where it says, "Sergeant Gonzalez along

15    with multiple officers from SWAT team entered with Sergeant

16    Gonzales."

17         So, if you would read that all the way down to right

18    before you talk about the jar.

19    A    Where is that?

20         MR. GUERRA:  May I approach, so I can show him?

21         THE COURT:  Yes.

22    BY MR. GUERRA:

23    Q    So basically.

24         (Pause in the proceeding.)

25    A    Sergeant Gonzalez along with multiple officers and the

1    SWAT team entered with Sergeant Flores.  As I approached the

2    first door, Sergeant Gonzalez opened it and found a small

3    living area.

4        Sergeant Gonzalez saw another door in which he opened and

5    the door led to the front parking lot where all the other

6    officers and agents were at.  That's when Sergeant Gonzalez

7    realized he was in a separate living area that connects thru a

8    door to subject Garza's apartment.

9        Sergeant Gonzalez then told the officers that were about

10   to follow me into this room, to get out of the room because it

11   was a separate living area.  Sergeant --

12   Q    That's my point.  So that is the part of your report that

13   reference what we've been talking about, okay.  And that is

14   the section where you talk about how you got into the

15   efficiency.

16       And that is what I was asking you when we started this

17   whole conversation about how that does not accurately reflect

18   what occurred because you did not include in there what you

19   testified to today that you had to move a couch to get -- gain

20   entry into the efficiency, right?

21   A    Right.  I did not put the couch in.

22   Q    You didn't put it in there.  But then also it says, you

23   use the word there and of course you're speaking I guess,

24   yourself, but you're speaking in the third person.  You're

25   saying well Sergeant Gonzalez realized that he was in

1    another -- where is it so I don't misquote you.  Realize

2    that -- realize he was in a separate living area.

3         Okay.  And that is -- that's not really when you realized

4    it because you realized it when you had to move a couch to get

5    in there.  You could have realized it any ways because there

6    was obviously something blocking your entrance in there which

7    should have given you, you would agree with me, some pause to

8    realize this may not be part of this particular unit and

9    they're blocking the entrance.  Yes or no?

10   A    No.

11   Q    Okay.  Okay.  And so, let's get back to the -- to the

12   kids were found.  Okay.  You're in there, you said with about

13   five SWAT officers and Investigator Sarquiz.  The kids were

14   found.  They're brought out.

15        And I want to be clear that your testimony is -- well

16   before I ask you this question, had you had communications

17   about entering the apartment -- either apartment one or the

18   efficiency with Special Agent Schlup before you did that?  Did

19   you talk to him?

20   A    Talk to him about making entrance to the apartment?

21   Q    About your next steps, yeah.  What you were going to do?

22   Did you talk to him like you had done before you got to 3104

23   Flores?

24   A    No.

25   Q    Did you talk to S.A. Mosely?

1    A    No.

2    Q    Did you talk to anybody else from your unit?

3    A    No.

4    Q    Okay.  So you -- it was your decision alone to just move

5    the couch and go in there?

6    A    Correct.

7    Q    And I want to be clear that your testimony to this Court

8    is that before gaining entrance into the efficiency, nobody --

9    I want to make sure I understand this correctly.  Nobody had

10   told you before that point that you could not go in there

11   because that was somebody else's property?  Somebody else's

12   leased unit?

13   A    Correct.

14   Q    That's your testimony?

15   A    It is.

16   Q    Okay.  Now, you said -- let me look at my notes real

17   quick.

18        (Pause in the proceeding.)

19   Q    You said by questioning by Mr. Ramirez, he asked you

20   about what happened after you exited the efficiency and you

21   were talking to Mr. Garza.  And I have in my notes that you --

22   this is, I'm quoting what you said.  You said, after you

23   searched the whole area that you had that conversation with

24   Mr. Garza after you searched the whole area.  That the term

25   you used.  You searched.

1        Okay, searched, you would agree with me, is very

2   different than saying after I mistakenly entered efficiency, I

3   spoke with Mr. Garza?

4        Okay, so you stated under direct examination that you

5   searched the whole area.

6   A    That's what I stated.  I did not mean actually search --

7   well search for the kids, but we did not go through any

8   cabinets, any property, but not searched --

9   Q    So you're clarifying --

10  A    -- the apartment.

11  Q    I'm sorry for interrupting.  So you're clarifying your

12  testimony now; is that your -- now you're clarifying it to say

13  you did not search.  Because you stated that earlier.

14  A    Correct.

15  Q    Okay.  Just wanted to make sure we understand what you

16  meant, even though you used very different words.  Now, in

17  reference to the statement that Mr. Garza made, the written

18  statement, you said -- and I don't want to put words in your

19  mouth, but my notes here say that you did not ask him to write

20  a statement, right?  That's what you said.

21  A    Yes.

22  Q    So is it your testimony here that you conducted an

23  investigation and is it your testimony that you conducted an

24  investigations and you don't ask people, witness, possible

25  witnesses to write statements?  Is that what you're telling

1   the Court?

2   A    I didn't do it at the time that we needed a statement

3   from them.

4   Q    You did not believe that it was -- that you needed one,

5   okay.  As a matter of fact, you did not really believe that

6   you needed any statements, right?  Because did you get a

7   statement from the woman in apartment 3?

8   A    No she didn't want to write one.

9   Q    She didn't want to.  As a matter of fact, you don't even

10  identify her in your -- in, I believe, in none of the reports

11  she's not even identified.

12  A    She wanted to remain anonymous.

13  Q    Okay.  But who is that -- did you even identify that

14  person?

15  A    One of the deputies did run her name.

16  Q    What's her name?

17  A    I don't know.

18  Q    You don't know her name?

19  A    No.

20  Q    Okay.  So you took no statements from any of the other

21  tenants.  If Mr. Garza had volunteered to give written

22  statement, you wouldn't have asked him to do a written

23  statement?

24       You didn't ask Mr. Anaya, the other person you detained

25  and you had handcuffed.  You didn't ask him for a statement?

1    A    No.

2    Q    You didn't ask him for a statement, okay.  And we haven't

3    asked this question, but the Sheriff's Department has body

4    cams, right?

5    A    Correct.

6    Q    Did any of the Webb County Sheriff's Officers, SWAT,

7    yourself, any of the officers involved, did they have body

8    cams?

9    A    At that time our system was down.  But our system was

10   down so the whole department did not have any body cams at

11   that time.

12   Q    None of the -- I don't know the exact number, but awhile

13   back I think the Sheriff's Office in Laredo had about 300

14   employees.  I don't know how many of those were actual patrol

15   deputies, but.

16        So you're telling me that your testimony is that at this

17   particular time June 1st, 2022, the Webb County Sheriff's

18   office system was not operating and none of the body cams for

19   any patrol officer or any other officer who was going to be

20   involved in any operations, none of those body cams were

21   working?

22   A    Correct.

23   Q    Okay.  What about the dash cams for vehicles?

24   A    Dash cams -- so the server was full.  So it wouldn't

25   think -- it wasn't downloaded to the server.  So I don't think

1    the dash cams were working either.  It wasn't -- we couldn't

2    put anything on the disc.

3    Q    And let's talk about that because I'm assuming --

4         MS. MARTINEZ:  If I may have a quick moment with

5    Mr. Guerra.

6         (Pause in the proceeding.)

7    BY MR. GUERRA:

8    Q    How many patrol -- because you guys have so many -- my

9    apologies, your officers had Webb County had a lot of

10   officers. So I'm assuming that there were a lot of units

11   blocking the front.  I mean you didn't just park in some

12   parking lot and then walk all the way over there, right?

13        You had a lot of units arriving the units and you were

14   all over the place?

15   A    Right.  No road blocking, they were at the front.

16   Q    They're blocking the entrance and probably the street and

17   the corners around there, right?

18   A    Correct.

19   Q    Okay.  So, there is -- I guess what I was getting at is,

20   there is no video tape of the officers interacting with

21   anybody or the executing, you know, making all the -- taking

22   all the action that you describing today.

23        There's no video of the body cam video?

24   A    Right.

25   Q    Okay.  And I was just corrected that apparently

1    Mr. Ramirez did submit some dash cam video is what I'm being

2    told. That he did provide. I just wanted to make sure that I

3    clarified that.

4         But body cam, no body cam?

5    A    That's correct.

6    Q    Okay. Now you said -- I want to talk about the

7    handcuffing. You don't recall when Mr. Saldana was

8    handcuffed, but you agree with me that Mr. Garza and Ms.

9    Renaya (phonetic) the first two people that your unit

10   encountered were immediately handcuffed. There is no dispute

11   about that?

12   A    Correct.

13   Q    As a matter of fact --

14        MR. GUERRA: Can you put it up again where Mr. Garza

15   is outside with his shirt outside?

16        (Pause in the proceeding.)

17   BY MR. GUERRA:

18   Q    Okay, I'm showing you Defendant's Exhibit No. 12. In

19   number 12 and you testified to this earlier. You said this is

20   when you had already moved in, the front door to the

21   efficiency is already opened. So you-all had already gone in

22   there.

23        And I believe you said you were beginning to process

24   whatever you had found. So, but Mr. Garza is shown to the

25   left leaning on what appears to be a stove. He has his hands

1    on his back, so he was still handcuffed at this particular

2    time; is that correct?

3    A    It appears that way.

4    Q    It appears.  And this is already -- I don't want to

5    speculate.  I mean, you don't know how many minutes or hours

6    into the operation he's still standing there handcuffed?

7    A    I'm not sure how long it was.  It was awhile.

8    Q    It was awhile, right.  I mean, what time did you-all

9    start this, do you remember?

10   A    I'm not sure exactly we actually made the approach.

11   Q    But I mean it's -- this is Mr. Anaya, correct?  The other

12   person that you handcuffed?

13   A    Correct.

14   Q    And he also has his hands behind his back and he's also

15   handcuffed?

16   A    Correct.

17         MR. RAMIREZ:  Excuse me.  I'm not -- it's not

18   obvious that he is handcuffed.  He would have to testify about

19   that.

20         MR. GUERRA:  Well let me ask a question.  That is a

21   fair question.

22   BY MR. GUERRA:

23   Q    I'm showing you Defendant's Exhibit No. 23 and you were

24   there.  I was not there.  But you just stated that when you

25   got there they were immediately handcuffed.

1          So, did you at any point -- you said this is Mr. Anaya --
2    did you at any point -- you or any other officer take the
3    handcuffs off him as far as you remember?
4    A    I don't recall taking the handcuffs off.
5    Q    And would it be reasonable to assume that the way he is
6    depicted in Exhibit -- Defendant's Exhibit No. 23, he is still
7    handcuffed?
8    A    I can't really tell from this picture.  His hands could
9    be --
10   Q    Okay.  Well, what about the guy behind him.  There's a --
11   I believe that's Special Agent Schlup right in front of --
12   yeah right in front of a Deputy.  And then I believe it's
13   Mr.  Saldana, our client, who is next -- in front of that
14   deputy.
15        Do you see Mr. Saldana's hand behind his back and does
16   that orange appear to be a handcuffed where he's handcuffed
17   back there too?
18   A    Yes.
19   Q    Okay.  So, but you said that you don't recall when
20   Mr.  Saldana was handcuffed?
21   A    Correct.
22   Q    But you stated -- there's Defendant's Exhibit No. 22, the
23   handcuffs are orange, is that correct?  That's Mr. Saldana
24   handcuffed?
25   A    I'm not 100 percent sure that this photo is him.  I don't

1    remember what he was wearing that day.

2    Q    Okay, okay.  You said that when you -- when your team got

3    the information about a person upstairs, you went up and you

4    went up with how many officers up there?

5    A    Corporal Ayala and Mr. Sarquiz.

6    Q    Okay.  And Corporal Ayala is -- was he part of the SWAT

7    team, was he --

8    A    Yes.

9    Q    So he was with an AR15?

10   A    I believe at that point he already put it away.

11   Q    He had put it away, okay.

12   A    Yes.

13   Q    But at one point he had an AR15?  And are you sure that

14   he had put it away at that point or you don't remember he had

15   put it away at that point?

16   A    Yes, I'm sure.

17   Q    You're sure?

18   A    Yes.

19   Q    Okay.  So you're sure that at the point that they tell

20   you that there's a person of interest that should be seen,

21   you're telling me that a SWAT officer went up there without

22   the most powerful weapon you can have?

23   A    Yes.

24   Q    That's what you're telling the Court?

25   A    Yes.

1    Q    Okay.  So, you get up there and who's the first person to

2    go into apartment 3 looking for Mr. Saldana?

3    A    It was -- I believe it was me.  It was me and Ayala

4    followed me.

5    Q    Okay.  And so, --

6         MR. RAMIREZ:  Your Honor, just for clarification the

7    question was he went upstairs to look for Mr. Saldana.  That's

8    actually not what the witness testified about.

9         He testified that he went up because a lady come

10   down said there's a person you may want to talk to.  I just

11   make that clear for the record.

12        THE COURT:  All right.

13        MR. GUERRA:  Thank you for that correction,

14   Mr. Ramirez.

15   BY MR. GUERRA:

16   Q    So what were the other SWAT officers doing?  Do you see

17   that stairwell right there in Defendant's No. 2?

18   A    Yes.

19   Q    Who, if anybody, was on that stairwell when you came out

20   of apartment three?

21   A    I don't remember.

22   Q    You don't remember?

23   A    No.

24   Q    You don't remember if officers were lining that whole

25   stairwell right there?

1    A    No, there was no officer -- after we had already built

2    the case up?

3    Q    No I'm talking about when you went into apartment three.

4    A    Oh, to go upstairs.  I don't know whoever was on that

5    stairwell.  I just remember myself and I remember a female

6    standing out here.   She had told Corporal Ayala about someone

7    inside her apartment.  And then Corporal Ayala went to go get

8    me when I was talking in the living room to Mr. Garza.

9         Then I went with Ayala, I went up the stairs to the

10   female.

11   Q    Okay.  So you don't remember if there were officers

12   either SWAT or other officers anywhere in the vicinity of the

13   stairwell?

14   A    No.

15   Q    Or at the bottom of the stairwell?

16   A    The bottom of the stairwell, yes.  There was officers

17   down there at the bottom.

18   Q    They were -- are you saying they were probably

19   congregating at the bottom?

20   A    Correct.

21   Q    Okay.  Now you said you went into the efficiency and you

22   made it clear that it was very quick and you report says you

23   realized that it was somebody else's and you exited.  Right?

24   A    Yes.

25   Q    But not before you saw a jar?

1    A    Correct.

2    Q    Okay.

3              MR. GUERRA:  Can we put that up?

4         (Pause in the proceeding.)

5    BY MR. GUERRA:

6    Q    Okay.  So I'm showing you Defendant's Exhibit No. 15.

7    And you testified earlier about the fridge and about the TV

8    and you didn't know exactly what it was to the right of

9    the -- you said, if I remember correctly, either a blanket or

10   it could have been a recliner I believe you said, right?

11   A    Correct.

12   Q    Do you see that little item way -- you can barely see it

13   in the picture, right there were the pointer is?

14   A    Okay.

15   Q    That's the jar that you saw, right?

16   A    Yes.

17   Q    So it's right at the corner --

18             THE COURT:  Wait was that -- did you agree that

19   that's the --

20             THE WITNESS:  The things that I remember earlier --

21   like I said earlier, I remember the jar this general area by

22   the fridge --

23             THE COURT:  Right.

24             THE WITNESS:  -- where the stuff is.  So I don't

25   remember exactly where the jar was.  As I was walking out, I

1    saw the jar in that area.

2              MR. GUERRA:  I was about to ask about that.  So, --

3              THE COURT:  So I just wanted to -- understood the

4    question to be were you agreeing that that was the jar as

5    Mr.  Guerra was referring to.

6              So is it your response that you're not sure that it

7    is?

8              THE WITNESS:  It's possible that's the jar.  I'm not

9    sure that that's the jar.

10             THE COURT:  All right.  Just wanted to clarify that.

11             MR. GUERRA:  Can we show the other one?  I don't

12   remember the exhibit number, but.

13             MS. MARTINEZ:  I think that's the only one that has

14   it.

15             MR. GUERRA:  No, we -- did we do the other one?  No.

16             MS. MARTINEZ:  Oh, yes, yes.  Sorry.

17         (Pause in the proceeding.)

18             MS. MARTINEZ:  Exhibit 18.

19             MR. GUERRA:  No, but there's -- can I have a minute,

20   Your Honor, so I can confer with Ms. Martinez?

21             THE COURT:  Yes.

22             MR. GUERRA:  Just I can make sure that I've.

23         (Pause in the proceeding.)

24             MR. GUERRA:  Your Honor, I apologize but apparently

25   we did not offer that.  I will -- we're going to mark it and

1    with the Court's permission, unless Mr. Ramirez has an

2    objection, we're going to offer the one that I thought we had

3    entered as an exhibit.

4              THE COURT:  One of what?  A photograph.

5              MR. GUERRA:  A photograph, Your Honor.

6              THE COURT:  Okay.

7         (Pause in the proceeding.)

8              MR. GUERRA:  Yes, ma'am.

9              MR. RAMIREZ:  Twenty-six?

10        (Pause in the proceeding.)

11             MR. GUERRA:  There it is.  Any objections?

12             MR. RAMIREZ:  No, no objection.

13             MR. GUERRA:  May I approach the witness, Your Honor?

14             THE COURT:  Yes.

15        (Pause in the proceeding.)

16   BY MR. GUERRA:

17   Q    Sergeant, I'm showing you what's been marked as

18   Defendant's Exhibit No. 26.  Sir, look at that please.

19        Can you look at the far corner where the recliner is --

20   one of the recliners is up.  There is an item right in the

21   corner.  Do you see what that is?

22   A    It appears to be that jar you had up there in the first

23   picture.

24             MR. GUERRA:  Your Honor, we offer Defendant's

25   Exhibit No. 26.

1          MR. RAMIREZ:  No objection, Your Honor.

2          THE COURT:  All right, it will be admitted without

3     objection.

4          (Defendant's Exhibit No. 26 received in evidence.)

5          THE COURT:  Is that what you're showing --

6          MR. GUERRA:  No that's not it.

7          MS. MARTINEZ:  I'm sorry.  I thought that was it.

8          MR. GUERRA:  Your Honor, can I put it on the Elmo

9     since it's been --

10          THE COURT:  Yes.

11          (Pause in the proceeding.)

12          THE CLERK:  It was working earlier this morning.

13          THE COURT:  Ms. Martinez, do you need any more luck

14     finding on your laptop?

15          MS. MARTINEZ:  Yes, Your Honor.

16          THE COURT:  So switch back to Ms. Martinez' laptop.

17          MS. MARTINEZ:  I'll just scroll up real quick, Your

18     Honor and find it.

19          (Pause in the proceeding.)

20          MR. GUERRA:  And, I guess we can tender -- if the

21     Court would like to see the actual exhibit, Your Honor, we can

22     tender it to the Court for the Court's immediate --

23          MS. MARTINEZ:  Is it this one?

24          MR. RAMIREZ:  That's it.

25          MR. GUERRA:  Yeah, that's it.

1          THE COURT:  Can you enlarge that?  So you're showing

2     up on the overhead screen what you're representing is the

3     photo that's been marked at Defendant's Exhibit 26?

4          MR. GUERRA:  That is correct, Your Honor.

5          THE COURT:  All right, you can continue.

6          MR. GUERRA:  And we tendered the actual 26 to the

7     Court.

8     BY MR. GUERRA:

9     Q    So Mr. Gonzalez, you just stated that does appear to be

10    the jar that you saw.  This picture, Defendant's Exhibit 26,

11    shows a couch that -- the couch that was in the efficiency,

12    correct?

13    A    That's correct.

14    Q    And that picture would be from the direction of the front

15    door.  The door actually facing the parking lot, correct?  As

16    you're coming in, right next to that -- and correct me if I'm

17    wrong -- but right next to that couch to the -- as you're

18    looking at the screen -- to the right would be the shower and

19    then right next to the shower or near the shower would be the

20    door.

21         So you're walking in the shower and then you see the

22    couch, correct?

23    A    Correct.

24    Q    And so you're saying that you saw -- even though you were

25    not searching and it was a very quick in and out -- you saw

1    that jar that you can barely see in Defendant's Exhibit 26,

2    correct.

3    A    Correct.

4    Q    Okay and you incorrectly stated earlier that you thought

5    you had seen it on the refrigerator but now that we've

6    refreshed your memory with Defendant's 26, you realize it was

7    actually on the floor partially covered by the recliner -- one

8    of the recliners from the couch?

9    A    That's not what I said.  What I said was I -- what I

10   remember was the jar being in that vicinity -- that area of

11   the refrigerator on the floor where that sticker was covering.

12   That's what I said.

13   Q    Okay.  Well, but you said something about the

14   refrigerator.  You agree with me in Defendant's Exhibit No. 6,

15   the refrigerator is not right next to the jar.  And it's

16   not -- the jar is not on top of the refrigerator.

17   A    This picture it looked like that, but if you zoom out,

18   the refrigerator is right there where the picture cuts off.

19   Q    It's in front of that.  But it's not -- that jar is not

20   next to the refrigerator.  The refrigerator is --

21   A    I never said it was next to it.  I said the area near the

22   refrigerator.

23   Q    Okay. Okay.  But you would agree with me though that it

24   is partial obscured by the recliner?

25   A    Correct, partially.

1    Q    Okay.  And so, you also testified --

2              THE COURT:  Can I, Mr. Guerra I mean as long as

3    we've been doing this, can we ask the witness -- Sergeant

4    Gonzalez is that now -- they have up on the over head screen

5    again Defendant's Exhibit No. 15.  In the bottom right corner

6    of exhibit -- Defendant's exhibit 15 what you see down there

7    close to the exhibit sticker, can you tell what that is now,

8    now that you've seen the other exhibit 26?

9              THE WITNESS:  Yes, the jar.

10             THE COURT:  With the -- is that brown thing close to

11   the jar?  What do you understand that to be?

12             THE WITNESS:  The brown thing close to the door?

13             THE COURT:  Yeah, right there, there's a big

14   brown -- in Exhibit 15 there's a brown thing.  What do you

15   understand that to be?

16             THE WITNESS:  It's a jar of marijuana.

17             THE COURT:  No, in front of that.  The brown -- that

18   (indiscernible).

19             THE WITNESS:  Yeah, that's the recliner.

20             THE COURT:  Okay.

21             THE WITNESS:  Sofa couch.

22             THE COURT:  Yeah if you cross reference this photo

23   to Exhibit 26, Defendant's Exhibit 26 -- which I'm handing to

24   the witness.  Can you -- I mean, I just want to make sure

25   we're all on the same page.

1          Is that the footrest to the couch in Defendant's

2    Exhibit 26, that footrest where the jar seems to be behind.

3    Is that footrest what pops up in what you see there, where the

4    sticker is on Defendant's Exhibit 50?

5          THE WITNESS:  Yes.

6          THE COURT:  Is that what you think?  I mean, is that

7    what you understand?

8          THE WITNESS:  Yes.

9          THE COURT:  Okay, just want to -- so because that

10   now puts it in context of -- for me anyway.  All right.

11         Go ahead and continue, Mr. Guerra.

12   BY MR. GUERRA:

13   Q    Sergeant, so you said that you did not -- under direct

14   examination you said you didn't search, you didn't move

15   anything, you didn't do anything, correct?

16   A    Correct.

17   Q    Okay.  And so did you -- when did ATF arrive or was ATF

18   there the whole time?  I don't want to assume that they were

19   not there the whole time.  When did they -- when was ATF

20   involved?

21   A    ATF was involved after we have found the vehicle.

22   Q    Okay.  When did they arrive on scene, if they did at all?

23   A    I don't remember the exact time.  It was 30, 45 minutes.

24   I don't remember the exact time.

25   Q    Okay.  And when we talk about ATF, who exactly responded?

1    Was it TFO Morales, I believe, or is it Special Agent --

2    A    Morales.

3    Q    TFO Morales and any additional ATF agent or was it just

4    TFO Morales who arrived?

5    A    TFO Morales and Agent Sean -- I don't remember his last

6    name.

7    Q    Hensley?  Hensley?

8    A    Yes.

9    Q    Okay, so those were the two ATF agents that responded?

10   A    Yes.

11   Q    Okay.  And did you debrief them about what had happened?

12   A    Yes.

13   Q    You did.  Okay.  You spoke to both Mr. Morales and Mr. --

14   Agent Hensley or you spoke only to Mr. Morales?

15   A    I was speaking more towards -- to Agent Hensley because

16   I've dealt with him before.  It was the first time meeting

17   Agent Morales.

18       So when I talked to them over the phone and I talked to

19   them on the scene, I was talking more towards Agent Hensley.

20   Q    Okay.  But you communicated to them what had happened,

21   correct?

22   A    Yes.

23   Q    You told them -- I would assume that you told them, as

24   you told the Court today, what happened from the beginning to

25   the end of this particular operation?

1    A    Correct.

2    Q    Okay.  So and you -- your testimony is that you never

3    looked at anything and you didn't see anything apart from the

4    jar that you testified today, correct?

5    A    Correct.

6    Q    So then would it surprise you to learn, Sergeant

7    Gonzales, that Agent Morales, in his report, says that the

8    impression they got was that after entry was made into the

9    efficiency, that they had seen -- let me locate it.  Make sure

10   I don't misquote the information, but.

11        (Pause in the proceeding.)

12   Q    Several metal boxes, military type green boxes.  It

13   says -- well, I'm not going to read what it says because we'll

14   get into that.  But does it surprise you that they have it --

15   that in the report that that's the information they got.

16        When they got there they were specifically told that when

17   whoever went into the efficiency -- which you said it was

18   you -- it was communicated to them that whoever went in there

19   saw military -- several military boxes and then in

20   parentheses, military type green boxes.

21        Did you communicate that to Agent Morales or Agent

22   Hensley?

23   A    No.

24   Q    You did not tell them that?

25   A    No.

1    Q    So they presumably got it from somebody else?

2    A    I'm not sure where they got it.

3    Q    You don't know where you got it.  Did you tell any of the

4    other agents that you had seen metal boxes, military type, in

5    the efficiency when you went in?

6    A    No.

7    Q    Did you tell anybody -- anybody apart from Agent Morales

8    or anybody else, that you had smelled marijuana when you went

9    into the room.  That it was a very strong smell of marijuana

10   when you went in there?

11   A    I don't remember smelling marijuana.

12   Q    You don't remember smelling that.  Okay.

13        (Pause in the proceeding.)

14             MR. GUERRA:  May I have a moment to confer with

15   Ms. Martinez, Your Honor?

16             THE COURT:  Yes.

17        (Pause in the proceeding.)

18   BY MR. GUERRA:

19   Q    Sergeant Gonzalez, when -- when you encountered

20   Mr. Saldana upstairs, you already testified you don't

21   remember whether he was cuffed immediately or not.

22        But, he was not free to go, correct?  I mean if he had

23   told I'm walking out of here, I'm gone.  He was not free to

24   go?

25   A    At that point he'd already lied to as far as identity. He

1    was --

2    Q    He had already lied to you about his identity?

3    A    Correct.

4    Q    Okay, let's talk about that because I forgot about that.

5         Who was the officer who stopped him?  Refresh my memory.

6    A    Corporal Ismael Garcia.

7    Q    Okay.  And Corporal Garcia wrote up -- as did a lot of

8    the other officers, wrote a report, correct?

9    A    Yes.

10   Q    Did you look at his report?

11   A    Back in June I did.

12   Q    Okay.

13        (Pause in the proceeding.)

14   Q    So, isn't it true that -- well let me ask you this

15   question.  Do you remember what name he gave to you-all when

16   you first -- by him, I mean Mr. Saldana, the Defendant in this

17   case.

18   A    I don't remember.

19   Q    You don't remember.

20   A    No.

21   Q    Okay, you don't have it in your report.  Well, Officer

22   Garcia says in his report that the name he gave was Alonso

23   Alaniz.  Does that sound familiar to you?

24   A    I don't know if that's the name he gave us.

25   Q    Okay.  Do you know what Mr. Saldana's complete full name

1    is?

2    A    I just read it.  It was Saldana Alaniz.

3    Q    His full name.  What is his full name, do you know?

4    A    No.

5    Q    His full name and according to Officer Garcia's report he

6    put in there that his full name is Jose Alonso Saldana-Alaniz,

7    right?

8    A    Correct.

9    Q    So, the name Alonso Alaniz is -- that is part of his

10   name, correct?

11   A    Okay.

12   Q    So when you stated earlier that you believed -- you

13   believed there was a false name.  But you-all found out that

14   it was part of his full name.

15   A    It's possible.  But he was asked again, though, what his

16   name was and he gave us a different name.  And I'm not sure --

17   I don't know exactly what name he had given us and that's when

18   we realized his name was (indiscernible).  He was lying, so.

19   Q    So, Mr. Garza was handcuffed and was detained, you said

20   for presumably hours, right?  He was not free to go.

21   Mr. Anaya was handcuffed immediately, was detained while all

22   this happened.  He was there detained for hours.

23        And while you-all were doing all this, he was not free to

24   go, correct?

25   A    I'm not sure if it was hours, but they were not free to

1    go.  There were pending charges -- pending (indiscernible).

2    Q    Okay.  And so Mr. Saldana, you don't remember when he was

3    arrested, but there's picture shown -- I'm -- handcuffed --

4    these pictures show he's handcuffed.  You don't remember if it

5    was immediately or not.  But he was handcuffed because there

6    was a picture.

7         And your testimony is he would not have been free to go

8    either?

9    A    Correct.

10        THE COURT:  And can you -- Mr. Guerra, can I ask you

11   to clarify that?  At what point was he not free to go.

12        MR. GUERRA:  Well, I guess -- that's a good

13   question, Your Honor.

14   BY MR. GUERRA:

15   Q    What I'm asking is any time during this -- in other

16   words, when you encountered him until you finished your

17   investigation, he was not free to go?

18   A    Who's that?

19   Q    Mr. Saldana.

20   A    Mr. Saldana.  At the point that we put he was lying to us

21   about his identity, he was not free to go from then or

22   (indiscernible).

23   Q    So that is the whole time because you encountered him

24   upstairs in apartment three and you were one of the first ones

25   who said, along with the other persons that you mentioned.

1    And from that point on, he was not free to go whether he was

2    handcuffed or not -- and you don't remember when he was

3    handcuffed, but he was not free to go.

4    A    Correct.

5    Q    Okay.

6         (Pause in the proceeding.)

7         MR. GUERRA:  Do you want to put it up?  Just one

8    more question, Your Honor and I will be done, but she reminded

9    me of, yes.

10   BY MR. GUERRA:

11   Q    So, Sergeant, you Defendant's Exhibit 11, there are

12   some -- you just testified earlier that that is not your

13   handwriting, so you didn't write it.

14        But there's some signatures at the very bottom to the

15   left.  Do you recognize those signatures?  Do you know who

16   signed that document as -- it says Castell, which is a

17   witness.

18   A    No, I don't.

19   Q    You don't recognize the signatures?

20   A    No.

21   Q    But those are not your signatures?

22   A    Correct.

23   Q    Okay.  So you don't -- as you stated earlier, you do not

24   know when this consent -- written consent was executed?

25   A    Correct.

1    Q    As far as you know, it could have been done after -- I

2    mean it has a time there, 7:24.  So were you done with the

3    entry into the unit and processing whatever you found at

4    7:24 p.m.?

5    A    I'm not sure.  I'd have to look back at the reports --

6    Q    Well do you have your report in front of you?

7    A    Yes.

8    Q    Can you look at it?

9    A    I don't think I have that in the report.

10        (Pause in the proceeding.)

11   A    I don't have the time as to when we found the ammo in my

12   report.

13   Q    Well, before I ask you about that.  All these pictures

14   that we've been seeing that were done by your office, who took

15   all those pictures?

16   A    Corporal Sarquiz.

17   Q    Corporate Sarquiz is the person who took all these

18   pictures?

19   A    Yes.

20   Q    Okay.  In Investigator Sarquiz report she has one time

21   that I'm looking at and it says this was when a vehicle was

22   seen -- I'm sorry.  It was a traffic stop.  It says about

23   18:11.  And you're saying -- well first of all 18:11 is

24   military time for what?

25   A    6;11 p.m.

1    Q    6:11 p.m. okay.  So your testimony is you don't remember

2    exactly when the operation started and when you actually --

3    the specific time as to when you actually made entry into the

4    efficiency and whether this particular exhibit -- Defendant's

5    11 was done before or after you gained entry, correct?

6    A    Correct.

7            MR. GUERRA:  That is all the questions, Your Honor.

8    We pass the witness.

9            THE COURT:  All right, Mr. Ramirez, do you have

10   cross-examination?

11           MR. RAMIREZ:  Just a couple of redirect, Your Honor

12   for clarification.

13           THE COURT:  Well I want an estimate of how long you

14   think it will take.  We're into --

15           MR. RAMIREZ:  Ten minutes.

16           THE COURT:  Ten minutes.  All right, go ahead

17   proceed.  Promptly.

18           REDIRECT EXAMINATION OF MICHAEL ANTHONY GONZALEZ

19   BY MR. RAMIREZ:

20   Q    Yes, you stated to Mr. Guerra that you Corporal Sarquiz

21   went to the bedroom directly.  That's the impression you gave

22   that when you walked in, others walked in and she also walked

23   in with a group and went to the other bedroom.

24   A    No, first there was the SWAT team that pulled off here,

25   here.  There were room.  And then I ended up -- I'm not sure

1    if I ended up by the efficiency and the SWAT guys went towards

2    where the bedroom was at.  And then Sarquiz went in after

3    that.

4    Q    To do what?

5    A    To help with the kids.  There were kids in the bedroom.

6    Q    So, is it your recollection that she went after the kids

7    were found -- children were found she went to help with the

8    children?

9    A    Yes.

10   Q    So she may not have been in the apartment?

11   A    Yes.

12   Q    Yes, what?

13   A    Correct.  She probably was not in there because the SWAT

14   team had traversed and she wasn't there.

15            THE COURT:  Wait, I'm sorry.  Let me clarify.

16   Sergeant Gonzalez, did the SWAT team enter the apartment

17   number one -- we're talking about the first -- well when you

18   first entered to get the children, Mr. Garcia children.  Did

19   the SWAT team go in first or did you enter the apartment

20   first?

21            THE WITNESS:  I entered the apartment with the SWAT

22   team.  We all entered first.

23            THE COURT:  Were they -- who was in front?

24            THE WITNESS:  I was.

25            THE COURT:  Okay, so you were the first person to

1    enter the apartment?

2            THE WITNESS:  Yes, sir.

3            THE COURT:  Okay, thank you.  Go ahead.

4    BY MR. RAMIREZ:

5    Q    There's been a lot of discussion arise about the sofa.  I

6    just wanted to ask you if the sofa was not there, would you

7    have gone in anyway?

8    A    Yes.

9    Q    If the -- because your concern was what?

10   A    To find the kids that were (indiscernible).

11   Q    If you -- let me give you this -- this -- let me ask you

12   this question.  If you happen to live in the efficiency

13   yourself, how would you make sure that no one could come in

14   through unit one -- through apartment one?

15           MR. GUERRA:  Your Honor, we object.  What Sergeant

16   Gonzalez would or would not have done is immaterial.

17           MR. RAMIREZ:  Let me -- I'll ask another way.

18           THE COURT:  I sustain that objection.  Go ahead.

19   Attempt to re-ask.

20   BY MR. RAMIREZ:

21   Q    Do you think that somebody who lives in the efficiency

22   apartment wants to barricade others from coming in from

23   apartment one by putting a sofa outside when he can't even get

24   to it himself?

25           MR. GUERRA:  We'd object because -- I don't know --

1   I'm not sure I understand the question, Your Honor.

2            THE COURT:  Yeah can you rephrase that?

3   BY MR. RAMIREZ:

4   Q    Is it reasonable to you that the Defendant wanted to have

5   no one enter his place by having that sofa out there and the

6   door open out?

7            MR. GUERRA:  Your Honor, we would object.  That

8   calls for speculation.  Speculating that the Defendant is the

9   one. Whereas I think the testimony will show that the

10  Defendant had nothing to do with the sofa being placed.

11           I believe the testimony will show that it was

12  Mr. Garcia's decision to place that.

13           MR. RAMIREZ:  Well that would answer my question.  I

14  know where to go from there.  Thank you.

15           So, I don't have any more questions.

16           THE COURT:  All right.  Then.  Okay, so no further

17  questions, Mr. Ramirez, from the Government?

18           MR. RAMIREZ:  No, questions.

19           THE COURT:  Okay, any thing else regarding this

20  witness from the Defense?

21           MS. MARTINEZ:  No, Your Honor.

22           THE COURT:  Okay.  Sergeant Gonzalez, you are

23  excused as a witness.  And your -- if you attempt to leave, is

24  anybody have any objection to Sergeant Gonzalez, you know,

25  leaving and excusing himself?  He's discharged as a witness.

1           Is he under subpoena?

2           MR. RAMIREZ:  No.

3           MS. MARTINEZ:  No, Your Honor.

4           THE COURT:  All right, you're excused Sergeant

5     Gonzales.

6           (Witness steps down.)

7           MS. MARTINEZ:  And if I may, Your Honor.  I'm not

8     sure, I assume we're breaking for lunch right now?

9           THE COURT:  Yes.

10          MS. MARTINEZ:  Is that what we're doing?  I was

11    going to ask for permission to take our witnesses out of

12    order.  Both of our witnesses have their respective

13    obligations -- different issues with their kids at 3:00 p.m.

14    So they're asking if they can be released earlier.

15          THE COURT:  Okay, any objections?

16          MR. RAMIREZ:  So they want --

17          THE COURT:  They want to call their witnesses right

18    after lunch, is what they're saying.

19          MR. RAMIREZ:  That's fine.

20          THE COURT:  Okay, all right.  Yes, I'll allow that.

21    No objection from the Government.

22          Let me tell you I have to take an hour break.  So --

23          THE CLERK:  Make sure we get Exhibit 25 back.

24          THE COURT:  Oh, okay, Exhibit 25.  My one last

25    question before we break is as to Exhibit 26 which was the

1    photo -- Defendant's Exhibit 26, which is a photo generally of
2    the couch in the efficiency and the jar on the floor close to
3    the couch.
4            I was -- we need to put a description of that
5    exhibit in the exhibit list.  And so I had -- hold on.  Let me
6    tell you what the wording I was going to tell my case manager.
7    Photo of couch and jar in efficiency.  Is that acceptable to
8    the Government?
9            MR. RAMIREZ:  Yes, Your Honor.
10           THE COURT:  Okay, is that acceptable for Defense?
11           MS. MARTINEZ:  Yes, Your Honor.
12           THE COURT:  Okay so it will say photo of couch and
13   jar in efficiency.  That'll be the description on the exhibit
14   list.
15           All right, anything else before we break for lunch
16   from the Government?
17           MR. RAMIREZ:  No, Your Honor.
18           THE COURT:  Okay, anything from Defense?
19           MS. MARTINEZ:  No, Your Honor.
20           THE COURT:  Okay, please we do need to start up
21   again promptly at I guess it'll be 1:15.  So just be ready to
22   go at 1:15.
23           All right, we'll take a -- I'm sorry, Mr. Ramirez?
24           MR. RAMIREZ:  Can we leave our things here or --
25           THE COURT:  You can leave your things here. It

1    should be secure and we're breaking for lunch.

2              MR. RAMIREZ:  Thank you very much.

3         (Recess taken from 12:15 p.m. to 1:13 p.m.)

4                        AFTER RECESS

5              THE COURT:  Okay.  Can we proceed?

6              Okay.  We're back on the Record in our case number

7    5:22-cr-822.  All right.  So I believe defense was going to

8    call their first witness, Ms. Martinez?

9              MS. MARTINEZ:  Yes, Your Honor.

10             THE COURT:  And if you're ready, you can proceed.

11             MS. MARTINEZ:  The defense calls Ramiro Resendez.

12   Can I turn on my computer, please.  Your Honor, is it okay if

13   I question just standing up from here so I can (indiscernible)

14   my computer and -- thank you.

15             THE COURT:  You're welcome.  Mr. Resendez, please

16   take the witness stand here.

17        (The oath was administered.)

18             THE COURT:  Okay.  Mr. Resendez, I'm Magistrate

19   Judge Kazen, presiding over this proceeding.  So just --

20   you're welcome to move the microphone around.  Please speak

21   into the microphone and speak clearly.

22             Listen to the questions that are asked of you by the

23   attorneys.  You'll be answering their questions here.  Try to

24   speak clearly and listen to the question, try and answer the

25   question that they just asked of you.  And so, Ms. Martinez,

1    you can proceed.

2            MS. MARTINEZ:  Thank you, Your Honor.

3                DIRECT EXAMINATION OF RAMIRO RESENDEZ

4    BY MS. MARTINEZ:

5    Q    Good afternoon, sir.

6    A    Good afternoon.

7    Q    Can you see me over here?

8    A    Yes, ma'am.

9    Q    Barely.  I'm Sara Martinez.  Mr. Resendez, I'm an

10   attorney with the Federal Public Defender's Office, and we've

11   spoken over the phone.

12   A    Yes.

13   Q    And I met you this morning, correct?

14   A    Yes, ma'am.

15   Q    To begin with, can you please state your name for the

16   record?

17   A    Ramiro (indiscernible) Resendez, the second.

18   Q    And how old are you?

19   A    I'm 45 years old.

20   Q    Okay.  I'm going to cut to the chase.  Mr. Resendez, I'm

21   going to begin by showing you on the screen in front of you,

22   this is marked as Defendant's Exhibit No. 1.  Do you see the

23   screen in front of you, sir?

24   A    Yes, I do.

25   Q    Do you recognize what's depicted in this picture?

1   A    Yes, my apartment, my property.

2   Q    Okay.  Can you please describe to the -- so are you the

3   landlord of this property?

4   A    Yes, I'm the landlord and the owner.

5   Q    Okay.  Can you please describe to the Court what is this

6   property?

7   A    What do -- this is a multiplex apartment, rental

8   property.

9   Q    And how many units would that apartment complex have?

10  A    It has in total five units, and then with the back room,

11  six.

12  Q    Okay.  Now I'm going to show you -- oh, and what is the

13  address of this apartment complex?

14  A    It's 3104 Lotus Avenue.

15  Q    And that's here in Laredo, Texas?

16  A    Yes, correct.

17  Q    I'm going to show you what's been marked as Defendant's

18  Exhibit No. 10.  Do you see that?

19  A    Yes, I do.

20  Q    Do you recognize this?

21  A    Yes.

22  Q    What is this?

23  A    This is the plans of my apartment.

24  Q    And you drew this, correct?

25  A    Yes, that's correct.

1    Q    Okay.  Can you please describe the situation where I'm
2    moving the cursor around, what is this -- I'm looking at the
3    top right corner of the drawing.  What is this area?
4    A    Right there is the apartment number one, living room and
5    kitchen, open concept.
6    Q    Okay.  And what is this on the very top corner of the
7    diagram?
8    A    That's an efficiency, (indiscernible).  I rent it out as
9    a one little small room.
10   Q    Okay.  Now can you explain or describe to the Court,
11   would you happen to know the square feet of that efficiency?
12   A    I do not know.  It used to be a carport, and when my
13   father was ill, we closed it in, and made a little room for
14   him.  And I don't know the dimensions.  It wasn't, you know --
15   it was a carport, a roof for the cars.
16   Q    Would you agree that it's a pretty small room?
17   A    Yes.
18   Q    Now does that room have a toilet in it?
19   A    No, it has a shower.
20   Q    Okay.  And now we're going to talk about the events that
21   occurred back in June, 2022.  Did you -- were you leasing this
22   room out to somebody?
23   A    Yes, I was.
24   Q    And to who were you leasing that out to?
25   A    To Mr. Saldana.

1    Q    Okay.  Which is the Defendant in the courtroom today,

2    correct?

3    A    Yes.

4    Q    Okay.  And how long had you been leasing it to

5    Mr. Saldana?

6    A    A little bit, almost a month.

7    Q    Okay.  Now correct me if I'm wrong, it was -- it began --

8    it was just an agreement, an oral agreement, correct, like an

9    agreement between the two of you to lease it out, correct?

10   A    Yes, but I did make a paper contract.

11   Q    Okay.

12   A    It was just going to be for a month (indiscernible).

13   Q    Now -- and just to be clear, and I'm going to show you

14   Defendant's Exhibit No. 9.

15   A    Okay.

16   Q    Now this is a lease agreement that you provided to the

17   government upon their request, correct?

18   A    Yes, that's correct.

19   Q    Now just to be clear, you never obtained Mr. Saldana's

20   signature on this, correct?

21   A    No.  His ID was pending, ma'am.

22   Q    Okay.

23   A    He had lost it, and he was going to give me that

24   information.

25   Q    But to be clear, you did have an agreement --

1   A    Yes --

2   Q    -- to rent it out?

3   A    -- I did.

4   Q    Now who was the tenant -- I'm going to go back to Exhibit

5   No. 10.

6   A    Okay.

7   Q    Who was the tenant in apartment number one?

8   A    It was Mr. Garza and Moecia Bernard.

9   Q    Okay.  And to be clear, Mr. Garza and his wife, Moecia,

10  did not -- were not part of the agreement to lease the

11  efficiency, correct?

12  A    That's correct.

13  Q    So there are two different leases, correct?

14  A    Yes.

15          MS. MARTINEZ:  Okay.  We'd pass the witness, Your

16  Honor.

17          THE COURT:  All right.  Mr. Ramirez?

18              CROSS-EXAMINATION OF RAMIRO RESENDEZ

19  BY MR. RAMIREZ:

20  Q    Mr. Resendez, how long have you lived in Laredo?

21  A    All my life.

22  Q    So when you first -- how did you end up meeting the

23  Defendant, Jose (indiscernible)?

24  A    Just --

25          THE COURT:  Wait.  Hold on.  How did you meet the

1   Defendant?

2           MR. RAMIREZ:  No, I paused and I said, how did

3   you --

4           THE COURT:  Did you refer to him as (indiscernible)?

5           MR. RAMIREZ:  Yes, that is the name on the lease.

6           THE COURT:  Okay.  Well, let's --

7           MR. RAMIREZ:  Yes, Your Honor.

8           THE COURT:  I don't want to --

9           MR. RAMIREZ:  I'll rephrase.

10          THE COURT:  -- confuse the Defendant with a name

11  that -- perhaps you can ask him if he knew a person that he

12  knows as, but let's not confuse the record of the actual name

13  of the Defendant, regardless of who he knew him as.  I mean

14  you can clarify that, but just want to make sure the record is

15  clear.

16          MR. RAMIREZ:  I will, Your Honor.

17  BY MR. RAMIREZ:

18  Q    So when did you first meet the Defendant?

19  A    Prior to the incident.

20  Q    A month before June 9th?

21  A    Yes.

22  Q    How did you meet him?

23  A    In person.  He showed up asking for if I had any

24  apartments to rent out.

25  Q    Okay.  Now you were asked by Ms. Martinez about the name

1    being Jose Cadena.  Why is the name Jose Cadena still on the

2    document you presented to the agents on June --

3    A    I didn't have his full name.  He hadn't given me his ID

4    yet.  That was all the information I had.  And I didn't take

5    it from his physical ID.  I did not know if he had more names.

6    Q    Well, what name did he give you when you first met him?

7    A    Jose.

8    Q    Jose what?

9    A    Cadena.

10   Q    He told you his name was Jose Cadena.  When did you find

11   out that his name is not Jose Cadena, but --

12   A    After I was approached to go ahead and you know, do the

13   plans and everything.  That's when I found out, when he had

14   the case, after you all had the case.

15   Q    That's when the -- and you're referring to a time later

16   on when the Defendant's attorneys and investigator approached

17   you to draw up a plan which is another exhibit, which is this

18   one here, Defendant's number 10?

19   A    Yes, that is correct.

20   Q    The one on your screen.  And were you approached by an

21   investigator with the government to let them -- let the

22   investigator go take photos of apartment number one?

23   A    I think -- recall, yeah, that was when people -- they

24   wanted to know how it was, you know.

25   Q    And did you make those arrangements?

1    A    Yeah, but I was not, you know, authorized to -- you know,

2    the people that lived there, the tenants are the ones that

3    have to give the authorization for going --

4    Q    Well, I --

5         A    -- in the house.  Anything they would ask me for, I

6    would try to help them, but to the best of knowledge.

7              MR. RAMIREZ:  Okay.  So what does May 2, June 2,

8    mean on the -- look at Defendant's Exhibit No. 10.  I'm sorry.

9    Look at my exhibit.  Can I switch to my --

10             MS. RODRIGUEZ:  Oh, I'm sorry.

11             MS. MARTINEZ:  I have it on for you right now.

12             MR. RAMIREZ:  Do you have it there?

13             MS. MARTINEZ:  Yes.

14   BY MR. RAMIREZ:

15   Q    Okay.

16   A    It was -- the agreement was for exactly one month.

17   Q    On your screen, you see Defendant's Exhibit No. 9.

18   A    Yes, I do.

19   Q    And who did you first hand this document to?

20   A    Who did I first hand it to?

21   Q    Yes.

22   A    I'm not sure.  The government, when they showed up.

23   Q    On the 6th, or at a different time?

24   A    No, like the same day that they arrived, I showed them

25   the document.

1  Q    Where are the other pages to this eight page agreement?

2  A    It was a printout, sir, from the internet.  You know, I

3  didn't make the -- another contract.  It was just for a month,

4  and I was waiting for his ID to do the -- it was, you know,

5  verbal (indiscernible) written agreement for a month.

6  Q    It was a verbal agreement?

7  A    Yes, and one month also, you have it there.

8  Q    So --

9  A    He was supposed to be out of there by the 2nd.

10 Q    By the 2nd of what month?

11 A    Of June.

12 Q    So he was supposed to be June 2nd.  Why was he still

13 there?

14 A    I have no idea.  He was --

15 Q    Did you talk to him about leaving?

16 A    I never spoke --

17          MR. GUERRA:  Your Honor --

18          THE COURT:  Yeah.  Mr. Ramirez --

19          MR. RAMIREZ:  Yes.

20          THE COURT:  -- I'm misunderstanding.  The incident

21 was on June 1st.

22          MR. GUERRA:  Yeah.

23          MR. RAMIREZ:  Oh, yes.

24          THE COURT:  Okay.  Yeah.

25          MR. RAMIREZ:  I'm sorry.  Yeah, I got my months

1    mixed up.

2              THE COURT:  Okay.

3              MR. RAMIREZ:  Thank you.

4    BY MR. RAMIREZ:

5    Q    So were you going to make other changes or corrections to

6    this document before it was signed by the Defendant, other

7    than his name?

8    A    No, sir.

9    Q    There you go.  Just one moment, Your Honor.  So how did

10   the Defendant pay you for the rent?

11   A    Cash.

12   Q    No one else paid you the cash, it was him?

13   A    Just him.

14   Q    You told ATF agents that the only person who would have

15   access to the efficiency where Ms. Saldana was staying would

16   be Mr. Saldana, but that's not absolutely correct, am I right?

17   A    No, that is correct.  He's the only one that should have

18   access.  The other door is -- should have been locked when I

19   rented him the apartment.

20   Q    So you don't -- did (indiscernible) complain to you about

21   the door, the lock not working?

22   A    No, sir.

23             MR. RAMIREZ:  Thank you very much.  Pass the

24   witness, Your Honor.

25             THE COURT:  Okay.  Let me -- hold on.  Let me

1   ask just -- I want to just clarify something.

2   BY THE COURT:

3   Q    Mr. Resendez, so there was a diagram, a drawing of the

4   layout of your apartment complex that you were shown a minute

5   ago, right?  You remember that?

6   A    Yes, sir.

7   Q    Okay.  One -- there was a room.  Oh, there it is, okay.

8   So there in the top right corner, there's that room that says

9   efficiency room on it.  You see that?

10  A    Yes, sir.

11  Q    Okay.  You wrote that, is that correct?

12  A    Yes, that's correct.

13  Q    Okay.  Now the person that you rented that room to, is it

14  your testimony that you rented that room to somebody, correct?

15  A    Yes, sir.

16  Q    That on June 1st, there was somebody who was renting that

17  room, June 1, 2022?

18  A    (No verbal response.)

19  Q    Yeah.  Is that person here in the courtroom?

20  A    Yeah, Mr. Saldana.

21  Q    Okay.  Could you please point to that person?

22  A    Yeah, he's over there, sitting on the other side of the

23  computer.

24  Q    Okay.  Is he wearing an orange jumpsuit?

25  A    Yes.

1   Q    Okay.  I just want to be clear, that the person sitting

2   in the courtroom in an orange jumpsuit is the person who

3   was -- who you had a lease agreement with to rent that

4   efficiency room on -- that was in effect on June 1st?

5   A    Yes, sir.

6   Q    Okay.

7   A    He was the only person that I (indiscernible).

8            THE COURT:  Just want to make sure.  All right.  Any

9   further questions from the defense?

10           MS. MARTINEZ:  No, Your Honor.

11           THE COURT:  Any further questions from the

12  government?  Any follow up on that, or anything you want to

13  ask, Mr. Ramirez?

14           MR. RAMIREZ:  No, sir.  Thank you.

15           THE COURT:  All right.  Then Mr. Resendez, that's

16  all.  You are excused as a witness in this case so you're

17  free.  Now he's under subpoena.  Is there any -- from the

18  government --

19           MR. RAMIREZ:  No.

20           THE COURT:  -- is he -- do you wish to --

21           MR. RAMIREZ:  He's free.

22           THE COURT:  -- hold him, or is he free to leave --

23           MR. RAMIREZ:  He's free to go.

24           THE COURT:  -- to be excused?  Okay.  From defense?

25           MS. MARTINEZ:  Yes, Your Honor.

1           THE COURT:  Okay.  Mr. Resendez, you are then done

2       as a witness.  Do not talk to anybody about your testimony,

3       but you are free to leave and go about your business.

4           MR. RESENDEZ:  Thank you, Your Honor.

5           THE COURT:  All right.  Thank you.  You're excused.

6       Don't forget your bag there, your pouch.

7           MR. RESENDEZ:  Yes, Your Honor.

8           THE COURT:  All right.  Defense, you want to call

9       your next witness?  You said you had two witnesses who you

10      wanted to call out of order?

11          MS. MARTINEZ:  Yes, Your Honor.  The defense calls

12      Eduardo Garza.

13          THE COURT:  All right.  Let's bring Mr. Garza in.

14          MR. RAMIREZ:  Should we switch the computer?

15          (The oath was administered.)

16          THE COURT:  All right.  Mr. Garza, I'm Magistrate

17      Judge Kazen.  I'm presiding over this proceeding.

18          MR. GARZA:  Yes, sir.

19          THE COURT:  You're here as a witness in this case.

20      Please, you'll be answering questions from the attorneys, and

21      if you'd please, you can move the microphone around, but speak

22      into the microphone and just speak clearly, and listen

23      carefully to the questions that you're asked.  And the

24      attorneys will proceed to ask you questions.  All right.

25      Okay.  Ms. Martinez, you can proceed.

1        MS. MARTINEZ:  Thank you, Your Honor.

2             DIRECT EXAMINATION OF EDUARDO GARZA

3  BY MS. MARTINEZ:

4  Q    Good afternoon.  Will you please state your name for the

5  Record?

6  A    Eduardo Garza.

7  Q    Mr. Garza, how old are you?

8  A    I'm 27 years of age.

9  Q    And where do you live?

10 A    I live in 3104 Lotus Avenue, apartment one.

11 Q    Okay.  I'm going to ask that you please look at the

12 screen in front of you.  This -- I'm showing you Defendant's

13 Exhibit No. 1.  Do you recognize the picture?

14 A    Yes, it's showing my apartments --

15 Q    Okay.

16      A    -- one of the apartments.

17 Q    I'm now showing you Exhibit No. 2, can you explain what

18 this is?

19 A    Those are the stairs leading up to the top apartments.

20 Q    Okay.  Now in Defendant's Exhibit No. 2, I'm not sure if

21 you can see my cursor, but --

22 A    I can.

23 Q    Okay.  What is this room to?

24 A    Well, that room, at the time belonged to the Defendant,

25 at that time (indiscernible).

1    Q    Okay.  And when you say at that time, you're talking

2    about June 1, 2022?

3    A    Correct.

4    Q    And just to be clear, at this time --

5    A    That is mine.

6    Q    Okay.

7    A    Yes.

8    Q    Now can you explain, from looking at this picture,

9    Exhibit No. 2, where is your apartment?  Where's the main

10   entrance?

11   A    Over on the left hand side of the stairs.  You go to that

12   bottom part, and it should be the first door on the right.

13   Q    Okay.  I'm now showing you Defendant's Exhibit No. 3.  Do

14   you recognize this?

15   A    I do.

16   Q    And what is this of?

17   A    That's basically my front door to my apartment.

18   Q    Okay.  And I'm showing Exhibit No. 4.  Do you recognize

19   this?

20   A    I do.

21   Q    And what is this of?

22   A    The entrance to the apartment of my landlord at that

23   time.

24   Q    Okay.  And that's Mr. Ramiro Resendez, correct?

25   A    Correct.

1    Q    Okay.  I'm now showing you what's been marked as

2    Defendant's Exhibit No. 5.  Do you recognize this?

3    A    Yes, I do.

4    Q    And what is this of?

5    A    The inside, facing towards the outer part, towards --

6    looking out from the inside in my apartment.

7    Q    Okay.  So just to be clear, in the middle of this

8    photograph where the cursor's at, what is this door?

9    A    That's my front door.

10   Q    Okay.  So on the other side, it would say apartment

11   number one, correct?

12   A    Correct.

13   Q    And now on the left hand side, what is this door?

14   A    That was the -- that's the door that adjoins the

15   Defendant's room at that time and my apartment.

16   Q    Okay.  Now I'm going to take you back to June 1st -- oh,

17   real quick.  Now this picture, number five, is this what your

18   apartment looked like --

19   A    No.

20   Q    -- on June 1st?  Okay.  Please explain what was

21   different?

22   A    The bed and all that stuff there on the left hand side,

23   where the door is, where the entrance -- the middle door was

24   not there at that time.  I don't know when these pictures --

25   oh, I actually do remember when these pictures were taken.  I

1   think they were taken by a Mr. Soto, when he came to ask us

2   about the whole ordeal.

3   Q    Okay.  Now I'm going to show you Defendant's Exhibit

4   No. 8.  What does this show?  Do you recognize this?

5   A    Yes, well, that's the front part of the apartments --

6   Q    Okay.

7        A    -- at that time, that couch -- I'm not sure if it

8   was that couch or another couch but that was where the bed was

9   in the previous picture.

10  Q    Would you recall -- do you recall when Mr. Soto met with

11  you awhile back, correct?

12  A    Yes, I do.

13  Q    In fact, you would agree that it was Mr. Soto, myself and

14  Mr. Guerra?

15  A    I do, yes.

16  Q    Okay.

17  A    I remember.

18  Q    And do you recall informing us that this was the sofa

19  that was inside your apartment?

20  A    Yes, you know, I do, I'm sorry.

21  Q    Okay.

22  A    Yes.

23  Q    So now that you've refreshed your recollection, you would

24  agree that this was a sofa that was inside your apartment?

25  A    I do, yes, that was the sofa.

1    Q    Okay.  And now going back to Defendant's Exhibit No. 5,

2    can you explain to the Court where exactly that sofa was

3    located on June 1, 2022?

4    A    That sofa was located basically as a barricade from the

5    door on my side, basically --

6    Q    So is it --

7         A    -- under the corner.

8    Q    -- where I'm putting the cursor, was it blocking --

9    A    Yes.

10   Q    -- this?

11        A    It was on the long side, yeah, would be -- the back

12   side of the couch would be towards the door and the wall.

13   Q    Now looking at this door which is a door that leads to

14   the efficiency, do you know how -- does it open towards the

15   inside of the apartment number one?

16   A    Towards -- it opens toward the inside of my house.

17   Q    Okay.

18   A    My apartment.

19   Q    Now to your recollection, was that door locked that day,

20   or unlocked?

21   A    It was not.

22   Q    And how do you know that?

23   A    Because when the ATF and all the agents were there, they

24   proceeded to move the couch, and after I had told them --

25   Q    Okay.  Well, we'll get to that.  You know, I'll come back

1    to that.  Right now, let me take you back now.

2    A    Well, it was just open when they were (indiscernible).

3    Q    You mean open, or unlocked?

4    A    Unlocked, I meant, sorry.

5    Q    So to be clear, it was closed?

6    A    It was closed, barricaded, and later -- we'll get to the

7    other part but --

8    Q    Okay.

9         A    -- it was moved and it was unlocked.

10   Q    Now going back to the events of June 1, 2022 --

11   A    It's actually -- I'm sorry.  That's actually why I had

12   the sofa there.

13   Q    Okay.  Explain that to me, why did you have the sofa

14   there?

15   A    Just because there were prior incidents, unrelated to

16   this case, we had had some incidents where the doorknob

17   sometimes wouldn't -- not the doorknob, the deadbolt wouldn't

18   lock.

19        And why I just made it a custom, you know -- my

20   landlord, I spoke to my landlord, is it all right if I put the

21   couch there just to -- just my family's security.  That's

22   pretty much it.

23   Q    Okay.  Do you -- now going back to June 1, 2022, what --

24   do you recall when, I guess, law enforcement arrived?

25   A    Yes.

1    Q    What were you doing when they arrived?

2    A    I was outside in the parking lot.  I was, to be more

3    specific and honest, smoking a joint with a friend of mine

4    outside.

5    Q    And who was this friend of yours?

6    A    Well, his name is Jesus Anaye (phonetic).

7    Q    I'm showing you Exhibit No. 23.

8    A    That would be him.

9    Q    Okay.  And so going back to Defendant's Exhibit No. 1,

10   where were you standing when law enforcement first arrived?

11   A    I was standing literally in what would be the middle of

12   the photo.  The car was parked where facing the apartments.

13   We were -- I was, specifically, bent over it, looking into the

14   car, in the window on the driver's side --

15   Q    Okay.

16        A    -- when law enforcement came and basically closed

17   off the entrance to the apartments with their vehicles.

18   Q    So let me show you -- I'm showing you Defendant's Exhibit

19   No. 12.

20   A    That's where the car was.

21   Q    So you're referring to this car that is --

22   A    Yes.

23   Q    -- in the middle?  Okay.  And where were you positioned,

24   on the passenger --

25   A    Where --

1    Q    -- side or the driver's side?

2    A    Yes, where the mirror would be, where the side mirror is

3    basically.

4    Q    Okay.  And who --

5    A    Hunched over.

6    Q    -- were you talking to?

7    A    Anaye.

8    Q    So Anaye was inside the vehicle?

9    A    Yes.

10   Q    Okay.

11   A    He had just gotten there.

12   Q    So you were on the passenger side or the driver's side?

13   A    I'm sorry.  I was on the driver's side.  I thought you

14   had said driver's side.

15   Q    Okay.  So you were standing right here where my cursor is

16   at, correct, on the --

17   A    Correct.

18   Q    -- driver's side?  The left hand side.  Okay.  So what

19   happened as soon as they got there?

20   A    Well, because as I stated, we were smoking, my wife had

21   just stepped out to get some groceries.  Because I saw these

22   law enforcements coming, my initial reaction was to go check

23   on my kids because I didn't know what they were there for.

24        I didn't know if they were going to detain me, or

25   not, or you know, etcetera.  And so I went -- my first

1   reaction was to initially go towards the stairs, to go to my

2   house, to my apartment.  But they detained me as I was walking

3   that way.

4   Q   Okay.  How many agents approached you, if you recall?

5   A   About -- I don't know, between five and eight.

6   Q   And --

7   A   Initially, it was just the one that specifically

8   approached me, like, hey, where you going, come here.  And

9   (indiscernible).  And I'm saying I'm going to go check on my

10  kids.  What's going on.  And that's when --

11          MR. RAMIREZ:  Objection, Your Honor.  He said

12  something in Spanish.  If we could have that translated for

13  the record?

14          INTERPRETER:  Get over here.

15          MR. GARZA:  Yeah, sorry, the -- he said, get over

16  here, come back this way, basically.

17  BY THE COURT:

18  Q   So he ordered you to come back?

19  A   Yes.

20  Q   You're talking about an officer?

21  A   Yes.  Sorry, force of habit.

22  BY MS. MARTINEZ:

23  Q   Okay.  So what happened when you came back?

24  A   Well, they put me in cuffs, and they detained me.  They

25  proceeded to ask me questions about what apartment I was in

1    because I stated I had -- I did originally state that I'm

2    going to go check on my kids, what do you want with me.

3    Q    And what did they tell you?

4    A    That they just wanted to talk to me, basically, and

5    figure out, I don't know, basically just come over here, like

6    where are you going, why are you walking away.

7    Q    So when they cuffed you, where were you standing?

8    A    When they cuffed me, I was standing -- at the moment,

9    what would be between the stairs and where the frame of the

10   white door starts, literally in that brick space.  That's

11   where they apprehended me, and slapped cuffs on me.  Then they

12   moved me over to where you see me in the picture that you're

13   showing right now.

14   Q    Okay.  I'm going to show you Defendant's Exhibit No. 2.

15   Okay.  Can you explain where it was that you were standing

16   when they cuffed you?

17   A    If you move over, if you move the cursor over to the --

18   in between the stairs and the front -- right there, basically,

19   right there.  That's where they had apprehended me.

20   Q    And what was happening to Anaye at that time?

21   A    I wasn't really paying attention to that due to my own

22   circumstances.  But I would believe he was being ordered out

23   of the vehicle because of the marijuana smoking.

24   Q    Okay.  What happened next, after you were cuffed?

25   A    They proceeded to ask me who I was, why did I initially

1  walk away when I saw them.  Then basically I explained to them

2  my situation, that my wife -- all I needed to find my kids.

3  I'd just left them in there watching TV.

4  Q    Okay.  Take a pause because they're translating.

5  A    Okay.  And basically started asking me questions about

6  what apartment number I was in, and --

7  Q    And what if anything did you tell them about what

8  apartment number you --

9  A    I stated that I'm in apartment number one, and that I

10  needed to check my kids before anything else would, you know,

11  happen.

12  Q    So what did they tell you after that?

13  A    Okay.  They basically said so your kids are alone in the

14  house while you're out here smoking.

15  Q    And what did you say?

16  A    I said, technically, if you want to get technical about

17  it, that's exactly what I said, yes, they are alone.  Yes, I

18  just literally stepped out to have a smoke with my friend.  My

19  wife is five blocks away in the mercado.

20              INTERPRETER:  At the market.

21              MR. GARZA:  At the market, yes, right.

22  BY MS. MARTINEZ:

23  Q    And what happened next?

24  A    That's basically what I -- basically they proceeded to

25  say your status and to go into my apartment.

1    Q    Why --

2    A    I do want to --

3    Q    Let me stop you there.

4         A     -- state.

5    Q    One second, okay.  You have to listen to the question and

6    then we'll get to that.  But --

7    A    Okay.

8    Q    -- did you feel that they showed an interest in your

9    apartment?

10   A    That was going to --

11   Q    Okay.

12        A     -- be my statement.

13   Q    Go ahead.

14   A    I do want to go on record and say that they -- from the

15   get-go, as I was -- I made a mistake.  As I was being

16   apprehended, to the right hand side of me where I'm showing

17   you, they -- I did notice that they were trying to open that

18   door.  They jiggled the doorknob.  They were trying to open

19   it.  And --

20   Q    You're referring to this door --

21   A    Yes.

22   Q    -- right here?

23   A    I am referring to the white --

24   Q    The door that's facing the street?

25   A    Yes.

1    Q    Okay.

2    A    And that's when they started asking me, just after then,

3    after I told them that my kids are alone, I need to go check

4    on them, started asking me where are your kids, is this your

5    apartment, and I said no.

6         My apartment -- I have apartment number one which is

7    on the side, I said.  And that's when they said so your kids

8    are alone and all that.  But they did show interest right off

9    the bat of that room.

10   Q    Okay.  So what happened after that?  They told you we're

11   going to go check on your kids?

12   A    We're going to do a welfare check on your kids, since you

13   were out here smoking, and they're inside alone.

14   Q    What did you say to that?

15   A    Go ahead.  That's what I was going to do.

16   Q    Okay.  And then what -- where were you standing at that

17   point?

18   A    At that point, I was standing, I believe -- if my memory

19   serves correct, I was already standing over here on the side.

20   Q    As in -- I'm looking at Defendant's Exhibit No. 2.  When

21   you say on the side, where are you talking?

22   A    Behind, what would be behind that photo.

23   Q    Okay.

24   A    On the side, yeah.

25   Q    So I'm going to show you Exhibit No. 3.  Were you like on

1     this part of the --

2     A    No, I was not yet there.

3     Q    Okay.  So going back to Exhibit No. 2, on the side --

4     A    Like I said, what would be behind the photo taken, on the

5     left hand side, on the photo previous to this one, where I

6     told you that later on, they put me over here, out to the

7     side, on the left hand side.

8     Q    Over here?

9     A    Yeah, basically behind that part --

10    Q    Okay.

11        A    -- what you can't see, yeah.  I was already there.

12    Q    That would be -- yes.  I'm showing you Exhibit No. 1.

13    A    Where it would -- where that bridge is at the moment.

14    Q    The bridge?

15    A    Yeah, which would be that black -- just beyond --

16    Q    Oh, to the left hand side?

17    A    Yes.

18    Q    Okay.  Over here?

19    A    That's where I was.  They had already moved me from there

20    to over here while all this conversation was going on.

21            THE COURT:  Ms. Martinez, I think he's referring to

22    Defendant's Exhibit 12, that photo that --

23            MS. MARTINEZ:  Thank you, Your Honor.

24            MR. GARZA:  Yeah, because this is a different photo.

25    BY MS. MARTINEZ:

1    Q    I'm showing you exhibit, Defendant's Exhibit No. 12?

2    A    Exactly where I'm at there, it's exactly where they had

3    me.

4    Q    Okay.  What if anything happened next?

5    A    We proceeded to do the welfare check on my children.  We

6    went through the left hand side of the stairs, went into --

7    Q    Now let me stop you there.  You said we, so did you go

8    with them to the apartment?

9    A    Well, they took me with them, yes, but I was already

10   detained technically.

11   Q    Who was them?

12   A    The agents in question.

13   Q    All right.  And --

14   A    I don't know.

15   Q    -- how many agents were there?

16   A    Well, pretty much everybody who initially got there went

17   in with me for a welfare check --

18   Q    Around how many would you say, more than one?

19   A    More than five.

20   Q    More than five.  And were they in SWAT gear, or

21   regular --

22   A    They were all in SWAT gear, AR -- I don't know what --

23   Q    Were they armed?

24       A    -- they had.  Yes, they were.

25   Q    With what kind of weapon?

1    A    Semiautomatic weapons I believe.

2    Q    Okay.  So then they took you to your apartment number

3    one, correct?

4    A    Correct.

5    Q    Okay.  And then what happened next?

6    A    Proceeded to go inside.  One of the -- there was one

7    Sheriff for a fact.  I don't know which one of them was there,

8    but he was the one who initially opened the door.  And I gave

9    him -- I authorized him to open the door to check.

10   Q    Now when you say the door, you're referring to the front

11   door to apartment number one?

12   A    Yes, which would be on the side, next to my landlord's,

13   you know, apartment.

14   Q    And you're referring to this door --

15   A    Correct, the right hand side door, yeah.

16   Q    -- in Exhibit No. 3?  So you gave them permission to open

17   the door?

18   A    Well, given the force, it's a little bit -- you know,

19   they were doing a welfare check --

20   Q    Okay.

21   A    -- because I had stated that they were there.  Had I

22   given them permission or not, they would have done it either

23   way.

24   Q    So what happened next?

25   A    So what happened next is I basically didn't fight it.

1    And I said well, let's go.  I was going to do that anyways.

2    So when we went inside, they -- we went into the door, and we

3    proceeded to go in.

4              We saw the children.  One of the Sheriffs, I'm not

5    sure who, I don't recall who, stated that one of my daughters

6    had a roach, like a roach, meaning a short of a joint.

7    Q    Okay.

8    A    Which she didn't, I mean my house was a mess, but just

9    irrelevant.  But that one Sheriff which was not the one who

10   initially detained me, was the one checking on the welfare of

11   my kids.

12   Q    Was the Sheriff a male or a female?

13   A    It was a male.

14   Q    Okay.

15   A    All this was happening.  They didn't even ask me

16   questions.  They immediately turned towards -- I do remember

17   that.  When we went into my apartment, they immediately turned

18   towards the middle door.

19   Q    Middle door as in?

20   A    The door on the left hand side --

21   Q    So I'm showing you Exhibit No. 5.  You're referring to

22   the door --

23   A    Yes.

24   Q    -- immediately when you go into your apartment to the

25   right?

1    A    They turned towards the right which would be the

2    conjoined door, yeah.

3    Q    Okay.  And what happened next?

4    A    They started asking me questions about that room.  I

5    stated -- actually initially, since I saw their interest from

6    the beginning in that room, I did state once we went inside

7    and they made it more evident, I did state if you're here for

8    that room, or whatever's in that room, that's not my room.

9         It's not part of my contract, and my landlord can

10   attest to this, I stated.  So you can check the entire house

11   if you want, but I cannot consent to you searching that part.

12   I specifically told them that.

13   Q    And where were you standing when --

14   A    I was standing by the door, specifically where --

15   right --

16   Q    Where the --

17   A    -- between the door and lamp that you see on the

18   right hand side --

19   Q    Okay.

20   A    -- of the photo.

21   Q    Over here where the little couch --

22   A    Yes.

23   Q    -- is at?  Okay.

24   A    My wife had not arrived at that time.

25   Q    And at that point, just to be clear, your kids had

1    already been found?

2    A    Yes, of course.

3    Q    And who were your kids with?

4    A    Well, they were basically seated.  Well, they weren't

5    really with anybody.  Like they were left alone because we

6    were already there.

7    Q    Y'all were --

8    A    But yes, they were inside the house, just --

9    Q    But were they with an agent, or a law enforcement

10   officer, or they're just there --

11   A    I mean they were with all of us --

12   Q    Okay.

13        A    -- technically, but --

14   Q    Everybody there?

15        A    -- nobody was holding onto them, if that's what

16   you're asking.

17   Q    Okay.  That's what I -- thank you.

18   A    No, nobody was holding onto them.  We were just making

19   sure that they didn't run outside because they have a

20   fascination with the outside world.

21   Q    Okay.  So then you were saying that they started showing

22   an interest, and --

23   A    Yes, they did right off the bat.  They asked me who's in

24   this room.  Is that room yours.  I said no, that room is not

25   part of my contract which is why I have the couch in the way.

1          It's a pretty heavy couch.  So you can check my

2     entire house, top to bottom, but I cannot authorize you, I

3     cannot consent to you searching that part.  It's not my

4     apartment.

5     Q    And what happened next?

6     A    They proceeded to basically move the couch, regardless of

7     what I had told them.  This was before they talked to my

8     landlord, mind you.  When they already knowledge of that not

9     being part of my house.  They did move the couch.  They

10    checked if the door was open.  When it clicked open, they

11    opened it fully.

12         Two agents, I'm not sure who, I think -- if my

13    memory serves correct, I believe it was a pony-tailed person,

14    and I believe there was an African-American (indiscernible),

15    one of them, I believe, stretching my memory.  But yes, two

16    agents went into the room, proceeded to look around.  They

17    destroyed some property then.

18    Q    When you say they destroyed some property, what did they

19    destroy?

20    A    Apparently there was a mirror leaning up against my door.

21    As I told you, my door opens inside to my house, so when they

22    did that, the mirror fell and broke into pieces of glass all

23    over my floor and his floor --

24    Q    Okay.

25    A    -- and the other side of the door.  So I had to clean

1   that up because my kids were in the house.

2   Q    So -- and did you say that they looked around, is that

3   what you said?

4   A    Yes, they looked around.  Specifically because where I

5   was, I was able to see where apparently there was a curtain,

6   there was some sort of makeshift curtain in that shower part.

7   I don't know if you have a picture of the inside of the room.

8         But there's a certain like makeshift shower.  It was

9   like a medical -- I believe it was like a medical room.  In

10  that shower, it's like a makeshift curtain.  And I did in fact

11  see one agents move the curtain, and see -- he didn't touch

12  anything inside.

13        I didn't see him reach in, but I did see him move

14  the curtain and check what was in there, take a sneak peek, if

15  you would like to call it.

16  Q    And again, to be clear, your children had already been

17  located when this was occurring?

18  A    Yes.  They had already established that my children are

19  fine and nothing was wrong with them.

20  Q    Okay.  And what happened next?

21  A    Well, what happened next is that once they opened that

22  curtain and I guess saw what was in there, they exited, closed

23  the room.  I had to ask them if I could sweep up that mess.

24  That was later on.  After that, I believe they tried to locate

25  the landlord after that.

1    Q    Okay.

2    A    They left me alone.  By that time, my wife had gotten

3    here.  She was making a scene.  They proceeded to hassle me

4    about what was in the room, and if I have knowledge, and who

5    rents it as well as they're asking me questions.

6         And they started to kind of try to intimidate me

7    about if I knew, if I had any knowledge of what's in that

8    room.  That if they find out that if I had knowledge, I would

9    be arrested as well, if I'm involved in anything and or

10   anything at all.

11        And I apologize.  This did happen right before --

12   some of those questions did happen right before they opened

13   that door.  Because they showed an interest, I did make a

14   statement at the moment, saying whatever you're looking for,

15   because it's evident that you're looking for something in that

16   room, whatever you're looking for, I have nothing to do with

17   it.

18        That is not part of my contract, and the landlord

19   can attest to this.  That's why I told them that.  So I mean

20   you have no reason to be doing this to me.  I had like more

21   than five agents in my house, surrounding me and my children.

22   I also do want to actually --

23        MS. MARTINEZ:  Well, give me a second.  I'm looking

24   for -- if I can get the Elmo turned on.  May I approach the

25   Elmo, Your Honor?

1              THE COURT:  Yes, if we can get it to work.

2              MS. MARTINEZ:  (Indiscernible).

3              MR. RAMIREZ:  Do you want the -- put it up?

4              MS. MARTINEZ:  Yeah.

5              MR. RAMIREZ:  I can (indiscernible), the statement?

6              THE COURT:  Is that the Elmo screen that you're

7      showing?

8              MS. MARTINEZ:  (Indiscernible).

9              MR. RAMIREZ:  Can you switch to mine?  I have it on

10     my computer what she needs.

11             THE COURT:  In the meantime, maybe call --

12             MR. RAMIREZ:  There you go.  Is that what you need?

13             MS. MARTINEZ:  Yes.

14             THE COURT:  Well, we need to get them back so they

15     can fix it.

16     BY MS. MARTINEZ:

17     Q    Mr. Garza, I'm showing you what's been marked as

18     Government's Exhibit No. 8.  Do you recognize that?

19     A    I do.

20     Q    What is this?

21     A    I mean it's a statement.

22     Q    By who?

23     A    By me.

24             MS. MARTINEZ:  Okay.  Do you recall making that

25     statement, or writing that statement?

1          MR. RAMIREZ:  Let me just make it -- enlarge it.

2          MR. GARZA:  Oh, yes.

3     BY MS. MARTINEZ:

4     Q    Okay.

5     A    It's a statement basically stating that my apartment --

6     it's basically the apartment, being that my apartment, my

7     contract was only involving the one room which is my -- the

8     master bedroom in my apartment, and it basically stating that

9     that one other room is not mine.  And that I do have a

10    contract in place with the landlord basically.

11    Q    And do you recall at what point that -- during that

12    event, did you write the statements?

13    A    That was at the very end, once they were already leaving

14    that they did that.

15    Q    And whose idea was it to write this statement, yours, or

16    did they ask you for it?

17    A    They asked me for it.

18    Q    Okay.  And do you know why they asked you for it?

19    A    I'm guessing to get it on record, I guess, because I

20    don't believe that my landlord had the contracts in hand.

21    Q    Okay.  Now you would agree with me that in this

22    statement, you did not include what you testified to which

23    is --

24    A    No, this was only -- I remember looking and reading.  I

25    remember one of the Sheriffs told me only mention the

1    technicality of the apartments and the room basically.

2    Q    Now you recall that you -- me and Mr. Soto and Mr. Guerra

3    met with you one time?

4    A    Correct.

5    Q    And you also met with the -- some agents afterwards,

6    correct?  Do you see -- there's an agent in the room, do you

7    recall --

8    A    I do recall him, yes, now that I'm actually looking at

9    him.

10   Q    Okay.  And do you recall making -- giving him statements?

11   A    I do.

12   Q    Okay.  And it was a recorded statement, correct?

13   A    Correct.  I do believe, however, that it was twice that

14   they -- I'm not sure if it was two people at the first time,

15   but the recorded statement was the second time that they had

16   come over to my house.

17   Q    Okay.

18   A    Yes.

19   Q    What happened the first time that they went over?

20   A    I don't specifically recall, but it had to do with the

21   same thing, it had to do with the same basically.  But I don't

22   believe, I'm not quite sure, I do not recall if I did give a

23   statement the first time, or even if I did, it wasn't a

24   specific technical statement.  It was just what happened, you

25   know, just like tell me what the (indiscernible).

1    Q    Would you agree that the first time that you brought up

2    the fact that you told law enforcement, hey, that room does

3    not belong to me was when --

4    A    That was established from the very beginning.  They did

5    not care.  They still went in there.

6    Q    Going back to Defendant's Exhibit No. 12, do you see

7    yourself in this photograph?

8    A    Let me --

9              THE COURT:  Wait -- see the photograph.

10             MS. MARTINEZ:  Oh, sorry.  There we go.

11   BY MS. MARTINEZ:

12   Q    Defendant's Exhibit No. 12, do you see yourself in this

13   photograph?

14   A    I do.

15   Q    And where are you?

16   A    Over by where the oven, on the outside, on the left hand

17   side, that's right.

18   Q    Okay.  And do you see Mr. Saldana, and he's the

19   Defendant, in this photograph?

20   A    No, not that I can see.

21   Q    Would you agree with me that that's him here?

22   A    If that's him, if that's a cap I'm seeing on that person,

23   then that would be him, yes.

24   Q    Okay.  In total, how many -- well, in this picture, how

25   many law enforcement officials do you see?

1   A   Well, you can see, it should be one, two, three, four,

2   five, six, seven, I'm sorry.

3   Q   That you could see.  But so how many were there though

4   that you can't see?

5   A   On the other side of the white Mercedes, I believe there

6   was -- and you're stretching my memory thin, but I think there

7   might have been two more.

8   Q   Okay.  Do you -- did you happen to see when Mr. Saldana-

9   Alaniz, was escorted down the stairs?

10  A   I did.

11  Q   Where were you standing?

12  A   I was standing, I believe, where I'm at in the photo.

13  Q   Okay.  And did you see how many agents were with him?

14  A   If it wasn't two, it was no more than three.

15  Q   Upstairs?

16  A   Yes, with him.

17  Q   Okay.

18  A   Escorting him down.

19  Q   Was he handcuffed, to your recollection?

20  A   At the time, I don't believe so.

21  Q   You don't believe so, but are you certain?

22  A   No, he was not.

23  Q   Okay.

24  A   He was just basically like detained, like he was -- being

25  made sure he didn't run.

1    Q    So what do you mean by he was -- you gestured --

2    A    Secured.

3    Q    What do you mean by secured?  You're saying they had him

4    (indiscernible)?

5    A    Yeah, basically, or from the shirt.

6    Q    Okay.

7    A    They were somehow -- he was somehow secured.

8    Q    And did you see him open the door to his --

9    A    No, he did not open the door.

10   Q    Who opened the door?

11   A    One of the agents, after getting consent from him, and

12   getting the key from his pocket.

13   Q    Did you ever see him sign any documents?

14   A    No, at the time of the incident, no.

15   Q    Okay.

16   A    Mind you, they had already gotten in there by that time.

17   Q    By the time of?

18   A    They brought him down, and grabbed the key from his

19   person.

20   Q    Okay.  But you're --

21   A    To go into the apartment.

22   Q    -- saying that they had already gone in to his efficiency

23   by that time?

24   A    Yes.

25   Q    And when they had gone into the efficiency, it was

1    through the adjoining door from your apartment?

2    A    Yes.

3    Q    Okay.

4    A    After knowing that is not mine, and I could not consent.

5    Q    Around how long did this whole ordeal take, like hours,

6    minutes?

7    A    An hour and a half, maybe two.

8    Q    Okay.  And --

9    A    At most.

10          MS. MARTINEZ:  -- do you recall when they --

11          MR. RAMIREZ:  Excuse me, Your Honor.  The phrasing

12   of ordeal was a little ambiguous to me.  I don't know if --

13   BY MS. MARTINEZ:

14   Q    Well, the events of the -- your detention and the search

15   and --

16   A    Well, it was an ordeal but yes.

17          MS. MARTINEZ:  Okay.

18          THE COURT:  Well, can we -- I guess to be a little

19   more specific, you mean from the time that the officers --

20   BY MS. MARTINEZ:

21   Q    From the time the officers arrived and detained you, to

22   the time they were done for the night?

23   A    Yes.

24   Q    How long did that take?  And when I say done with for the

25   night --

1    A    At the most --

2    Q    -- they secured everything and --

3    A    Yes.  At the most, two hours.

4    Q    Okay.  And were you present when they were -- I'm going

5    to show you, let me see, Defendant's Exhibit No. 20.  Were you

6    present when they took out all these boxes?

7    A    Technically, they had already undetained me.  They

8    already -- then they had me on the side.  Go back to the

9    photo.

10   Q    The first photo that I showed you?

11   A    Yes, go back to the other photo, the previous one to this

12   one.  They basically had me --

13   Q    I'm showing you Exhibit No. 12.

14   A    Yes --

15   Q    Okay.

16       A    -- they basically had me where you see -- on the

17   side, would be in front of my door, my apartment door.

18   Q    So --

19   A    They had me there with my kids and my wife, eating alive

20   by mosquitos.

21   Q    I'm showing you Defendant's Exhibit No. 2.  You're saying

22   that you were --

23   A    Yes, in that -- exactly where your cursor is, is exactly

24   where I was -- where they had me basically standing and

25   waiting to see what happened.  They did not allow me, as

curious as I was, I'm naturally curious, I wanted to come and
see what's going on, and they proceeded to tell me do not go
over there.  You need to wait.  It's better if you don't see
anything at all.

Q    And were agents going -- when they were doing the search
through --

A    The front?

Q    -- the front --

A    Yes.

Q    -- were agents going into --

A    My apartment?

Q    -- your apartment?

A    No.  I had already -- by that time, I had already swept
up the mess on my side and put -- closed the door and put the
couch back.

Q    I'm going to show you Defendant's Exhibit No. 15.  Now
you would agree with me that this is an image taken from
inside the efficiency, correct?

A    Yes.

Q    And this door that I'm pointing to is the adjoining door?

A    Yes.

Q    Okay.  And you would agree with me that this area where
the cursor's at is your apartment number one?

A    Correct.

Q    And this door is open?

1    A    Right, yes.

2    Q    So you would agree that while they were in this room, the

3    door was open?

4    A    Yes, I mean -- well, I mean obviously seeing the photo,

5    like yeah, it was open.  I assumed that I already opened it,

6    but then again, maybe that was the reason why we were still

7    outside with my children.  So that makes sense.

8    Q    Now I'm going to --

9    A    I apologize for that.

10   Q    Do you see where the cursor, where I have it?

11   A    Yes.

12   Q    What is that?

13   A    That's that mirror that I'm talking about.

14   Q    And this is a mirror that was -- that you believe was --

15   A    Leaning up against that --

16   Q    -- leaning?

17       A    -- door, yes.  It's actually why the shards of glass

18   fell on my side.

19   Q    And in this picture, it indicates that the majority of

20   that mirror is in your property?  That's where the shards of

21   glass went?

22   A    Correct.

23   Q    Okay.  Do you recall this refrigerator being moved, or

24   you don't recall anything having to do with the refrigerator?

25   A    I don't recall if it was or wasn't moved.

1          MS. MARTINEZ:  We'd pass the witness, Your Honor.

2          THE COURT:  All right.  Mr. Ramirez, for the

3    government?

4          MR. RAMIREZ:  Can we keep this exhibit up?  Let me

5    have Defendant's Exhibit No. 15.

6               CROSS-EXAMINATION OF EDUARDO GARZA

7    BY MR. RAMIREZ:

8    Q    How would you know if things were moved or not moved if

9    you hadn't been there before, meaning you haven't been into

10   that room, efficiency before?

11   A    No, I hadn't.

12   Q    So the first time you --

13   A    I did state that I do not recall because I don't remember

14   if it was or wasn't moved because I don't -- I'm not there.

15   So I don't know how the fridge was in the first place.

16   Q    You've never been into that -- you were never into that

17   efficiency until perhaps --

18   A    I'd seen the inside of the -- I had seen before, the

19   inside of the efficiency, but I made a custom not to go in

20   there for whatever reason, because it's not my efficiency.

21   From the outside of the apartments, staring in, that's how I

22   knew that the curtain -- that's one of the reasons also, you

23   know, when they initially opened the door, I knew.

24          I could see that the curtain of the shower was

25   there.  And when you open the front door, I mean that's the

1    first thing you see is the shower on the right hand side and
2    all that other stuff.
3    Q   Can we go to the sofa exhibit, go (indiscernible),
4    please, or I can do it.  We can go to mine, my computer and
5    I'll pull it from here.  So referring to Defendant's Exhibit
6    No. 8, when you were asked to identify this being the sofa
7    that was, in your words, barricading the door --
8    A   Correct.
9    Q   -- that opens into your apartment, you first said you
10   weren't sure if it was this one or another one?  Did you --
11   A   Correct.
12   Q   How many sofas did you have in your apartment back then?
13   A   Well, I've had many sofas in my apartment from the time
14   that I moved in to the time I moved out.  But I remembered
15   after the fact, the question, that that was the sofa because
16   it was really heavy, and that was the whole point to the
17   barricade.
18        We needed something heavy for that, so that if
19   somebody did come in from that room to my house, it would be
20   noticeable.  I would hear them.
21   Q   Had the Defendant ever gone into your room, into your
22   apartment, unannounced?
23   A   Not to my knowledge.
24   Q   Unannounced?
25   A   Not to my knowledge.

1    Q    Did you ever -- so you never -- you're saying you never

2    gave him any food, or water, or money, or anything?

3    A    If I did, I mean if he has stated that I helped him in

4    any way with food, or something like that, then I probably

5    did.  I'm just like that.  If anybody comes to my door and

6    asks me for food, water, and or etcetera, I mean if I have it,

7    I give it.

8    Q    Now officers reported that you did not like the idea of

9    him being there in that apartment because you -- and that's

10   why you barricaded the door because he would --

11   A    Well, no, well, you see that misconstrued --

12   Q    Okay.

13        A    -- because like I stated, prior to -- prior

14   unrelated incidents, there was incidents with the door, with

15   the deadbolt not locking and locking at times, and sometimes

16   it was locked.

17            And then at other times, it wasn't locked, and it

18   was just the doorknob lock.  So that was a little bit, you

19   know, like I didn't feel -- I wasn't too fond of the idea of

20   the door -- something not being in that door.

21   Q    Are you saying that this is before the Defendant was

22   occupying it, or --

23   A    I believe so, yes.

24   Q    -- are you sure, or you're just --

25   A    I mean it was around the same time.  I mean it's around

1    the same time.

2    Q    And why were you barricading it?  You were afraid -- what

3    is it you were afraid of, or what did you want to avoid

4    happening?

5    A    The security of my family.  I have four kids.

6    Q    So you're concerned about the security, and you leave the

7    six month old twins and another just barely older child and

8    you go outside --

9    A    (Indiscernible).  I didn't leave.  I was right outside my

10   apartment which legally, I don't see there's a problem with

11   that.

12   Q    You were outside smoking marijuana in public?

13   A    Right, correct.

14   Q    And that's -- you know, that that's --

15   A    Well, the public --

16   A    Yes, I was in the apartment.

17   Q    Let me just finish my question.  I know we both want

18   to --

19   A    Right, of course.

20   Q    -- talk?  And you know that that's a criminal offense

21   because you said, to be honest --

22   A    Correct.

23   Q    -- when you've made all these statements.  You know it's

24   a criminal offense.  You know you can be arrested for that?

25   A    I fail to see the relevance to --

Q    Let me rephrase the question.  You know that you could

have been arrested?

A    Yes, I am well aware of that, which is why I told the

officers -- nobody argued with the officers.  Nobody was -- I

didn't become a hard ass.  I did not get in their way to be

more specific because like I said, I had nothing to hide.  I

had nothing -- I didn't even know what they were there for at

first, until they showed interest for that room.

Q    I understand.  All I'm saying is that, looking from the

point of view of the officers --

A    Of course.

Q    -- they come upon you.  You are smoking outside.

A    Right.

Q    There are two children, you say there are two children in

there, and they have a decision to make.  So that could be --

you're committing a crime?

A    It's my -- I have reason to believe that they did make a

decision because shortly after all this incident --

Q    Okay.

     A    -- because you don't want me to use the word ordeal,

after all this happened, CPS not long after came, showed up to

my door about endangering environment to my children which is

unrelated.  We're not going to get into that but you know.

Q    Well, it doesn't matter to me, sir, what words you want

to use honestly.  So before the officers arrived, why were you

1   closing the parking gate?

2   A    Why was I closing the parking gate?

3   Q    Yes, the gate that --

4   A    It's the sliding gate?

5   Q    Yes, the sliding gate?

6   A    What do you mean?  The gates were open when they came.

7   Q    Did you -- were you out there, moving them?  The

8   officers saying that --

9   A    No, I was --

10  Q    -- you moved --

11  A    When they came, I was with my friend as I stated.

12  Q    You were nowhere near the gate?

13  A    No.

14  Q    Okay.

15  A    No, I was literally just -- would be 20 feet, like not

16  even, 15 feet away from my apartment.  I had -- I do -- I had

17  literally just stepped out of my apartment.  I didn't even

18  have five minutes out of my apartment.

19        MR. RAMIREZ:  Oh, well, that clarifies it then.

20  Thank you very much.  I have no more questions.

21        THE COURT:  Okay.  Let me just -- hold on before

22  you -- if you have any more questions, Ms. Martinez.  Let me

23  just ask you, Mr. Garza, a couple questions.

24  BY THE COURT:

25  Q    When you entered your apartment with the law enforcement

1    officers, that was your testimony that when they went into

2    your apartment, you were with them, is that correct, or no?

3    A    The Sheriff entered first.

4    Q    Yes.

5    A    And the ones that had me uncuffed entered with me after

6    that, yes.

7    Q    Okay.

8    A    But it was when they came just after -- like we were

9    walking together.  We were all walking together.

10   Q    When you entered your apartment at that time, where were

11   your children?

12   A    One of my girls was I believe in the room, in one of the

13   rooms which you can't see it here but --

14   Q    One that was separate, like a bedroom?

15   A    Yeah, a bedroom, yeah.

16   Q    Okay.

17   A    That's where that officer grabbed that roach and said,

18   hey, this is child endangerment or something like that.  And

19   my son was over here, I believe, in the living room.  And I

20   think also my other little girl was with her sister over there

21   in the room.

22   Q    Was the door to the -- when you say the room, it was a

23   bedroom?

24   A    Yes, it was a bedroom --

25   Q    Okay.

1      A      -- it was open.

2      Q    Was it -- that was my question.  Was the door to the

3      bedroom that two of your children were in, was the door open

4      or closed?

5      A    I believe it was open.  I usually leave the doors open

6      but again, this happened -- I don't know how long ago so --

7            MR. GUERRA:  Your Honor, the exhibit is up, if the

8      Court wishes to use that --

9            THE COURT:  Okay.

10           MR. GUERRA:  -- picture (indiscernible).

11           THE COURT:  I'll refer to that.  I think that's all.

12     BY THE COURT:

13     Q    Mr. Garza, just review again, when you -- as I understand

14     your testimony, you were standing outside at the time that the

15     Defendant, Mr. Saldana, was brought down the stairs --

16     A    Correct.

17     Q    -- outside of the apartments, is that correct?

18     A    Correct.

19     Q    Okay.  So again describe what you saw at that point with

20     Mr. Saldana?

21     A    Mind you, they didn't ask but I'm going to state, the

22     only reason that they had to go up there was because my wife

23     was inclined to state if you're looking for the person that

24     owns that apartment, they're up there.

25     Q    Okay.  Right.

1    A    Which means the apartment that he was at, at the time.

2    Q    Upstairs?

3    A    That's how they ended up going to him.

4    Q    Okay.  But my question is, what did you see when they --

5    when he came down?

6    A    To my memory, to my knowledge, I saw them coming, walking

7    down with him.  I don't believe he was in handcuffs.  I'm

8    not -- I don't recall correctly.  But I believe they had him

9    like just detained, like grabbed from the shirt or arm.  They

10   were coming down.

11   Q    But they were holding him with their hands?

12   A    And they -- there was some dialogue.  I couldn't make it

13   out.

14   Q    Okay.

15   A    But the only dialogue I could make out was when they

16   asked him in Spanish if that was his efficiency.  He said yes,

17   and that he has the key on him.  Then that's when they grabbed

18   the key and opened the door.

19   Q    When you say they grabbed the key, tell me what you saw?

20   A    The agents, they searched his person obviously, and they

21   saw the key and that's when they asked him if the key was to

22   that door to the efficiency.  He stated yes.  And that's when

23   they asked him if they could go in.

24   Q    Okay.  You heard them ask -- the officers ask the

25   Defendant is it okay if we go in?

1    A    Yes, I did hear that.

2    Q    Okay.  And what --

3    A    And he said --

4    Q    -- did he answer that you heard?

5    A    He answered yes.

6    Q    Okay.  And then at that point, the officer opened the

7    door, one of the officers?

8    A    Yes, one of the agents.

9    Q    Agents.  Okay.

10   A    That was after the fact though, that they had already

11   gone in there by that time to be more specific.

12   Q    Yeah, but when you say that, you mean they had already

13   gone in through that door --

14   A    Yes.

15   Q    -- between your apartment and the efficiency?

16   A    Correct.

17          THE COURT:  All right.  Okay.  Just wanted to make

18   sure I was clear on his testimony.  Ms. Martinez, do you have

19   any other questions?

20          MS. MARTINEZ:  No, Your Honor.

21          THE COURT:  Okay.  Mr. Ramirez --

22          MR. RAMIREZ:  No, sir.  Thank you.

23          THE COURT:  -- if you have any other questions.

24          MR. RAMIREZ:  No, sir.

25          THE COURT:  Okay.  Any objection to the release of

1   this witness, he can leave?  Ms. Martinez, any --

2           MS. MARTINEZ:  No objection, Your Honor.

3           THE COURT:  Okay.

4           MR. RAMIREZ:  He can be released.  I don't --

5           THE COURT:  Then Mr. Garza, you are excused as a

6   witness.  You're free to leave the courthouse and go home or

7   go about your business.  Please do not talk to any of the

8   other witnesses or person about the case today, or as long as

9   this proceeding is going on.

10          MR. GARZA:  Okay.  (Indiscernible).

11          THE COURT:  I mean afterwards -- and I'm not talking

12  about --

13          MR. GARZA:  Can I go -- will I be coming back, or --

14          THE COURT:  No, not as far as I know.  For this

15  hearing that we're having, you're done.  You won't be coming

16  back for this hearing.  I can't speak to whether or not --

17  what happens in the future.

18          MR. GARZA:  Okay.

19          THE COURT:  All right.  Okay.  But you're excused.

20          MR. GARZA:  Thank you.

21          THE COURT:  Thank you.  All right.  Do you have --

22  for the defense, Ms. Martinez, do you have any further

23  witnesses you're requesting to call out of order?

24          MS. MARTINEZ:  No, Your Honor.

25          THE COURT:  Okay.

1           MS. MARTINEZ:  Not at this point.

2           THE COURT:  All right.  Then that means the

3    government can proceed to call their next witness.

4    Mr. Ramirez, if you're ready?  And under -- just FYI, I mean I

5    suppose we'll take a break.  We started right about 1:15.

6    We'll take a break, you know, maybe around 3:15, about an

7    hour, I don't know, maybe 3:00, or 3:15.  Just so you get an

8    idea of where that would fit into any witnesses.

9           MS. RODRIGUEZ:  Judge, can we take a five minute

10   recess?

11          THE COURT:  Well, then let's take a short break

12   right now.

13       (Recess taken from 2:25 p.m. to 2:28 p.m.)

14                        AFTER RECESS

15          THE COURT:  All right.  So have a seat, everybody.

16          Is the Government ready to proceed with their next

17   witness?

18          MR. RAMIREZ:   Yes, Your Honor.  Call Jorge

19   Martinez, a Sergeant with Webb County Sheriff's Department.

20   It should be fairly quick on my part.

21       (Participants confer)

22     JORGE MARTINEZ, WITNESS FOR THE GOVERNMENT, SWORN

23          THE COURT:  Okay.  Sergeant Martinez, yeah.  I don't

24   know if you've testified before in court, but -- oh, you

25   haven't.  You know, you can -- that's the microphone you're

1   speaking into.  You can move it around, flex it up and down.

2   Just be sure it's pointed at your face and mouth.  Speak

3   clearly.  Please try and listen to the question that's being

4   asked, so you can, you know, try and answer the questions.

5   And you'll be questioned by the attorneys for the Government

6   and the attorneys for the Defendant in this case, and so go

7   ahead and listen carefully.

8           Mr. Ramirez, you can proceed.

9           MR. RAMIREZ:  Thank you, Your Honor.

10          DIRECT EXAMINATION OF JORGE ALBERTO MARTINEZ, JR.

11  BY MR. RAMIREZ:

12  Q    State your full name, your job title, and what agency you

13  work with.

14  A    My name is Jorge Alberto Martinez, Jr., and I work with

15  the County Sheriff's Office as a patrol sergeant.

16  Q    On June the 1st, 2022, were you a corporal?

17  A    Yes, sir.

18  Q    You're listed in one of the reports as a corporal, so --

19          MR. RAMIREZ:  Can we switch the computer?

20  Q    So the -- so we see the name of Jorge -- Corporate Jorge

21  Martinez in a report, we can assume that it's you --

22  A    That's correct.

23  Q    -- being referred to.

24       Congratulations on your promotion, by the way.

25  A    Thank you.

1   Q    On -- how long have you been with the Sheriff's
2   Department?
3   A    It's been nine and a half years.
4   Q    And just very quickly, tell me what you started doing and
5   what you're doing now?
6   A    So, when I first started, I worked at the jail as a
7   corrections officer.  Then, in 2016, I became a peace officer,
8   I was then transferred out to patrol.  And I'm just recently
9   promoted to sergeant now of patrol, also involved with SWAT
10  team.
11  Q    So you do both; you're a Sergeant with the Patrol
12  Division and you're also a SWAT member.
13  A    Yes, sir.
14  Q    How do you -- how do you do get assigned both positions?
15  Do you do one or the other or how does that work?
16  A    So, since we are not a twenty-four-hour SWAT team, we
17  pretty much just wait on -- on callouts.  I am one of the team
18  leaders for one of the teams there, for the SWAT team, so we
19  just wait on any further assistance needed by any other agency
20  or our Narcotics Division.
21  Q    Okay.  So look at the screen before you or you look up at
22  the projector screen and -- it should be on your tele -- your
23  monitor there.
24  A    Yes, sir.
25  Q    I'm showing you Defendant's Exhibit Number 1, which is a

photograph taken after June 1st, some months after.  Do you
remember being at that area?

A    Yes, sir.

Q    What was the -- what were you -- what was your assignment
on the day that you were called to that area?

A    So my assignment was as a SWAT team member, to make it on
scene, due to the possible reasons of -- of ammunition that
might have been involved in that -- in that house.  So they
needed some SWAT presence in case it -- anything were to go
sideways.

Q    Do you remember who called you about going there?

A    I don't recall.

Q    Do you know what time you arrived?

A    I don't recall.

Q    Do you know what time you left?

A    I don't recall.

Q    Okay.  So did you go as a SWAT member or as a patrol
officer?

A    I went as a patrol officer, but to assist as a SWAT
member because I was working on -- I was on duty at the time.

Q    You were on duty, got the call while you were in your
patrol uniform?

A    Correct.

Q    And then you went there.  And I'm assuming you have your
SWAT whatever or your equipment and everything in your car?

1   A    Correct.

2   Q    And tell me what equipment you had when -- or you put on

3   when you arrived there.

4   A    So, as I arrived there, I -- you know, the same equipment

5   I used for patrol is the equipment that I continue to use, and

6   so I did not throw on anything like the ballistics vest, stuff

7   like that; I just used my regular patrol vest.  Other than

8   that, I did not change out or anything like that.

9   Q    Okay.  So -- all right.  So I want to go to a very

10  specific situation on June 1st, 2022.  And just to lay a

11  little groundwork, there's been testimony that Sergeant

12  Gonzalez -- and he's your SWAT commander?

13  A    Correct.

14  Q    Was he your SWAT commander then, also?

15  A    Correct.

16  Q    He made an announcement for a knock-and-talk or an

17  approach, basically, to go to the location -- and I'm going to

18  magnify Defendant's Exhibit Number 1 -- to make an approach to

19  the area.  And when you went, there were several ...

20       (Participants confer)

21       MR. RAMIREZ:  It will just take me one moment, Your

22  Honor.

23  BY MR. RAMIREZ:

24  Q    All right.  Now let's go to -- I'm going to switch gears

25  and -- because I want to show you this different exhibit,

1    Defendant's Exhibit Number 12.

2         Does this look like what was going on at the time?

3    A    Yes, sir.

4    Q    But this is after the events.

5    A    Correct.

6    Q    So do you recognize -- do you remember that there were --

7    how many persons were initially encountered as you all made an

8    approach?

9    A    So, by the time I arrived on scene, I remember seeing

10   Sergeant Michael Gonzalez talking to the shirtless man,

11   Mr. Garza.  And that was the only person that I had seen as I

12   arrived.

13   Q    And do you see that person in the picture?

14   A    Yes, sir.

15   Q    Which one is he?

16   A    He's going to be the one on the left, wearing the gray

17   shirt.

18   Q    Do you know why he's wearing a gray shirt at that point?

19   A    No, sir.  I believe because we had already been done with

20   check -- checking the apartment, number.  So I believe --

21   Q    But --

22   A    -- they gave him a shirt.

23   Q    But you're sure this is him --

24   A    Yes, sir.

25   Q    -- the one in Defendant's Exhibit Number 12, left of the

1    picture, leaning against an appliance, wearing a gray t-shirt

2    and black basketball shorts.

3    A    Yes, sir.

4    Q    When you saw Sergeant Gonzalez and the shirtless man who

5    was confirmed as Mr. Garza --

6    A    Yes, sir.

7    Q    -- what were they doing?

8    A    I don't recall what they were talking about.

9    Q    Do you remember a conversation that Sergeant Gonzalez had

10   with Mr. Garza?

11   A    The only conversation I overheard was when he asked

12   Mr. Garza if there was anybody else in the apartment complex.

13   Q    And what did Mr. Garza say?

14   A    Mr. Garza said that he had kids inside the apartment

15   house.

16   Q    And what happened after that?

17   A    So, after that, Sergeant Gonzalez told him that we were

18   going to go in to retrieve the kids for him, to which he --

19   Mr. Garza then agreed to allow us to return the kids for him.

20   Q    He agreed.

21   A    Yes, sir.

22   Q    How did he agree?  Did he -- what did he say or do?

23   A    He said (in Spanish), along those lines.

24        THE INTERPRETER:  Yes, sir.  Yes, sir.  Go ahead.

25   A    Yes, sir.  Yes, sir.  Go ahead.

1    Q    And what happened next?

2    A    So, at that time, myself and a few other SWAT team

3    members made entry into the apartment, for one.

4    Q    Did you go in with Mr. Garza?

5    A    No, sir, he stayed outside.

6         MR. RAMIREZ:  Sorry.  I need to get another exhibit

7    here.

8    BY MR. RAMIREZ:

9    Q    Do you -- sir, do you recognized Defendant's Exhibit

10   Number 3, what that represents?

11   A    Yes, sir.

12   Q    It's a white door with a number one on it.

13   A    Correct, sir.

14   Q    Is that the door that you made entry into?

15   A    Yes, sir.

16   Q    How did you make entry into it with Sergeant Gonzalez and

17   others?

18   A    So the door was already halfway open, so we pretty much

19   just went straight in.

20   Q    As you walked in, did you happen to see the children in

21   the living area?

22   A    No, sir.  So I was the first person in.  As I went into

23   the apartment, I made some more room for the others, I guess,

24   to come in.  And my priority was the door on the far right,

25   which I believe was a bedroom, only because I did see some

1    little shadows on the bottom of the door.

2          As I approached and I opened the door, I did see the --

3    the children there.  So, as of that point, right there, I

4    stayed -- I made myself -- I took myself out of the team and I

5    stayed there with the children.

6    Q    Now, referring to Government Exhibit Number 10, which is

7    on the screen, I have magnified the -- and just to tell you

8    what it is, this is a sketch that was drawn by the landlord,

9    which purports to show the four apartments and the efficiency,

10   which is where Mr. Saldana was later -- you know, later -- or

11   entry was eventually made by Sergeant Gonzalez, but -- and

12   Mr. Saldana occupied "efficiency room" that's listed there.

13         Let me rotate it a little bit to the right and that might

14   help viewing.  Does that help?

15   A    Yes, sir.

16   Q    Okay.  So I've rotated Defendant's Exhibit Number 10

17   clockwise 90 degrees to show you and so you can read what's

18   marked on the exhibit.

19         So this Apartment Number 1, this is a sketch, shows

20   Apartment Number 1.  And there is a large living area with a

21   kitchen and two squares that are drawn to the righthand side,

22   one -- the lower right one is the efficiency room and the one

23   at the top of Apartment 1, the small, is called a "bedroom."

24   And in between is something, a little area called "bathroom

25   shower."  And then, to the right of that, away from what would

1    be the apartment, are the words "parking lot."

2    A    Correct.

3    Q    Is that generally accurate, without looking at the scale

4    and so forth?  But is it generally the way the apartment was

5    configured --

6    A    Yes, sir.

7    Q    -- on the interior?

8    A    Yes, sir.

9    Q    You have a puzzled look.  Is there something puzzling

10   you?

11   A    I do not recall the bathroom, to be honest.  I don't

12   recall the bathroom, but everything else does seem fairly

13   accurate.

14   Q    All right.  So, if we look at the bottom of the page, it

15   says entrance exhibit one -- Apartment 1 -- excuse me.  That -

16   - where the cursor is at, that shows a door that opens into

17   the apartment.  Is that -- so you -- that would be "door" with

18   the number one on top.

19   A    That's correct.

20   Q    So you walk in through the door.  Were you -- who walked

21   in first, by the way?

22   A    Myself.

23   Q    You walked in first.

24        And who walked in second?

25   A    I do not recall.

1    Q    Sergeant -- what -- and did Sergeant Gonzalez walk in at
2    some point?
3    A    I believe so.  I can't -- I don't recall.
4    Q    So you walked in.  And where did you go and what did you
5    do?
6    A    So I walked straight and I went straight towards the
7    bedroom, again, because I did notice that door, on the bottom
8    of the door I did see some shadows, like if somebody was
9    standing behind the door.  So that's what got my attention and
10   I went straight to that room.
11   Q    Did you hear any noise?
12   A    No, sir.
13   Q    Any silence?
14   A    No, sir.
15   Q    Did you smell any marijuana?
16   A    Yes, sir.
17   Q    Okay.  So, as you walked in, you went straight to the
18   bedroom.  And was the door open, closed?
19   A    It was closed, but not hinged completely.  It was kind of
20   like -- it had been cracked open.
21            THE COURT:  Is that ajar?
22            MR. RAMIREZ:  Ajar.
23        (Laughter)
24            MR. RAMIREZ:  Sorry, that's -- sorry, Your Honor.
25   It's the -- I had too many cookies at lunch today.

1          THE COURT:  Yeah.

2          (Laughter)

3     BY MR. RAMIREZ:

4     Q    So the door --

5          THE COURT:  When is a door -- when is a door not a

6     door?

7          MR. RAMIREZ:  When it's ajar.

8          THE COURT:  Yeah.

9          MR. RAMIREZ:  One of my daughter's favorite jokes

10    when she was a kid.

11    BY MR. RAMIREZ:

12    Q    So then was -- you walked into that -- is that where you

13    found the children?

14    A    Yes, sir.

15    Q    Who was with you when you found the children?

16    A    So, when I found the children, I took a knee and I stayed

17    with them.  And at that case, Investigator Sarquiz, she came

18    and she stayed there in the same room with me.

19    Q    Did Sarquiz -- or did Investigator Sarquiz walk into the

20    living area with all of you, to the best of your recollection,

21    or did she stay somewhere, waiting for you to call her or

22    someone to call her?

23    A    I don't recall, to be honest.

24    Q    But she, at some point, came to help you or --

25    A    Yes.

1    Q    Is it because you called her or she came on her own?

2    A    No.  She came on her own.

3    Q    What was the condition of the three children?

4    A    So I -- the two children that were with me, they were

5    only wearing diapers.  They looked calm.  There was another

6    child on the bed, looked like he had just had woken up from a

7    nap.  He was also in diapers.  But he didn't -- he never got

8    off the bed.

9    Q    All right.  And so you walked out and Investigator

10   Sarquiz helped you with the children.

11   A    Yes.

12   Q    And what did you do then?

13   A    So, once I was told by Sergeant Ayala that they had

14   already cleared the area, that it was safe for the children to

15   -- to be extracted from there, I went ahead and I picked up

16   two of the children -- two of the three children and Dana went

17   ahead and recovered the other child, and we walked them

18   outside.

19   Q    So you came out with the children.  Sergeant --

20   Investigator Sarquiz is in there.  But you wait for a

21   confirmation of some kind before you leave.

22   A    That's correct.

23   Q    And the "all clear," what does that mean?

24   A    So just pretty much telling me that it's safe, that

25   they're not still conducting the area check to make sure that

1   there was nobody else in the apartment complex, other than the

2   children.  The last thing I want to do is get -- you know, get

3   the children in danger.  So I just stayed there with them.  I

4   know some of the children were trying to leave the room, so I

5   took a knee and distracted them there for a little bit.  But

6   yes, I waited for the clear from Sergeant Gonzalez, that it

7   was safe to extract them.

8   Q    And when you came out of the apartment, where was

9   Mr. Garza?

10  A    He was -- as soon as you exit to your left, he was

11  standing by.  On the lefthand side, do you see that gate?  He

12  was in there, which would be outside the door.

13  Q    So he was outside the door.

14  A    He was outside the door to the right.

15       MR. RAMIREZ:  Let me see if I -- so let me enlarge

16  Defendant's Exhibit Number 1.

17  BY MR. RAMIREZ:

18  Q    Show me when the cursor is approximately in the area.

19  Was he -- let me rephrase that.

20       Was he --

21  A    To the -- move the cursor to the left a little bit.

22  Q    Okay.

23  A    Right there, inside like a little hallway, before you get

24  to Door Number 1 --

25  Q    Okay.

1   A    -- he was there in that little hallways.

2   Q    Okay.  Was he standing at the doorway?

3   A    He was offset to the door.  He was not really at the

4   door.

5   Q    Did he say anything when he saw you?

6   A    No, sir.  Not to me, sir.

7   Q    Did you tell him anything?

8   A    No, sir.

9   Q    When you were waiting for the all clear, did you hear him

10  speaking to anyone inside the -- who was inside the apartment?

11  A    No, sir.

12  Q    Did he call out, yell, or give any instructions?

13  A    No, sir.

14  Q    Did he say don't go there, don't do this or that?

15  Nothing.

16  A    No, sir.

17  Q    So it's your recollection that he just stayed nearby, but

18  didn't say a word.

19  A    Correct.

20  Q    Okay.  Is there anything, while you were in -- let me go

21  back to apartment -- to apartment -- to Defendant's Exhibit

22  Number 3.

23       This is the door.  When you were inside, were there any

24  officers or investigators or anyone standing by the door?

25  A    To my recollection, the only person I remember would be

1    Sergeant Mike Gonzalez.  He was standing offset with

2    Mr. Garza.  I don't recall seeing anybody else.

3              THE COURT:  I'm sorry.

4    Q    So --

5              THE COURT:  What was that question?  Was that

6    question that, before they went into the apartment or after --

7    or when they came out?

8              MR. RAMIREZ:  I actually meant afterwards.  I may

9    have said before.

10             THE WITNESS:  I'm sorry.  Afterwards.

11             THE COURT:  I wasn't clear.  I --

12             MR. RAMIREZ:  I think I said.

13             THE COURT:  Repeat the question.  Repeat the

14   question.

15   BY MR. RAMIREZ:

16   Q    Okay.  So, before -- let's talk about before you went

17   into the apartment --

18   A    Uh-huh.

19   Q    -- into Apartment Number 1.  And we're looking at

20   Defendant's Exhibit Number 3, looking the door marked "Unit 1"

21   -- door marked "Number 1."

22        So, before going into that door, where was Mr. Garza and

23   where was mister -- Sergeant Gonzalez.

24   A    So, before we did -- would make entry into the apartment,

25   mister -- Sergeant Gonzalez and Mr. Garza were outside.  They

1    were not in the hallway.

2    Q    Okay.  So, going back to Defendant Number 1, they were

3    out here somewhere?

4    A    Correct.

5    Q    And were they speaking?

6    A    I believe so.

7    Q    Did you heard --

8    A    I don't recall anything that they were talking about,

9    other than, when I approached, I heard them saying that there

10   was kids in there.

11   Q    Okay.  Is that where the conversation took place --

12   A    Yes, sir.

13   Q    -- about the children and then giving the okay to go in.

14   A    Yes, sir.

15   Q    Okay.  Earlier, you said that he said that -- Mr. Garza

16   said something in Spanish.  That's where it occurred.  It

17   didn't happen in the parking lot, it didn't happen back here.

18   It happened over here --

19   A    Correct.

20   Q    -- where I'm showing --

21   A    Over at that little gate area.

22   Q    -- and by the gate.

23   A    Yes.

24   Q    Okay.  And after you were -- you retrieved the children

25   and you walked towards the door and you exited the door, did

1      you see Mr. Garza?

2      A     Yes.

3      Q     Where was -- was he in about the same area?

4      A     Yes, sir.

5      Q     Defendant's Exhibit Number 3.

6            THE COURT:  I'm sorry.

7      A     Yes, sir.

8            THE COURT:  The same area outside of the apartment.

9            MR. RAMIREZ:  Outside of the apartment.

10           THE COURT:  Yeah.

11           MR. RAMIREZ:  I'm sorry.  I'm rushing and I'm --

12           THE COURT:  Yeah, well --

13     BY MR. RAMIREZ:

14     Q     Outside of the apartment.

15     A     Yes, sir.  Offset to the door in the --

16     Q     Offset.  All right.

17           Under the stairs?

18     A     Or about, yes.

19     Q     Just to clarify for me, going to Defendant's Exhibit

20     Number 1, was he in the same area between this gate, in this

21     gate area --

22     A     Yes.

23     Q     -- or closer behind -- underneath the stairs?

24     A     So, when we exited with the children, he was in that

25     hallway, but not underneath the stairs because, if I remember

1    correctly, I think the stairs were being blocked off by

2    something.  I don't know if it was a wall or furniture.  I

3    don't recall.  But he was offset to the door in -- in that

4    hallway.

5    Q    Okay.  Who handed the children to him?

6    A    I -- the two children that I had on me, by the time we

7    made it out, his wife was already there with him.  So I went

8    ahead and I handed the children -- or I placed them down on

9    the ground for her and she took custody of the children.

10   Q    Was Mr. Garza in handcuffs at the time?

11   A    I don't recall.

12   Q    Okay.

13        (Participants confer)

14   Q    Did you see Sergeant Gonzalez, Mike Gonzalez, either walk

15   into the efficiency or come out of when he was coming out of

16   the efficiency, into the living area of Apartment 1?

17   A    No, sir.  Once I committed to the children and I stayed

18   there with them, I did not see what -- what else was done.

19   Q    All right.  Thank you.

20        MR. RAMIREZ:  I'll pass the witness, Your Honor.

21        THE COURT:  All right.  For defense, cross-

22   examination.

23        MR. GUERRA:  Yes, Your Honor.

24        May I also go to the -- again, go to the --

25        THE COURT:  Yes.  Use the podium?

1            CROSS-EXAMINATION OF JORGE ALBERTO MARTINEZ, JR.

2    BY MR. GUERRA:

3    Q    Sergeant Martinez.

4    A    Yes, sir.

5    Q    I'm Raul Guerra.  I'm going to ask you some questions.

6    I'm part of the defense team for Mr. Saldana.

7    A    Yes, sir.

8    Q    So you did not write a report, correct?

9    A    Correct, sir.

10   Q    And you know, from your training and experience, that's

11   very important.

12   A    Correct.

13   Q    You had classes, they told you documenting, documenting,

14   documenting what happened is very important.

15   A    Correct.

16   Q    But you didn't do that in this particular case.

17   A    Correct.

18   Q    Did you -- are you also the type that takes notes while

19   you're at an operation, at an event, at an incident?

20   A    No, sir.  Whenever I'm there for SWAT duties --

21   Q    You don't take any notes.

22   A    No, sir.

23   Q    Okay.  And you have no notes that you took with relation

24   to what you testified here today --

25   A    No, sir.

1    Q     -- on June 1st, 2022.

2    A     No notes, sir.

3    Q     Okay.  So everything you've testified to today we have no

4    way of verifying in writing because you did not write a report

5    for the Webb County Sheriff's Office.

6          You did -- did you write anything in particular for ATF,

7    for Agent Morales here?

8    A     No, sir.

9    Q     Did you write anything in particular for DEA and turn it

10   over to Agent Schlup or any other DEA agent?

11   A     No, sir.

12   Q     Any other federal agency?

13   A     No, sir.

14   Q     You didn't give any information to anybody else.

15   A     No, sir.

16   Q     Okay.  And so this happened June 1st of 2022.  We're

17   having this hearing today, and today is February 1st, 2023,

18   and you're going based completely off of your memory because

19   you failed to write down and record the events as you were

20   involved, more than -- what is that eight months ago?

21   Whatever it is.

22   A     Well, if I may, like I said, I was there as a SWAT member

23   and we do not write reports.  Anything that we do, when we're

24   doing a mission like that, when it comes to the SWAT team.

25   And then, secondly, we all had our body cams on.  But at the

1    time, we didn't have any space in the system, so we had been

2    months already that the body cams were not --

3    Q    And I understand and I'm glad you said that because that

4    is a question I asked Sergeant Gonzalez.  And he stated that,

5    just like you did --

6    A    Uh-huh.

7    Q    -- that the body cam was not -- but he had stated -- and

8    certainly, if I'm mistaken, the record will correct me.  But I

9    believe he stated also that he understood that the dash cam

10   unit -- the units in the dash cam were not recording because

11   the system was full, as you're saying.

12   A    Correct.

13   Q    Would it surprise you to know -- to learn -- and I

14   corrected myself as I was in -- as I was asking him questions

15   because we did receive two -- I believe it was two recorded

16   dash cam videos from that event.

17   A    Okay.

18   Q    And so, when you testified here today and Sergeant

19   Gonzalez testified that the system was full, that appears to

20   be inaccurate because that -- at least two dash cam -- and I

21   don't want to presuppose that it's the same system.  But

22   whatever the system is, if -- unless there's two different

23   systems, at least one of them was not full because there was

24   space for dash cam videos.

25            THE COURT:  Hold on.

1           MR. RAMIREZ:  It --

2           THE COURT:  Is there -- Mr. Ramirez?

3           MR. RAMIREZ:  Yes, Your Honor.  I was going to

4   discuss this with Ms. Martinez during the break, but I forgot.

5   But I thought I had sent an email that I received from the IT

6   person at the Sheriff's Department advising that that was the

7   case, that they could not have -- they were going through a

8   transition.  There was some system issue with space --

9           THE COURT:  Hold on, hold on.  I don't want what

10  you're saying to --

11          MR. RAMIREZ:  Oh --

12          THE COURT:  -- affect the witness' testimony.  But

13  there was a communication you --

14          MR. RAMIREZ:  I passed on, yes.

15          THE COURT:  -- that you sent on to Ms. Martinez.

16  Okay.  Thank you, Mr. Ramirez.

17          MR. RAMIREZ:  And certainly that --

18          THE COURT:  Mr. Guerra, I'm not sure that was worded

19  in the form of a question or you were just telling him what

20  you thought or your concerns or thoughts --

21          MR. GUERRA:  It was --

22          THE COURT:  -- about it.

23          MR. GUERRA:  It was a question.  I was making sure -

24  - I was trying to be fair to say, well, I don't know how the -

25  - obviously, I don't work for Webb County IT, so I don't --

1    and I was unaware of this particular email that Mr. Ramirez

2    had sent, so --

3              THE COURT:  So, if your question is essentially

4    would it surprise you that there was a couple of dash cam

5    videos that came out --

6              MR. GUERRA:  Yes.

7              THE COURT:  Anyway.  I'm not going to -- reword the

8    question or proceed --

9              MR. GUERRA:  Yeah.

10             THE COURT:  -- with your question.

11             MR. GUERRA:  And that is the question, Your Honor.

12   I'll use the phrasing that the Court did.

13   BY MR. GUERRA:

14   Q    And that would be the phrasing that:  Would it surprise

15   you that there were two dash cam unit recordings that were

16   provided from that particular date, the units that were

17   involved in this particular incident on June 1st, 2022?

18   A    No, sir, it wouldn't surprise me.

19   Q    Okay.  Were you aware of that?

20   A    So can I explain the --

21   Q    Well, just answer my question first.  I mean --

22   A    Was I aware of that?  No, sir --

23   Q    No.

24   A    -- I wasn't.

25   Q    Okay.  And I'll let you explain what you wanted to

1    explain.

2    A     So the way -- certain dash cams and certain body cams

3    that a lot of us have had storage on them.  So it would tell

4    us if your storage system is -- is already full, well, there's

5    no way we can download it or anything like that because of the

6    system.  But there are some dash cams and some body cams that

7    were not full at the time.  Unfortunately, mine was one of the

8    ones that were full.

9    Q     Well, I'm glad you said that.  So, to your knowledge,

10   were any of the other -- and there were a lot of Webb County

11   Officers who were involved.

12   A     Uh-huh.

13   Q     Sergeant Gonzalez testified that it was the entire

14   Narcotics Unit, a patrol officer such as yourself, a lot of

15   SWAT officers.

16   A     Sure.

17   Q     And so I don't remember getting the exact number.

18         Do you know how many Webb County Officers were involved

19   in this?

20   A     No, sir, I don't.

21   Q     You don't have a number.  Okay.

22   A     No, sir.

23   Q     But to your knowledge, did any of the other Webb County

24   Officers who were involved, who had body cams, did any of

25   those -- were any of those operational at the time, to your

1     knowledge?

2     A    I would only know to my own, sir.

3     Q    You don't know?

4     A    No, sir.

5     Q    But now you're saying that, to your knowledge, some of

6     those body cams apparently had some capacity.

7     A    Yes.

8     Q    Okay.  And I'm saying in general, not the --

9     A    Yes.

10    Q    So you don't know -- you don't know if any one of the

11    ones --

12    A    Correct.

13    Q    -- that were used --

14    A    Yeah.

15    Q    -- were for another -- okay.

16    A    Yes, sir.

17    Q    So let me see if I understand this correctly.  We've

18    established you didn't write a report.

19          But you're saying that you went in there and you were in

20    your patrol uniform.

21              MR. GUERRA:  And can you put up ...

22    Q    I believe -- I think that's you, and I want to make sure.

23    I wanted to ask you this because it looks like that's you, and

24    I want to make sure whether that is there.

25          But there is a -- there is a deputy in uniform in exhibit

1    -- one of the exhibits, and I could be wrong, I'm not a

2    hundred percent, but I think it's you, so ...

3              MR. GUERRA:  No, I think it's -- we're -- the one

4    talking to Mr. Saldana.  There's one where there's -- at the

5    time Mr. Saldana -- and I apologize, I don't remember the

6    number.

7              (Participants confer)

8              MR. GUERRA:  Well, I'll move on as she's looking for

9    it.

10   BY MR. GUERRA:

11   Q    But -- so you said you -- even though you're a SWAT team

12   member, you yourself did not change out into a SWAT uniform.

13   A    Correct.

14   Q    And you only had your sidearm, you didn't -- did you take

15   out your AR-15 to go in?

16   A    No, sir.

17   Q    Okay.  How many other people --

18             MR. GUERRA:  There it is.  That one.

19   Q    Is that you or am I --

20   A    Yes, sir, that's myself on the --

21   Q    That's what I thought.  The one with the arms crossed and

22   full uniform --

23   A    Yes, sir.

24   Q    -- Webb County Sheriff's Office uniform.

25   A    Yes, sir.

1    Q    Okay.  And in this particular Defendant's 23, you're

2    talking to Mr. Saldana, right?

3    A    It appears so, yes, sir.

4    Q    Okay.  And Mr. Saldana is handcuffed behind his back,

5    correct?

6    A    It appears so, yes.

7    Q    And that agent with the ponytail, that's Agent Schlulp,

8    correct?  If you know.

9    A    I -- I don't know.

10   Q    You don't know.  Okay.

11        So -- but you said you didn't have your AR-15.

12        How many of the SWAT deputies who responded in full gear,

13   how many were in full front gear with AR-15s?

14   A    I don't recall, sir.

15   Q    Okay.  Was it several?  Was -- is it fair to say several?

16   A    I mean, I would -- it wouldn't be surprising.

17   Q    Well, let me ask you this:  How big is your SWAT team?

18   A    We currently have about 19.

19   Q    Nineteen members.

20        And so, out of the 19 members of the full SWAT team, how

21   many do you recall that were present on June 1st, 2022 at this

22   event?

23   A    I can't -- I can't give you a number.  I don't recall.

24   Q    You don't know if it was half or if it was more than

25   half, less than half?

1    A    I would assume less than half.

2    Q    Less than half.  So that would be about less than nine,

3    is what you're saying.

4    A    I would think so.

5    Q    Okay.  And -- but you -- you do not contest the fact that

6    several of those people, again, less than nine, but several of

7    those SWAT members had their AR-15s at the ready when they

8    responded to assist.

9    A    Yeah, I don't recall.  I mean, it's common practice, but

10   I -- I don't recall.

11   Q    It's common practice.

12   A    Correct.

13   Q    And -- but you're saying you don't remember seeing -- I

14   want to make sure.  Are you saying you don't remember seeing

15   any rifles, or are you just saying I don't remember how many

16   rifles I saw?

17   A    I -- I don't remember seeing any rifles.

18   Q    You don't remember seeing any rifles at all.

19   A    Yes, sir.

20   Q    Okay.  I -- thank you for clarifying that.

21   A    Yes, sir.

22   Q    Now, going into the unit, your testimony is you were the

23   first one to go in.

24   A    Correct.

25   Q    Okay.  Before anybody went in there, before Sergeant

1    Gonzalez, before Investigator Sarquiz, before anybody else,

2    you were the first person to go into Apartment 1 to look for

3    the kids.

4    A     Correct.

5    Q     Did you do that on your own or did Sergeant Gonzalez tell

6    you, you go first?  Because Sergeant Gonzalez was in charge,

7    right?

8    A     Correct.

9    Q     Okay.  So did he instruct you to do that or did you do it

10   on your own?

11   A     I did that on my own, sir.

12   Q     You did that on your own, so -- okay.

13   A     Yeah.  They requested first stack, and I stacked up, and

14   I was the first one there.

15   Q     Okay.  So when you say a "stack," that is a SWAT, that's

16   a -- kind of a paramilitary term, right?  I mean, it's a --

17   A     Well, it's just -- it's just so we're all on the same

18   line and not having people --

19   Q     Exactly.  Right.  But I mean, there's a certain --

20   there's a reason why you do that, right?  I mean, what is --

21   you tell me.  What is the reason why you do that?

22   A     Accountability, pretty much.  To make sure everybody is

23   on the same page and everybody is -- is not lost and we're all

24   going to be moving in together --

25   Q     Okay.

1    A    -- and not one by one.

2    Q    Okay.  So you go -- you went in.  But your testimony is

3    you were first and you don't remember in who went in second.

4    If I recall your testimony correctly, you don't remember who

5    went in after you did.

6    A    Correct.

7    Q    And you would agree with me that that apartment,

8    Apartment 1, that you went into is a very small apartment,

9    right?

10   A    Correct.

11   Q    I mean, you take several steps -- and I'm trying to

12   remember because I went in, but I did go in.  And probably,

13   you know, the door is here.  And if I'm not mistaken, right

14   around where you're at is probably the door to the bedroom.  I

15   mean, it's not that far --

16   A    Correct.

17   Q    -- right?

18   A    Correct.

19   Q    As you walk in, you look.  And about where you're sitting

20   right now, which is -- it wasn't ten feet, but it's around ten

21   feet for me -- you see the bedroom door --

22   A    Correct.

23   Q    -- right?

24        So you took the steps necessary to get there and you said

25   the door is ajar.

1    A    Uh-huh.

2    Q    You walked in.  Did you leave the door open?

3    A    Did I leave --

4    Q    To the bedroom.

5    A    Oh, to the bed -- well, the bedroom was -- yeah, it was

6    cracked open.

7    Q    It was cracked --

8    A    It was cracked open.

9    Q    I understand that.

10        But when you walked in, you left it open.

11   A    Yes.

12   Q    I'm sure you didn't close the door --

13   A    Yes.

14   Q    -- right?

15   A    Exactly.  So I left it open because I didn't completely

16   go straight into the room.  Maybe -- the children were already

17   at the doorway.  So that's when I took a knee and I stayed

18   there with the --

19   Q    Okay.

20   A    -- with the children.

21   Q    So the kids were like practically waiting for you by the

22   door --

23   A    Yes.

24   Q    -- two of them, anyways.

25   A    Yeah, two of them.

1    Q    You take the knee.

2    A    Uh-huh.

3    Q    And you said you see the other baby --

4    A    Correct.

5    Q    -- looked like waking up from a nap, I believe is what

6    you said, right?

7    A    Right.

8    Q    So, right away, that shouldn't have taken you more than,

9    you know, from seconds to a minute or so to do that, correct?

10   A    Correct.

11   Q    It was a very, very (indicating) fast sequence of events,

12   and you immediately you knew the kids were -- they were okay,

13   right?

14   A    Correct.

15   Q    And so how quickly after that did Investigator Sarquiz

16   come to assist you?  You were in there seconds --

17   A    I mean --

18   Q    -- minutes, and then --

19   A    Yeah.  I mean, it wouldn't have been more than a minute -

20   -

21   Q    Okay.

22   A    -- tops.

23   Q    Very, very quickly, right?

24        And then, so -- but then you said something interesting.

25   You said that you had to wait there until you got the -- let

1    me look at my notes here.  Where is it?  Of course, now I

2    can't find it, but -- oh, I'm sorry.  Here it is.

3          You had to wait there -- and I wrote here:

4                "-- until Sergeant Mike told you that the area was

5    cleared."

6          Okay.

7    A    Correct.

8    Q    "Sergeant Mike" is Sergeant Mike -- Michael Gonzalez,

9    correct?

10   A    Uh-huh.  Correct.

11   Q    And he was in charge of the scene.

12   A    Correct.

13   Q    So you had to wait until he told you that it was clear,

14   whatever he was doing, he was going to let you know it's clear

15   to come out of the bedroom --

16   A    Correct.

17   Q    -- right?

18         So, then, really, the well being of those kids was not

19   really the main focus at that point, it was make sure you've -

20   - whatever is happening gets done, gets -- he gives you the

21   clear and then you can bring the kids out, even though you're

22   already within the unit, per se.

23   A    Correct.

24   Q    Correct?  Okay.

25   A    Yes.  But I don't know if there's somebody else in that -

1      -

2      Q    Oh --

3      A    -- apartment complex.

4      Q    -- I understand that.

5           But I mean you stated -- again, I'm not here to put words

6      in your mouth.

7      A    Of course.

8      Q    You stated --

9      A    Of course --

10     Q    -- you had to wait until Sergeant Mike -- again, Sergeant

11     Michael Gonzalez -- gave you the all clear to take the kids

12     out until whatever he was doing was done, even though you just

13     told the Judge, the Court, you don't know when he came into

14     the room.  You don't remember that.

15     A    Correct.

16     Q    But he was obviously in the room or he was somewhere near

17     the room because you were waiting for the all clear --

18     A    Correct.

19     Q    -- from him, not from anybody else, but from him.

20     A    Correct.

21     Q    He wasn't going to be in the parking lot and yelling it

22     to you.  You want -- you said you had to hear the all clear,

23     right?

24     A    Uh-huh.  Correct.

25     Q    Okay.  So, presumably, he was close by.

1    A    Correct.

2    Q    Okay.  But you have no idea what he was doing.

3    A    I -- to my recollection, he was offset to the door,

4    outside with Mr. Garza.

5    Q    That's what you remember.  He's -- the whole time that

6    you were in there, he was outside.

7    A    Well, I don't know if he was in or not, I can tell you

8    that much.  But I do remember, because the other officers had

9    came in and cleared the area, telling okay, it's okay in

10   there.  So now my security is clear to bring out the children.

11   Q    Okay.  So how much -- we've already established it took

12   you very -- very, very little time to go in there, the kids

13   are okay, Sarquiz comes in.

14            THE INTERPRETER:  Your Honor?

15            THE COURT:  Yes?  Hold on.

16            THE INTERPRETER:  The sound got interrupted.

17            THE COURT:  Oh, we're having technical difficulties

18   with the interpreter, the interpreter's equipment.

19       (Participants confer)

20            THE INTERPRETER:  Thank you, Your Honor.

21            THE COURT:  You ready?

22            You can continue, Mr. Guerra.

23            MR. GUERRA:  Thank you, Your Honor.

24   BY MR. GUERRA:

25   Q    So we've established, like I said, that you -- it was

1    very quick.  You said -- you agreed with me it's a very short

2    distance, the door was ajar, you made sure the kids were fine,

3    Sarquiz joined you within -- also very quickly.

4         Do you know how -- I mean, approximately how long you

5    were there waiting for the all clear before you took the kids

6    out?

7    A    No, sir, I don't recall.

8    Q    I mean, is it safe to say that it was seconds, minutes?

9    I mean, you weren't --

10   A    It wasn't seconds, but I -- I don't recall how -- how

11   long.

12   Q    A couple of minutes?  I mean, you were -- let me put it

13   to you this way:  I mean, you weren't in there for half an

14   hour, an hour waiting.

15   A    No, sir.

16   Q    No?  I mean, it was minutes, and  more than likely a few

17   minutes and not like a lot of minutes.

18   A    Correct.

19   Q    Okay.  And so, when you came out, do you recall in that

20   apartment -- when you went in, do you recall a couch being in

21   there?

22   A    Yes, I do.

23   Q    So, when you went in, where was the couch?

24   A    It was to my righthand side.  I saw a couch.  I just

25   bypassed it because I noticed the child in the door.

1    Q    Okay.  And so the -- but when you saw it, that couch was
2    still against the wall?
3    A    Yes.
4    Q    Okay.  When you took the kids out, where was the couch?
5    A    The same place.
6    Q    Still against the wall.
7    A    Yes, sir.
8    Q    Okay.  And mister -- and Sergeant Gonzalez is outside.
9    A    It was up against the wall, but moved, it was offset.
10   Q    Oh, so it had already been moved.
11   A    Yes.
12   Q    Okay.  How much was it moved?
13   A    I don't recall.
14   Q    Okay.  Well, would you say a couple of feet away from the
15   wall?  And when you say "moved," what -- are we talking about
16   towards the middle of the livingroom or was it pushed to --
17   you know, towards the kitchen?  How exactly was it moved?
18   A    I want to say it was moved up against the wall, but out
19   of the way.
20   Q    So like into the living area.
21   A    Correct.
22            MR. GUERRA:  Is that -- can you put --
23            THE COURT:  And Mr. Guerra, I missed, I guess, the
24   key portion of your question.  What time frame are you --
25            MR. GUERRA:  This is --

1          THE COURT:  -- is this question about with the

2    witness?

3          MR. GUERRA:  He's already secured the kids, Your

4    Honor.  I had asked him he had secured the kids, Investigator

5    Sarquiz is with him.  And he said it was a couple of minutes

6    that then they -- then they get the all clear.  He walks out

7    and he sees the couch --

8          THE COURT:  And on his way out --

9          MR. GUERRA:  On his --

10          THE COURT:  -- you're --

11          MR. GUERRA:  -- way out --

12          THE COURT:  So we're --

13          MR. GUERRA:  -- he sees --

14          THE COURT:  -- talking about what he saw about the

15    couch on the way out.

16          THE WITNESS:  Correct.  Yes, sir.

17          MR. GUERRA:  On the way out, yes.

18          THE COURT:  Got it.  Just want to make sure.  Okay.

19          THE WITNESS:  Yes, sir.

20    BY MR. GUERRA:

21    Q    So this is --

22          MR. RAMIREZ:  And it was sort of one location before

23    it, and it was moved --

24          MR. GUERRA:  Yes.

25          MR. RAMIREZ:  -- sometime later.

1        MR. GUERRA:  Yes, Your Honor.  He's testified he --

2   going into the bedroom, the couch is against the wall.  It is

3   --

4        THE COURT:  I got it.

5        MR. GUERRA:  -- flush, flush with the wall.  Coming

6   out a couple of minutes later, the couch is moved, and this is

7   what I want to clarify.

8   BY MR. GUERRA:

9   Q    This is -- this picture, Defendant's Number 5, Sergeant

10  Martinez, was taken, as has already been established on the

11  record, months after the event in question, months after June

12  1st.  I'm not going to be able to tell you the date because I

13  didn't take it, so I don't remember the date.  But obviously,

14  it doesn't depict -- there's no couch there.

15       But you see, again the wall there, you see a bed.

16  A    Correct.

17  Q    Okay.  And so is that where you recall seeing the couch

18  when you --

19  A    Correct.

20  Q    -- when you first came in?

21  A    Yes, sir.

22  Q    And the couch was flush, blocking that door?

23  A    Correct.

24  Q    Okay.  So then, when you came out of the room minutes

25  later, approximately minutes later, did you see it moved like

1    towards the front door, like in that direction?  Because

2    that's what I was trying to establish.

3    A    So it was kind of towards my left, this way, this

4    direction.

5    Q    So towards the kitchen?

6    A    Correct.

7    Q    Okay.  So pushed up.

8    A    Yes.

9    Q    Okay.  That's what I was trying to establish.

10    A    Yes, sir.

11    Q    But it was no longer blocking entrance into that room.

12    A    Correct.

13    Q    Okay.  Was that door open or closed, that -- the door

14    leading into the efficiency, the door that was being blocked.

15    A    I don't recall.

16    Q    You don't remember that.

17    A    I don't remember that.

18    Q    But you remember the couch had already been moved.

19    A    Yes.

20    Q    Okay.  And this is after Sergeant Gonzalez gives you the

21    all clear, you're -- you can get out, you can move out of the

22    -- move the children out of the room.

23    A    Correct.

24    Q    Okay.

25    A    Yes, sir.

1    Q    And at that point, he's already outside talking to

2    Mr. Garza.

3    A    Correct.

4    Q    Okay.  Do you -- did you hear -- well, let me backtrack

5    and ask you the question that's the foundation for that.

6         You obviously, I would imagine, had sat down, as I would

7    imagine law enforcement does, to have debriefs after a

8    situation like this, and people talk about what so-and-so did

9    and -- especially in your case because you didn't write a

10   report --

11   A    Uh-huh.

12   Q    -- right?  So you all talked about what had happened.

13        What did you hear, if anything, about what happened to

14   gain entry into that room, the efficiency?

15   A    Can you rephrase the question?

16   Q    Okay.  When -- after this event was done and you all were

17   debriefing, you were talking to Sergeant Mike, you were

18   talking to Investigator Sarquiz, whoever you spoke to, to tell

19   them, okay, this is what I did, this is what I didn't do.

20   What was discussed about how entry was gained into that room?

21        MR. RAMIREZ:  Your Honor, that's assuming that

22   something had occurred.  I'm objecting because it hasn't been

23   established that he was present at any kind of meeting like

24   that yet.

25        MR. GUERRA:  Well --

1          THE COURT:  Well --

2          THE COURT:  -- if he --

3          MR. GUERRA:  -- I'm asking if --

4          THE COURT:  I mean --

5          MR. GUERRA:  -- he had a debriefing.

6          MR. RAMIREZ:  Yeah.

7          THE COURT:  Yeah.

8          MR. GUERRA:  I was asking him.  That's why I said

9   I'm assuming you had a meeting.

10  BY MR. GUERRA:

11  Q    Did you have a meeting?

12  A    No, sir.

13  Q    You never --

14  A    I was not a part of the debriefing.

15  Q    You did not -- you never debriefed.

16  A    No, sir, not that I can say.

17  Q    And you --

18  A    No, sir.

19  Q    Okay.  So you never told anybody what you just told the

20  Court that you did.

21  A    No, sir.

22  Q    As far as -- as far as today, if agent -- if Investigator

23  Sarquiz takes that stand, she's going to -- not going to tell

24  the Judge what you did.

25  A    Not from my perspective.

1    Q    Well, because you never told her.  That's what I'm

2    getting at --

3    A    Right.

4    Q    -- right?

5    A    Correct.

6    Q    So you never told her this is how the sequence of things

7    happened, this is how I --

8    A    Correct.

9    Q    Because she wasn't there next to you, so she doesn't know

10   what happened in the room with the kids or anything, right?

11   A    Correct.

12           THE COURT:  Well --

13   Q    And nobody else does because nobody else was with you in

14   the room.

15           THE COURT:  Hold on.  I'm sorry.  I should not --

16   you're -- I thought I understood the witness to testify

17   earlier that Investigator Sarquiz did enter the bedroom.

18           MR. GUERRA:  Eventually.

19           THE COURT:  Eventually.

20           MR. GUERRA:  But --

21           THE COURT:  But -- and I don't know how long.

22           MR. GUERRA:  Exactly.

23           THE COURT:  But --

24           MR. GUERRA:  But that -- eventually, she did join

25   him.  But he was the first one going in there, he's already

1    testified --

2              THE COURT:  Right.

3              MR. GUERRA:  -- not only into Apartment 1, but into

4    the bedroom.

5              THE COURT:  Yes, that's my --

6              MR. GUERRA:  And I'm just --

7              THE COURT:  -- understanding.

8              MR. GUERRA:  I'm trying to establish from him that

9    he didn't communicate, apparently.

10             THE COURT:  Right.

11             MR. GUERRA:  I'm --

12             THE COURT:  And he's --

13             MR. GUERRA:  I didn't know this, but I'm making sure

14   he didn't communicate any of this information to anybody, is

15   what he's saying.

16             THE COURT:  Right.  I just didn't want it -- it

17   sounded -- I didn't want confusion about that she never went

18   into the room, never saw him with the children because,

19   apparently, at some point --

20             MR. GUERRA:  No --

21             THE COURT:  And it sounded like it was a relatively

22   short time.

23             MR. GUERRA:  Yes.

24             THE COURT:  Okay.  Let me interject right there, can

25   I just ...

1          Sergeant Martinez --

2          THE WITNESS:  Yes, sir.

3          THE COURT:  -- how long, in total, do you think you

4   were in the -- what's your best estimate of how long you were

5   in the apartment?

6          THE WITNESS:  I don't recall, honestly, Your Honor.

7          THE COURT:  The best --

8          THE WITNESS:  Maybe --

9          THE COURT:  -- estimate?

10         THE WITNESS:  I don't know.  Maybe five minutes.

11         THE COURT:  All right.  Go ahead, Mr. Guerra.  You

12  can continue.  I'm sorry.  I had a question.

13  BY MR. GUERRA:

14  Q    Okay.  So the question -- one of the questions I should

15  have asked you is:  So why didn't you communicate -- as soon

16  as you knew the kids were secured, why didn't you yell or

17  radio or whatever, tell, hey, the kids are all secure, as soon

18  as you -- because you were the first one.

19  A    Uh-huh.

20  Q    Why did you not do that?

21  A    So I don't recall who also went into the apartment, but

22  they obviously saw me with the children, so they relay that

23  information to -- to Mike, that, hey, I was with the children.

24  So I was tied up there until we were cleared to go -- to go

25  out.

1    Q    Okay.  So your understanding is somebody did communicate

2    that information, but again, you couldn't move until Sergeant

3    Mike said all secure --

4    A    Yeah.  I chose not to only for the safety of the

5    children.

6    Q    Okay.  Okay.  So you were not present -- you said that

7    the only thing you remember of that conversation -- yeah.

8    Okay.

9         So, when you stated earlier that you were staying there

10   for the safety of the children, I mean, what was -- if you

11   were with them and you're a law enforcement officer, and then,

12   eventually, Dana Sarquiz joined you and she's a law

13   enforcement -- she was armed, as well, correct?

14   A    Correct.

15   Q    Okay.  And you just said that there were other law

16   enforcement officer in there, you stated that also, right?

17   A    Correct.

18   Q    What -- why were the children endangered?

19   A    Well, we don't know if they were in danger.  Though --

20   and what I mean by "for their safety" is I wouldn't want to

21   start escorting children out when there are still officers

22   moving around there with their weapons, especially, or if

23   there's anybody else in the apartment complex hiding or

24   anything like that.  You have to assume the worst to make sure

25   that they're safe until we're --

1    Q    Okay.  So you just introduced another element --

2    A    Uh-huh.

3    Q    -- that hasn't been addressed.

4         How many officers have their weapons drawn?

5    A    I don't recall, sir.

6    Q    But they're -- but officers had their weapons drawn.

7    A    Of course.

8    Q    Okay.  Because, a little while ago, you just said you

9    didn't remember, even though SWAT was called in -- when you

10   call SWAT, you don't usually call them -- correct?  If I'm

11   wrong.

12   A    Uh-huh.

13   Q    And tell them leave the rifles at home and just bring the

14   sidearm because that's all you need.

15   A    Yes --

16   Q    You don't call SWAT unless you need the heavy firepower,

17   right?

18   A    Correct.

19   Q    And you just said a little while ago that you don't

20   remember seeing any rifles.  But now you're telling us you do

21   remember guns being drawn.

22   A    Well, yes.  We're going entry into an apartment complex

23   and we don't know who's in there.  So, like myself, I had my

24   weapon drawn, too.  I didn't have my rifle.

25   Q    Okay.  So you drew your weapon to go in.  What did you

1    draw -- what is your everyday carry?

2    A    It's going to be a pistol, P3-20, Sig Sauer.

3    Q    Okay.  And Sarquiz same?

4    A    I believe so, yes.

5    Q    Okay.  Sergeant Gonzalez had his weapon drawn?

6    A    I don't know if Sergeant Gonzalez --

7    Q    You don't remember.

8    A    No.

9    Q    Okay.  Who else do you remember seeing with their weapons

10   drawn?

11   A    I know Corporal Ayala was also there.  I don't know if he

12   had his rifle or not with him.

13   Q    So -- and you know, that's an interesting and a very

14   important point, Sergeant.

15        So you just said that, when you're in a situation like

16   that -- and this, here, you were going into an apartment where

17   the person tells you there's kids --

18   A    Uh-huh.

19   Q    -- and knowing there's kids, you drew your weapon and you

20   went in there, right?

21   A    Correct.

22   Q    And so when -- I'm going to -- I've got some other

23   questions about this, but I'm going to skip over it.

24        Were you involved in the situation securing, arresting my

25   client in Apartment 3 upstairs?

1    A    In arresting him?  I didn't place him under arrest, no.

2    Q    Well, but you --

3    A    But I --

4    Q    Were you --

5    A    I was --

6    Q    -- up there?

7    A    Yes, sir.

8    Q    Did people have their weapons drawn?

9    A    No, sir.

10   Q    So they drew them downstairs where there's kids.  But

11   you're telling the Court that they did not draw them upstairs?

12   A    No, sir.

13   Q    They did not.

14   A    No, sir.

15   Q    Okay.  I thought you said a little while ago that, when

16   you're in an intense situation like this, that's normal

17   procedure.

18   A    So, because of the way the tip came in, yes.  But the

19   upstairs, when we went to go speak to Mr. Saldana, we didn't

20   go in expecting to come into contact with anybody.  We went up

21   there because of a female who made an outcry saying that he

22   was -- he was an older gentleman.

23   Q    Even though there's kids in -- help me understand this

24   because this is very confusing for me.  I'm not a law

25   enforcement officer, but it's very confusing that you know

there's three children and you go with weapons drawn there, in

there, into that room, into the bedroom where the kids are at,

but you don't when there's only adults and where you are

presumably following the leads regarding, again, the person

that you see as a target and you have brought in a lot of SWAT

team members.

A     At the time --

              MR. GUERRA:  Bless you.

A     -- when I made contact with Mr. Saldana, I didn't know he

was a target.

Q     You didn't know that.

A     No, sir.

Q     Okay.  Okay.  So you're saying you didn't draw your

weapon.  But are you telling the Court nobody else that was in

-- went into Apartment 3 drew their weapons when they

approached Mr. Saldana, or are you just saying I don't know?

A     I don't know.

Q     You don't know.

A     No, sir.

Q     But there's a possibility some of those people drew their

weapons?

A     I can't answer for that, I don't know.

Q     You cannot answer that question.  Okay.

       One other thing that you mentioned that is also a little

bit confusing for me, you -- and I -- and maybe I

1    misunderstood you, Sergeant.  But when Mr. Ramirez asked you a

2    question about the stairs and you were talking about where

3    people were positioned, you -- correct me if I'm wrong, but I

4    heard you say the stairs were blocked.  Is that what you

5    testified, that the stairs --

6            MR. GUERRA:  Could you put that up again, Sara, that

7    -- Defendant's 2.

8    BY MR. GUERRA:

9    Q    Are you talking about those stairs right there?

10   A    No.  I'm talking about the -- so, yes, these stairs.  But

11   in back of them, under them, there was some -- like you see

12   this brown wall -- sorry -- that brown wall right there?

13   Q    Uh-huh.

14   A    It was blocking the bottom of the -- of the stairs.

15   Q    Oh, okay.

16   A    So there could have been something had been standing

17   under the stairs, but it was blocked.

18   Q    Okay.  So you're not talking about that stairwell.

19   You're talking about the -- I mean, you're talking about that

20   stairwell --

21   A    Yes.

22   Q    -- but not the --

23   A    At the bottom.

24   Q    Not the steps, the back portion.

25   A    Correct.

1          THE COURT:  Kind of underneath there.

2          THE WITNESS:  Yes, sir.

3   BY MR. GUERRA:

4   Q    Underneath.

5   A    Underneath.

6   Q    Okay.

7   A    Yes, sir.

8   Q    I just wanted to make sure because I had it in my notes

9   and I -- that confused me a little bit --

10  A    Yes, sir.

11  Q    -- as to what exactly was blocked.  Okay.  Let me

12  just ...

13          (Participants confer)

14  Q    Okay.  I think those are -- well, just one thing.

15          So you do know that Investigator Sarquiz prepared a

16  report, right?  You know that?

17  A    Yes, sir.

18  Q    And you know that she documented the events -- well, you

19  know that she documented the events as they relate to June

20  1st, 2022 in her report.

21  A    Yes, sir.

22  Q    Okay.  And do you know that your name is mentioned in

23  there as one of the officers -- as a matter of fact, let me

24  ask you because it says -- so her report lists Sergeant

25  Michael Gonzalez, Corporal Hectero (phonetic) Robert Ayala.

1    Is that -- that's also the Sheriff's Office, correct?

2    A    Yes, sir.

3    Q    Okay.  Corporal Ismael Garcia.  That's also the Sheriff's

4    Office --

5    A    Correct.

6    Q    -- correct?

7         Sergeant Michael Alvarez.  Is that also Sheriff's Office?

8    A    Yes, sir.

9    Q    Okay.  Then yourself.  And then Deputy Alejandro --  and

10   you're listed as a corporal because you already testified that

11   was your rank at the time.

12   A    Yes, sir.

13   Q    Deputy Alejandro Rodriguez.  Obviously, by the term, I'm

14   assuming he's a Webb County, not a U.S. Marshal Deputy.

15   A    Correct.

16   Q    Okay.  Deputy Kevin Alvarez?

17   A    Correct.

18   Q    Okay.  That's also Webb County?

19   A    Yes, sir.

20   Q    Deputy Alejandro Barrera (phonetic)?

21   A    Correct, also Webb County.

22   Q    Deputy Jose Sanchez?

23   A    Yes, sir.

24   Q    Deputy Ephraim --  it says "Gracia," (phonetic), but I'm

25   assuming that's Garcia.

1    A    No, it's Gracia.

2    Q    It is Gracia.

3    A    Yes, sir.

4    Q    Okay.  Thank you for correcting that -- or clarifying

5    that.

6         So -- and then Investigator Rosando Ramirez (phonetic)?

7    A    Correct.

8    Q    Of course, Investigator Dana Sarquiz.

9         Before you read you the other names, out of the -- those

10   people that I was mentioning -- and I can mention the names

11   again -- tell me which ones, if you know, are SWAT.  Sergeant

12   Gonzalez already established he's the commander.

13   Q    Is Corporal Hectero Ayala SWAT?

14   A    Yes, sir.

15   Q    Okay.  So that's two.

16        Is Corporal Ismael Garcia SWAT?

17   A    No, sir.

18   Q    No?

19        Is Sergeant Michael Alvarez SWAT?

20   A    Yes, sir.

21   Q    That's three.  Is -- well, you are, that's four.

22        Deputy Alejandro Rodriguez?

23   A    Yes, sir.

24   Q    SWAT?  That's five.

25        Kevin Alvarez?

1    A    No, sir.

2    Q    No?

3    Q    Alejandro Barrera?

4    A    No, sir.

5    Q    Jose Sanchez?

6    A    No, sir.

7    Q    Ephraim Gracia?

8    A    No, sir.

9    Q    And Investigator Rosando Ramirez.

10   A    Yes, sir.

11   Q    Okay.  So that's six, if I -- that's six.  Okay.

12   A    Right.

13   Q    What about Investigator Sarquiz, is she SWAT?

14   A    No, sir.

15   Q    No?  Okay.

16        And then it says here that the other people involved in

17   approaching was Special Agent Zach Schlup, Special Agent Kyle

18   Hansworth (phonetic), DA TFO Director Romando (phonetic).  Do

19   you know if he's SWAT?

20   A    No, sir.  I don't know --

21   Q    No?

22   A    -- whether he is.

23   Q    You don't know.

24   A    No, sir.

25   Q    Okay.  Special Agent Joseph Atria (phonetic), Special

1    Agent Diamore Rodriguez (phonetic), Special Agent Eric Park

2    (phonetic), Special Agent Frank Mosely (phonetic), DA TFA

3    Sandra Rolla Garcia (phonetic).  Do you know if he's SWAT?

4    A    I don't know, sir.

5    Q    okay.  DA TFO Tiadora Garcia (phonetic).  Do you know if

6    he's SWAT?

7    A    I don't know, sir.

8    Q    Okay.  So do you know -- apart from all those names that

9    I just listed -- I mean -- or mentioned that are listed in

10   Investigator Sarquiz's report, was anybody else involved apart

11   from that long list of agents and deputies and whatever, SWAT

12   member that I just --

13   A    No, sir, not that I recall.

14   Q    Those were all the people that you recall that were back

15   -- were involved in this particular encounter.

16   A    Correct.  The other agents, I have -- I don't know who

17   they are, so I couldn't tell you yes or no.

18   Q    Okay.  The federal -- the ones that are --

19   A    Federal agents --

20   Q    -- federal agents.

21   A    -- yes, sir.

22   Q    Okay.

23   A    Yes, sir.

24   Q    One last question.  So look at exhibit -- Defendant's

25   Exhibit Number 11.

1    A    Yes, sir.

2    Q    On the left side, you see that are signatures.  Are any

3    of those two signatures your signature?

4    A    The bottom signature is mine.

5    Q    Okay.  So you witnessed this document.

6    A    Yes, sir.

7    Q    And when was this done, when was this -- first of all,

8    were you the one that approached Mr. Saldana about this

9    document?

10   A    No, sir.

11   Q    You did not.  You were just --

12   A    No.

13   Q    Did you sign it after the fact or were you --

14   A    I -- I signed it -- after he gave the consent, I signed

15   as a witness that I was there.

16   Q    Okay.  Well, so you were there when it was -- when it was

17   executed.

18   A    Correct.

19   Q    Okay.  Was Mr. Saldana handcuffed at the time?

20   A    I don't recall.

21   Q    You don't remember whether he is?

22   A    I don't recall.

23        MR. GUERRA:  Well, let's go back to the picture

24   where he's talking too him.

25   BY MR. GUERRA:

1    Q    Is that why you're talking to him in that particular

2    picture that we have?  And we'll show it to you again -- show

3    it to you again.  Defendant's 23.

4    A    Uh-huh.

5    Q    You're talking to him.  Is that about the time -- is that

6    -- would that be why you're there because you are about to

7    witness or you just witnessed the execution of this document?

8    A    I don't recall the time frame, but I --

9    Q    Well, how many --

10   A    -- do recall it was after the --

11   Q    I --

12   A    -- fact.

13   Q    I'm sorry to interrupt you.

14   A    Yes, sir.

15   Q    Finish your thought and --

16   A    Yes.  I believe it was after the fact.

17   Q    It was after the -- after he had executed this.

18   A    Yes, sir.

19   Q    Shortly thereafter?

20   A    I wouldn't say "shortly."  I don't recall how long after.

21   Q    Well, how many -- let me ask you this question.

22   A    Because I never --

23   Q    How --

24   A    I never made contact with Mr. Saldana to actually talk to

25   him until after it was --

1    Q    That was the question I was going to ask you.

2    A    Yes, sir.

3    Q    You should recall because, if you remember how many times

4    you actually talked to him, then you can -- I mean, you know,

5    if you talked to him ten times, well, you're not going to

6    remember which one out of the ten.  But --

7    A    Yes.

8    Q    -- if you only talked to him once or twice -- and how

9    many times did you talk to him?

10   A    That I can recall?  I talked -- I spoke to him one time

11   upstairs and then downstairs where he was -- yes.

12   Q    Okay.  So then, if this is downstairs, this was, you're

13   saying, shortly after this was --

14   A    That was after.

15   Q    After this --

16   A    Right.

17   Q    -- was executed.

18   A    Correct.

19   Q    And you can tell that he's handcuffed, though, right?

20   A    Yes, sir.  At that time --

21   Q    Okay.

22   A    -- yes, sir.

23   Q    So now this refreshes your memory that he was handcuffed.

24   A    After the fact, yes, sir.

25   Q    Okay.  So was he -- do you think he was handcuffed -- are

1    you saying that you don't think he was handcuffed until after

2    he gave consent?

3    A    I don't know if he was --

4    Q    You don't --

5    A    -- handcuffed before because he signed, so I don't see

6    why he would be handcuffed if he was signing it, but I don't

7    recall --

8    Q    Well, I'm not saying to sign.  Obviously, he would have

9    to be -- unless you meet him like this.

10   A    Yeah.

11   Q    But I'm talking about before you go and you say, here,

12   sign here --

13   A    Uh-huh.

14   Q    -- or whatever you said.  Was he handcuffed?

15   A    I don't recall --

16   Q    You don't --

17   A    -- if he was handcuffed or not.

18   Q    But this shows him handcuffed right after --

19   A    After --

20   Q    -- you're saying --

21   A    -- the fact..

22   Q    -- he executed --

23   A    Correct.

24   Q    -- the -- okay.

25              THE COURT:  So --

1    Q    Who is --

2              THE COURT:  Hold on, Mr. Guerra.  Let me just ...

3              So, Sergeant, you don't recall when Mr. Saldana was

4    handcuffed during this process, you don't remember when he was

5    handcuffed?

6              THE WITNESS:  That's correct, Your Honor.

7              THE COURT:  Okay.  All right.  Go ahead, Mr. Guerra.

8    BY MR. GUERRA:

9    Q    And you were -- to follow up on the Judge's question.

10   You -- like you just testified a couple of seconds ago, you

11   were upstairs when he was encountered.

12   A    Correct.

13   Q    And so you're saying, from upstairs down to now, until we

14   see this picture, you really don't know what -- at what point

15   he was handcuffed.

16   A    Correct.

17   Q    Okay.

18   A    Because, after we brought him downstairs, he was speaking

19   to Sergeant Mike Gonzalez, and when -- I got kind of pulled to

20   the perimeter once again.

21   Q    Okay.  Do you know who the other signature is on that doc

22   -- we already changed it.  But do you know who the other

23   signature is?

24   A    I believe it was Corporal Garcia.

25   Q    Corporal Garcia.

1    A    Yes, sir.

2    Q    So you were present and you were witnessing how this was

3    executed.  Let's put it up again, Sergeant, so you can see it.

4            UNIDENTIFIED:  What number is it?  Do you have it?

5            MR. GUERRA:  Number 11.  I'm sorry.

6    BY MR. GUERRA:

7    Q    So who -- since you were present, who filled it out?  Did

8    you do it?  Did Corporal Garcia do it?  Did Mr. Saldana do it?

9    Who filled out the writing on the top?

10   A    I don't know, sir.

11   Q    You don't --

12   A    It wasn't -- it wasn't myself.

13   Q    You don't -- you didn't do it.

14   A    No, sir.

15   Q    And you don't know if Corporal Garcia did it.

16   A    No, sir.

17   Q    You don't know if my client did it.

18   A    No, sir.

19   Q    Okay.  So did you explain this form to my client?

20   A    No, sir, I didn't.

21   Q    Did Corporal Garcia explain this form to him?

22   A    I don't know, sir.

23   Q    Well, you were there.  How do you -- I mean, what do you

24   mean --

25   A    I --

1    Q    -- you don't know?

2    A    I was there.  When he was going to sign, I was perimeter,

3    like I said, and they called me over, hey, we need a witness

4    here, witnessing that he is -- you know, was written this and

5    was given the -- the warrant.

6    Q    So you're saying that, while you were present, neither

7    you, nor Corporal Garcia explained this form to my client?

8    A    Well, I don't know if Corporal Garcia explained it to him

9    or not.

10   Q    Ah --

11   A    I don't know if Corporal Garcia is also the one --

12   Q    Let --

13   A    -- that might have signed -- might have filled it out.

14   Q    But listen to my question --

15   A    Uh-huh.

16   Q    -- Sergeant.  While you were there --

17   A    Uh-huh.

18   Q    -- as a witness, I'm asking you, so is it your testimony

19   that, while you were there as a witness, neither you, nor

20   Corporal Garcia explained this form to my client?

21   A    I can say -- speak for myself that I did not explain it

22   to the client.  I don't know if Corporal Garcia did.

23   Q    Well, again, but you -- listen to my question.  While you

24   were there --

25   A    Uh-huh.

1    Q    So, unless you have temporary deafness, I'm asking you --

2              MR. RAMIREZ:  Your Honor --

3    Q    -- did you hear --

4              MR. RAMIREZ:  -- I'm objecting.  I --

5              THE COURT:  Yeah.  Well, to that comment?

6              MR. RAMIREZ:  To that comment.  And also because

7    he's already answered the question.  And as to --

8              THE COURT:  I -- no, I'll allow the question.  To

9    the extent --

10             MR. GUERRA:  I apologize for the comment.  But Your

11   Honor, he --

12             THE COURT:  Just re-ask --

13             MR. GUERRA:  It's a very specific.

14             THE COURT:  Just -- I do want this clarified.  Ask -

15   -

16             MR. GUERRA:  Yeah.

17             THE COURT:  Please ask the question.

18   BY MR. GUERRA:

19   Q    It's a very specific question, Agent -- or Sergeant.

20   While you were standing there as a witness because that's why

21   your signature is on there --

22   A    Correct.

23   Q    -- did you hear -- and you've already said you didn't

24   explain this form.  Did you hear Corporal Garcia explain this

25   form to my client?

1    A    I did not Corporal Garcia.

2    Q    You did not hear.  Okay.  That's interesting.

3              THE COURT:  Well, Mr. Guerra, hold on.

4              Sergeant, did you hear anybody else explain the

5    consent form to Mr. Saldana?

6              THE WITNESS:  I don't recall, sir.  I know Sergeant

7    Gonzalez was speaking to him the whole time --

8              THE COURT:  All right.

9              THE WITNESS:  -- that we were --

10             THE COURT:  But you don't recall --

11             THE WITNESS:  That's correct.

12             THE COURT:  -- anybody else talking to Mr. Saldana

13   about the consent form.

14             THE WITNESS:  That is correct.

15             THE COURT:  Okay.  All right.

16   BY MR. GUERRA:

17   Q    Okay.  And so who called you to go -- you said somebody

18   called you to come in and be a witness.  Who called you?

19   A    I don't recall if it was Corporal Garcia or Sergeant

20   Gonzalez.  I don't recall.

21   Q    One of those two did it.

22   A    Correct.

23   Q    Okay.

24             THE COURT:  Wait.  And I'm sorry.  Clarify.  The

25   other witness is Garcia --

1                   THE WITNESS:  Corporal Garcia.

2                   THE COURT:  -- or Gracia?  Because you said one of

3        them was --

4                   THE WITNESS:  Yeah.  No, that would be Corporal

5        Garcia.

6                   THE COURT:  Corporal --

7                   THE WITNESS:  Gracia --

8                   THE COURT:  -- Garcia.

9                   THE WITNESS:  -- was another deputy.

10                  THE COURT:  Okay.  Corporal Garcia.

11       BY MR. GUERRA:

12       Q    So --

13                  MR. RAMIREZ:  And he's on my witness list, Your

14       Honor.

15                  THE WITNESS:  Yes.

16       BY MR. GUERRA:

17       Q    Well, one final question -- I keep saying and she keeps

18       coming to give me more questions.  But was Sergeant Gonzalez

19       present when you and sarge -- and investigator -- Corporal

20       Garcia were executing this form with my client?

21       A    Yes, Sergeant Gonzalez was there.

22       Q    He was also present.

23       A    Yes, sir.

24       Q    Okay.  So who else -- well, okay.  So now it was you,

25       sergeant -- I mean -- I keep -- Corporal Garcia, yourself,

1    Sergeant Gonzalez.

2         Who else was around the -- Mr. Saldana when he executed

3    this form?

4    A    I don't recall, sir.

5    Q    But there could have been other officers that were

6    around.

7    A    There could have been.

8    Q    All right.  Did anybody have their -- were there any

9    other SWAT officers around?

10   A    We were holding perimeter in the area, so yes.

11   Q    But I'm talking immediately around where Mr. Saldana was

12   standing to execute this form.  You already established it was

13   yourself, Corporate Garcia, Sergeant Gonzalez.

14   A    Uh-huh.

15   Q    Any others who were immediately around them while he

16   executed this form?

17   A    I don't believe so.

18   Q    Okay.

19   A    I don't recall anybody.

20   Q    Did any of you three that you do recall being present,

21   have your weapons drawn?

22   A    No, sir.

23   Q    Not at that time.

24   A    No, sir.

25   Q    But you did have weapons on your -- in your holster,

1   right?

2   A    Correct.  Yes, sir.

3   Q    Okay.  Did any of the three -- any of you three have a

4   long gun while you were executing the form?

5   A    No, sir.

6   Q    No?

7        (Participants confer)

8   Q    So, when he -- when you were talking to him about this,

9   had -- to the best of your recollection, Sergeant Martinez,

10  have the agents all ready gone into the efficiency room and

11  already started searching and removing -- extracting stuff at

12  that point?

13  A    Beforehand, no, sir.

14  Q    No?  Before he signed it, no.  That is your recollection.

15  That is --

16  A    That's correct.

17  Q    -- your testimony.

18  A    Correct.

19           MR. GUERRA:  Okay.  Thank you, Your Honor.

20           THE COURT:  All right.  Any cross-examination -- or

21  further direct?

22           MR. RAMIREZ:  Yes, Your Honor.  Yes -- no, Your

23  Honor, I don't have any questions.  Thank you.

24           THE COURT:  Okay.  I -- let me -- let's do this with

25  this witness before we excuse the Sergeant.  We don't have an

1    English translation of this Exhibit 11, which is the consent

2    form that the Defendant purportedly signed, giving consent to

3    enter the efficiency.  I think it needs -- there needs to be

4    an English translation on the record.  So we don't have one in

5    writing; and so, therefore, I'm going to ask the interpreter

6    to read the document out loud to translate it.

7              Does anybody -- do you have any problem with that,

8    Mr. Ramirez --

9              MR. RAMIREZ:  No.

10             THE COURT:  -- or the Government?

11             MR. RAMIREZ:  No problem.

12             THE COURT:  Any problem or objection to that on

13   behalf of Defendants?  I think it's necessary --

14             MR. GUERRA:  No, Your Honor, no objection.

15             THE COURT:  -- and appropriate.

16             MR. GUERRA:  Yes, Your Honor.

17             THE COURT:  Okay.  Just to have the translation on

18   the record.  So let me ask our interpreter to please translate

19   the -- verbally here, the Defendant's Exhibit Number 11, from

20   Spanish into English.

21             MR. RAMIREZ:  Do you have a paper copy?

22        (Participants confer)

23             MR. RAMIREZ:  Your Honor, I have a paper copy.

24             THE COURT:  Hold on.  Okay.  Somebody just handed

25   her a printed copy, so she can use that.

1           All right.  Our interpreter will now translate

2       Defendant's Exhibit Number 11 into English.

3           THE INTERPRETER:  "Webb County Sheriff's Office,

4       CID.  Consent to Search, Inspect, Examine.  State of Texas,

5       Webb County.  I, Jose Alonso Saldana-Alaniz, hereby give my

6       consent to Sarquiz and Sergeant Gonzalez, Webb County

7       Sheriff's Department Officers, to search the following."

8           First bullet:

9           "Vehicle located at," blank space; "Vehicle

10      described as," blank space; "Color," blank; "Year," blank;

11      Model," blank; "Outside style or its general style," blank;

12      License Number," blank; "Identification Number of the vehicle,

13      including all containers in the vehicle and their contents,"

14      blank.

15          Next bullet:

16          "Apartment/house located at 13104 Flores,

17      including," blank.

18          Next bullet:

19          "Place of business known as," blank; "located at,"

20      blank.

21          "I understand that I have the right to refuse" --

22          (Participants confer)

23          THE INTERPRETER:  "-- to give this search consent as

24      described above and refuse to sign this form.  I also declare

25      that no promise, threat, force, or physical or mental coercion

1    of any kind has been used against me to make me give this

2    consent to search what has been described above and to sign

3    this form.  Date, 06/01/22; Time 7:24 p.m."

4              Witness on the lefthand side, bottom, illegible

5    signatures.  And righthand side bottom, a signature,

6    illegible.

7              THE COURT:  All right.  Thank you.

8              From the Government, any objection to that

9    translation or interpretation of exhibit -- Defendant's

10   Exhibit Number 11?

11             MR. RAMIREZ:  None at all.

12             THE COURT:  From the defense?

13             MS. MARTINEZ:  No, Your Honor.

14             THE COURT:  All right.  Then that concludes that

15   translation.

16             All right.  Anything else from this witness from the

17   Government?

18             MR. RAMIREZ:  No, Your Honor.  Thank you.

19             THE COURT:  From defense?

20             MR. GUERRA:  Just I understand that it has Sarquiz's

21   -- he did stated that -- nobody else, but to clarify whether

22   Sarquiz was also --

23             THE COURT:  You can ask him that question, right.

24             MR. GUERRA:  Yes, Your Honor, with your permission.

25   BY MR. GUERRA:

1    Q    Sergeant, you can see that the document has Sarquiz's

2    name on there, along with Sergeant Gonzalez.  Do you remember

3    if she was also there when he executed the document?

4    A    I don't recall, sir.  I know that Sarquiz was back and

5    forth, so I -- I can't tell you if she was or wasn't.

6    Q    So only the three --

7    A    Yes, sir.

8    Q    -- of you that you've already mentioned --

9    A    That I --

10   Q    Gonzalez, yourself --

11   A    -- can recollect.

12   Q    -- and -- thank you.  Thank you, sir.

13   A    Yes, sir.

14        THE COURT:  Okay.  Any followup from the Government?

15        MR. RAMIREZ:  No, sir.

16        THE COURT:  All right.  Sergeant, thank you.  You

17   are excused as a witness and free to go about your day.

18        THE WITNESS:  Thank you, Your Honor.

19        THE COURT:  You're released.  And don't have any

20   conversations with anybody else about --

21        THE WITNESS:  Yes, sir.

22        THE COURT:  -- your testimony.  All right.  Thank

23   you.

24        (Witness excused)

25        THE COURT:  All right.  The Government can proceed

1    with your next week, although -- well, we've been going -- I

2    don't know we've been going for over an hour.

3                MR. RAMIREZ:  Your Honor --

4                THE COURT:  I'm trying to plan our next break.

5                MR. RAMIREZ:  He can be excused?

6                THE COURT:  Yes, I told him he was excused.

7                MR. RAMIREZ:  Okay.  I'm sorry.  I didn't -- yeah.

8                THE COURT:  Yeah, I did tell him he was excused.

9                Anyway, I was thinking about, if we're here breaking

10   for a witness -- do you have a short witness that we could do

11   before we take another break or --

12               MR. RAMIREZ:  Mine are short, yes, Your Honor.

13               THE COURT:  Well, I'll be happy to -- we can do --

14               MR. RAMIREZ:  I'll --

15               THE COURT:  So call your next witness.  Let's see

16   what we do --

17               MR. RAMIREZ:  Fine.

18               THE COURT:  -- with direct of your next witness.

19               MR. RAMIREZ:  Thank you.  Roberto Ayala, Corporal,

20   Webb County Sheriff's Office.

21               THE COURT:  What's the name again?

22               MR. RAMIREZ:  Roberto Ayala, Witness Number 8 on my

23   list.

24               THE COURT:  All right.

25          (Witness summoned)

1       THE CLERK:  Please raise your right hand to be sworn

2   for me.

3           ROBERTO AYALA, WITNESS FOR THE GOVERNMENT, SWORN

4           THE CLERK:  Thank you.  Please be seated.

5           THE COURT:  All right.  Corporal, good afternoon.

6   I'm Magistrate Judge Kazen, I'm presiding over this

7   proceeding.  You're here to testify at this hearing.  You've

8   got the microphone there in front of you.  You can feel free

9   to adjust it as much as you need to find a good position.

10          And you'll be answering questions from the lawyers,

11  maybe one or two from me.  Just, you know, listen carefully to

12  the question that's asked and try to answer to the best of

13  your ability.  All right?

14          So, go ahead, you can proceed, Mr. Ramirez.

15          MR. RAMIREZ:  Yes, Your Honor.  May have the

16  computer switched over to me?  Thank you very much.

17              DIRECT EXAMINATION OF ROBERTO AYALA

18  BY MR. RAMIREZ:

19  Q    Good afternoon, sir.  Please state your full name, your

20  title, and what agency you work with.

21  A    I work with the Webb County Sheriff's Office, corporal is

22  my title.  My name is Roberto Ayala.

23  Q    What do you do with the Sheriff's Office?

24  A    I am currently assigned to the -- the jail as a

25  supervisor, and I'm part of the SWAT team, I'm a team leader

1   on the SWAT team.

2   Q    All right.  I want to take you to a couple of specific

3   matters.

4        How long -- before then, how long have you been with the

5   Sheriff's Office?

6   A    I'm in my seventeenth year.

7   Q    And how many of those years -- tell me what you started

8   doing, what you -- what you're doing now, and what you did in

9   between.

10  A    I started at the -- at the job as a correctional officer.

11  Then I went to the academy in 2010.  I got sent out to patrol,

12  I did a few years out on patrol, got into the SWAT member,

13  became a SWAT member in 2014, and joined the narcotics team in

14  around 2016 and got promoted in 2017, '18, went to the jail as

15  a supervisor there.

16  Q    All right.  So let me take you to June 1st, 2022.  I'm

17  showing you Defendant's Exhibit Number 12 and ask you if you

18  can identify this scene and what it represents and what it

19  brings to you -- to your mind.

20  A    I don't remember the names of the people involved, the

21  Defendants, but that's the apartment complex we -- we went

22  into -- well, the door that's open right there in the front of

23  the -- by the SUV, where the cursor is at right there, that's

24  where we pulled the boxes of ammunition from.  But that's not

25  where we originally entered the -- that building.  We entered

1    it from the left side of that picture, under that staircase.

2    There's another door there.  We went into search for some --

3    yes, that door.

4    Q    Let me -- I'm now showing you Defendant's Exhibit Number

5    3.

6         So, when you say "we," I'm going to -- let me take -- try

7    to take you step by step.

8         So about what time did you arrive at the apartment

9    complex.  And I'm showing you Defendant's Exhibit Number 1.

10   A    I -- I do not recall.  I believe it was some time after 4

11   or 5 because I was on my way to PT some of our SWAT cadets.

12   There was a SWAT academy going on that -- that week, and I was

13   -- I was going to be out PT then in the morning and in the

14   afternoon.

15   Q    What does that mean, "PT"?

16   A    The physical training.  At the beginning of the academy,

17   the cadets go at 6:00 in the morning and then, and then I go

18   there in the evening when they're released, about 5:00 or 6:00

19   in the evening.

20   Q    So you were on your way there.  And how did you end up at

21   this apartment complex at 3104 Flores?

22   A    We got a call for any available units to go and assist

23   and attend, available units that weren't tied up or a few SWAT

24   operators that were on their way to go and PT the SWAT cadets.

25   We met somewhere prior to that.  I don't recall -- I'm pretty

1    sure it was at the Family Dollar.  By the time I showed up, we

2    started driving out towards this -- to this location.

3         When we got there, they had some people detained by --

4    Q    Okay.  Let me go back just a little bit.

5         So you met at a pre -- another predesignated location

6    that was probably part of the callout, I'm guessing.  And

7    there you received what -- you did what, you got a little

8    briefing or something?

9    A    The guys that got there in time got -- got briefed.  I

10   showed up a little late because I was already at the location

11   with my SWAT cadets.  I was one of the last ones to show up.

12   And I'm pretty sure they got briefed on -- as to what was

13   going on --

14   Q    Did --

15   A    -- and had just detained somebody.

16   Q    Did you get briefed?

17   A    No.

18   Q    Were you part of the briefing or did you get there late?

19   I'm not sure --

20   A    I got there --

21   Q    -- I understand.

22   A    I got there late, sir.

23   Q    So did you hear any of the briefing?

24   A    I did not.

25   Q    Okay.  Did you -- so when you the diverted to go over to

1    this apartment complex, you -- what was the scene like when

2    you arrived?

3    A    It was like the -- the picture.  I think it was Exhibit

4    Number 12 that you pulled up.  It was some -- something with -

5    - there wasn't as many people, but they did have some guys

6    detained.  I believe they were over by that silver car.  I

7    don't know if it was silver.  I don't remember.  There was a

8    car right there where that silver car is, the purple line.

9    And they had somebody detained there.

10        They just advised us that there was kids in the -- in the

11   apartment with the -- in the other picture that has the door,

12   Number 1.  So we needed to go in and do a walkthrough, check -

13   -

14   Q    And --

15   A    -- check on the kids.

16   Q    And here we're talking about Defendant's Exhibit Number

17   12.

18        So do you remember who was detained near this gray car?

19   A    I do not.

20   Q    Do you recognize anyone in the photo who might have been

21   somebody who was detained, if at all?

22   A    (No verbal response)

23   Q    Okay.  You're shaking your head.

24   A    No, sir.  I'm very -- I can't -- no.

25   Q    Does that help any?  No?

1    A    No, I don't.

2    Q    Okay.  So let's talk about Defendant's Exhibit Number 3.

3    And this is a door that leads into Apartment Number 1.

4         Did you go into the -- through that door?

5    A    Yes, I did.

6    Q    Tell me what were the circumstances which led you to go

7    into Number 1.  Were you just ordered to go or did you get

8    some kind of instruction before you went in?

9    A    We were asked to go in there to check for children that

10   were left unattended.

11   Q    Who asked you to do that?

12   A    I don't recall.

13   Q    Did somebody give an order to do that, but you don't

14   remember --

15   A    I don't --

16   Q    -- or you don't --

17   A    I don't recall if there was anyone --

18   Q    Okay.

19   A    They put it out there and that's something we know we got

20   to do, whether they give us the order or not.  If there are

21   some children that are not attended, as an officer, it's our

22   responsibility to go in there and check on them.

23   Q    Let me show you -- I'm looking for the floor plan.  I'm

24   sorry, I thought I had it here.

25             UNIDENTIFIED:  It's Number 10.

1    MR. RAMIREZ:  Number 10.  Thank you.  My computer is

2    a little slow.  Thank you.

3    BY MR. RAMIREZ:

4    Q    I'm showing you now on your screen Defendant's Exhibit

5    Number 10, which is a sketch which shows -- at the bottom

6    right of the exhibit shows a square with the letters

7    "apartment" -- or lettering, "Apartment Number 1," and then

8    shows a kitchen, living area, a couple of squares at the top

9    as a bedroom, bottom is efficiency room, a little AC sub-

10   drawing in the corner, and then a middle bathroom, shower in

11   between, and several what appear to be doors that lead to and

12   into the various or out of the various areas.

13         Does that look like what you -- did you go into that

14   apartment?

15   A    I did.

16   Q    And do you remember if the first, second, third or --

17   where were you in the sequence of persons who went in?

18   A    I don't remember.

19   Q    Do you remember going in with Sergeant Gonzalez, who was

20   then Corporal Gonzalez -- I'm sorry -- Martinez, Jorge

21   Martinez?

22   A    I remember going in with both of them.

23   Q    And Michael Gonzalez?

24   A    (No verbal response)

25   Q    Do you recall who went in first, who went in last?

1    A    I -- I do not.

2    Q    How many of you went in?  How many of you -- was it --

3    let me withdraw that question.

4        How many were SWAT members that went in?

5    A    I don't remember everybody that went in, but I remember

6    at least four or five SWAT members.

7    Q    And when you went in, who did you -- what did you -- what

8    happened first?  What did you do?

9    A    We checked the general area for children.  We went -- I

10   think, when we got into the -- the room that's labeled

11   "bedroom," we ran into a couple of kids.  They called it out

12   that they ran into a couple of kids.  We hadn't checked all

13   the doors, so the rest of us continued sweeping the rest of

14   the house to see if there was any other children around the

15   house.

16   Q    Now, in your experience, just because somebody says there

17   are two or three children in the house, do you take their word

18   for it when they're unattended, under the circumstances in

19   which you found the situation to be in?

20   A    I do not.

21   Q    So do you remember -- let me draw your attention to this

22   efficiency room here.  And there is a view of -- let me see.

23        MR. RAMIREZ:  I don't know where I put it.

24   Q    The efficiency -- well, you go in through this door --

25   and I think we were looking at the sketch.

1          UNIDENTIFIED:  10.

2          MR. RAMIREZ:  I'm sorry.  We were at 10, right?

3    Yeah, I'm losing my perspective here.

4    BY MR. RAMIREZ:

5    Q    So did you go towards the bedroom or towards the

6    efficiency or somewhere else?

7    A    At what point, sir?

8    Q    When you walked in?

9    A    When I -- when I walked in, I swept in through -- through

10   the kitchen, and we had bodies sweeping in through the

11   bedroom, and I guess when they -- the bathroom, I never walked

12   in there.  And I was scanning around and then I went into the

13   -- or I didn't actually go into the efficiency, I didn't fully

14   go in.  I had somebody that went in, in front of me, and

15   before I made complete entry into that room, they stopped me.

16   Q    Who was -- who went into the efficiency?

17   A    Sergeant Gonzalez, Sergeant Michael Gonzalez.

18   Q    And what did he -- how did he stop you from going in?

19   A    It was a short room, what we call a "short room."  He

20   went -- he went in.  And as I was going in -- because I had

21   just moved some -- a sofa that was by the door, I opened the

22   door and he went in.  I don't remember if he opened it or I

23   opened it.  He went in before me.

24        It was a short room, we call that a "short room."  He was

25   like hold up.  I'm by the doorway.  I'm going to pull out.

1   And I'm -- that was a little confusing.  He said, no, it's --

2   it looks like it's something separate, so I'm going to pull

3   out.

4   Q    What does that mean, "something separate"?

5   A    It doesn't look like it belongs to part of this

6   apartment.

7   Q    Did you have any information beforehand that the

8   efficiency may not be part of Apartment Number 1?

9   A    I did not.

10  Q    Do you know if Sergeant Gonzalez did?

11  A    I don't.  If he would have, I don't believe he would have

12  gone in.

13  Q    Okay.  Now you said that -- let's talk about the sofa.

14       So there's a -- according to the -- I'm going to back to

15  Exhibit Number 10.

16       You say there was a sofa blocking a door that leads into

17  the efficiency.  And --

18  A    I don't know if it was blocking it or not.  It was in

19  that -- it was in the way of the door, of us to get to that

20  door.

21  Q    Looking at Exhibit Number 6 -- Number 5, Defendant's

22  Exhibit Number 5.  Does that look like the area with the door

23  that's towards the center being the door that you would walk

24  in from and the door to the right being the efficiency.  Does

25  that --

1    A    That looks like it.  That -- I don't know what that is on

2    the floor.  Whatever was blocking it did not look like that,

3    though.

4    Q    So this photo was taken -- I'll let you know this photo

5    was taken by the defense team somewhat afterwards, so just

6    ignore that mattress or whatever that is on the floor and the

7    other items that are on there.

8         And so, essentially, a sofa was blocking or obstructing

9    part of the door.  And the only -- and do you -- how far onto

10   the door area or doorway at -- did the sofa continue?

11   A    I don't recall.

12   Q    But did it keep the door from opening?

13   A    No, sir.

14   Q    The sofa --

15   A    That -- this was a -- well, the layout was like that.  It

16   was the top floor.  I had my -- my weapons, so I would have

17   been able to just move it with one arm, slide it off.

18   Q    Did you, in fact, do that?

19   A    I did.

20   Q    Can you describe this sofa, what it was like?

21   A    I don't know what it was made of.  I think it was a --

22   either a love seat or a three-seater.

23   Q    I'm now drawing your attention to Defendant's Exhibit

24   Number 8, which is a photo of a sofa that's outside.

25        Does that look like the sofa that you pushed aside that

1    was blocking the door?

2    A    I don't remember.

3    Q    Either way, whether it was this sofa or another sofa, you

4    were able to move it with one arm?

5    A    Yes, very easily.

6    Q    And when you moved it, did you move it by pulling it or

7    pushing it, sliding it across, or some other way?

8    A    I don't remember.  It would have -- there would have been

9    some sliding motion --

10   Q    So --

11   A    -- either pulling or pushing.  By looking at the layout

12   by the door -- I don't remember -- but looking at it, I would

13   assume that I swept it by pushing it.

14   Q    And so you moved it, you moved it over, clearing the sofa

15   from the door.

16        And who opened the door?

17   A    I don't remember, sir.

18   Q    So --

19   A    Since I'm -- I don't -- this isn't an actual -- yeah, we

20   were just checking for children.  But in most circumstances, I

21   would be opening there, if Michael ended up inside.  I don't

22   recall if that's what occurred that specific day.

23   Q    Okay.  So I'm going back to Defendant's Exhibit Number 5.

24        So the door opened, somebody opened the door.  When you

25   say "Mike," you're referring to Sergeant Gonzalez.  He goes

1    into the efficiency.  And you're saying that, before you were

2    able to go in, he told you not to go in, with the words you

3    just described.  Is that right?

4    A    That's right.

5    Q    And so, when he came out -- before he came out, did you

6    get to see what was inside the efficiency; did you look in,

7    did you glance?

8    A    Well, yes, sir.  I was in the doorway.

9    Q    And did you get to see any of the items?  Let's see.

10   Actually that's the wrong one.

11          MR. RAMIREZ:  I'm sorry, Your Honor.  I think it's

12   this one.

13   BY MR. RAMIREZ:

14   Q    Does that ring a bell, Defendant's Exhibit Number 15?  Do

15   you remember --

16   A    Yes.

17   Q    -- seeing that?

18   A    I see that.  Yes, sir.

19   Q    And you saw it from the outside or after you went in?

20   A    When we opened the door and I started walking in towards

21   Michael, I was there at the doorway.  Whatever that is on the

22   floor, I was standing around that area.

23   Q    When the door opened, did you hear anything fall, crash,

24   or break?

25   A    I don't remember hearing that.

1    Q    Do you remember seeing a mirror, a broken mirror, on the

2    ground?

3    A    I don't remember seeing that.

4    Q    So he walked out, told you not to go in.  He walked in.

5    And what happened next?

6    A    We pulled out of there.  I don't remember if we closed

7    the door or not, but that's when he explained to me that he

8    believed it was a different -- it was something separate from

9    that apartment.  So we would need a few minutes to speak to

10   somebody to see if they wanted to proceed with a warrant.

11   Q    So -- and the sofa, did it stay where it was, or did you

12   or somebody move it back?

13   A    I pulled out, sir.  I pulled out of that apartment.

14   Q    Then you --

15   A    Then we pulled security after that.

16   Q    You left.  Okay.

17        And what does it mean to "pull security"?

18   A    I secured the area from the outside, where the people

19   that were detained from the original -- the first traffic

20   stop, I believe, or whatever it was when they first came up on

21   -- on the apartment complex.

22   Q    When you walked outside, when you were in -- Sergeant

23   Gonzalez walked out of the efficiency doorway, did you see him

24   walk out with you or did he stay in the living room?

25   A    Since he -- he walked out of the efficiency.

1    Q    Yes.  And then what did he do, after he told you about
2    the warrant possibility and all that?  Did he stay in the
3    apartment or did he leave with you?
4    A    He walked out of the apartment at first, but I -- when I
5    broke off to go pull security, no, I don't -- he stayed
6    behind, maybe outside the apartment.  I don't -- I -- I didn't
7    stay with him at that moment.
8    Q    Okay.
9    A    It was until later I linked back up with him.
10   Q    And then, later, when did you meet up with him again?
11   A    Well, we went upstairs to another apartment complex --
12   another apartment, where they found the Defendant, where we
13   found the Defendant.
14   Q    And when you say "we," you mean you and Sergeant
15   Gonzalez.
16   A    Sergeant Michael Gonzalez.
17   Q    Only the two of you went --
18   A    The first --
19   Q    -- upstairs.
20   A    -- time.
21   Q    The first time.  Okay.
22        So you went upstairs.  And what did you -- what did you
23   see?
24   A    The Defendant -- I believe the Defendant was sitting --
25   sitting on the coach.  We approached him and Sergeant Gonzalez

1   made contact with him, started asking him questions.  He --

2   Q    What were the questions about?

3   A    His name, what he was doing there because the person --

4   the female that was leasing that apartment, her story had

5   changed when we were talking to her outside before approaching

6   that apartment.  At first she said a friend was there, and

7   then she changed it to she didn't really know the person.  I

8   believe one of the agents or somebody had made a comment if --

9   that she didn't want that person there, if he seemed off, and

10  if so, we can check -- go into her apartment and -- and speak

11  to the unidentified man at the time.  And that's when Sergeant

12  Gonzalez went in.

13       And were you present when all -- when the conversations

14  with her about asking her for permission to go up and

15  approach?

16  A    Yes, sir.

17  Q    You heard her -- the conversation she was having.

18  A    (No verbal response)

19  Q    Okay.  And so then did you speak to -- who was the person

20  at the -- sitting on the couch?  Do you recognize him in the

21  courtroom today?

22  A    I don't recognize him.  I don't -- I don't remember.

23  Q    You don't remember what he looks like.

24  A    To be honest, I don't remember what he looked like.

25  Q    But eventually, you --

1    A    It was a brief -- maybe if I saw a picture of that day, I
2    would.
3    Q    But eventually, you saw -- did you -- you saw Sergeant
4    Gonzalez speaking with him.  What was their conversation
5    about?
6    A    I don't remember the -- I remember him asking about his
7    name.  There were other questions that were asked, but I don't
8    remember exactly what they were.  His name changed, though, a
9    couple of times when Sergeant Gonzalez asked him, I believe.
10   Then when Sergeant Jorge Martinez asked him, as well, it
11   changed at one point.
12   Q    So he essentially gave different names.
13   A    He gave different names, that's correct.
14   Q    And at this time, where was the lady who asked you to go
15   upstairs to look and check into him?
16   A    I'm sorry.  I don't remember.
17   Q    So then were you present -- you said there was a -- the
18   first time.  Was there a second time in which you approached
19   the individual who was on the third -- on the second floor?
20   A    We were -- I went back to up to the -- or went back to
21   the apartment with Sergeant Gonzalez and Corporal Ismael ...
22   Q    Garcia?
23   A    Garcia.
24   Q    Is that before or after the identification had been made,
25   the positive identification of the individual was --

1   A    It -- I believe it was Corporal Garcia that made the
2   identification, so that's when I was -- that's the second time
3   I went up.
4   Q    All right.  And so, when you went up the second time,
5   what did you see when you looked into the apartment?
6   A    Into --
7   Q    The lady's --
8   A    -- the other apartment?
9   Q    Yes, the lady's apartment.
10  A    They were talking with him, they were -- they were making
11  contact with him.
12  Q    What kind of contact?
13  A    They were trying to identify him.  And by then, Corporal
14  Garcia said he already seen him, or he had -- he identified
15  himself in a different name.
16  Q    What was the Defendant doing or the person on the couch
17  doing at the time --
18  A    I --
19  Q    -- at the second time?
20  A    I believe, when they were speaking to him, he was
21  standing.
22  Q    And did he say anything while he was standing?
23  A    I was there for a very short, brief moment.
24  Q    Okay.  And then you left.
25  A    Then I left.

1    Q    Do you remember seeing -- what other officers with the

2    Sheriff's Department do you remember seeing speaking with him

3    or in the room the second time you went up?

4    A    It was Sergeant Martinez, Corporal Garcia, Corporal Dana

5    Sarquiz, Sergeant Michael Gonzalez, and myself.

6             MR. RAMIREZ:  Okay.  I'll pass the witness.

7    A    I believe, when I -- when I was breaking off, there were

8    some agents that approached, as well.

9    Q    DEA?

10   A    DEA.  Maybe DEA or ATF.  I wasn't sure whether -- they

11   don't -- I didn't -- I didn't look at the identifiers to see

12   either way.

13   Q    So do you recall seeing, at any point, the Defendant or

14   hearing the Defendant giving any consent to search his

15   efficiency downstairs?

16   A    I didn't hear.

17   Q    Okay.

18   A    But the -- we were advised that he had given consent and

19   he had signed a consent form.

20   Q    So what happened next?

21   A    We went in to search the efficiency through the front

22   door.  One of the pictures you have open, we went through that

23   door and -- somebody got the key.

24            MR. RAMIREZ:  No, it's over here.

25   A    And even though we already had access through the other

1    door, we went in through the front door.  And there was a few

2    of us that were going to go in, but it was a small room, so we

3    didn't all go in.

4    Q    So this is the -- I'm looking at Government Exhibit

5    Number 1 now.

6         So is this is the door that eventually you walked in and

7    --

8    A    Yeah, that's --

9    Q    -- did a search?

10   A    -- the door that we went in.

11   Q    And how did you get access to that door?

12   A    Somebody got a key.

13   Q    Do you remember who?

14   A    I do not.

15   Q    And do you remember seeing the Defendant anywhere near

16   when the door was opened?

17   A    I don't remember.

18   Q    Okay.  Do you remember seeing -- well, was it the same

19   person who was sitting on the couch that was eventually the

20   one that provided the key, or do you remember?

21   A    I don't remember that.

22        MR. RAMIREZ:  Okay.  All right.  Pass the witness,

23   Your Honor.  Thank you.

24        THE COURT:  All right.  Well, we're going to take a

25   break.

1          Let me see.  The -- Corporal, you'll remain, you
2     know, on the stand as a witness, but we're going to take a
3     break, so you can get up and stretch your legs.
4          THE WITNESS:  Okay.
5          THE COURT:  But Counsel, we'll take ten minutes and
6     then be back.  And when we come back, defense will start their
7     cross-examination.
8          MR. GUERRA:  Yes, Your Honor.
9          THE COURT:  Okay.  When we come back, you'll
10    continue with questioning.
11         THE COURT OFFICER:  All rise.
12        (Recess taken from 4:08 p.m. to 4:24 p.m.)
13                        AFTER RECESS
14         THE COURT:  Okay.  Everybody have a seat.
15         All right.  Counsel, so, if we go until 6:00 o'clock
16    today or we -- I mean, you can go ahead and come back on the
17    stand, Corporal.
18        (Witness resumes stand)
19         THE COURT:  Are we going to finish the presentation
20    of all of the evidence on behalf of the Government?  Would
21    that be your expectation?
22         MR. RAMIREZ:  If we don't do cross-examination, yes.
23    I'm just joking, Your Honor.  Quite seriously --
24         THE COURT:  How many more witnesses does the
25    Government intend to call?  Out of -- I know we have the

1  witness list.  But how many do you intend -- let me see.  I've
2  got the Government's exhibit list here.  You -- we've heard --
3  we've called or heard from three, including Corporal Ayala
4  here.  This is the third witness out of eight on your exhibit
5  list.  Are you intending to call the remaining the five?
6         MR. RAMIREZ:  I'm not intending to call Corporal
7  Garcia.  I was going to call Investigator Sarquiz to address
8  something concerning the --
9         THE COURT:  Okay.  But then --
10        MR. RAMIREZ:  And --
11        THE COURT:  Then you don't -- that's fine.  Okay.
12  So --
13        MR. RAMIREZ:  And Agent Morales, Officer Morales.
14        THE COURT:  And --
15        MR. RAMIREZ:  Those were the only persons I was
16  going to call.
17        THE COURT:  Okay.  ATF Agent Morales, those are the
18  two.  So you're anticipating that you will call two more
19  witnesses for the Government.
20        MR. RAMIREZ:  Yes, Your Honor.
21        THE COURT:  Okay.  For the defense, how many
22  witnesses do you intend to call, Ms. Martinez or Mr. Guerra?
23  We've heard from two of your nine listed witnesses.
24     (Participants confer)
25        THE COURT:  Although there is some overlap like

1    Sarquiz.  If the Government calls her, then you wouldn't need
2    to call her.  We've already heard from Michael Gonzalez --
3                MS. MARTINEZ:  It would be --
4                THE COURT:  So --
5                MS. MARTINEZ:  -- Special Agent Schlup that, if the
6    Government doesn't call him, we'd be calling him.  But it
7    would be a quick questioning, Your Honor.  And then --
8                THE COURT:  Right.  So the Government said they
9    intend to call Agent Morales.  Were you saying -- who are you
10   talking about?
11               MS. MARTINEZ:  Zachary Schlup.
12               MR. RAMIREZ:  Number 3.
13               THE COURT:  Okay.
14               MS. MARTINEZ:  Number 8.
15               THE COURT:  Schlup, Number 8.
16               MR. RAMIREZ:  Or 8, I guess.
17               THE COURT:  Okay.  You might call Schlup.  Okay.
18   Yeah, who else?
19               MS. MARTINEZ:  And then perhaps our client, Your
20   Honor, the Defendant.
21               THE COURT:  So you're thinking -- so, if the
22   Government calls Morales and Sarquiz, then the only other
23   witnesses you anticipate you might call are Agent Schlup and
24   the Defendant.
25               MS. MARTINEZ:  Yes, Your Honor.

1          THE COURT:  So maybe we're looking at a total of

2    four more witnesses.

3          All right.  Well, we are -- we're going to go until

4    6:00 o'clock tonight.  If I thought we could finish, we could

5    just go until we finish, but I don't -- with that many

6    witnesses, I don't guess we're going to get them all done,

7    unless you all start going a lot quicker.  And we still have

8    to finish with the -- with Corporal Ayala here.  So, and then,

9    I'd like to talk to you all about some closing arguments and

10   address the issues and questions that I have and things.

11         So my plan is that, tomorrow, I have to do the

12   naturalization ceremony that is scheduled in the morning.  And

13   then I'm intending to clear my calendar for the afternoon to

14   then continue with this hearing at 1:00 o'clock in the

15   afternoon.

16         Does that work for you, Mr. Ramirez?

17         MR. RAMIREZ:  It works for me.

18         THE COURT:  Okay.  Ms. Martinez and Mr. Guerra, can

19   you came that work?

20         MR. GUERRA:  Yes.  Yes, Your Honor.

21         MS. MARTINEZ:  Yes, Your Honor.

22         THE COURT:  And --

23         MR. GUERRA:  I think I had some client calls

24   scheduled, but I can reschedule them, Your Honor, in the

25   afternoon.

1    THE COURT:  Okay.  Because we'll just continue then

2    for another four or five, six hours, if we have to, until we

3    finish because I can't -- yeah, I got to do -- I mean,

4    everything is blocked out for awhile, so -- okay.  Well,

5    that's the plan right now.  Continue until 6:00 o'clock today

6    and then continue tomorrow afternoon, starting at 1:00 o'clock

7    with --

8    THE CLERK:  Judge, if I could just have the Marshals

9    make a note of that, so that they can jot it down, since I

10   didn't add him to the docket that I sent.

11   THE COURT:  To have Defendant be brought, he's going

12   to be back to continue this hearing at 1:00 o'clock, for 1:00

13   o'clock tomorrow.

14       (Participants confer)

15   THE COURT:  Okay.

16   MR. RAMIREZ:  May I  just ask?  Were you planning to

17   call ATF Hinojosa (phonetic)?

18       (Participants confer)

19   MR. RAMIREZ:  Because I wasn't planning to call him.

20   MR. GUERRA:  No.

21   MR. RAMIREZ:  His role was --

22   THE COURT:  Okay.  So nobody is planning on calling

23   ATF Hinojosa.  And -- oh, I struck off the wrong one, so --

24   but -- wait.  So -- I'm sorry.  So maybe I messed this up.  Is

25   the -- all right.  So I'll mark this off.

1          The Government was intending to call ATF Agent

2     Morales?

3          MR. RAMIREZ:  Yes, Your Honor.

4          THE COURT:  And defense was planning to call ATF

5     Hinojosa or Morales?

6          MR. GUERRA:  We may --

7          THE COURT:  Or if they call Morales, you won't call

8     them, but --

9          MR. GUERRA:  Exactly.  If they call Morales, we're

10     not going to call Hinojosa, Your Honor.

11          THE COURT:  You will not call Hinojosa.

12          MR. GUERRA:  We will not.

13          THE COURT:  Okay.  All right.  So -- okay.  Good.

14     Okay.

15          All right.  So, again, then I had it accurate.  The

16     -- right now, the continued anticipated witnesses are, for the

17     Government, ATF Agent Morales and Investigator Sarquiz.  And

18     then, for defense, it's DEA Agent Schlup and perhaps

19     Defendant.

20          MS. MARTINEZ:  Correct, Your Honor.

21          THE COURT:  Okay.  So we've got four witnesses, I

22     did add that correct.

23          All right.  Then we are continuing with the cross-

24     examination, defense's examination of this witness.  Are you

25     ready, Corporal?

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  Okay.  All right.  You can continue, --

3          MR. GUERRA:  Thank you, Your Honor.

4          THE COURT:  -- Ms. Martinez and Mr. Guerra.

5               CROSS-EXAMINATION OF ROBERTO AYALA

6     BY MR. GUERRA:

7     Q    So and you're a sergeant now, correct?

8     A    I'm still a corporal.

9     Q    I'm sorry, corporal.  Some of these people were corporal

10    and now they're sergeants so I was looking at it and it said

11    corporal, but I wanted to make sure that I did not misaddress

12    you as with a wrong title.  But you are jail supervisor

13    presently and a SWAT team leader.

14    A    Yes, sir.

15         MR. GUERRA:  Okay.  So I'm going to -- I'm Raul

16    Guerra, and I'm going to ask you a couple questions.

17    BY MR. GUERRA:

18    Q    So you're SWAT, you said, and so you came in -- well,

19    first of all, you did not write a report.

20    A    No, sir.

21    Q    No.  Did you take any notes during this or after this

22    event that you shared with either Sergeant Gonzalez, the

23    commander on scene, or Investigator Sarquiz, or anybody else?

24    A    Did not.

25    Q    You did not.  You did not take any notes.

1    A    I didn't take any notes.

2    Q    No notes, okay.  So everything you testified to today is

3    strictly from memory of this event that happened approximately

4    nine months ago on June 1st, 2022.

5    A    Yes, sir.

6    Q    Okay.  And did you use this -- did you use anything else

7    to refresh your recollection prior to testimony, to

8    testifying?

9    A    To refresh my memory?

10   Q    Yeah.  Nothing.

11   A    No, sir.

12   Q    Okay.  So you were there as a SWAT team member.  And tell

13   us does that mean you were full SWAT gear?

14   A    I wasn't -- I didn't get called just because I was SWAT

15   team.  I got called because I was an available unit that can

16   assist.

17   Q    I understand that.  But I mean were you -- did you

18   respond with the full SWAT gear is my question?

19   A    I don't remember.

20   Q    You don't remember.  What I'm interested in is, for

21   instance, did you have a long rifle, did you have an AR-15,

22   which that is the standard, right, for the SWAT testimony

23   previously was, did you have your AR-15, did you use

24   specifically -- because at one point you testified that you

25   had to do security, you were doing security in the perimeter,

1    the outside perimeter is according to the notes, that was your

2    testimony previously, right?  So is it your testimony that you

3    did security for the perimeter with a regular sidearm or did

4    you do it with an AR-15?

5    A    I don't remember.

6    Q    You don't remember.

7    A    No.  And let me explain that a little bit.  I know that

8    you're used to all SWAT members carrying the long rifle.  But

9    I don't always carry the long rifle because -- it's always in

10   my unit but my primary job is a breacher.  So I normally don't

11   carry a long rifle --

12   Q    Okay.

13   A    -- with me because I have a breeching tool that I need to

14   carry with me.  In this case, I didn't have that.  So I don't

15   remember if I picked up my long rifle or not.

16        MR. GUERRA:  Okay.  Well, the reason I'm asking you,

17   Corporal, is because previous testimony has been -- and if I

18   remember correctly it was from Sergeant Gonzalez who said that

19   due to the nature of he information that they had gotten, he

20   decided to call in SWAT.  I believe that was what he testified

21   earlier.  And so if I understood his testimony correctly it

22   was because not just to have available bodies but they needed

23   basically SWAT who, you know, which has special training.  You

24   know that better than I do because you're a SWAT team member.

25   And obviously heavier fire power than a patrol officer.

1    Q    So that's why I'm asking you if you were -- if you

2    responded and you were SWAT, because your current assignment

3    is to the jail, so did you bring your long rifle?  And you do

4    not remember.

5    A    I always have it with me in the unit.  I don't remember

6    if I got off with it --

7    Q    Okay.

8    A    -- because I'm used to not carrying it because I usually

9    have a breaching tool with me.

10   Q    I understand.  Okay.  So then you testified that you went

11   into -- eventually you went into apartment number one.  And

12   you testified that you yourself, you were the one who moved

13   the sofa.  Did you do it by yourself or did you have help from

14   somebody?  I know that you said that -- if I understood your

15   testimony, it appeared to me that you were saying that it was

16   by yourself, and I want to make sure that that's clear.  Was

17   it just you or did Sergeant Gonzalez or anybody else help --

18   A    I remember doing it by myself.

19   Q    You did it by yourself, okay.  Do you recall where

20   Sergeant Gonzalez was when you moved the sofa?

21   A    I don't.

22   Q    Do you recall where Investigator Sarquiz was when you

23   moved the sofa?

24   A    I believe me and Sergeant Gonzalez were the only ones

25   around that area when we went into that room.

1    Q    Okay.  Because you testified earlier that again -- and I

2    want to make sure I'm not -- you know, I don't want to put

3    words in your mouth.  But if my recollection is correct and my

4    notes are correct, you said that four or five SWAT members

5    went into apartment one, right?

6    A    Into the apartment, that's correct.

7    Q    Right.  So, you know, you and Sergeant Gonzalez are SWAT

8    members.  So then I'm trying to figure out, okay, Sarquiz is

9    not SWAT is what the previous testimony was.  So then where

10   were the other SWAT members?

11   A    They were clearing the other rooms.

12   Q    Okay.  So because -- sorry --

13   A    I didn't go into every single room so I don't remember

14   how many rooms there were.  I remember the room they pointed

15   out where the kids were and the kitchen, because that was in

16   the open, general area.  I -- my -- the room that I

17   concentrated on most was the door that they hadn't gotten to,

18   which was the one I had to move the sofa.

19   Q    Okay.  And do you recall why you all decided or you

20   decided to move it?  Why did you decide to move the sofa?

21   A    Because there was a door right there where the sofa was.

22   We need to clear every single room.

23   Q    Okay.  But did you do it because you need to clear every

24   single room or did you do it because you were looking for the

25   children?  Those are --

1    A    We were clearing --

2    Q    You understand that those are --

3    A    -- the rooms to make sure that there's no other children

4    in the house.  That's what --

5    Q    But --

6    A    -- we were clearing the rooms for.  That's why we were

7    clearing the whole apartment for.

8    Q    When you were told that you were looking for children,

9    what was your understanding of how old these children that you

10   were -- or did you even know how old these children were that

11   you were looking --

12   A    I have no idea.

13   Q    You did not know.  But you -- they were children and they

14   were not --

15   A    They were unattended children in the apartment.

16   Q    Right.  And so nobody said teenagers, nobody said young

17   adults.  They said children, right?

18   A    They didn't specify.

19   Q    And so in other words denoting very small kids, right.

20   And so but, again, my question is since that sofa was blocking

21   the door, I understand you were looking for children, but it

22   did not occur to think how could the kids have moved that sofa

23   and gotten into that room.

24   A    Well, like I said earlier, that sofa was fairly easy to

25   move.

1   Q    For you.  I understand that.  You are -- and you're a

2   SWAT team member.  I'm sure you do special training.  You look

3   like you're in really good shape.  I understand that that's a

4   very -- it's very easy for you to move it.  But we're talking

5   about kids, right?  And so you do understand the distinction,

6   that a child is not going to have the strength that you do as

7   a -- how old are you again?

8   A    I'm 37.

9   Q    Thirty-seven year old, and you been a peace officer for

10  17 years.  You look like you -- again, you look like you

11  exercise regularly, that you're in really good shape.  So you

12  understand that distinction, right?  I mean, a young child is

13  not going to have your strength, right?

14  A    I do.

15  Q    Okay.  So but did you testify earlier that you heard that

16  the kids were -- somebody said that the kids were okay?  Did

17  you --

18  A    I -- somebody had made contact with some kids --

19  Q    And so --

20  A    -- in one of the bedrooms --

21  Q    I understand that.  But how did -- like how was that

22  communicated to you?  Did somebody yell it out on the radio?

23  A    I believe somebody just yelled it out, announced it.

24  It's a -- wasn't a very big apartment.

25  Q    Okay.

1    A    Just you're doing what you're doing, you're clearing the

2    rooms, checking for the children, and you're listening to what

3    people are saying.

4    Q    Okay

5    A    Somebody said, I've got some kids here.

6    Q    Okay.  So and that was before you got into the room or --

7    A    I think that was in the process of me moving.

8    Q    You're in the process of moving the sofa when you heard

9    the kids are -- somebody saying the kids --

10   A    They said -- I don't remember them saying the kids.  I

11   remember there's some kids.

12   Q    Okay.  So somebody -- one of your fellow officers alerted

13   you, well, and everybody else who could hear that kids, we

14   found the kids or, you know, we found kids, something to that

15   effect.

16   A    Yes, sir.

17   Q    Okay.  But having heard that you still proceeded to go or

18   attempted to go and -- well, you did go into the room.  You --

19   I know -- I understand you said you started to go in, but you

20   did go into the room even though you had heard that already.

21   A    Yes, sir.  We had to check every door.

22   Q    Okay.  But you were checking every door -- after you

23   heard that the kids were okay, you were checking every door

24   for a different reason, is that correct, not for --

25   A    We were checking for kids.

1    Q    Well, --

2    A    They didn't tell us how many kids were in the room, in

3    the house.  They didn't tell us how many kids were in the

4    house or how old they were.  They didn't specify or give any

5    of that information.  They just told us there were some

6    unattended kids in that --

7    Q    So you --

8    A    -- apartment.

9    Q    I understand that.  So your testimony is that Sergeant

10   Gonzalez, even though sergeant -- per his testimony, Sergeant

11   Gonzalez -- at a minimum Sergeant Gonzalez had had a

12   conversation with Mr. Garza about the children and had

13   communicated how many kids.  That was -- the number of kids

14   was never communicated to you or to any other office, that's

15   your testimony?

16   A    It wasn't to me, sir.

17   Q    Okay.  But that is your testimony.

18   A    Yes, sir.

19   Q    You didn't know how many kids you were looking for.

20   A    I didn't know how many kids.

21   Q    Okay.

22   A    I still don't even know how many kids they found in the

23   bedroom.

24        MR. GUERRA:  Okay.  It was three, sir.  Okay.  It was two

25   little ones -- well, they were all very little but it was two

1    that were apparently -- I think that the testimony was six

2    months and then another one that was a toddler.  I forget the

3    exact age.

4    Q    Now, you said -- and I have it in my notes -- I wouldn't

5    be opening it if Michael wasn't going -- was going in is how I

6    have it.  So I want to understand that.  So are you -- is your

7    testimony that you would not have moved the sofa and moved

8    and, you know, basically breached that door unless your

9    understanding was that Michael -- and I understand Michael to

10   be Michael -- Sergeant Michael Gonzalez was going to be going

11   into that.  Is that how you -- when you responded to the

12   question from Mr. Ramirez, is that how you were explaining it?

13   A    I believe I was saying that if Michael, if Sergeant

14   Gonzalez, went in first, into the room first, in most cases I

15   would be -- I don't recall if I opened it or not.  But most

16   cases -- in most tactical situations, I would be opening.

17   Q    Okay.  So based on --

18   A    Because --

19              MR. GUERRA:  I'm sorry, go ahead.

20              THE WITNESS:  -- if you're going in first, you're

21   not going to open the door.  Somebody else is going to open

22   because that's the most tactical way to open and go into a

23   room.

24   BY MR. GUERRA:

25   Q    So what you're saying is based on your team's training,

1    your SWAT team's training, that would have been your job, you

2    know, you opened the door and then Sergeant Gonzalez goes in

3    because that was your testimony earlier, you're the breacher,

4    I think is the term that you used, right?

5    A    (No audible response.)

6    Q    Okay.

7    A    But I couldn't say for sure I was the one that opened the

8    door since this wasn't a hit, it was a welfare check.

9    Q    But --

10   A    Usually when we train a certain way and we do things,

11   even when we're out on patrol doing our regular duties, that

12   training sticks to us and we still do things that same way.

13   Q    Okay.  No, and I understand, Corporal Ayala.  But I think

14   what you're saying and -- well, you just said it, that your --

15   if you did what your training -- if you followed your

16   training, your training would have been that you breach and

17   then Sergeant Gonzalez goes in, if that -- if you did that on

18   this particular date, that's -- that would have been the

19   sequence.

20   A    That's correct.

21   Q    Okay.  Now I want to also make sure I understand, you

22   made -- you responded to one of the questions from Mr. Ramirez

23   about what had happened after Sergeant Gonzalez went in and

24   then -- and told you to stop and not go in.  But there was a

25   question.  I want to make sure.  Your testimony was, and

1    correct me if I'm wrong, that Sergeant Gonzalez had told you

2    something to the effect that you all would need a warrant.

3    A    He, when we pulled out, said he's going to check to see

4    if we want to get a warrant to go into that room.

5    Q    He told you that after he went into the efficiency room,

6    he came out and he told you he had to check to see if they

7    were going to need a warrant to --

8    A    Said it was -- first he explained that it was a different

9    room.  It looks like it's something different, that we're

10   going to go in and search it, we might need a warrant, let me

11   check what we need to do.

12   Q    And you usually get a warrant when you have probable --

13   when you believe you have probable cause that contraband or,

14   again, illegal -- something illegal is in a particular

15   location, and then you go to a judge like Judge Kazen and you

16   say, here is my probable cause, Judge, approve this warrant,

17   correct?

18   A    Not always.  When I worked in narcotics, we got a lot of

19   consent to searches --

20   Q    I understand that.  But that's not a warrant because

21   you're doing a consent.  My question was about warrants.  If

22   you're going to get a warrant, that's --

23   A    If you're going to get a warrant --

24   Q    -- the procedure, right.  And that's the word he used.

25   A    It's one of the options.

1    Q    I understand that.  But that's the word that you used and

2    you said you were repeating what Sergeant Gonzalez had told

3    you, and he told you that he was going to look into whether

4    they were going to need a warrant, correct?

5    A    Yes.

6    Q    Okay.  Now, did he say that after he communicated to you

7    what he had seen inside?  Did he tell you what he saw inside?

8    A    I believe he said he saw some marijuana, some useable

9    amount of marijuana on the table.  Or I don't remember exactly

10   where but --

11   Q    What else did he tell you he saw?

12   A    That's it.

13   Q    Okay.  You don't recall him -- did he ever tell you that

14   he had seen any military style boxes inside the efficiency?

15   A    Later that evening when we were pulling them out I saw

16   them.

17   Q    I understand that.  I understand if you saw them.

18   A    Before all of that, no, he didn't.

19   Q    Okay.  But --

20   A    No, he didn't.

21   Q    -- did he tell you --

22   A    No, he didn't.

23   Q    Okay.  Did you hear him telling everybody else after he

24   walked out of that room that he had seen military style boxes?

25   A    If he would have told anybody else when I was next to

1    him, I would have heard him so no.

2    Q    Okay.  But you went to do security perimeter, remember,

3    so you weren't --

4    A    Yeah.  But you asked when he walked out of that room.

5    Q    Well, --

6    A    Yeah.

7    Q    -- let me rephrase the question.  Did you ever hear him

8    at any time -- at any time did you ever hear him tell anybody,

9    whether it was right after he walked out of the efficiency or

10   at any other time, did you ever hear him tell anybody, I saw

11   "X," "Y," and "Z" military style boxes, I saw marijuana, I saw

12   whatever else?

13   A    No, sir.

14   Q    No, okay.  Now let's talk about the -- your assistance in

15   -- up in apartment three.  So you testified that there were

16   two -- you went up there two times to apartment three.  And

17   you said -- again, I'm trying to make sure if my notes are

18   correct here -- that the first time you went, it was just

19   yourself and Sergeant Gonzalez; is that correct?

20   A    Yes, sir.

21   Q    Okay.  So none of the other SWAT team members went the

22   first time with you.

23   A    No, sir.

24   Q    No other deputy, no other DEA agent, nobody else, no

25   ATF --

1    A    Not the first time, sir.

2    Q    Not the first time.  And so when you all went in, again,

3    did you go into apartment three with your weapons drawn?

4    A    I don't remember doing that, sir.

5    Q    Okay.  And let me backtrack.  When you went into

6    apartment one looking for the kids, did you go in there with

7    your weapons drawn?

8    A    They were probably pulled out of the holster.

9    Q    Okay.

10   A    They weren't in the ready position.

11   Q    Right, because I --

12   A    We were ready.

13   Q    Okay.  Because I remember you testified, and correct me

14   if I'm wrong, that you had at least one arm available as I

15   think -- as I recall that's what you said to -- and presuming,

16   and correct me if I'm wrong, I'm assuming that you're talking

17   about you have the gun in the other hand so you have one -- at

18   least one arm available, right?

19   A    (No audible response.)

20   Q    So you did have your weapon drawn when you went into

21   apartment seven, yes.

22   A    Yes, sir.  That's --

23   Q    What about the --

24   A    I don't remember because I wasn't paying attention to the

25   other guys.  But going off the way it should be, yes, you

1    should have your weapon out in a certain --

2    Q    Like that.  So then when you went up to apartment three

3    to approach Mr. Saldana, did you have your weapon drawn?

4    A    I don't remember.

5    Q    You don't remember.  Did -- you remember Sergeant

6    Gonzalez having his weapon drawn?

7    A    I do not, sir.

8    Q    You don't remember.  Okay.  So the second time, though,

9    when you went back, you said that second time it was Sergeant

10   Gonzalez, Corporal Ismael Garcia, and I think I don't have --

11   was that it or I want to make sure I didn't miss somebody

12   else.  Was it yourself, Sergeant Gonzalez, and Corporal

13   Garcia?

14   A    There were other people around.

15   Q    So the second time there were more people.  Are the --

16   are we talking about SWAT team members?

17   A    No.  There was, well, Sergeant Martinez --

18   Q    Sergeant Martinez was there.

19   A    I don't remember who but there was an agent or two

20   there --

21   Q    Okay.  From --

22   A    -- that showed up --

23   Q    -- From DEA.

24   A    -- at one point.  I don't remember checking identifiers,

25   sir.

1    Q    Okay.  So are we talking about what is that, about five

2    or six people, office -- law officers is what I'm getting at,

3    five or six approximately, maybe less, maybe more?

4    A    About five -- by the time I was leaving, walking out,

5    there was about five circled around outside the apartment

6    complex.

7    Q    Okay.  No, but I'm talking about when you went up the

8    second time to apartment three.

9    A    Yeah.  They were outside the little catwalk.

10   Q    Okay.  So any of those people have their guns drawn the

11   second time?

12   A    At that point when they're talking to the Defendant they

13   don't.

14   Q    They don't, okay.  So --

15   A    If they have their rifle, it's not on them.  The pistol's

16   going to be holstered.  Nobody's going to be talking to them

17   with the weapon out.

18   Q    Okay.  So they might have had them out before they

19   started talking him, but after they -- your testimony is after

20   they talk -- starting talking to them, they would have

21   holstered.

22   A    I don't remember because I don't remember that detail.

23   But they wouldn't have had them out anyway because me and

24   Sergeant Gonzalez had already made contact with them and were

25   talking to them.  I think we brought them by the doorway, so

1     they wouldn't have came up with their weapons out anyway.  We
2     were there.
3     Q   Okay.  And you're saying if the SWAT had the rifle, it
4     would have been just down, not in a ready position.  Okay.
5     A   Correct.
6     Q   So and you don't recall exactly what was discussed the
7     second time that they were -- well, you said something about -
8     - I believe you said there was some sort of discussion about
9     the name.  But what else was discussed, if you recall, the
10    second time that you went up there?  What did you hear talked
11    about?
12    A   I don't remember details.
13    Q   Okay.  So but then I have further in my notes, and you
14    already had mentioned Sergeant Martinez, but it says that the
15    second time sergeant -- I'm sorry, apart from Sergeant
16    Martinez, Corporal Sarquiz was also -- I just have corporal.
17    I think she's -- well, actually is that her title or is it
18    investigator?
19    A   She's now a corporal.  She's investigator slash corporal.
20    Q   Okay.  So Corporal Sarquiz was also present; is that
21    correct the second time?
22    A   Yes, sir.
23    Q   Okay.  And, but again, same question, Sergeant Martinez
24    or Corporal Sarquiz have their weapons drawn.
25    A   No, sir.  They --

1    Q    You don't --

2    A    -- didn't have -- I don't remember --

3    Q    You don't remember but --

4    A    -- seeing them --

5    Q    Okay.

6    A    -- but they -- no, they normally wouldn't have their

7    weapons drawn.

8    Q    Okay.  And your testimony is that somebody at some point

9    after the second time that they talked with them got a key.

10   That's what I have in my notes, right?

11   A    When we went into the apartment front door.

12   Q    Okay.  Somebody got a key from the Defendant.

13   A    I didn't see that.

14   Q    Okay.  Now, did you -- were you present at all when any

15   documents were executed with Mr. Saldana, any signing of

16   documents, were you -- did you witness any of that?  Were you

17   present for any of that?

18   A    Not that I remember.

19   Q    No.  Okay.  And so when you went to look for Mr. Saldana

20   in apartment three, do you -- did you at that point already

21   know that he was the person that had the lease on the

22   efficiency?

23   A    When we went to speak to him upstairs the first time?

24   Q    Any of the times that you went to speak to him, did you

25   know that he was the person that had the lease?

1   A    No, sir.  It wasn't until later.

2   Q    Okay.  How much later?  When did you find that out?

3   A    I don't remember if it was from him or from the female

4   that has that apartment upstairs that said that he stays there

5   sometimes.

6   Q    And what was the need for you to go talk to him twice?

7   Why go talk to him one --

8   A    Well, it wasn't that we went to go talk to him twice.  It

9   was that I was there, then there was twice.  I would have

10  stepped out for a bit for something, maybe called somebody.  I

11  don't remember what.  And then the second time was when that I

12  had contact with the other officers that I mentioned.

13  Q    So is it your testimony that --

14  A    But somebody was with him the whole time.

15  Q    But I understand that.  But so is your testimony that you

16  left and Sergeant Gonzalez stayed with -- by himself with him?

17  A    I don't remember if while me and Sergeant Gonzalez were

18  talking to him, somebody came up and I stepped out or called

19  somebody and then walked back in.

20  Q    So then the whole number of people around him could be

21  more than two because you don't recall the -- for the first

22  time.

23  A    Well, the first -- when we first approached him, it was

24  just two of us.

25  Q    Yeah.  But then you left, you said.

1    A    When I walked out, somebody else might have approached.

2    I don't know.

3    Q    Okay.  Now, your -- you testified earlier that you moved

4    the couch.  Now, would it surprise you to learn that Sergeant

5    Gonzalez testified earlier that he moved the couch?

6    A    Would it surprise me?

7    Q    Yeah.

8    A    I told you I didn't remember if he did or not.  I

9    remember I moved it.

10   Q    Okay.  So then his testimony could be incorrect that he

11   moved it.  You moved it or your --

12   A    Correct, he could have moved it with me.

13   Q    Because I asked you earlier and you said nobody helped

14   you so --

15   A    I remember myself moving it.  You were asking about him.

16   I said I don't remember is all.

17            MR. GUERRA:  Okay.  No.  And we're just trying to,

18   you know, trying to understand who did what.  So I understand,

19   Corporal.

20            THE COURT:  Is that it?

21            MR. GUERRA:  We pass the witness, Your Honor.

22            THE COURT:  All right.  From the Government.

23            MR. RAMIREZ:  Nothing further.

24            THE COURT:  Corporal, let me just ask you this

25   question.  How -- before this date of June 1st, 2022, had you

1    participated in other welfare checks as far as like --

2              THE WITNESS:  Yes, sir.  I was in patrol for a few

3    years.

4              THE COURT:  Okay.  As part of the SWAT team did you

5    ever participate in welfare checks?

6              THE WITNESS:  I've done it with other SWAT team

7    members.  We've never had a callout as a SWAT team just for a

8    welfare check that I can recall.

9              THE COURT:  Okay.

10             THE WITNESS:  But right now our SWAT team consists

11   of 20 officers, and our patrol division alone is sometimes

12   only five guys.  So you run into a lot of different SWAT team

13   members because we're in all different types of divisions on

14   the job.  There's some different divisions so they cross up

15   and tend to run into a lot of other SWAT team members.

16             THE COURT:  Yeah.  Okay.  All right.  Any follow-up

17   questions from the Government?

18             MR. RAMIREZ:  No, Your Honor.  Thank you.

19             THE COURT:  Any follow-up questions from defense?

20             MR. GUERRA:  No, Your Honor.

21             THE COURT:  All right.  Okay.  Corporal, thank you

22   for your time today.  You are excused as a witness.  Please

23   don't talk to anybody about your testimony here today until

24   after the hearing, which will continue on until tomorrow.  But

25   you are excused.

1    THE WITNESS:  Yes, sir.

2    THE COURT:  All right.  Thank you.

3    THE WITNESS:  Thank you.

4    (Witness excused.)

5    THE COURT:  All right.  The Government may call your

6 next witness.

7    (Pause)

8    MR. RAMIREZ:  Dana Sarquiz, Your Honor.

9    THE COURT:  Dana Sarquiz, is that --

10    MR. RAMIREZ:  Yes.

11    THE COURT:  -- what you said?  Okay.  I didn't

12 understand.

13    MR. RAMIREZ:  I'm sorry.

14    THE COURT:  Thought you said Dennis but, okay, Dana.

15    MR. RAMIREZ:  Dana Sarquiz.

16    THE COURT:  Yeah.

17    MR. RAMIREZ:  I said it kind of fast and -- Sarquiz.

18    (Pause)

19    THE CLERK:  Good afternoon, Ms. Sarquiz.  May I

20 please have you raise your right hand to be sworn?

21    DANA PAULA SARQUIZ, GOVERNMENT'S WITNESS, SWORN

22    THE COURT:  Okay.  What's your current title?

23    THE WITNESS:  Investigator Dana Sarquiz.

24    THE COURT:  Slash corporal, did we --

25    THE WITNESS:  Corporal.

1          THE COURT:  -- hear that you've been promoted?

2     Okay.  I don't -- what do you prefer to be referred by,

3     Investigator or Corporal?

4          THE WITNESS:  It doesn't matter.  Investigator's

5     fine.

6          THE COURT:  Okay.  Investigator Sarquiz, welcome.

7     I'm Magistrate Judge Kazen.  I'm presiding over this

8     proceeding today.

9          You're here to answer questions from the attorneys

10     in this case.  And so if you would just be sure to -- you can

11     move the -- adjust the microphone anywhere to make sure that

12     you're speaking clearly into it.  And just please try to

13     listen carefully to the question that is asked and answer

14     those questions, all right?

15          So with that, the Government can proceed.

16          MR. RAMIREZ:  Thank Your Honor.

17          DIRECT EXAMINATION OF DANA PAULA SARQUIZ

18     BY MR. RAMIREZ:

19     Q     State your full name, spell your last name, your title,

20     and the agency you work with.

21     A     My name is Dana Paula Sarquiz, S-A-R-Q-U-I-Z.  I am

22     currently in the Narcotics Division at the Webb County

23     Sheriff's Office.

24     Q     How long have you been with the Sheriff's Office?

25     A     Approximately four years.

1  Q    And what have you been doing for the last four years at
2  the Sheriff's Office?
3  A    I have worked in the intel department, I've worked at
4  the jail as a correctional officer.  Then I went into the
5  academy for a police officer.  I was in patrol for
6  approximately two years.  And I've been in narcotics ever
7  since.
8  Q    So now the -- I want to take you to June the 1st, 2022,
9  and 3104 Flores Avenue; does that ring a bell?
10 A    Yes, sir.
11 Q    What was the reason that you and others -- were you at
12 3104 Flores Avenue at any time during the day?
13 A    Yes, sir.
14 Q    What -- about what time did you get there?
15 A    May I refer back to my report?
16 Q    Yes.  Do you have it with you?
17 A    Yes, sir.
18 Q    Okay.
19 A    I do not recall the time.  But it must have been maybe
20 around 3:30 that we're out there conducting surveillance.
21 Q    Okay.  So your -- what was your role in this operation
22 at 3104 Flores Avenue?
23 A    I was an investigator.
24 Q    Who was in charge of the investigation?
25 A    I was in charge of the investigation.

1    Q    Okay.  Not Sergeant Martinez.

2    A    Sergeant Gonzalez.

3    Q    I'm sorry, Sergeant Gonzalez, Mike Gonzalez.

4    A    I was the one that received the information but once on

5    scene, he kind of just took over and conducted the rest of the

6    investigation.

7    Q    Do you know why?

8    A    I don't know why.  Maybe because SWAT was there and they

9    felt like they could just -- they felt easier to approach him

10   than me.

11   Q    When you say "they," who do you mean by "they?"

12   A    The SWAT members and the investigators that were

13   present.

14   Q    So you were in charge but he's the one that handled the

15   operation on scene --

16   A    Yes, sir.

17   Q    -- once he got there.  And who made the call out to

18   bring in the SWAT members?

19   A    Sarge did.

20   Q    Do you know why?

21   A    I do not know why.

22   Q    Okay.  So when you were there, what was your job or your

23   responsibility at the scene?

24   A    To conduct an investigation on the information we had

25   received.

1    Q    And what was the information you received?

2    A    We had received third party information from a

3    confidential informant that there was ammo and drugs stashed

4    at 3104 Flores.

5    Q    Was there a specific quantity of ammo or and marijuana?

6    A    Approximately 5,000 rounds of .50 caliber ammunition,

7    and approximately 300 pounds of marijuana.

8    Q    Did the person who called give an -- a specific

9    apartment number?

10   A    He did not give the specific apartment number but he did

11   give a description of the apartment.

12   Q    How'd he describe the apartment?

13   A    He stated it was a white metal security door facing the

14   street, and that there was security cameras, and the front

15   door was facing the street.

16        MR. RAMIREZ:  Could I have the computer?  Thank

17   you.

18   BY MR. RAMIREZ:

19   Q    I'm showing you on the monitor as well as on the

20   projector Defendant Exhibit Number 1; is that the target

21   location?

22   A    Yes, sir.

23   Q    And I'm calling it target location because I think

24   that's what you would probably refer to it as.

25   A    Yes, sir.

1    Q    And so did you identify -- I'm going to zoom in a bit.

2    So I'm zooming in to the only door that's facing from the

3    apartment to the street it looks like.  And that is a gate

4    with a door behind it.  Does that -- did that match the

5    description of what -- of the location that was provided by

6    the confidential informant?

7    A    Yes, sir, it did.

8    Q    Okay.  And once that occurred, tell me about the traffic

9    stops at -- that occurred and what other things were occurring

10    at the scene that may have heightened any tensions or concerns

11    there.

12    A    So it's common practice when we do surveillance that we

13    do traffic stop, you know, people that are coming in and out

14    of a certain location we're targeting.  And therefore there

15    was one vehicle that we had traffic stopped with two male

16    subjects in there that had left the target location.

17    I do want to add that where I was parked at doing

18    surveillance, I could not see where the people were getting

19    out, like the apartment number that the people were getting

20    out and getting in the vehicle.  But I could just see the

21    vehicles leaving the target location.

22    And on the second traffic stop we conducted, there

23    was a pursuit from IH-35 all the way to maybe Guadalupe where

24    it ended.  And we did do a BOLO out for it.  No one was able

25    to traffic stop it.  So that raised a lot of suspicion on our

1    end.

2    Q    So this last vehicle that you did the BOLO on or

3    somebody did the BOLO on, is that a vehicle that had been at

4    the -- at this apartment, --

5    A    Yes, sir.

6    Q    -- at this complex?

7    A    Yes, sir.

8    Q    And so in that amount of time that you were there, do

9    you know about how much time happened from the time that you

10   arrived there and the time that the decision was made to do an

11   approach?

12   A    So if I remember correctly, we must have gotten there

13   around 3:00, 3:30.  The first traffic stop was conducted

14   around 4:53.  The second one that led us on a pursuit was

15   round 6:11.  And right after that we all just gather up with

16   DEA together and they -- we all decided what agencies that --

17   we didn't know what was leaving the apartment, we didn't know

18   if they were getting rid of the ammo or the evidence,

19   therefore we decided to approach.

20   Q    At this point when the approach is made, you suspected

21   but were not aware that there was any actual ammo or drugs in

22   any of the apartments or this place in particular.

23   A    Yes, sir.

24        MR. RAMIREZ:  And I'm referring to the metal door

25   that leads to the efficiency on Defendant Exhibit Number 1.

1    BY MR. RAMIREZ:

2    Q    So then when -- so what are the reasons that led to the

3    -- if you could summarize then what concerns you all had.  You

4    said that there were possibly people moving things,

5    contraband, vehicles going in and out.  What else, anything

6    else?

7    A    Yes.  There was two -- well, if I recall correctly,

8    there was one male subject which was a shirtless guy.  He was

9    walking in and out of the parking area from what I could see.

10   I ended up seeing him all the way to the sidewalk.  And he was

11   just on the phone.  So that raised obviously a lot of

12   suspicion.  That was one of the red flags, as well as the

13   pursuit that had just occurred, and vehicles going out of the

14   parking lot.

15   Q    Were you involved in that pursuit?

16   A    I did follow the vehicle.  I was the one that was doing

17   -- conducting surveillance, therefore I did follow the vehicle

18   all the way to IH-35 until the marked unit was able to get

19   eyes on the vehicle.

20   Q    And this is a vehicle that had left the apartment

21   complex.

22   A    Yes, sir.

23   Q    So in fact you were making it a point to conduct traffic

24   stops or identification stops or PC stops or you tell me what

25   they were on persons who were arriving and leaving the

1    apartment complex.

2    A     Yes, sir.

3    Q     What were they?

4    A     All of the above, identification stops and any probable

5    cause that would lead us to maybe finding something and

6    leading us back to the apartment.

7    Q     And so you left the area for a bit of time.

8    A     Yes, sir.

9    Q     Do you know about how much time you left for?

10   A     It was maybe 20 minutes, --

11   Q     Twenty minutes.

12   A     -- maybe a little more than that.  Yes.

13   Q     So during those 20 minutes, except for that time, most

14   of the time you were probably watching this area and you were

15   watching as you said the shirtless guy.

16   A     Yes, sir.

17   Q     How much time did that individual, that shirtless guy or

18   shirtless person, spend outside of the apartment complex?

19   Except for the time that you --

20   A     Right.

21   Q     -- were not there.

22   A     I don't think I have a estimate time but it was a long

23   time.  I mean, he was just out there going -- kind of pacing

24   back and forth in the parking area.

25   Q     And you said he was on the phone.

A     Yes, sir.  He was on the phone.  And he was scouting.

He was just kind of looking back and forth down the street to

see if anyone was there.  So that obviously raised another red

flag.

Q     So he would walk out to the street, look around.  And I

guess that you were -- you all were conducting surveillance

from an area that he didn't see you or did he see you?  Was he

able to see you?

A     I'm not sure if he was able to see me or not.  I was

maybe one street down from the target location.  So maybe he

was able to see me.  That's on Tanaja (phonetic).  I couldn't

see -- from my point, I could not see people who was entering

the vehicle.  I was only able to see the vehicles coming in

and out.  But he was so far out by the gates and the sidewalk,

I was able to see him go in and out of the parking lot.

Q     And did you have the units that were there, yours in

particular, was your unit a marked unit or was it a unmarked

vehicle?

A     Unmarked.

Q     Meaning that it's designed to blend in as a regular

vehicle.

A     Yes, sir.

Q     No lights, sirens that are visible, no insignia, that

kind of thing.

A     Yes no.

Q     Okay.  And as far as you know, the other units that were assisting or in the surveillance, were they marked units or unmarked?

A     We had unmarked.

Q     Okay.  So then after that BOLO was out, did you see anything happen at the apartment complex that drew your attention?

A     No.  After the BOLO, I -- that's when I made contact with my sergeant.  He was obviously monitoring the radio.  He heard that I just got into pursuit.  That's when we rallied up, DEA, Webb County Sheriff's office, couple streets down from the target location.  And that's when we decided it was best to approach.

Q     And where did you rally up?

A     I don't recall the street name but it was an intersection that was --

Q     Was there a store or something?

A     Yes.  There was multiple stores.  It was like a plaza near the target location.

Q     All right.

A     South of the target location.

Q     And during that meet, what was -- what instructions did you all receive?  But I'm imagining that since you were in charge, were you giving instructions and providing the briefing or were you receiving a briefing from someone?

1    A    I was receiving the briefing from someone.

2    Q    You and everyone else.

3    A    Yes, sir.

4    Q    Who were you all receiving a briefing from?

5    A    From Sergeant Gonzalez.

6    Q    Okay.  What briefing did he give you and what did he

7    instruct?

8    A    He just instructed that we're going to approach the

9    premise and try to find out what's going on in that house.

10   Q    When you say "the premise," you mean the apartment

11   complex --

12   A    The apartment complex.

13   Q    -- or a specific apartment.

14   A    Well, we're focusing on the apartment facing the street,

15   so that apartment.

16   Q    And did he provide any information that suggested to you

17   that he knew what was already in the -- in that little let's

18   call it the efficiency behind that gated door?

19   A    Well, we all knew the same information, that that

20   apartment was stashing the ammunition and the drugs.

21   Q    Because of the tip.

22   A    Yes.

23   Q    Or because somebody had gone in to look.

24   A    No.  Because of the tip.

25   Q    Okay.  So then what was the approach -- how was the

1   approach going to be under -- is there anything else that

2   happened before -- so let's go to the approach.  So when you

3   decided to do the approach, I guess all of you drove back,

4   those of you that were at that meetup.  And what -- were any

5   other persons remained, any other vehicles remain conducting

6   surveillance?

7   A     That I do not recall.

8   Q     So then when you got back, did you -- were you in a

9   position to observe the apartment complex and the parking

10  area?

11  A     Yes.

12  Q     That's shown here, Defendant's Exhibit Number 1.

13  A     Yes.

14  Q     How much time after you got there was an approach made?

15  A     It was quick.  I mean, it took us maybe ten minutes,

16  ten, 15 minutes just to get everyone to the rally area, kind

17  of debrief everyone, and then we just all approached.

18  Q     What were the things that were discussed at the rally

19  area that were the reasons for making a decision to do the

20  approach?

21  A     Well, we did a -- well, Sarge let everyone know that we

22  had received third party information from a confidential

23  informant that it did -- was about ammunition, marijuana.  And

24  then he did mention the pursuit that we had just had happened.

25  Q     And how did he tie all these things together?

1    A      (Indiscernible) --

2    Q      Did he tie them together into something or did he -- are

3    those the reasons why?

4    A      Yes.

5    Q      Is that what you mean?

6    A      Uh-huh.

7    Q      Okay.  And so when you say "Sarge," I'm assuming you

8    mean Sergeant Gonzalez.

9    A      Gonzalez, yes, sir.

10   Q      So when he made that decision, even though you were in

11   charge but he made that decision, what kind of approach was

12   going to be used; a felony approach, a progressive approach,

13   SWAT will approach, or something else?

14   A      No.  There was concerns due to the amount of ammunition

15   that could have possibly been at the house, therefore we did

16   want people to help us out in the approach.  Usually

17   narcotics, we're only three to four officers at a time.

18   Therefore, we did call DEA for assistance.  And we called some

19   patrolman that were there, too, and some SWAT officers that

20   were there also.

21          MR. RAMIREZ:  Let me take you to the sketch.  I

22   think I have a sketch here.

23          MS. SPEAKER:  Ten.

24          MR. RAMIREZ:  Ten.  Oh, thank you.

25   BY MR. RAMIREZ:

Q     I'm showing you Exhibit Number 10, Defendant's Exhibit
Number 10, which is a sketch that was drawn by and provided by
defense.  It's their exhibit.  But nevertheless don't worry
about the -- about whether it's drawn to scale and things like
that.  But just simply what I want to highlight first is that
this purports to show four apartments, one, two, three, and
four; is that right?

A     Yes.

Q     And after everything was done and said, you confirm that
there were four apartments.

A     Yes.

Q     And apartments three and -- two and three happen to be
apartments that are directly above one and four.

A     Yes, sir.

Q     So it's one at the bottom, which is the first one you
would be abutting the parking area.  Above it is apartment
two.  Directly next to apartment two is apartment three.  And
below apartment three is apartment four.

A     Yes, sir.

Q     That correct.

A     Yes.

Q     And apartment four I believe is the apartment manager.

A     Yes, sir.

Q     Okay.  Landlord.  All right.  So did you have any
information -- was there anything discussed at the rally point

1    when you were discussing and getting the briefing about this

2    efficiency being a separate unit from the -- from apartment

3    number one?

4    A    No.

5    Q    Did you discuss apartments one, two, three, and four or

6    what would happen?  Were you aware that there were four

7    apartments at the rally place?

8    A    No.  I was not aware of that.

9    Q    And that wasn't discussed there.

10   A    No.

11   Q    Okay.  So the knock-and-talk was going to be to approach

12   what apartment or apartments or areas?

13   A    The metal fence, the door with the metal fence, the

14   metal gate.

15   Q    Defense Exhibit Number 1, the gate.  So the intent was -

16   - well, you understood it and in your mind was to do --

17   conduct a knock-and-talk at that gate --

18   A    Right.

19   Q    -- and see what -- for what purpose?

20   A    To see what was going on due to the pursuit, the

21   information we had received, there was two male subjects

22   outside, gather some intel, and see what was going on.

23   Q    So how would you characterize this knock-and-talk?  Was

24   it going to be a pounding on the door, police, let us in, or

25   was it going to be some other way?

1    A    Some other way.

2    Q    Like what?  Describe it, please.

3    A    Knock on the door and ask for consent or start gathering

4    information as to what's going on and then lead to consent.

5    Q    And if the person said go away, what would you all have

6    done?

7    A    We would go away.

8    Q    Why?

9    A    Because at that point we only had the pursuit but we

10   didn't have the actual probable cause to go into the house.

11   Q    All right.  So what changed -- what caused you to then

12   go into another apartment or Sergeant Gonzalez or whoever went

13   into another apartment as you were making the approach?

14   Anything?

15   A    Right.  Yes, as soon as everyone approached the

16   apartment complex, there was two male subjects outside.  They

17   were both detained.  One of the male subjects, which was

18   identified as the shirtless guy, he started speaking to Sarge

19   and he mentioned that he had three underage kids inside the

20   apartment, his apartment.

21   Q    What are the two persons doing in the parking lot?

22   A    That I don't know.  I don't know exactly what they were

23   doing.  I know later one of them had marijuana on him.  That's

24   all I know.  I wasn't really part of the approach.  I kind of

25   laid back.  So I don't know, you know, the conversation that

1    everyone had with those two individuals.

2    Q    So at some point you're aware that there was a entry

3    made.  And I'm going now to exhibit -- Defendant Exhibit

4    Number 3, which is unit one or apartment one.  Do you know why

5    an approach was made to apartment one instead of the metal

6    door, efficiency?

7    A    Yes.  Because of the three underaged kids.

8    Q    Tell me about how that came about.

9    A    As Sergeant was talking to one of the detained guys, the

10   shirtless guy, he mentioned that he had three underage kids

11   inside the house that was -- that were being unsupervised.

12   Q    And this is the shirtless guy that you -- is it only you

13   or you and others believed were -- was a looking or -- of some

14   kind?

15   A    Right.  At that point I had seen him before at the -- on

16   the sidewalk on the phone after the pursuit.  So we thought he

17   was involved some way, somehow.

18   Q    So -- sorry.  So then the -- who went -- you weren't

19   there to hear any discussion.  I think you're telling us that

20   you didn't hear any discussion between Sergeant Gonzalez and

21   the shirtless man.

22   A    Right.

23   Q    So who said we're going into apartment one?

24   A    I'm assuming Sergeant Gonzalez was the one that made a

25   decision.

1   Q    Well don't assume.  If you know, you know.  If you don't

2   know, just say you don't know.  But a decision was made --

3   A    Right.

4   Q    -- by somebody.

5   A    Yes.

6   Q    You can look at your reports anyway.  You have your

7   report with you, am I right?

8   A    Yes.

9   Q    If it will refresh your memory.  So you just know that

10  there was a discussion between them and three children were

11  inside.  And then you state that you inform Mr. Garza that you

12  were entering the house to ensure the kids were safe.

13  A    Yes, sir.

14  Q    And you're not sure -- but it wasn't you who made that

15  decision.

16  A    No.

17  Q    So did you actually go -- let's go back to number ten,

18  Defendant's number ten.  Generally speaking, apartment one, is

19  that more or less described accurately?

20  A    Yes, it is.

21  Q    Okay.  So did you enter apartment number one?

22  A    Yes, I did.

23  Q    When did you enter apartment number one, you yourself?

24  A    I entered apartment number one when I recovered the

25  kids.

1    Q    How did you -- tell me how that occurred.

2    A    After SWAT and the deputies had cleared the house, they

3    ended up calling Georgie and I to go take care of the -- take

4    the kids out.

5    Q    Who's Georgie?

6    A    Sergeant Jorge Martinez.

7    Q    Okay.  So did you enter with the SWAT members and walked

8    in or did you stay outside?

9    A    I stayed outside.

10   Q    Okay.  Because there's some testimony that maybe you had

11   gone inside and wasn't really -- I just wanted to hear from

12   you what you remember.  So who told you to go into the

13   apartment at some point?

14   A    If I remember correctly it was Sergeant Georgie

15   Martinez.  He needed help with the kids.

16   Q    How did he communicate that he needed help to you?

17   A    He came outside to get me.  I was right outside the

18   door.  Well, kind of by the door.  By the tree.

19   Q    How did he come out to get you, alone or with children?

20   A    Yes, alone.

21   Q    What did he tell you when he came out to talk to you?

22   A    Just to go get the kids.  He's like, the kids are here,

23   there's three.  Okay.  We went in there.

24   Q    You didn't see him with the children.

25   A    No.

1   Q    You went by yourself to get the children at that point.

2   A    Yes.  With Georgie.

3   Q    With Georgie.

4   A    Yes.

5   Q    So did you hear anyone say, all clear, it's clear,

6   anything like that?

7   A    Yes.  That was after the fact.  After the house was

8   cleared we went in.

9   Q    Okay.  So after the house was cleared is when Georgie

10  told you he needed help.

11  A    Yes, with the kids.

12  Q    With the kids.  Why did he need help?

13  A    Because there were two -- there was twins, two little

14  kids, and then a toddler that was sleeping on the bed.

15  Q    And so I'm guessing that I'm -- that it's the bedroom

16  that you went to.

17  A    Yes, sir.

18  Q    Now, did you see what Sergeant Gonzalez did?

19  A    No.

20  Q    Did you see him go into that efficiency through that

21  other door?

22  A    No.

23  Q    Did you see a sofa --

24  A    No.

25  Q    -- against the door?

1   A      No.

2   Q      You just focused on -- and why is that?

3   A      Going into the bedroom, got the kids, and walked

4   outside.

5   Q      All right.  Did you see Sergeant Gonzalez at all when

6   you came out of the apartment?

7   A      Yes.

8   Q      What -- when -- did you have the children with you when

9   you came out?

10  A      Yes.  I had the children with me.

11  Q      And where was he?

12  A      He was outside I believe talking or discussing something

13  with Mr. Garza.

14  Q      Okay.  So you don't know at this point whether he or

15  somebody had already gone into the efficiency.

16  A      Right, no.

17  Q      Right.  Okay.  About how much time elapsed between the

18  time that you -- that Georgie went in and he called you to go

19  to help?

20  A      Less than a minute.

21  Q      Less than a minute.

22  A      We walked in and out, yes.

23  Q      And who made the all-clear call, who gave it?

24  A      Must have been one of the SWAT guys.  I'm not sure.  I

25  don't know who.

1    Q    Okay.  You don't know who it was.  Okay.  And then as

2    you walked out with the children, you said you saw Sergeant

3    Gonzalez talking to Mr. Garza.  And did you hear what they

4    were talking about?

5    A    No.  I was taking care of the kids along with Sergeant

6    Georgie Martinez.

7    Q    And so what did you both do with the children?

8    A    We were just taking care of them.

9    Q    For how long?

10   A    Until the wife and the other showed up, which was longer

11   than 30 minutes, 40 minutes.

12   Q    Mr. Garza's wife.

13   A    Yes, sir.

14   Q    The mother of the children.

15   A    The mother of the children and the grandmother, his

16   wife's mother.

17   Q    All right.  So after that happened, what happened next?

18   A    After that happened, the wife showed up, the mother-in-

19   law showed up.  The mother-in-law took the two set of twins.

20   The mother kept the toddler.  And then we went inside

21   Mr. Garza's apartment, along with the wife and the toddler.

22   They were sitting down on the sofa.  Sergeant -- I don't

23   recall who else was there.  I just remember Sergeant was

24   there.  I was towards the back.

25        Sergeant and Mr. Garza were discussing back and forth.

And then I kind of moved towards the front of the
conversation.  And that's when Mr. Garza started explaining
the whole situation with the other efficiency room.

Q    Okay.  So when you all -- why were you all in the
apartment?  Do you know why you were all in the apartment with
Mr. Garza and everybody, Mr. Garza, his wife, and Sergeant
Gonzalez and others?

A    No, sir.

Q    Okay.  What was discussed?  What did Mr. Garza tell you
all?

A    Mr. Garza started explaining that he has been trying to
get that efficiency room to be part of his apartment because
he basically pays for the water bill, he pays for the light
bill, he pays for everything.  And he cannot -- he doesn't
have access to that room.  And his wife said the same thing,
that it's been unfair, that they've spoken to the landlord
about that issue and nothing has been done.

Q    So you have some -- there's -- one of the questions that
has arisen is the matter of whether Sergeant Gonzalez or
anyone knew that there were -- there was ammunition and there
were -- and there was a quantity of marijuana in the
efficiency, and that he had been warned or others had been
warned by Mr. Garza not -- that he could not give them
authorization to go in through the door that led to the
efficiency from the apartment.  Do you know anything about

DANA PAULA SARQUIZ - DIRECT BY MR. RAMIREZ                    364

1   that?

2   A     No.

3   Q     Let's move on to the matter of your contact with the

4   Defendant.  Do you see the -- you made contact with a female,

5   I think.

6   A     Yes, sir.  It was Corporal Ayala that made contact with

7   the female.

8   Q     Okay.  And what happened after you made contact with the

9   female?

10  A     She just gave some information regarding a male subject

11  inside her apartment.

12  Q     And did you have anything -- did you do anything after

13  that?

14  A     Yes.

15  Q     And you --

16  A     At first we approached, we went upstairs, and

17  Mr. Saldana was there behind the door.  We got him out of the

18  door.  He was kind of hiding behind the door.  We were able to

19  escort him out.  And that's when Corporal Garcia was able to

20  identify him as the passenger from the previous traffic stop.

21  And he stated -- when he gave his name, he gave a different

22  name.  And that's when Corporal Garcia was like, no, you said

23  this name.  And then that's when he put, okay, my name is Jose

24  Alonso Saldana-Alaniz.

25  Q     And so you said you approached when you -- and you say

1    approached, does that mean that you approached with weapons

2    drawn or just a soft approach?

3    A    Soft approach.

4    Q    Meaning?

5    A    We just went upstairs.  We were talking to the tenant,

6    the female, upstairs.  And that's when she said there is this

7    man right here.  Georgie went inside.  We tried to get him and

8    he finally came outside.  But no -- nothing physical or

9    anything like that.

10   Q    Did you hear her say anything that sounded like a

11   complaint about the Defendant?

12   A    No, not to me.

13   Q    Did you -- do you recognize that man in the courtroom?

14   A    Yes, I do.

15   Q    Can you point him out?

16   A    He's sitting right over there.

17   Q    Is he the one in orange?

18   A    Yes, sir.

19   Q    Okay.  Did you have any direct contact or communication

20   with the Defendant when you all were at apartment number two

21   upstairs?

22   A    Yes, I did.

23   Q    Is it two?

24   A    Towards the end, I mean, everyone was kind of

25   conversating with him after a while.  That's when we asked for

1    consent.  I went to get the consent, written consent form.  I
2    gave it to him, and that's it.
3    Q    During the time that you were there and everybody --
4            MR. GUERRA:  Mr. Ramirez, I'm sorry.
5            MR. RAMIREZ:  Go ahead, sir.
6            MR. GUERRA:  You asked her if they went to
7    apartment two.
8            MR. RAMIREZ:  It's three, right.
9            MR. GUERRA:  You want to clarify I believe it's
10   apartment three, just to clarify.
11           MR. RAMIREZ:  I'm thinking yeah.
12   BY MR. RAMIREZ:
13   Q    So are these numbers reversed?
14   A    (No audible response.)
15           MS. SPEAKER:  No, it's two.  Two was on top.
16           MR. GUERRA:  She -- I thought she would go there.
17           MS. SPEAKER:  It was right.
18           MR. RAMIREZ:  Oh, she lived in apartment three?
19           MS. SPEAKER:  No, it's two.
20   BY MR. RAMIREZ:
21   Q    Can you tell us what apartment you went to?
22   A    My report says apartment number three.
23   Q    Okay.  So you went apartment number three.  Okay.  Thank
24   you.  So then you went apartment number three.  While you all
25   were conversing, why do you use the word "conversing?"

1    A    Everyone was kind of talking to the female tenant and to

2    the subject, Mr. Saldana-Alaniz, kind of going back and forth

3    on who lived downstairs, where he lived, what he was doing

4    there, things like that.

5    Q    Was it -- how would you characterize that conversation?

6    Was it tense, was it argumentative, was it pushy, was it

7    calm --

8    A    Normal conversation.

9    Q    Normal.

10   A    Right.

11   Q    What was the Defendant doing during all this time?

12   A    He was really nervous, jumpy.  And then he just said

13   that he lived downstairs in apartment one.  And that's when

14   Sergeant asked him for consent.  He said, yes.  Sergeant was

15   like, go get the consent, the written consent form.  I went to

16   go get it.  He signed it voluntarily.  That's it.

17   Q    So you said he was jumpy and nervous.  Did he ever give

18   -- you say that he gave consent.  Tell me how he gave consent.

19   A    He gave consent voluntarily.  We didn't have to push him

20   --

21   Q    Verbal.

22   A    Verbal consent, right.  We didn't have to ask him much.

23   I mean, right away he was like trying to -- in my opinion, he

24   was just trying to get away, like he was trying to get rid of

25   whatever was happening.  He didn't want to be part of it.  So

1    he was like, yes, I give consent.

2    Q    Was he handcuffed?

3    A    That I do not recall.

4    Q    Was he free to move about the apartment?

5    A    We were outside the apartment.  We --

6    Q    You were --

7    A    -- were right in the hallway.

8    Q    You were in the hallway.

9    A    Yes, sir.

10   Q    Okay.  And so did you hear him say -- did you hear him

11   give verbal consent?

12   A    Yes, I did.

13   Q    Using his words as best as you can remember, what

14   exactly did he say?

15   A    He said it in Spanish.  He said I give you permission to

16   check my apartment.

17   Q    Thank you.  And did he say that -- did it seem to you

18   that he was saying that under stress, under fear?

19   A    No.  Like kind of just, you know, trying to saying it

20   like you can go check my apartment, I have nothing to hide, in

21   my opinion, in that sense.

22   Q    He didn't actually say that but that was --

23   A    No.

24   Q    -- the tone, the way you understood.

25   A    The tone, right.  Very relaxed, I mean, regular.  You

1    could tell he was nervous because maybe he didn't want to be

2    found upstairs.  But, I mean, the whole --

3    Q    Or maybe all the -- or maybe the police presence.

4    A    Right.  But, I mean, the conversation was a regular

5    conversation.

6    Q    So then after a verbal consent you said you are the one

7    that obtained the --

8            MR. RAMIREZ:  This one.  I think it's Defendant's

9    exhibit, the consent, the written consent.

10           MR. GUERRA:  I think it's 11.

11           MR. RAMIREZ:  What is it?

12           MR. GUERRA:  Exhibit 11.

13           MR. RAMIREZ:  Eleven.  Oh, you got that, too.

14           MR. GUERRA:  Could be wrong.

15           MR. RAMIREZ:  No, it is.  You're correct.

16   BY MR. RAMIREZ:

17   Q    Do you recognize what's on the screen, Defendant Exhibit

18   Number 11?

19   A    Yes, sir, I do.

20   Q    Is this the form that you then had then presented for

21   his signature?

22   A    Yes, sir.

23   Q    It's the form is defense number 11.  It's -- it has a --

24   there's some handwriting on the top, first line, second line,

25   and then later on for an address it appears; who wrote that?

1    A    He did.

2    Q    He wrote this, he printed --

3    A    Yeah.

4    Q    -- his name.

5    A    Yes, sir.

6    Q    And he printed your name.

7    A    Yes, sir.

8    Q    And he printed Sergeant Gonzalez.

9    A    Yes, sir.  I kind of followed him through step-by-step

10    on how to fill out the form, explain it to him, and told him I

11    -- he had to write his name, who he was giving consent to,

12    meaning me and Sergeant Gonzalez, to go into apartment one,

13    three, oh, one, 3104 Flores.

14    Q    Okay.  So you told him or you helped him or --

15    A    I helped him.

16    Q    -- however you want to say it.

17    A    I helped him, yeah.

18    Q    But -- and how about the date and hour; who wrote that?

19    A    He did.

20    Q    You provided him the date and you provided him the time.

21    A    Yes.  And he had to sign at the very bottom.

22    Q    Did you read everything in Spanish to him?

23    A    Yes.

24    Q    And did he ever stop to ask questions?

25    A    He did.  As you can see, he didn't know how to spell my

1  name so he kind of had to scratch it out.  And that's it.  But

2  at no point did he ask any questions.  He was willing to give

3  consent voluntarily.

4  Q     Did you or anyone in your presence force him to sign

5  this?

6  A     No, sir.

7  Q     Or tell him that he had to sign it, otherwise he

8  couldn't leave --

9  A     No, sir.

10  Q     -- or anything like that?  And the two signatures that

11  appear here as under the witnesses as witnesses, who are they?

12  Just to confirm.

13  A     The first one is S5147, which would be Corporal Ismael

14  Garcia.  And the second one is Corporal Ayala.

15  Q     Okay.

16          MR. GUERRA:  I'm sorry, could you -- what were the

17  Corporal Ayala and the other person?

18          THE WITNESS:  Corporal Ismael Garcia, 5147.

19          MR. RAMIREZ:  Ismael Garcia.

20  BY MR. RAMIREZ:

21  Q     And above the word that in Spanish would mean signature,

22  right next to it, the exhibit label, Defendant Exhibit Number

23  11, whose signature is that?

24  A     That is the Defendant's signature.

25  Q     Who provided him a pen to write all this?

1    A    That I do not recall.

2    Q    Okay.  Because it's in blue.

3    A    Yes, sir.

4    Q    So -- and did he ever tell you he didn't want to sign?

5    A    No, sir.

6    Q    So after this form was signed, what happened next?

7    A    After that form was signed he went downstairs with us,

8    he was escorted downstairs.  And he took out his key, it was a

9    silver in color key, out of his front pocket.  I can't recall

10   if it was the right or left pocket but it was a front pocket,

11   and he opened the white metal gate, door.

12   Q    Was he handcuffed when you asked him to fill this out,

13   fill out form Defendant's Exhibit Number 11?

14   A    I do not recall.

15   Q    Was he handcuffed when he gave verbal consent?

16   A    I do not recall.

17   Q    Okay.  So when he was you said led downstairs, did you

18   walk with him and the others would walk with him downstairs?

19   A    Yes.

20   Q    And when you -- as you walked through the hallway --

21   well let's talk about -- let's go back to defense number one.

22   There to the left of the middle is a stairway that lead down

23   from the upstairs.

24   A    Yes.

25   Q    So were there officers along up here, the -- along the

1    stairs or up here in the second part balcony?

2    A    Yes, upstairs in the second door balcony.

3    Q    I don't know if it's balcony but it's --

4              THE COURT:  At what point in time, Mr. Ramirez --

5              MR. RAMIREZ:  Thank you, sir.  Sorry about that.

6              THE COURT:  -- be specific.

7    BY MR. RAMIREZ:

8    Q    After the form was signed and you all decided to escort

9    him downstairs to his apartment, when you walked, did you --

10   were there persons in the balcony upstairs?

11   A    I don't remember.

12   Q    And how about on the stairway, any officers?

13   A    I mean, just the officers that were escorting him.

14   Other than that, the officers were all in the parking lot.

15   Q    How many officers escorted him down?

16   A    I do not recall.

17   Q    How close were you to him during your walk down to the

18   apartment, to the efficiency?

19   A    Right behind him.

20   Q    Did -- was there -- was he quiet, was there any

21   conversation?

22   A    No.

23   Q    Okay.  How was he being escorted or held or pushed or

24   anything?

25   A    He was not being pushed, and I do not recall the way he

1    was being held.

2    Q    Okay.  And so when he -- before locking the gate did he

3    say anything?

4    A    No.

5    Q    So he didn't -- as far as you know he didn't withdraw

6    his consent.

7    A    No, he did not.

8    Q    And you're sure you made it clear to him that he could

9    withdraw his consent, because that's what the form says.

10   A    Yes.

11   Q    So then upon -- he took the key out.  And did he open

12   the door himself?

13   A    Yes, he did.

14   Q    And what happened at that point?

15   A    At that point Sergeant was the one that was closest to

16   him, if I remember correctly, and that's it.  We went into the

17   house, took pictures, searched, that's it.

18   Q    And you took all the photos that --

19   A    Yes, sir.

20   Q    -- we're seeing here, except for the ones provided by

21   defense, except the ones the defense has advised that they

22   took.  So how much ammunition was found and how much marijuana

23   was found?

24   A    There was 29 metal boxes containing .50 caliber live

25   ammunition; 25 boxes containing 200 rounds of 5.56 caliber

1    ammunition; and 20.54 pounds of marijuana.

2    Q    Where was the marijuana found?

3    A    The marijuana was found --

4         MR. RAMIREZ:  That's okay, let me move on to

5    something else.

6    BY MR. RAMIREZ:

7    Q    So after this occurred, at some point later you

8    participated in a interview of the Defendant along with other

9    individuals; is that right?

10   A    Yes, sir.

11   Q    Who were the individuals that were in the interview --

12   A    It was --

13   Q    -- of the Defendant?

14   A    -- ATF Mr. Morales, ATF Sean, Mr. Saldana-Alaniz, and

15   myself.

16   Q    Sean Ensley (phonetic).

17   A    Yes.

18   Q    Right.  Okay.  Also with ATF.

19   A    Yes, sir.

20   Q    And during that, where was that interview held?

21   A    At the Webb County Sheriff's Office substation.

22   Q    And that was recorded.

23   A    Yes, sir.

24   Q    And there was a *Miranda* statement provided.

25   A    Yes, sir.

1          THE COURT:  Hold on, counsel.  Before you get into

2    that, at what time, when is this?  You're using the term --

3          MR. RAMIREZ:  Yes.

4          THE COURT:  -- later again.

5          MR. RAMIREZ:  Later.

6          THE COURT:  Never heard anything more specific than

7    that.

8          MR. RAMIREZ:  Yes, Your Honor.

9    BY MR. RAMIREZ:

10   Q    Do you remember at what time you all arrived at the

11   substation?

12   A    I do not recall the time.  But he did sign his *Miranda*

13   warnings at 9:52 p.m.

14   Q    So he signed the consent form at 7:24 p.m.

15   A    Yes, sir.

16   Q    And the *Miranda* was signed at nine --

17   A    Fifty-two.

18   Q    -- fifty-two.  At the substation.

19   A    Yes, sir.

20   Q    So during the -- about how long was the interview?

21   A    I do not recall.

22   Q    Were you there for the entire interview?

23   A    Yes, sir.

24   Q    Did you ever leave the room?

25   A    No, I did not.

1   Q    During the interview did he complain about anything?

2   A    No, he did not.

3   Q    Did he express any concern or frustration with you or

4   anybody?

5   A    No, sir.

6   Q    Did he complain about how he was treated by any officers

7   before he was taken to the substation?

8   A    No, sir.

9   Q    After the interview concluded and the -- and this is all

10  audio, video recorded.  After the audio, video recording was

11  concluded did you continue to have any conversation with the

12  Defendant?

13  A    I stayed behind because ATF Morales and ATF Sean Ensley

14  went to debrief Sarge Gonzalez.  I stayed behind with

15  Mr. Saldana-Alaniz.  And we were just having regular

16  conversation, and that's when he mentioned that he had been to

17  jail in Mexico and he was being treated very bad --

18            MR. GUERRA:  Your Honor, we would object to any

19  introduction of any of that information that has nothing to do

20  with the issues at hand, Your Honor.

21            MR. RAMIREZ:  Oh, it does, Your Honor, because it

22  also -- what she's going to testify I anticipate will show the

23  atmosphere that occurred and his demeanor afterwards which

24  goes --

25            THE COURT:  All right.  For that purpose --

1          MR. RAMIREZ:  -- directly to the issue.

2          THE COURT:  -- I agree that it's relevant to show

3     the -- again, the circumstances, the atmosphere, and to the

4     extent he's claiming coercion and non-voluntariness of giving,

5     you know, of making his statements, I think it goes to the

6     circumstances and the environment, so I'll allow it.  Go

7     ahead.

8          MR. RAMIREZ:  Thank you.

9     BY MR. RAMIREZ:

10    Q    So what did you all talk about, you and the Defendant?

11    A    We talked about that he had a very rough life and he

12    went on saying that he was treated very badly once he was in

13    jail in Mexico.  He even lifted his shirt towards like the

14    back.  I was able to see his back and he showed me all his

15    markings from where they beat him up over there.

16    Q    So did you initiate that conversation with him about his

17    history or did he bring it up on his own?

18    A    He just kept on talking the whole time.  He was very

19    jumpy.  He just was talking to me regular conversation.

20    Q    And in that room it was only the two of you at that

21    point.

22    A    Yes, sir.

23    Q    Do you know about that must have been around, what,

24    10:30 or so?

25    A    Yes.

1    Q    At night.  And so at about approximately that time did

2    he seem -- did he just start talking to you; is that what

3    you're saying?

4    A    Yes.

5    Q    And how did you feel about what he was telling you?

6    A    I felt sorry for him.  I felt bad.  And that's it.  I

7    just told him that everything was going to be okay.

8    Q    So he was able to be expressive and free --

9    A    Yes, sir.

10   Q    -- and communicate with you in a way that did not --

11   would not be characteristic of somebody who's being

12   threatened.

13   A    Yes, sir.

14   Q    Okay.  At any point did he ask for any water or food or

15   anything like that?

16   A    I don't recall.

17              MR. RAMIREZ:  Okay.  I'll pass the witness, Your

18   Honor.

19              THE COURT:  All right.  From the defense.  I know,

20   look, well let's talk about this.  I was of course hoping I

21   don't want to have to bring the investigator back tomorrow

22   morning for her inconvenience to split it up, so I'd like to

23   finish the questioning with her.  I might have some clean-up

24   questions.

25              But so with that, I mean, just so everybody

1    understands, I was planning on trying to break at 6:00 but I

2    don't know that we're going to be able to do it.  I think for

3    your benefit it'd be better to just try and finish.  So we're

4    going to keep going until we finish with this witness.

5              MR. GUERRA:  Yes, Your Honor.

6              THE COURT:  Mr. Guerra, if you want to continue

7    with the cross-examination.

8              MR. GUERRA:  Yes, sir.  May I speak to her from --

9    again from the -- from this here?

10             THE COURT:  Yes, of course.

11             MR. GUERRA:  Thank you.

12             Okay, Investigator Sarquiz, I'm Raul Guerra.  I'm

13   going to be asking you some questions, okay.

14             THE WITNESS:  Yes, sir.

15             MR. GUERRA:  I'm part of the Public Defender's

16   Office defending Mr. Saldana.

17             CROSS-EXAMINATION OF DANA PAULA SARQUIZ

18   BY MR. GUERRA:

19   Q    So let's start with what -- where we just ended.  So he

20   basically -- your testimony today is that my client had a fear

21   of the police because he had suffered beatings in Mexico at

22   the hands of the police, and he had the actual physical

23   markings on his body to show it.

24   A    Yes, sir.

25   Q    And so he has -- he before --

1      MR. RAMIREZ:  Objection, Your Honor.  I'm not sure

2   that that's what she said.  She didn't mention police.  She

3   said he'd been beat up and had been beaten --

4      THE COURT:  Well I don't know that I heard her use

5   the words that he expressed fear of the police but --

6      MR. GUERRA:  May I -- I can ask her --

7      THE COURT:  -- if you want to --

8      MR. GUERRA:  I can ask her.

9   BY MR. GUERRA:

10  Q    So you said that he had told you you all are different

11  than the Mexican police; did you not --

12  A    Yes.

13  Q    -- say that?  Okay.  And so was it your understanding

14  that it was when he made that comment and he was showing you

15  the beating or the markings as you said on the back, was he

16  telling you that he had been beaten in custody in Mexico?

17  That's the way you understood it.

18  A    Yes.

19  Q    Okay.  And --

20  A    But he never mentioned police.  Just said he was being

21  beaten.

22  Q    Well, but that's the way you understood it.  Is that the

23  way you understood it?  If somebody tells you, you guys are

24  different than the police in "X" country, look at what

25  happened to me over there --

1    A    He didn't say like that, no.  He just -- we were just

2    having a regular conversation like I mentioned, going back and

3    forth, and he mentioned that he was in prison in Mexico, he

4    had gotten beaten very badly, he showed me the lacerations.

5    Not once did he mention it was by inmates or by police.  He

6    just mentioned that he had gotten beaten.

7    Q    Okay.  So then your testimony now is he just decided to

8    show you the markings just to show you that he had markings

9    and had been beaten by some unknown people unrelated to the

10   police in Mexico.

11   A    I didn't go into questioning with him who beat him or

12   how they beat him.  I just know they beat him, and he showed

13   me his lacerations, and I felt very bad for him.

14   Q    But he told you, you guys are different than the police

15   in Mexico.

16   A    I don't recall saying --

17   Q    You didn't say that a couple minutes ago.

18   A    I don't recall saying I -- no.

19   Q    Okay.  Well, but what did he tell you about the police?

20   Because you mentioned something about --

21   A    About the police?

22   Q    You mentioned that he said you guys are different.  What

23   was the context of that?

24   A    I don't recall saying I said that he was different, it

25   was different.  I said that I was having regular conversation

1    with Mr. Saldana-Alaniz.  After ATF Morales and ATF Sean

2    Ensley went to go debrief my sergeant, after that I sat alone

3    with Mr. Saldana-Alaniz.  He opened up.  We had regular

4    conversation.  He stood up.  He was like, yes, I've been

5    beaten, this and that, I've had a rough life, showed me his

6    back.  That's it.

7    Q    So he never told you, you guys are different.  You did

8    not say that earlier; is that what you're saying?  Because

9    that's what I heard.  I heard you say --

10   A    I don't recall saying that.

11   Q    -- you guys are different.  You didn't say that.

12   A    No.

13   Q    Okay.  All right.  Well I stand corrected.  Let's go

14   back to the beginning where what -- so you started to tell the

15   Court on direct examination that you were supposed to be in

16   charge of this but somehow Sergeant Gonzalez ended up being in

17   charge, right?

18   A    Yes, sir.

19   Q    And he I guess I have in my notes took control at the

20   scene.  So you were in charge because you received the

21   information.

22   A    Right.

23   Q    Okay.  And so now as part of your surveillance, or at

24   any time for that matter, had you ever been to this address,

25   3104 Flores?

1    A    No.  That was my first time.

2    Q    You had never been there before.

3    A    No.

4    Q    Okay.  So not during surveillance you didn't go look

5    around or even before this surveillance you had never been

6    there.

7    A    No.  That same day I received information is the same

8    day we went out.

9    Q    Okay.  So you got it --

10   A    Yes, sir.

11   Q    You actually got the information on June 1st.

12   A    Yes.

13   Q    Okay.  So there were multiple agencies and officers from

14   the Webb County Sheriff's Office who responded.  And so your

15   report has -- and, well, let me backtrack.  You prepared a

16   report, correct?

17   A    Yes, sir.

18   Q    Okay.  And so your report has a listing of -- and I

19   actually read it out to the previous witness, but there's a

20   long list of people.  Is this all the people or is this all

21   the people you remembered at the time that you were writing

22   the report?  Were there other people that participated that

23   are not listed in your report?  Because there's a long list of

24   State or, you know, County officers and City -- or, I'm sorry,

25   Federal officers --

1          THE COURT:  Counsel, just let her answer the
2     question.
3          Is that the entire list of everybody who was out
4     there, all the law enforcement officers?
5          THE WITNESS:  Yes.  If I remember correctly, yes,
6     it is.
7          MR. GUERRA:  That is the whole list, okay.
8     BY MR. GUERRA:
9     Q    And so of the SWAT officers, what is your recollection
10    as to how they were -- how many of them have long gun -- long
11    rifles, I'm sorry.
12    A    I don't recall.
13    Q    But some of them did.
14    A    Yes, some of them did.
15    Q    Some of them did.  And it could be a handful.
16    A    Handful.
17    Q    A handful, okay.  And those people were -- had those
18    weapons and they were ready, obviously at the ready to use
19    them if the need arises, why they were --
20    A    If need be.
21         MR. GUERRA:  That's why they were there.  So you
22    testified earlier, and I got a lot of notes here so I'm going
23    to have to move into the side so I can actually -- because I
24    do my little stars and then I don't remember what I was
25    supposed to ask you.

1    Q    But you testified earlier that you all did the rally,

2    you did all the other stuff, and then you approached.  You

3    said -- Mr. Ramirez asked you, well, is this -- was this a

4    felony approach, was it not, and you said, well, it was -- you

5    did not describe it as a felony approach and but you did have

6    a pretty heavy police presence in general and a very heavy

7    also SWAT presence, correct?

8    A    If I remember correctly, I believe I answered

9    Mr.  Ramirez's questions by saying knock-and-talk.

10   Q    Right.  Okay.  Which is not a felony approach.

11   A    Exactly.

12   Q    Right.  So but do you normally do bring in SWAT for

13   knock-and-talks?

14   A    No, sir.

15   Q    Okay.  SWAT is breaching, right?  That's when they're

16   usually brought in.

17   A    Well, SWAT is for breaching and for support for

18   narcotics.  And like I mentioned before, we're a very small

19   unit so we do need manpower sometimes.

20   Q    Okay.  And you said that in response to one of

21   Mr. Ramirez's questions, when he asked you basically what was

22   your -- why were you approaching and why were you doing the

23   knock-and-talk, you said because you all had no probable cause

24   to enter that efficiency.

25   A    Right.

1    Q     Right.  You didn't have a legal right to go in there.

2    A     Into the apartment, no.

3    Q     Right, okay.  And you all --

4          MR. RAMIREZ:  Excuse me.  Your Honor, that's

5    something I'd like clarification on.  He said to go in there.

6    Maybe if counsel would be more specific for the record

7    purposes, whether he means apartment or efficiency --

8          THE COURT:  And/or efficiency, Mr. Guerra, can you

9    clarify that just --

10         MR. GUERRA:  I -- no, I think I specifically said

11   efficiency.  If I --

12         MR. RAMIREZ:  In the first question, yes.

13         MR. GUERRA:  If I didn't, I'm asking --

14   BY MR. GUERRA:

15   Q     When you said you have no probable cause, you had no

16   probable cause to go into the efficiency.  That was your

17   target, I mean, the -- and not -- when I say efficiency, you

18   refer to it as the apartment with the metal security door.

19   A     Right.  That is apartment one.

20   Q     Right.  And when you said --

21         THE COURT:  No, no, hold on.  Her answer right

22   there was, yes, that was apartment number one.

23         MR. GUERRA:  Okay.

24         THE COURT:  That's not --

25         THE WITNESS:  And this --

1          THE COURT:  You need to clarify with her then that

2     there's some kind of distinction we think versus maybe her

3     understanding, --

4          MR. GUERRA:  Okay.

5          THE COURT:  -- sounds like.

6     BY MR. GUERRA:

7     Q    So do you believe or did you believe at that time --

8          THE COURT:  Could we put up the -- could we put up

9     Exhibit Number 11?  Or Number 10, please.

10         MR. RAMIREZ:  Yes.  Could I get the control?

11         THE COURT:  Maybe it'll help the discussion,

12    Mr.  Guerra.

13         MR. GUERRA:  Yes, Your Honor.  Yes, absolutely.

14         MR. RAMIREZ:  You want the sketch.  I think the

15    sketch would be good.  Here you go.  I'm going to zoom in

16    Defendant's Exhibit Number 10.

17    BY MR. GUERRA:

18    Q    Okay.  So I'm showing Defendant's Number 10.  That

19    little portion on the right side that says efficiency room,

20    was it your understanding that that was apartment one?

21    A    Yes, sir.

22    Q    That was your understanding.

23    A    Yes.  I mean, when we approached the house, we did not

24    know that that was a different living are.  We thought that

25    whole efficiency room was apartment one.

1    Q    Okay.  Even though there's -- it doesn't say apartment

2    one in the front, but that was your understanding.

3    A    Right.

4    Q    How did you develop that understanding that that was

5    number one if it doesn't say number one?  Let me ask you that.

6    A    We just went in there and, I mean, apartment one, we

7    just thought it was apartment one.

8    Q    I understand that.  But why would you think that if it's

9    not labeled as apartment one?  You're doing surveillance and

10   then you actually go there.  It doesn't say apartment one.

11   Why would you be thinking that is apartment one?

12   A    Well I had gotten, like I mentioned, description of the

13   house, the target house, which is that one with the metal gate

14   door.  And when we approached and we stopped, talked to the

15   shirtless guy, gave us consent to search his -- or not consent

16   but we had exigent circumstances to enter his apartment.  And

17   then that's when we're -- we realized that that was a

18   different efficiency.

19   Q    I understand that.  But I think -- but you're not

20   answering my question.  If that unit is not marked as

21   apartment one, why were you all under the impression that that

22   was apartment one when it is not marked as apartment one?

23   A    I don't know.

24   Q    Okay.  Now, on that note, when you did execute the

25   written consent, by that point you knew there was a difference

1    between apartment one and the efficiency, right?

2    A    Consent of the Defendant?

3    Q    The written consent document, we're going to talk about

4    it.  But by --

5    A    Yes.

6    Q    -- that point you already knew there was a distinction,

7    right?

8    A    Yes.

9    Q    Okay.  So then back to after you do the approach, you

10   think that's apartment one, you testified that you went into

11   the -- you waited outside, the SWAT people went into the

12   apartment, apartment one, went into apartment one, Mr. Garza's

13   apartment, and you waited outside, and that the decision to go

14   into apartment one was to recover the kids, right, to --

15   A    Yes, sir.

16   Q    -- do a quote, unquote welfare check, right?  And your

17   testimony is that you went in after SWAT had cleared it.

18   A    Yes.

19   Q    And specifically -- and I'm going to use the term you

20   used.  You said Georgie, Sergeant Martinez, right?

21   A    Yes.

22   Q    Georgie called out to you and you went to get the kids.

23   A    Yes.

24            MR. GUERRA:  Okay.  So would it surprise you to --

25   well, I'll probably go back to that.

1    BY MR. GUERRA:

2    Q    But you also said that it was -- this was very quick,

3    you know, and I'm looking for it, but you actually -- oh, here

4    it is.  You said that Mr. Ramirez asked you about the time

5    lapse and you said Georgie went in with Vajilla (phonetic)

6    SWAT, he went in with the SWAT, and then I have here in my

7    notes one minute and you were called out to get the kids.

8    A    Yeah, I mean, to me it was fast so yeah.

9    Q    I understand that.  You were there.  So I'm -- but I

10   want to verify.  So you're saying one minute.  And you agree

11   with me, that's a very small apartment.  And I'm talking about

12   apartment one now, not the efficiency.  That's even smaller.

13   But apartment --

14   A    Yes.

15   Q    -- one is a very small apartment, right?

16   A    Yes.

17   Q    Okay.  So within one minute, Georgie was already saying,

18   the kids are okay, hey, come in, help me get them.

19   A    Yes.

20   Q    Okay.  And you said -- Mr. Ramirez asked you if when you

21   went in, you had noticed any sofa, whether the sofa was moved

22   or not moved.  You said you don't remember any sofa at all.

23   A    I did not say that.  I said I do not remember the sofa

24   being moved.  I was not looking for anything.  I just went

25   straight to get the kids is exactly what I said.

1    Q    Well, that's -- well, let's clarify that.  So when you

2    went in to get the kids, do you or do you not remember that

3    there was a sofa in apartment one?

4    A    Of course I do.  It's a huge sofa.

5    Q    Okay.  It was huge and you do remember it.

6    A    The big sofa, yes.

7    Q    Okay.  So how -- when you went in to get the kids, how

8    was that sofa?

9    A    It was towards the wall.

10   Q    It was back against a wall.

11   A    Yes.

12   Q    Okay.  So your testimony is after you got the kids,

13   within a minute Georgie calls you to get the kids, that

14   eventually you make your way up to talk to -- you went looking

15   for Mr. Saldana.  That lady says somebody's here.  I believe

16   you said Corporal Ayala got the information.  And I have in my

17   notes that you said everybody was talking to Saldana.  Who's

18   everybody?

19   A    The officers present.  They were talking -- I mentioned

20   they were talking to Saldana and the tenant --

21   Q    Okay.

22   A    -- in apartment three.

23   Q    But who is everybody?  Who do you remember was talking

24   to him?

25   A    Sergeant Gonzalez was present, Corporal Ayala was

1    present, I was present, and I don't recall who else.

2    Q    But it was there were more people.

3    A    Maybe one more, two more.

4    Q    Okay.  Including some of the SWAT people with the

5    rifles.

6    A    No.

7    Q    You don't remember that.

8    A    No, I don't remember that.

9    Q    You don't remember it or you're saying, no, they were

10   not there.

11   A    I don't remember that.

12   Q    Okay.  Now, you also will agree with me that as you

13   testified, Corporal Garcia, if I'm not mistaken, had stopped a

14   vehicle and Mr. Saldana was in that vehicle before.

15   A    Yes, sir.

16   Q    Okay.  That was one of the I believe it was three

17   vehicles that were stopped that were leaving the complex

18   earlier, right?

19   A    Yes, there were two vehicles that I recall.

20        MR. GUERRA:  Okay.  And you testified that you

21   don't -- you're not sure what time because your report doesn't

22   have the time that you got, you know, the approach -- well,

23   the word you all are using, the approach started.  And I'm

24   looking at my notes here but because you give an estimate.

25   BY MR. GUERRA:

1  Q     You arrive now you said 3:30.  Was that for the
2  surveillance or was that for the approach?
3  A     For the surveillance, it was around 3:00, 3:30.  I don't
4  recall --
5  Q     Okay.
6  A     -- the exact time.
7  Q     Do you recall approximately when you started the actual
8  approach, when you went to do the knock-and-talk and all the
9  other things that you've --
10  A     No.  I mentioned there was after -- it must have been
11  after 6:11 because that was the last pursuit.
12  Q     After what?  I'm sorry.
13  A     Six, eleven.
14  Q     Six --
15  A     Because that was the pursuit.  That's when we decided to
16  rally up.
17  Q     Okay.  So you're saying it was after 6:00, 6:11 --
18  A     Six, eleven.
19  Q     -- specifically actually you're saying.  Okay.  And then
20  how long did that take more or less, everything that you
21  described going into the looking for the kids, going up,
22  looking for Mr. Saldana?
23  A     I don't know.  It took a long time.
24  Q     Like how long?
25  A     A long time.  I don't know.  I don't have --

1    Q    Like an hour.

2    A    -- specific timeframe.

3    Q    Two hours, three hours, you don't know.

4    A    No.

5    Q    Okay.  And you didn't document anything in your --

6    A    No.

7    Q    -- report.  Okay.  And so Mr. Ramirez asked you about

8    whether you knew how Sergeant Gonzalez or if anybody for that

9    matter had gone into the efficiency.  And so is it your

10   testimony that you did not see anybody from law enforcement go

11   into that efficiency?  I'm talking about in that drawing in

12   Defendant's Number 10, that little room marked efficiency

13   where the door is, the -- one of the entry doors is from

14   apartment number one.

15   A    You mean in when we first went in there for the welfare

16   check --

17   Q    At any time did you -- and I'm talking about any time.

18   At any time when you were involved, did you find out any

19   information as to who went into that room and when?

20   A    No.

21   Q    Nobody ever told you.

22   A    No.

23   Q    And you didn't hear any -- you were part of the team.

24   You didn't hear anybody talking about it.

25   A    No.  Like I mentioned before, I was taking care of the

1   kids.

2   Q    Okay.  So you have no specific knowledge as to any entry

3   into that room, that's your testimony.

4   A    Yes.

5   Q    Okay.

6   A    The only time I went to the room that I know was when we

7   got consent from Mr. Jose Saldana.

8   Q    Okay.

9        (Mr. Guerra/Ms. Martinez confer.)

10        MR. GUERRA:  I'm just -- Judge, I'm just crossing

11   my questions as I finish them.

12   BY MR. GUERRA:

13   Q    So with regard to the entry into the efficiency, it --

14   does it surprise you to know that Sergeant Gonzalez testified

15   earlier and said that he did go into the efficiency after the

16   SWAT members went?  As some of them went to the bedroom, he

17   went into the efficiency.

18   A    No, it wouldn't surprise me.

19   Q    Okay.  It wouldn't surprise you.

20   A    No.

21   Q    But you didn't hear anything about it.

22   A    No.

23   Q    Corporal Ayala didn't tell you anything, Sergeant

24   Gonzalez didn't tell you anything.

25   A    No.  Like I mentioned, I was not part of the initial

1    going into the house.  I was taking care of the kids.

2    Q    Well, but you were -- I mean, you started this as the

3    person in charge of this operation, by your own testimony.

4    A    Yes.  And then I mentioned that Sergeant Gonzalez took

5    over.

6                 MR. GUERRA:  I understand that.  But, I mean,

7    you're saying that even though you started this in charge of

8    this operation, you actually never -- and you were part of the

9    team, you never found out how they entered that.  That is your

10   testimony before the Court.

11                THE WITNESS:  When they entered what?

12   BY MR. GUERRA:

13   Q    Entered the efficiency.

14   A    I'm telling you I did not know they entered the

15   efficiency room.

16   Q    You did not know that they had even done it at all,

17   okay.

18   A    No.

19   Q    Okay.  Now, you said that --

20                MR. GUERRA:  That's okay.

21   BY MR. GUERRA:

22   Q    So you're not telling us that actually in preparing for

23   today's hearing you didn't find out that Sergeant Gonzalez

24   actually went in.  I mean, you did find out eventually, right?

25   A    Eventually, yes.

1  Q    But on -- is it your testimony that on June 1st you had
2  no idea how he gained entry or who went in?  Okay.  But
3  subsequently you did find out.
4  A    Yes.
5  Q    How did you find that out?
6  A    I found it out when we had a meeting with Mr. AUSA
7  Homero.
8  Q    Okay.
9           MR. RAMIREZ:  Ramirez.
10          THE WITNESS:  Ramirez.
11          MR. RAMIREZ:  Close enough.
12 BY MR. GUERRA:
13 Q    And so back to the kids, you said Georgie -- and again
14 correct me if I'm wrong.  It says here that I have in my notes
15 that -- and I -- that he came out to get you.  Was that
16 Georgie?
17 A    Yes.
18 Q    Okay.  So he found the kids.  And is it your testimony
19 then he left the kids alone and went out to get you to go in
20 and help them?
21 A    I don't know if he left the kids alone or not.  I don't
22 know who was -- if anyone stayed behind or not.  I just know
23 Georgie came to get me and I went back inside, got the kids,
24 and that's it.
25 Q    Because I mean the whole object was the welfare of the

1    children.  And so are you saying that --

2    A    I can tell you I don't know --

3    Q    -- then they did exactly the same thing, they just left

4    them?

5    A    I don't know if someone stayed behind or not.  I just

6    know Georgie went to get me and then I went back inside, got

7    the kids, and that's it.

8    Q    Okay.  And what was your understanding about the all --

9    the SWAT all-clear?  What was your understanding what had

10   happened when that was announced and then you were able to go

11   in?

12   A    Well, that it was clear, that there was no immediate

13   danger to the officers or anyone else.

14   Q    But you don't have any idea after Georgie came to get

15   you who stayed with the kids.  You -- I think you said that.

16   You do not know who --

17   A    Yes.

18   Q    -- stayed with the children, right?

19   A    No, I do not know.

20   Q    Okay.  So let's talk about the consent form that --

21              MR. GUERRA:  Can you put it up, Sara?

22              MR. RAMIREZ:  This -- what do you need?  Or do you

23   want to switch?  What do you need me --

24        (Ms. Martinez/Mr. Ramirez confer.)

25              THE COURT:  Exhibit 11, Defendant's.

1          MR. RAMIREZ:  Oh, the consent.  Eleven.

2   BY MR. GUERRA:

3   Q     So you testified earlier that when you first started

4   this, your understanding was that that unit with a door facing

5   the front, the street, was apartment one, right?

6   A     Yes.

7   Q     But then after everything happened and you all met with

8   the landlord and all that, you found out that is not apartment

9   one and there is -- it's a separate lease for that unit.

10  A     Exactly.

11  Q     Which is why you had to get --

12  A     Consent.

13  Q     -- consent.  All right.  Look at the consent form that's

14  signed.  What does it say?

15          THE COURT:  Which part of it, counsel?

16          THE WITNESS:  Which part?  Yeah.

17          MR. GUERRA:  Well, good question.

18  BY MR. GUERRA:

19  Q     The section in the middle that says -- of course I'm

20  trying to read it from up here -- but where you see one 3104

21  Flores.

22  A     It says, apartment house located at.

23  Q     Right.  It says one and then 3104 Flores.  You see that.

24  A     Yes.

25  Q     Okay.  And you testified earlier, and I have in my

1    notes, and again correct me if I'm wrong, that you said he

2    gave us consent to search apartment one.

3    A    Yes.

4    Q    Right.  Okay.  He didn't have consent to give you to --

5    he didn't have authority to give you consent to search

6    apartment one, you realize that, right?

7    A    Yes.

8    Q    Okay.  So that's the consent you got, to search an

9    apartment that you had already searched.

10   A    Well, he did say that he lived in the metal gate door

11   facing the street.

12   Q    I'm not asking you what he said.  I'm asking you what he

13   signed consent for.  And what your testimony here before this

14   Court is that you obtained consent for apartment one --

15   A    Yes.

16   Q    -- from him.  Okay.  And by this point you knew

17   apartment one was not his apartment, that was Mr. Garza's

18   apartment, correct?

19   A    Yes.

20   Q    Okay.  And this document and then your testimony is that

21   your understanding is he gave you consent to search apartment

22   one at 3104 Flores.

23   A    Yes.

24   Q    Okay.  But that's not the efficiency.

25            MR. RAMIREZ:  That's been established Your Honor.

1    It's asked and answered.

2            MR. GUERRA:  I understand.  But I mean I want to

3    make sure she understands that.

4            THE WITNESS:  I understand.

5            MR. GUERRA:  Okay.

6            THE WITNESS:  I said yes twice.

7            MR. GUERRA:  Right.

8    BY MR. GUERRA:

9    Q    So then he didn't give you consent to search the

10   efficiency.  He didn't give you written consent to search the

11   efficiency.

12   A    Yes, he did not.Q    Thank you.  Okay.  But you

13   searched it anyways.

14   A    Well, I mean, he had given verbal consent.  He had

15   explained where he lived.  He mentioned he lived downstairs,

16   metal gate door, white in color, he had the key, took us

17   downstairs, led us to the front door, opened himself.  So

18   maybe he didn't specify here apartment one but he did tell us

19   where he lived.

20           MR. GUERRA:  Well, but that's not the question I

21   asked you.

22           THE WITNESS:  That's fine.

23           MR. GUERRA:  Sara, anything else?

24           MS. MARTINEZ:  Your Honor, may I have a moment to --

25           THE COURT:  Briefly.

1          MR. GUERRA:  Oh, actually I do, I have that over

2     here.  Forgetting a couple things.

3          (Mr. Guerra/Ms. Martinez confer.)

4          MR. GUERRA:  Okay.  So a couple final questions,

5     Investigator.

6     BY MR. GUERRA:

7     Q     So one of them was you testified you did not -- you do

8     not recall when my client was cuffed or not cuffed.  I

9     understand that.  But you also said that he was led down the

10    stairs, and you were behind, and you said there were some

11    officers.  You could not recall whether they were leading him

12    down, I believe it was your testimony, or not.  You were very

13    clear that they were not pushing him down, if I recall

14    correctly.  But he was not free to go at any time, right?  I

15    mean, if he had told you when you first went, you and Sergeant

16    Gonzalez and the -- all the other people, you said it was, you

17    know, four or five people, he was not free to go.  If he had

18    told you I'm going to leave, he wasn't going to go anywhere.

19    You were not -- no, you were not going to let him leave.

20    A     No.  He was detained at that moment.

21    Q     He was not free to go.

22    A     He was detained.

23    Q     He was not free to go.

24    A     He was detained, not free to go.  He --

25    Q     Okay.

1    A      -- was detained.

2            MR. GUERRA:  All right.  And there was another one.

3    I'm sorry.  She comes and whispers in my ear and then I --

4            THE COURT:  Go back to written notes.

5        (Mr. Guerra/Ms. Martinez confer.)

6    BY MR. GUERRA:

7    Q    So the -- you took the pictures, you testified that

8    already, right?

9    A    Yes, sir.

10   Q    And you're saying that you had -- you also testified

11   that until after whatever time you met with Mr. Ramirez, you

12   had no idea that the efficiency had actually been entered from

13   apartment one, correct?

14   A    Correct.

15           MR. GUERRA:  Okay.  Let's put up, Sara, Defendant's

16   Exhibit Number 15.

17           MR. RAMIREZ:  Oh, it's mine, 15, I have it here.

18   BY MR. GUERRA:

19   Q    So you took this picture, right?

20   A    Yes.

21           MR. GUERRA:  This picture, Defendant's Exhibit 15,

22   shows the door that leads into apartment one is open.  It

23   shows a mirror, what has been testified earlier that it's a

24   mirror, kind of like a wall mirror on the floor.  There's been

25   testimony from other witnesses that it broke.

1          So you took this picture and it shows that there

2     was some sort of entry from apartment one because the door's

3     open.  And you testified earlier that when you went in to get

4     the kids, the sofa was still against that wall.  I mean the

5     door, I'm sorry.

6          THE WITNESS:  I didn't say it was against the door.

7     I said it was against the wall.

8          MR. GUERRA:  Against the wall.  Okay.

9          THE WITNESS:  Yes.

10    BY MR. GUERRA:

11    Q     But you said you did not know that there was any entry,

12    so let me ask you this question.  Was the door already opened,

13    you forgot to mention that?

14    A     I don't remember.

15    Q     You don't remember.  Okay.  But you were certain that

16    you had no idea that your officers, fellow officers, had

17    entered --

18    A     Yes.

19    Q     -- until later.

20    A     I mean a door can be open.  That doesn't mean you go in.

21    So, no, I don't recall anyone ever telling me that day --

22    Q     Okay.

23    A     -- they had entered the efficiency.

24    Q     You -- after you took that picture, you don't recall

25    asking anybody, hey, wait a minute, I just took a picture, the

1    door's open, how did that door end up being went open, who

2    went in or none of that.

3    A    No.

4    Q    You had no curiosity.

5    A    No.

6          MR. GUERRA:  Okay.  All right.  Anything else,

7    Sara?  Oh, yeah, so I'm sorry.

8    BY MR. GUERRA:

9    Q    Regarding the picture, so you obviously took pictures

10   before anything -- I'm -- let me not make that assumption.

11   Did you take pictures before everything was moved?

12   A    I do not recall.

13   Q    Isn't it procedure to take pictures --

14   A    It is.

15   Q    -- before and after?

16   A    It is.

17   Q    Okay.  But your testimony is you do not -- you don't

18   remember if you followed that procedure or not.

19   A    I'm pretty sure I did but I cannot tell you for certain.

20         MR. GUERRA:  Okay.  No further questions, Your

21   Honor.  Thank you.

22         THE COURT:  Okay.  Mr. Ramirez, let me -- before

23   you, --

24         MR. RAMIREZ:  Yes.

25         THE COURT:  -- let me just ask a few questions,

1    that way you'll have the opportunity to follow-up with your

2    redirect.

3            Investigator Sarquiz, the couple of questions

4    specifically about -- first about the written consent form,

5    exhibit -- Defendant's Exhibit 11.  Was it your testimony that

6    you read through the entire document with the Defendant?

7            THE WITNESS:  Yes.

8            THE COURT:  That you read it word for -- was it

9    word-for-word?

10           THE WITNESS:  I explained it -- I -- yes, I

11   explained it to him, read it, helped him out, yes.

12           THE COURT:  Okay.  But I mean the entire -- not --

13   did you just read to him the portions that he was filling out

14   or did you read the entirety of it where it goes down and the

15   -- you have that bottom language at the bottom that, you know,

16   (speaks Spanish) --

17           THE WITNESS:  I read the whole thing.

18           THE INTERPRETER:  I understand that I have the

19   right to deny.

20           THE COURT:  Okay.  So you read all of that

21   language.

22           THE WITNESS:  Yes, sir.  I read everything.  And I

23   was even helping him, like I mentioned, (speaks Spanish) I

24   told him (speaks Spanish).  He filled out his name, who he's

25   giving consent to.  I had explained that, me, Sergeant and

1    myself, and then the (speaks Spanish).  And then at the bottom
2    I told him to just put the fetcha and --
3                 THE INTERPRETER:  The date.
4                 THE COURT:  Okay.  And the form indicates that it
5    was filled out as approximately or at 7:24 p.m., right?
6                 THE WITNESS:  Yes, sir.
7                 THE COURT:  Where were you with him when the form
8    was filled out?
9                 THE WITNESS:  We were upstairs in the balcony area
10   right outside apartment three.
11                THE COURT:  Okay.  And who else was present up
12   there at the time?
13                THE WITNESS:  My witnesses are Corporal Ismael
14   Garcia, 5147, Corporal Ayala.  And I believe there was other
15   ones.  I know Sergeant Gonzalez was present as well.
16                THE COURT:  Okay.  Well that's what I was asking.
17   Were there other law enforcement officers standing around
18   upstairs?
19                THE WITNESS:  For sure it was Corporal Ayala,
20   Corporal Ismael Garcia, myself, and if I recall correctly, it
21   was also Sergeant Gonzalez.  And I do not recall there was
22   anyone else.
23                THE COURT:  Okay.  All right.  And then your
24   testimony is that -- again, I know this has been asked and
25   answered.  But you didn't go in with the original group of

1    officers when they went in to apartment one, correct?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  Okay.  So you were waiting out.  You

4    said that Georgie, who is --

5              THE WITNESS:  Jorge Martinez.

6              THE COURT:  -- Sergeant Jorge or George Martinez,

7    came out and asked you to go in, help take care of the

8    children.

9              THE WITNESS:  Yes, sir.

10             THE COURT:  Okay.  And you said that was only about

11   a minute.

12             THE WITNESS:  I don't recall the time specifically.

13   It was -- to me, everything happened so fast so --

14             THE COURT:  But it was after the all-clear.

15             THE WITNESS:  Yes.

16             THE COURT:  Okay.  And that's the first time you

17   went in to apartment one.

18             THE WITNESS:  Yes.  That is my very first time

19   going in to apartment one, to get the kids.

20             THE COURT:  Okay.  How long if you -- give me at

21   least an estimate of how much time passed between when you all

22   went in to the -- well, not you all but the officers who were

23   with you went into the apartment one for the welfare check of

24   the children and between the time that you -- that the consent

25   form was signed?

1          THE WITNESS:  So you mean from when we went into
2     apartment one for the welfare check and then --
3          THE COURT:  Right.
4          THE WITNESS:  -- all the way until the consent was
5     signed?
6          THE COURT:  I mean, another way of saying it is do
7     you know approximately what time the entry into the apartment
8     for the welfare check was?
9          THE WITNESS:  I do not.
10         THE COURT:  Because I know you talked about the
11    rally and the time that the vehicle, that the stop of the
12    other vehicle was done before that resulted, and we got to
13    rally up and go over there, and you said that was about 6:11
14    p.m. I think was mentioned.  But so I'm not really clear on
15    the timeline of what -- of the timing of things that happened
16    between that 6:11 p.m. and 7:24 p.m. when the consent form was
17    signed is what I'm trying to get a better feel for.
18         THE WITNESS:  Right.  So after 6:11, which was when
19    the pursuit happened with the vehicle, --
20         THE COURT:  Right.
21         THE WITNESS:  -- after that we all rallied up and
22    then we conducted the knock-and-talk I want to say -- I mean,
23    by the time the officers went into the apartment one and the
24    consent was signed, maybe 45 minutes had passed, 40 minutes
25    had passed.

1          THE COURT:  Okay.  And -- okay, that's fair enough.
2     When the Defendant, Mr. Saldana-Alaniz, was -- so he signs
3     this form.  Did you hear -- I forgot what you -- if you
4     testified about this.  Did you hear his conversations with
5     Sergeant Gonzalez about, you know, either going into the
6     efficiency or not or, you know, giving consent?  Did you hear
7     him talking about that before he signed this form?
8          THE WITNESS:  No.  The sergeant just told me that
9     he had given verbal consent, that I needed to go get it, get
10    the form.  I went to go get the form.  I took it upstairs and
11    I explained it all to him.
12         THE COURT:  Okay.  And then from that point forward
13    I believe your testimony was then you all walked downstairs, -
14    -
15         THE WITNESS:  Yes.
16         THE COURT:  -- down the stairs, correct?  That he
17    was accompanied -- you were behind him and there were, what,
18    two officers on each side of him or --
19         THE WITNESS:  Yeah, two, three officers.
20         THE COURT:  You don't recall whether --
21         THE WITNESS:  I don't recall.
22         THE COURT:  -- he was handcuffed.
23         THE WITNESS:  I don't recall whether he was
24    handcuffed.  But I do remember clearly that he was able to get
25    the key out of his front pocket.  I don't remember if it was

1       the left or the right.  And he himself opened the front metal
2       white in color door.
3               THE COURT:  Did he say anything during that time
4       period or as he was opening the door, immediately after
5       opening the door?
6               THE WITNESS:  Nothing, no.  He was very willing.
7       Like he was very volunteering everything, very -- he seemed
8       nervous but, I mean, not like scared or anything.  So, no, he
9       was fine.
10              THE COURT:  Okay.  All right.  I think that's all
11      the clarification I have.
12              Mr. Ramirez, do you have any further questions of
13      this witness?
14              MR. RAMIREZ:  Yes, Your Honor, just a few which
15      won't take me very long.
16              REDIRECT EXAMINATION OF DANA PAULA SARQUIZ
17      BY MR. RAMIREZ:
18      Q    Going to Defendant Exhibit Number 11, which is on the
19      screen before you, which is a consent form, so you told the
20      Defendant to write what he wrote on the form in blue, correct?
21      A    I guided him but he --
22      Q    You guided him.
23      A    -- was the one that decided what to put there.
24      Q    Well, he -- you said that he was willing to do it and
25      you --

1    A    Yes.

2    Q    -- helped him with it.

3    A    Yes.

4    Q    So the idea of the number one that Mr. Guerra was saying

5    was improper and the proper location, was that your suggestion

6    or his suggestion?

7    A    His suggestion.

8    Q    So he wrote one.

9    A    Yes.

10   Q    And the 3104 Flores, whose idea was it to write that?

11   A    His idea.

12   Q    And at the time you were discussing one at 3104 Flores,

13   was it your understanding after having had a conversation with

14   him that you were talking about the main unit or were you

15   talking about the area with the gate, the efficiency?

16   A    The metal with the gate with efficiency due to the

17   description he had given us prior.

18   Q    All right.  And the matter of the Georgie or Sergeant

19   Martinez, there's your -- I know it's been like, what, eight

20   months or so?

21   A    Yes, sir.

22   Q    And it's not in your report about you leaving to go in

23   and Georgie coming out, anything like that.

24   A    Correct.

25   Q    Is it possible that it could have happened some other

1    way?  Maybe he called out to you or someone called you to go

2    get the children?

3    A    Yes.

4    Q    But you testify that he's the one that walked out to

5    where you were because you were outside of the apartment.

6    A    Right.  I was by the door.  Like I was very close to the

7    door.  I was right by the tree.  I don't know there's a

8    picture of, but I was on the left side of where Mr. Eduardo

9    Garza was at the --

10   Q    And that is by over -- I'm showing you --

11   A    Right there, yes.

12   Q    -- Defendant Exhibit Number 1.  So he was -- where was

13   Mr. Garza; around where this "X" is?

14   A    Yes, right there.

15   Q    Right there.  And where were you?

16   A    I was inside so towards the --

17   Q    Closer to the door.

18   A    By the -- yeah, right in between the door and right in

19   between the tree.

20   Q    Okay.  And --

21            THE COURT:  And you just showed her that's exhibit

22   -- what is that?

23            MR. RAMIREZ:  Exhibit Number 3.

24            THE COURT:  Three.  Okay.

25            MR. RAMIREZ:  Defendant Exhibit Number 3.  And,

1    finally -- oops, I deleted --

2    BY MR. RAMIREZ:

3    Q    Question was asked of you by Mr. Guerra about whether

4    you took photos before or after or -- and you weren't sure you

5    remembered.  Let me take you through these very quickly.

6    Exhibit -- Government Exhibit Number 1, did you take that

7    photo?

8    A    Yes, I did.

9    Q    And was that taken before or after entry was made

10   through -- after consent was given?

11   A    It was before.

12   Q    So you took the photo before you -- so, in other words,

13   the door -- the Defendant opened the door and then you took

14   the photo, and then the officers went in.

15   A    Yes.

16   Q    Government Exhibit Number 2, this is the interior of

17   two, three, and four.  Did you take these three photos?

18   A    Prior to searching.

19   Q    But did you take them yourself?

20   A    I did, yes.

21   Q    And this was before the searching.

22   A    Yes, sir.

23   Q    So three and four, notice that three has -- well, it's a

24   different view.  But you took those photos.  That was before

25   the search, --

1    A      Yes, sir.

2    Q      -- correct?  So number five, Government Exhibit

3    Number 5, it shows the shower stall but there are no cushions

4    or blankets.  So you must have taken it --

5    A      After they --

6    Q      -- during the search, after their -- okay.  So you were

7    -- in effect would it be fair to say that you were taking

8    photos -- you took -- started taking photos before, during,

9    and after?

10   A      Yes, sir.

11          MR. RAMIREZ:  All right.  I have no more questions,

12   Your Honor.  Thank you very much.

13          THE COURT:  All right.  Mr. Guerra, any further

14   questions?

15          MR. GUERRA:  Yes, Your Honor, just a couple.

16          Can you put up the consent form?

17          MR. RAMIREZ:  I got it.

18          THE COURT:  Let me -- before you do that, just in

19   case you want to follow-up, I did remember one other question.

20   Let me --

21          MR. GUERRA:  Yes, Your Honor.

22          THE COURT:  -- ask this so you'll have the

23   opportunity to follow-up if you'd like to.

24          So, Investigator Sarquiz, one other follow-up

25   question.  At the time that the written consent form was

1     filled out that has the time on it of 7:24 p.m., was it your

2     testimony that before the form was filled out that somebody

3     had already talked to the landlord, that that happened before

4     the consent form was filled out?

5                THE WITNESS:  Yes.  If I remember correctly, when

6     we were downstairs inside Mr. Garza's apartment with the wife,

7     the toddler, I remember clearly one of our investigators,

8     Ramirez, he came in and he said that he had just finished

9     speaking to the landlord.  I never spoke to the landlord

10    myself.  One of the investigators did.

11               THE COURT:  And the information from the landlord

12    was that the efficiency was separate from apartment number

13    one.

14               THE WITNESS:  Yes.

15               THE COURT:  It was being rented out separately to

16    Mr. Saldana.

17               THE WITNESS:  Yes.

18               THE COURT:  Okay.  And also before the consent form

19    was filled out at 7:24 p.m., Mr. Garza, the resident of

20    apartment number one, had told somebody, I forget if you were

21    there, maybe you heard him say it, inside the apartment number

22    one that he told -- he was saying that the efficiency was not

23    part of his lease of the property that he was renting.

24               THE WITNESS:  Yes.

25               THE COURT:  That happened before 7:24 p.m. when the

1    written consent form was filled out.

2              THE WITNESS:  Yes.

3              THE COURT:  Okay.  All right.  If you have any --

4    go ahead, Mr. Guerra.

5              MR. GUERRA:  Yes, Your Honor.

6         (Pause)

7              THE COURT:  Mr. Guerra.

8              MR. GUERRA:  Yes, Your Honor.  I apologize.

9              RECROSS-EXAMINATION OF DANA PAULA SARQUIZ

10   BY MR. GUERRA:

11   Q    Investigator Sarquiz, so you testified that the

12   execution of this particular waiver that is Defendant's

13   Exhibit 11, that that occurred upstairs; that's your

14   testimony.

15   A    Yes.

16   Q    Okay.  Would it surprise you that Sergeant, as you call

17   him Georgie Martinez, Jorge Martinez, testified, if I am not

18   mistaken, that the -- that this document was executed

19   downstairs?  And apart from that would it surprise you that

20   you said that he -- that the signatures there are Ayala and

21   Garcia, and he said he -- that's one of his signatures?  One

22   of those, I'm sorry, is his signature is what he had

23   testified.

24   A    Okay.  I was not aware of that.

25   Q    You were not aware of it.

1    A    No.

2    Q    Okay.  So are you correct or is he correct?

3    A    I'm not sure.  I remember upstairs.  He remembers

4    something else.  It was eight months ago.  I clearly remember

5    being outside.

6    Q    Okay.

7    A    Because the only time I went downstairs when -- was when

8    he led us to the front door of his apartment or his

9    efficiency.

10              THE COURT:  Okay.  But also I'm interested in the

11   identification of the signatures of the witnesses on the form.

12   You -- to the best of your recollection, those signatures,

13   let's go with the top signature, is the signature of --

14              THE WITNESS:  Ismael Garcia.  I know that because

15   of 5147.

16              THE COURT:  And what --

17              THE WITNESS:  That's his badge number.

18              THE COURT:  -- you're referring to, that that's --

19   you can interpret that as numbers.  That's -- I couldn't tell.

20   Looks like chicken scratch to me.  But on that first

21   signature, a witness line, the last part of that signature are

22   numbers.  And now that you say it, it seems like it may be

23   five, one, four, seven.

24              THE WITNESS:  Yeah, that's his badge number.

25              THE COURT:  Okay.  That's his badge number.  And

1    the second line is you believe that is the signature of --

2                THE WITNESS:  I thought it was the signature of

3    Ayala just because he was with me upstairs the whole time.

4                THE COURT:  Okay.  You can't -- do you

5    independently recognize that signature?

6                THE WITNESS:  No.

7                THE COURT:  Okay.  Mr. Guerra, if anything -- so go

8    ahead.

9                MR. GUERRA:  Just one --

10   BY MR. GUERRA:

11   Q    So you don't recall sergeant -- now Sergeant Georgie

12   Martinez, at the time he was a corporal -- you don't recall

13   him being present for the execution of this document.

14   A    I don't, no.

15               MR. GUERRA:  Okay.  Thank you.  No further

16   questions, Your Honor.

17               THE COURT:  Okay.  Mr. Ramirez, anything else?

18               MR. RAMIREZ:  No, Your Honor, thank you.

19               THE COURT:  Okay.  Investigator Sarquiz, thank you

20   for being here today.  You are excused.  And don't speak to

21   anybody about your testimony.  This hearing will continue for

22   tomorrow so don't speak to anybody about your testimony while

23   this hearing is ongoing, okay?  But you are excused, thank

24   you.

25               THE WITNESS:  Thank you.

1        (Witness excused.)

2             MR. RAMIREZ:  My next --

3             THE COURT:  All right.

4             MR. RAMIREZ:  -- witness, your --

5             THE COURT:  Yeah.  Tomorrow afternoon at

6  1:00 o'clock we will continue here.  That will leave -- let me

7  see here.  So what that will leave one more witness for the

8  Government, correct, Mr. Ramirez?  If you decide.  That would

9  be ATF Agent Morales.

10           MR. RAMIREZ:  No.  I don't think I'm going to call

11  anybody else, Your Honor.

12           THE COURT:  Okay.  Well, look, you all talk about

13  it.  I mean, if you --

14           MR. RAMIREZ:  So --

15           THE COURT:  -- definitively announcing that now,

16  that's fine.  But then otherwise I want defense counsel to be

17  ready.  I want you to let them know so that they'll be ready

18  to call their first witness if they intend to proceed.

19           And knowing that if you've decided you are not

20  going to call ATF Agent Morales, if that was a factor in your

21  all's decision of who you were going to call or not, you need

22  to know that and decide who you're going to start with at

23  1:00 o'clock tomorrow.

24           THE CLERK:  I set it for 1:30.  I'm sorry.

25           THE COURT:  1:30.

         THE CLERK:  Yeah.  Because I wasn't sure how much
time you would have.
         THE COURT:  All right.  Well, I'll reluctantly go
with 1:30.  But it sounds like now we're --
         MR. RAMIREZ:  Well --
         THE COURT:  -- looking at --
         MR. RAMIREZ:  -- we'll talk.
         THE COURT:  -- maybe two -- well, maybe three,
still three witnesses if you all -- if the defense decides to
call somebody that the Government has decided they're not
going to call.
         MR. GUERRA:  Yes, Your Honor.  If --
         MR. RAMIREZ:  We'll confer, Your Honor.
         MR. GUERRA:  -- Mr. Ramirez is not going to call
Agent Morales, we would like to call Agent Morales.  It should
be rather brief but we do want to call him.
         And also still want to call Agent Schulp.  It
should be very brief.
         And then subject to Ms. Martinez's decision, the
Defendant may testify as well, Your Honor.
         THE COURT:  Yeah.  So, okay.  So I'm marking that.
And, okay, so that's who we'll anticipate is the universe of
potential witnesses for tomorrow.
         And then we'll hopefully have time to do some
closing arguments and discussion of the issues.  Okay,

1    counsel, everybody, thank you for your time today.  You are

2    excused.

3            The -- for the Marshals, you will have the

4    Defendant back here at -- before 1:30 tomorrow is the time.

5    Okay.

6            U.S. MARSHAL:  I've already confirmed.

7            THE COURT:  All right.  Thank you all, appreciate

8    it.  Okay.  You all are --

9            MR. RAMIREZ:  Thank you, Your Honor.

10            THE COURT:  -- excused, thank you.

11        (Proceedings adjourned at 6:32 p.m.)

12                        * * * * *

13        *I certify that the foregoing is a correct*

14    *transcript to the best of my ability produced from the*

15    *electronic sound recording of the proceedings in the*

16    *above-entitled matter.*

17       */S./  MARY D. HENRY*

18    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

19    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

20    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

21    *JTT TRANSCRIPT #66816*

22    *DATE FILED:  FEBRUARY 8, 2023*

23

24

25