1        IN THE UNITED STATES DISTRICT COURT

2       FOR THE SOUTHERN DISTRICT OF TEXAS

3              LAREDO DIVISION

4    UNITED STATES OF AMERICA      §    CASE NO. 5:22-CR-822
                                   §    LAREDO, TEXAS
5    VERSUS                        §    THURSDAY,
                                   §    FEBRUARY 2, 2023
6    JOSE ALONSO SALDANA-ALANIZ    §    1:32 P.M.

7              **SUPPRESSION HEARING – DAY TWO**

8         BEFORE THE HONORABLE JOHN A. KAZEN
              UNITED STATES DISTRICT JUDGE
9

10

11

12   APPEARANCES:                       SEE NEXT PAGE

13   ELECTRONIC RECORDING OFFICER:      ANABEL POTTIN

14   CASE MANAGER:                      JESSICA RODRIGUEZ

15   OFFICIAL INTERPRETER:              JANIS PALMA

16

17

18

19

20            TRANSCRIPTION SERVICE BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, LLC
              935 Eldridge Road, #144
22             Sugar Land, TX 77478
                  281-277-5325
23          mary@judicialtranscribers.com

24
     Proceedings recorded by electronic sound recording;
25     transcript produced by transcription service.

1                          APPEARANCES:

2

3   FOR THE GOVERNMENT:            JOSE HOMERO RAMIREZ, ESQUIRE
                                  Assistant U.S. Attorney
4                                 11204 McPherson Road
                                  Suite 100A
5                                 Laredo, TX 78045
                                  956-794-2101
6

7   FOR THE DEFENDANT:            RAUL GUERRA, ESQUIRE
                                  SARA A. MARTINEZ, ESQUIRE
8                                 Federal Public Defender
                                  1202 Houston Street
9                                 Laredo, TX 78042
                                  956-753-5313
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

PAGE:

PRELIMINARY MATTERS                                              4

WITNESSES:              Direct    Cross    Redirect    Recross

ISMAEL GARCIA
  By Mr. Ramirez         30         .         .          .
  By Mr. Guerra          .          43        .          47
  By the Court           45         .         .          .


ZACHARY SCHLUP
  By Mr. Ramirez         49         .         .          .
  By Mr. Guerra          .          73        .          88
  By the Court           84         .         .          .

JOSE MORALES
  By Mr. Ramirez         91         .         .          .
  By Mr. Guerra          .          101       .          109
  By the Court           107        .         .          .

JOSE ALONSO SALDANA-ALANIZ
  By Mr. Martinez        115        .         .          .
  By Mr. Ramirez         .          133       .          .
  By the Court           136        .         .          .


DEFENDANT'S EXHIBITS:                      ID'd        Received
2   Photograph                             36            .
11  Consent form                           37            .
27                                         150          150


CLOSING ARGUMENTS:        PAGE
  By Ms. Martinez          151
  By Mr. Ramirez           165

REBUTTAL ARGUMENT:
  By Ms. Martinez         189

***

1     **LAREDO, TEXAS; THURSDAY, FEBRUARY 2, 2023; 1:32 P.M.**

2          THE COURT:  All right.  So as I was saying, good

3    afternoon.  We are here for a continuation on a hearing on

4    Defendant's Opposed Motion to Suppress Evidence, Docket

5    Number 24 in this case, Case Number 5:22-CR-822, the matter

6    of the United States v. Defendant Jose Alonso Saldana-

7    Alaniz.

8          All right.  Any announcements?  Anything we need

9    to discuss before we continue with the hearing?

10         MR. GUERRA:  Yes, Your Honor.

11         MR. RAMIREZ:  May we approach?

12         THE COURT:  Yes, you may.

13         MR. RAMIREZ:  Or, well, the three Government

14   witnesses are here, but there is a matter that we would like

15   to discuss with you at the bench.

16         THE COURT:  Yes.  I mean, come on.  Yeah.  Turn on

17   the -- yeah.

18       (Bench conference commenced at 1:33 p.m.)

19         THE CLERK:  Is this on the Record?  On the Record,

20   Judge?

21         THE COURT:  Yes.  This is on the Record.  Yes.

22   Hold on.

23         THE COURT:  Was that your intention?

24         MR. GUERRA:  Yes, Your Honor.  It is.  Your

25   Honor --

1          THE COURT:  Do you want to get your co-counsel.

2          MR. GUERRA:  I'm sorry.  I'm sorry.

3          MS. MARTINEZ:  Right here.  No.  You're going to

4    take it up.

5          MR. GUERRA:  So Your Honor, we communicated to

6    Mr. Ramirez over the phone prior to coming today.  As the

7    Court may recall, yesterday, when I was questioning Dana

8    Sarquiz, I got into the area inquiry.  The Court allowed --

9    I'm sorry --

10          THE COURT:  I was just getting that out of your

11   way.

12          MR. GUERRA:  Okay.  The Court allowed -- I speak

13   with my hands -- the Court allowed --

14          MR. RAMIREZ:  (Speakers talk at the same time) --

15          THE COURT:  Get it out.  Go ahead.

16          MR. GUERRA:  The Court allowed the Prosecution to

17   get into some post-interview conversation that happened with

18   Mr. Saldana.

19          THE COURT:  (Speakers talk at the same time).

20          MR. GUERRA:  Remember that, Your Honor?  So and

21   then, when I started cross-examining her, and I asked a

22   question about -- that it was related to his treatment by

23   the police --

24          MS. MARTINEZ:  The Mexican (speakers talk at the

25   same time) --

1    MR. GUERRA:  -- the Mexican Police -- I'm sorry.

2    THE COURT:  Right.  I remember that.

3    MR. GUERRA:  Right.  And so I just wanted to make

4  sure that the Court -- because I felt very bad, but that

5  I -- but I didn't want the Court to think that I was asking

6  questions that was not based on fact.

7    And so she testified, and it appears that maybe

8  she was confused about what time frame because that

9  information was provided to them.  It was not provided at

10 the time that he was addressing with her which is the post-

11 interview.  It was -- it was provided to them during the

12 interview.  And so he did make those statements during the

13 interview and so --

14    THE COURT:  Oh.  So that was actually something

15 that was said during --

16    MR. GUERRA:  Yes, sir.

17    THE COURT:  -- the court of --

18    MR. GUERRA:  It was.

19    THE COURT:  -- during her first private

20 conversation --

21    MR. GUERRA:  Yes.

22    THE COURT:  -- with him afterwards.

23    MR. GUERRA:  Yes.  Right.

24    THE COURT:  Okay.

25    MR. GUERRA:  And so I didn't want the Court to

think that I was injecting facts into the Record that there
was no basis for.  There was a basis for it, and maybe she
was confused what time frame --

            THE COURT:  What exactly --

            MR. GUERRA:  My question --

            THE COURT:  -- was he saying or something.

            MR. GUERRA:  Maybe my question was not phrased
properly, but anyways, we wanted just to clarify that
because there is a factual basis for it.  My question or my
trying to elicit that from her -- and maybe she was confused
in saying that "No.  There was no reference to that."

            MS. MARTINEZ:  And it is relevant to the Court's
determination here because it goes to his frame of mind --
his state of mind -- that he does have a fear of police
because of his bad experience with Mexican Police.

            THE COURT:  Okay.

            MR. RAMIREZ:  I think the issue, as we discussed
this morning, is that what I had pointed out to the Court in
her presence is that I was only going to get into the
matters that occurred after the interview.

            And so he was -- he was relying on what he
remembered from the audio recording.  And so the way he
asked the question it was -- to me, it sounded like the
question was only about what happened after, which may be
what she was asking.  So I think you wanted to ask her or at

1  least address the Court and let the Court know that, that

2  was his perspective.

3        MR. GUERRA:  In other words, for her to -- to

4  clarify, I guess, she was -- if she understood my question

5  to be that, "Was that addressed during the time that she

6  spoke to him after the interview," her testimony yesterday

7  was, "No.  It was not."  But it was addressed, but it was

8  during the interview, not post-interview.

9        THE COURT:  Yeah.  She -- my recollection is not

10  perfect by any means, but my recollection -- my

11  understanding of her testimony was that she was saying that,

12  "Whatever conversation I had with him about this issue about

13  him being beaten in a Mexican prison" --

14        MR. GUERRA:  Uh-huh.

15        THE COURT:  -- but I thought I understood her to

16  say, "He never specified to me whether that was by police or

17  by somebody else."

18        So she was just saying, "I just remember him

19  telling me," you know, "the fact that he had a hard life.

20  He had been beaten.  He had been in a Mexican prison.  He

21  had been beaten."

22        And then you were asking her, "Well, he said he

23  had been beaten by police, right?"  And then she was, you

24  know, basically, paraphrasing it.  Was she paraphrasing it?

25  And she was like, "I don't know.  He didn't say that to me.

1  He just said he had beaten."

2          I don't know.  So now, maybe, if you were saying,

3  "Well, you know, actually we either -- in the recording of

4  his interview, his formal interview, he did say that he was

5  beaten by police in Mexico, and you know, I don't know.  But

6  so are you saying you wanted to -- to me, number one, I

7  appreciate you clarifying with the Court that, "Judge, I

8  want you to know, you know, I wasn't just making up stuff to

9  ask her."  I appreciate that.

10          Number two, are you wanting to call her back to

11  the stand to clarify that and -- because, otherwise, are you

12  -- is it you-all's collective intent to try and avoid, you

13  know, getting into what he said during the interview?  I

14  mean, it sounds like everybody agrees we don't want to get

15  into that.

16          MR. GUERRA:  Right.  I don't think we need to is

17  my --

18          THE COURT:  Right.  And --

19          MR. GUERRA:  -- except for that is what you're

20  raising --

21          MS. MARTINEZ:  Just that -- just that --

22          THE COURT:  Yeah.  Now, it sounds like --

23          MS. MARTINEZ:  Well, just that.

24          THE COURT:  -- you want to ask him or ask her --

25          MR. GUERRA:  Just to clarify the --

1    MS. MARTINEZ:  Just --

2    MR. GUERRA:  -- Record that my -- I mean, there

3  was a factual basis of my question, but it's not the time

4  frame that she was addressing.  It was --

5    THE COURT:  Well, what if she says, "Well, I don't

6  remember that"?  I mean, are you -- are you going to try and

7  impeach her with --

8    MR. GUERRA:  Yes, sir.

9    THE COURT:  -- "Hey, no.  He did say that."  I

10  mean, what if she just says, "Well, I don't -- I don't

11  remember him ever saying that"?

12    MS. MARTINEZ:  We can play that snippet, Your

13  Honor, to refresh --

14    MR. RAMIREZ:  I have the entire recording here.

15    THE COURT:  Do you --

16    MS. MARTINEZ:  It's just like ten seconds.  That's

17  all I would play.  It's just that little ten-second

18  statement that he says.

19    THE COURT:  Okay.  Are you -- because are we

20  sending the call -- well, I don't know.  I guess, then,

21  there is contradictory testimony.

22    I was going to say, if you were intending to call

23  your client, if and -- and if he was going to testify to

24  that, you know, then that would be what it was, but then

25  there would be contradictory evidence --

1          MR. RAMIREZ:  Right.

2          THE COURT:  -- well, he said it, but she said,

3   "No, he never" --

4          MR. RAMIREZ:  Right.

5          THE COURT:  -- "mentioned anything about the

6   police."

7          MR. RAMIREZ:  Yep.  Exactly.

8          THE COURT:  So --

9          MS. RAMIREZ:  If I may speak?  As we've heard the

10  recording, and we listened to it sort of together.  You told

11  me, and I listened to it while we were speaking, and there

12  is no mention of a beating by Mexican police.

13         THE COURT:  No.

14         MR. RAMIREZ:  So I'll acknowledge that.

15         THE COURT:  In the interview.

16         MR. RAMIREZ:  In the interview.

17         THE COURT:  Yeah.  There is no mention of a

18  beating?

19         MR. GUERRA:  Not of a beating by the police.  He

20  just says that -- well, you --

21         MS. MARTINEZ:  I'll have to paraphrase this.  He

22  said something like, "Okay.  Now" -- just to give you some

23  background, Judge.  After he's, you know, arrested, at the

24  Flores Street apartment complex, he's taken to, I guess, the

25  station.

1        MR. RAMIREZ:  The substation.

2        MS. MARTINEZ:  The substation.  He had a

3  conversation with someone -- who, I don't know -- but we

4  don't know what happens.  So then they start the interview

5  recording; and at the inception of the recording, he says to

6  the agents, "Okay.  Okay.  Now, I know that you guys are

7  different from the Mexican Police."  (Spanish spoken).

8  "Now, you all have explained it to me or shown it to me that

9  you guys are different."

10        THE COURT:  Yeah.  So --

11        MS. MARTINEZ:  Up until the point -- so

12  everything --

13        THE COURT:  Yeah.

14        MS. MARTINEZ:  -- is relevant to his state of mind

15  when everything was happening at Flores because he was

16  afraid of the police; but once he gets to the station, they

17  made him feel better.  They calmed him down.

18        THE COURT:  Right.  Before he starts giving --

19        MS. MARTINEZ:  Before he starts the interview.

20        THE COURT:  So that's the part that you want --

21        MS. MARTINEZ:  Yes.

22        MR. GUERRA:  It's at the very beginning, Judge.

23  It's at the -- literally, at the very beginning of the

24  interview on there.

25        THE COURT:  Could you ask -- I'm just --

1          MS. MARTINEZ:  We could just ask them --

2          THE COURT:  -- I don't know.  If both of you all

3    agree that, "Hey, we're going to limit it to that portion

4    of" -- if we get in the recording.  But I mean, otherwise,

5    you could also just ask her, hey, is it -- is it correct

6    that, before you started the recording of his interview at

7    the station, was there some preliminary -- if you were there

8    -- was there some preliminary discussion about, you know,

9    talking about his concerns about his dealings or experiences

10   with the Mexican Police or something?  And I don't know how

11   she would answer about that.

12          Anyway, if you all agree, and you're not -- you're

13   agreeing that you are or are not opening the door to other

14   things and the interview and whatnot, well, then I'm fine

15   with it; but at the end of the day, if you're just asking,

16   "Judge, can we recall Investigator Sarquiz to address" --

17          MR. GUERRA:  Just to clarify --

18          THE COURT:  -- (indiscernible) --

19          MR. GUERRA:  -- that point.

20          THE COURT:  -- "of that one point" --

21          MR. GUERRA:  Just that.  Just to clarify that she

22   was -- she was referring to that in that it was addressed at

23   the beginning of the interview.

24          THE COURT:  But she might still be like, "Uh."

25          MS. MARTINEZ:  "I don't remember that."

1          THE COURT:  "I don't remember that."  But in which

2    case -- but that's fine.  I mean, you took a shot.  I mean,

3    that's fine with me.  Anyway, your agreement --

4          MS. MARTINEZ:  (Speakers talk at the same time) --

5          THE COURT:  -- is --

6          MS. MARTINEZ:  -- or we can do it (speakers talk

7    at the same time).

8          THE COURT:  -- your agreement to recall her and

9    discuss with her the possibility, or she just thinks she's

10   here in reserve?

11         MR. RAMIREZ:  No.  I've -- that's why she's here.

12         THE COURT:  Oh.

13         MR. RAMIREZ:  We spoke.  I called her, and she's

14   here to testify, if required, for that limited purpose, and

15   we agree that we can do that, and --

16         THE COURT:  Does she remember when he talked to

17   her about it?  Does she remember that, during the interview,

18   that, that was said, or she doesn't remember?

19         MR. RAMIREZ:  She doesn't remember.  She

20   remembered after I played it for her.

21         THE COURT:  Oh, okay.

22         MR. RAMIREZ:  But I did want to let you know that.

23         THE COURT:  Okay.

24         MR. RAMIREZ:  Because I have to go to that and a

25   few other matters with her.

1          THE COURT:  Okay.  If you -- well, now, but are we
2    limiting if she takes the stand?  Is it just as to that
3    question?
4          MR. RAMIREZ:  I would like it to be just for that
5    question.
6          MR. GUERRA:  Yes.  Yeah.  No, Your Honor.
7          THE COURT:  Okay.
8          MR. GUERRA:  Same thing.  And that's what I told
9    Mr. Ramirez earlier.  When he asked me that specific
10   question, that's what I said.  I just want to clarify that.
11   I don't want -- I don't want the Court -- I didn't want the
12   Court to be under the impression that I was trying to inject
13   facts that were -- there was no basis for, you know?
14         THE COURT:  So then let's frame this clearly.  Is
15   defense making a request to recall her to the stand in order
16   to address that issue?  Is that how we're phrasing -- you
17   all have a joint agreement?
18         MR. GUERRA:  Do you want to just let it go?  I
19   mean, it's your -- it's your --
20         MS. MARTINEZ:  No.  That fact is relevant, so it
21   has to be presented.
22         MR. RAMIREZ:  Okay.
23         MS. MARTINEZ:  Whether it be through Morales -- he
24   was present, too.  We can ask him.
25         MR. GUERRA:  Uh-huh.

1          MS. MARTINEZ:  Or we can call her.  But I mean, is

2    what Morales -- does Morales know about it?

3          MR. RAMIREZ:  Does he -- does he remember?

4          THE COURT:  He remembers or --

5          MS. MARTINEZ:  Or Morales remember?

6          THE COURT:  -- what he --

7          MR. GUERRA:  Yeah.  Is Morales going to remember,

8    too?

9          THE COURT:  Yeah.

10          MR. RAMIREZ:  Yeah.

11          THE COURT:  He may not remember.

12          MR. RAMIREZ:  He does.

13          MS. MARTINEZ:  If Morales knows it, then --

14          THE COURT:  If you're making the request, and it's

15    unopposed --

16          MS. MARTINEZ:  Okay.

17          THE COURT:  -- I'll grant the request.  I'm not

18    ordering it though.  That term that he should be ordered --

19          MR. RAMIREZ:  I understand, Judge.

20          THE COURT:  -- I mean, --

21          MR. GUERRA:  I understand, Judge.

22          THE COURT:  -- but I mean, if it's -- if a request

23    is being made, and it's unopposed, I will grant it for five

24    minutes of, you know, further questioning.

25          MR. RAMIREZ:  And I will state, further, that I

1   don't think that Mr. Guerra had any intent to mislead or --

2             THE COURT:  No, no, no.

3             MR. RAMIREZ:  -- anything like that at all.

4             THE COURT:  I mean, apparently --

5             MR. RAMIREZ:  I don't at all.

6             THE COURT:  -- you know, it's -- I think it's more

7   of a question you all just wanting to --

8             MR. RAMIREZ:  (Indiscernible).

9             MS. MARTINEZ:  We want the Record to be clear that

10  there was --

11            MR. RAMIREZ:  That's what I was --

12            MS. MARTINEZ:  -- it goes to his -- to his mental

13  state.

14            THE COURT:  Yeah.  But that's -- it's also a

15  question of, you can't force a witness to, you know, to

16  answer the question and say, you know, "You do remember you

17  better" -- I mean, again, you could say, "Well, hey, we're

18  going to play this little clip for you.  Does that refresh

19  your memory?"

20            If not, that clip is in the Record.  Who -- it's

21  the recording, and you have that teed up.  Can you --

22            MR. RAMIREZ:  It's the post-*Miranda* --

23            THE COURT:  -- play it?

24            MR. RAMIREZ:  I think we all do --

25            MS. MARTINEZ:  Uh-huh.

1          MR. RAMIREZ:  -- but it's --

2          THE COURT:  Well, it's just -- I know it's post-

3   *Miranda*, but there is still a question of even what --

4          MR. RAMIREZ:  No.  It's --

5          THE COURT:  -- how voluntary that, you know --

6          MR. RAMIREZ:  I'm sorry.

7          THE COURT:  -- was.

8          MR. RAMIREZ:  I'm sorry.  It's pre-*Miranda*.

9          MR. GUERRA:  Yeah.

10         MR. RAMIREZ:  It's pre-*Miranda*.  It's the

11  interview -- it's the recording -- I forgot -- the

12  interview --

13         THE COURT:  As far as the recording, he's making

14  some comments.

15         MR. RAMIREZ:  Yeah.

16         THE COURT:  And then he's --

17         MR. RAMIREZ:  (Speakers talk at the same time),

18  and then he -- before the intros, he says, "And so are you

19  willing to talk to us?"  "Yes."  And then he makes that

20  comment, and then he goes into -- there are some other

21  information, and then the *Miranda,* which is standard

22  practice.

23         THE COURT:  You know, I don't know.  I'm just

24  really thinking about all this out loud, but I mean, you

25  know, it goes, I guess, to the extent that he's declaring,

1   "Oh, okay.  Now, I'm comfortable.  I'm okay now."

2           MR. RAMIREZ:  Uh-huh.

3           THE COURT:  "You want to waive your *Miranda*

4   rights?"  "Sure."  You know?  Yeah.  Anyway -- but you all,

5   if you --

6           MR. RAMIREZ:  I think his concern is just simply

7   that he wants to clarify -- and I'm not trying to put words

8   in your mouth -- to clarify that he wants an answer to his

9   question about "At any time, did he say anything about being

10  beaten by Mexican Police?" or something of that effect.

11          THE COURT:  That was --

12          MS. MARTINEZ:  Or fear.  At any time, did he

13  express --

14          MR. RAMIREZ:  Or fear.

15          MS. MARTINEZ:  -- any form of -- sort of fear --

16          MR. RAMIREZ:  Uh-huh.

17          MS. MARTINEZ:  -- of Mexican Police?

18          MR. GUERRA:  I --

19          MR. RAMIREZ:  Yes.

20          MR. GUERRA:  -- think I asked that question.  I

21  don't think he --

22          THE COURT:  (Speakers talk at the same time) --

23  yeah.  Not that my recollection is perfect.  It seemed to be

24  couched more in terms of, did he express that he was afraid

25  because he had been -- at least as I remember -- you were

1  really focusing on that he said he was beaten by Mexican

2  Police.

3          MR. RAMIREZ:  Uh-huh.  Okay.

4          THE COURT:  Not that maybe he had, had other bad

5  interactions, or in general, had bad experiences, but that

6  he said he was in prison, and that he was beaten in prison,

7  and that you were asking her, "He was beaten by police,

8  right?"  And she was like, "I don't remember that."

9          But irregardless, you-all, if you -- if you want

10 to call her back to the stand, and it's not opposed, I'll

11 allow it for this limited purpose --

12         MR. RAMIREZ:  (Speakers talk at the same time).

13         THE COURT:  -- to ask her these questions.

14         MS. MARTINEZ:  Well, I guess, I'm just -- I don't

15 know.  I'm just confused why that question was asked in the

16 first place then.

17         MR. RAMIREZ:  Yeah.

18         MS. MARTINEZ:  What was the relevance of it then?

19 Of the prison situation.

20         THE COURT:  Well, it seemed to be touching on that

21 issue.  It was -- it was about not what he was saying.  It

22 was about the fact that he was comfortable enough to be, I

23 think -- again, I'm not putting words in their mouth -- but

24 that it was the idea that he was comfortable to be having a

25 casual conversation with her that he was just sitting there

1  chatting with her about his personal background.

2          Now, again, whether or not that happened

3  afterwards, and she was misremembering things that he said

4  even before the interview started or whatever, I don't know.

5  I mean, I think that's -- so if you want to clarify that --

6  if you want to clarify that --

7          MR. RAMIREZ:  Well --

8          THE COURT:  -- with her --

9          MR. RAMIREZ:  You want -- I'm sorry.

10          MR. GUERRA:  No, no, no.  I was --

11          MR. RAMIREZ:  (Speakers talk at the same time) the

12  Judge.  I'm sorry.

13          MR. GUERRA:  No.  I was going to say that, I

14  guess, you know, when I objected yesterday, Judge, and I

15  know the Court's already ruled, and it's already been

16  admitted, but I think I had it backwards.  That, if the

17  conversation had been before that, you know, that he was

18  Mirandized and everything, well, that would show how

19  comfortable he was, and how then, when he did voluntarily --

20  when he did waive his rights, then, yeah, that shows he was

21  comfortable doing it; but after the fact, I guess, I was

22  failing to understand how that would support, you know, the

23  admitting it because it was after he had been Mirandized,

24  and his statement had been taken.

25          So I'm -- maybe, I'm missing something.  Maybe, I

1  misunderstood -- so -- no.  I mean, I (indiscernible).  You

2  want to just either call (indiscernible) --

3           MS. MARTINEZ:  Yeah.

4           MR. GUERRA:  Okay.

5           MS. MARTINEZ:  (Indiscernible).

6           MR. GUERRA:  Okay.

7           THE COURT:  So yes?

8           MR. GUERRA:  Yes.  That's --

9           THE COURT:  Okay.  (Speakers talk at the same

10  time) --

11           MR. GUERRA:  -- what she's saying.  She's the

12  boss.

13           THE COURT:  So --

14           MR. GUERRA:  (Indiscernible).

15           THE COURT:  -- okay.  So Ms. Martinez, you are

16  making the request, then, to recall the witness Sarquiz to

17  the stand for the limited purpose of asking her this

18  question about her conversations with the Defendant about

19  his distrust of Mexican Police.  Something relevant to --

20           MS. MARTINEZ:  Without going into --

21           MR. GUERRA:  Anything else.

22           MS. MARTINEZ:  -- anything else.  No.

23           THE COURT:  And not the --

24           MS. MARTINEZ:  Or asking that she be instructed

25  not to talk about why he was in prison.  We want to just be

1  clear on all that.  It's just the statement that he had a

2  fear of Mexican Police.  That's all we want her to clarify

3  for the Record.

4         THE COURT:  Okay.  Well, I don't know if I can,

5  you know --

6         MS. MARTINEZ:  Or --

7         THE COURT:  -- I don't want to tie your hands.

8         MS. MARTINEZ:  -- (speakers talk at the same

9  time).  You know, I don't know.  Let's get Morales to do it.

10        MR. GUERRA:  Okay.  That's -- I mean --

11        THE COURT:  Unless you have to put Morales in and

12 then --

13        MS. MARTINEZ:  Yeah.

14        THE COURT:  -- if you all want to re-urge the

15 motion.

16        MS. MARTINEZ:  Yeah.  We can do that.

17        THE COURT:  Okay.  So at this time, you're

18 withdrawing the motion?

19        MS. MARTINEZ:  Yes.  Yes.  Yes, Your Honor.

20        THE COURT:  All right.  We'll --

21        MS. MARTINEZ:  Okay.

22        THE COURT:  -- see what happens.

23        MR. RAMIREZ:  But for the Record, based on our

24 phone call this morning, I agreed to make her available.

25        THE COURT:  If it comes back up --

1          MR. RAMIREZ:  -- (speakers talk at the same time).

2          THE COURT:  -- I can just hear if you're opposed

3    or not, or you'll just state that you're -- (indiscernible)

4    expecting that you'll say you're unopposed on the Record.

5          MR. RAMIREZ:  Yes, sir.

6          THE COURT:  Okay.

7          MR. RAMIREZ:  And that she's here.

8          THE COURT:  And that she's here.  Is she going to

9    remain here for --

10         MR. RAMIREZ:  She's here voluntarily.

11         THE COURT:  Okay.  But I mean, it's one thing to

12   say, "Well, I thought" --

13         MR. RAMIREZ:  She (speakers talk at the same

14   time) --

15         THE COURT:  -- "I thought I was going to be here

16   for 15 minutes," versus she's going to sit through another

17   witness --

18         MR. RAMIREZ:  Yeah.

19         THE COURT:  -- for an hour.

20         MR. GUERRA:  We anticipate it's going to be short

21   with the witnesses.  I don't about Mr. Ramirez, but from our

22   side, it will be short, Your Honor.  There is not a lot

23   of --

24         MS. MARTINEZ:  Their witnesses.

25         THE COURT:   -- for whatever --

1          MR. GUERRA:  For their witnesses.

2          THE COURT:  When we get back, I'm going to --

3    first of all, I'm going to ask you-all to re-announce

4    yourselves.  I'll do that, and then I'll ask the Government,

5    you know, "Call your next witness."

6          And he will informally sit down (indiscernible)

7    probably not going to call anymore witnesses, but I'll ask

8    if you have anymore witnesses to call --

9          MR. RAMIREZ:  I will be calling witnesses.

10         THE COURT:  You will?

11         MR. RAMIREZ:  Very short -- yeah.  We discussed

12   that --

13         THE COURT:  Okay.  So you do have another witness?

14         MR. RAMIREZ:  Yes.

15         THE COURT:  Well, I am going -- I'm going to ask

16   you then.  Okay.  Well, then we'll just continue that way.

17         MS. MARTINEZ:  Thank you.

18         MR. GUERRA:  Thank you, Judge.

19         MR. RAMIREZ:  Thank you, Your Honor.

20         THE COURT:  All right.

21      (Bench conference concluded at 1:49 p.m.)

22         THE COURT:  Okay.  So continuing, let me get

23   announcement on the Record.

24         Present for the Government?

25         MR. RAMIREZ:  Homero Ramirez, Your Honor.

1        THE COURT:  And --

2        MR. RAMIREZ:  Good afternoon.

3        THE COURT:  -- present for Defendant?

4        MS. MARTINEZ:  Sara Martinez and Raul Guerra.

5        THE COURT:  All right.  So we ended yesterday with

6  -- before we broke for the evening -- with the Government

7  calling witnesses, and we finished with the witness,

8  Investigator Sarquiz.

9        And so, at this time, does the Government have any

10 -- another witness to call?  You may proceed to call your

11 next witness if you do, Mr. Ramirez.

12       MR. RAMIREZ:  Yes, Your Honor.  Israel Garcia with

13 the Sheriff's Department.  Ismael -- I'm sorry.  Ismael

14 Garcia.

15       And all three Government witnesses are in the

16 courtroom.  They're also on the Witness List for the

17 Defendant.  Since the Rule has been invoked, maybe they

18 should step outside.

19       THE COURT:  These are witnesses who have not yet

20 testified --

21       MR. RAMIREZ:  They have not testified.

22       THE COURT:  -- or expected to testify again?  I

23 don't know if you --

24       MR. RAMIREZ:  Correct.  One -- two have -- there

25 are three in the courtroom, the witness I just called, who

1  is going to testify and also Zach Schlup with DA.

2         THE COURT:  Yes.  He hasn't testified.

3         MR. RAMIREZ:  He has not testified.  I will be

4  calling him.  If I don't call him, I anticipate the defense

5  would call him.  He's on their Witness List.

6         And Investigator Corporal Dana Sarquiz is also

7  here at my request to be here after our conversation with

8  defense counsel in the event they wish to re-call her.

9         THE COURT:  Right.  And so then, I think, it's

10 appropriate, then we'll excuse to step outside Investigator

11 Corporal Sarquiz and Agent Schlup or Schlup and -- go ahead.

12 Agent, I don't know -- Agent Schlup, were you here

13 yesterday?

14        MR. SCHLUP:  Yes, sir.

15        THE COURT:  By invoking the Rule, that means -- I

16 don't know if you know if you've heard this --

17        MR. SCHLUP:  Yes, sir.

18        THE COURT:  -- before as a witness -- but don't

19 talk to anybody about your testimony or the witnesses who

20 have testified until after the hearing is concluded.

21        MR. SCHLUP:  Yes, sir.

22        THE COURT:  Okay.  All right.  So thank you.

23 You're excused to wait outside.  Thank you.

24        MR. RAMIREZ:  And I -- Your Honor, just to -- his

25 last name is pronounced Schlup.  I mispronounced it.  I'm

1  sorry about that.

2        THE COURT:  Schlup?

3        MR. RAMIREZ:  Schlup.

4        THE COURT:  Is it kind of like --

5        MR. RAMIREZ:  It's Schlup.

6        THE COURT:  -- it's spelled with a double "O."

7  Schlup, Schlup, Schlup.

8        MR. RAMIREZ:  Well, we're going to let him

9  clarify, but --

10        THE COURT:  Yeah.  We'll let him --

11        MR. RAMIREZ:  -- we can go with --

12        THE COURT:  -- tell us.

13        MR. RAMIREZ:  -- Schlup for now.

14        THE COURT:  All right.  So let's have Corporal

15  Ismael Garcia take the stand.  He has not been sworn.  So

16  he'll need to be sworn in.

17          ISMAEL GARCIA, STATE'S WITNESS, SWORN

18        THE COURT:  All right.  Corporal Garcia, go ahead

19  and have a seat.

20        Okay.  So you're here to testify as a witness in

21  this proceeding today.  You've got the microphone there in

22  front of you.  Feel free to adjust it so that it's there in

23  your mouth, and you can speak clearly into the microphone.

24        Just, you know, do your best to listen carefully

25  to the question and answer clearly as best you can, and then

1    you'll be answering questions from the attorneys beginning

2    with Mr. Ramirez on behalf of the Government.  You can

3    proceed with your questions --

4              MR. RAMIREZ:  Thank you.

5              THE COURT:  -- of this witness.

6              MR. RAMIREZ:  Thank you, Your Honor.

7                   DIRECT EXAMINATION OF ISMAEL GARCIA

8    BY MR. RAMIREZ:

9    Q    State your full name for the Record, please.

10   A    Ismael Garcia.

11   Q    And what is your current title and who do you work for?

12   A    My title is corporal, and I work for the Webb County

13   Sheriff's Office.

14   Q    What do you do with the Sheriff's Office?

15   A    I'm assigned to the interdiction area.

16   Q    What does that mean?  What does "interdiction" mean?

17   A    I will work the Highway 35 to try to get weapons,

18   drugs, money.

19   Q    Could you do me a favor and speak a little louder, and

20   get the microphone closer to you?

21   A    Yes.

22   Q    Okay.  So can you repeat your answer?  I didn't hear

23   it.

24   A    Interdiction is where we're working southbound traffic

25   on 35 to intercept weapons or drugs, money going into

1  Mexico.

2  Q    All right.  Are you -- were you doing that back on June

3  the 1st, 2022?

4  A    No.

5  Q    What were you doing on June the 1st, 2022?

6  A    I was assigned to the patrol division as a supervisor.

7  Q    As a supervisor?

8  A    Yes, sir.

9  Q    What did you -- or who did you supervise?

10 A    The shift.

11 Q    Well, what do you mean by "the shift?"

12 A    There is three shifts we're in charge of.  There should

13 be three supervisors overseeing the shift.

14 Q    What shift did you have?

15 A    At the time, I don't recall.

16 Q    Do you remember if was a shift based on time or by

17 maybe work specialty or anything like that?

18 A    No.  It's on the time.

19 Q    Time.

20 A    They're broken down into three:  one, 6:00 to 2:00,

21 2:00 to 10:00, 10:00 to 6:00.

22 Q    I'd like to call your attention to an event that

23 occurred in the afternoon and went into part of the late

24 afternoon on June 1, 2022, that occurred at 3104 Flores

25 Avenue.  Do you have recollection of being at that address?

1  A    Yes.

2  Q    Do you remember what you did at that address -- just

3  generally what you were -- did you -- what you did at that

4  address?

5  A    I assisted the Narcotics Division.

6  Q    Now, in the course of that, of your being there, do you

7  know what time you got to 3104?

8  A    I don't recall.

9  Q    Okay.  Let me show you --

10         MR. RAMIREZ:  May I have the computer?  And I

11  wonder if you wouldn't mind erasing those marks?  Oh.

12  Sorry.  Whoops.  Is that my --

13         UNIDENTIFIED SPEAKER:  It's probably a green line.

14         MR. RAMIREZ:  Right.  The green line.  I'm not

15  sure what that is, but let me --

16         THE CLERK:  You don't have the --

17         MR. RAMIREZ:  I can use the ELMO.

18         THE CLERK:  (Indiscernible).

19         MR. RAMIREZ:  But --

20         THE CLERK:  (Indiscernible) I can just type it.

21         MR. RAMIREZ:  -- that --

22         THE CLERK:  Normally, I can just (indiscernible).

23         MR. RAMIREZ:  Is that your computer?

24         THE CLERK:  Is that yours?

25         MR. RAMIREZ:  On the screen.

1          UNIDENTIFIED SPEAKER:  Yes, it is.

2          MR. RAMIREZ:  I think those green and the red

3  marks are what certain individuals had touched the screen.

4  We just need to erase them.

5          THE CLERK:  You know, I'll call IT right now to

6  see.

7          MR. RAMIREZ:  It may be able to be cleared on the

8  Defendant's --

9          THE CLERK:  If it's not pulling up the menu, it's

10  not going to clear it.

11          MR. RAMIREZ:  All right.  There it is.

12          THE COURT:  Ms. Martinez, is there -- that's --

13  well, I don't know that it's connected to your screen there.

14  It actually would have been from touching and writing either

15  from the ELMO or from the witness computer here.

16          THE CLERK:  (Indiscernible).

17          THE COURT:  All right.

18          MR. RAMIREZ:  So --

19          THE COURT:  In the meantime --

20  BY MR. RAMIREZ:

21  Q    Let me ask you --

22          THE COURT:  -- Mr. Ramirez, is -- are you

23  comfortable proceeding?

24          MR. RAMIREZ:  Yes, Your Honor.

25          THE COURT:  Okay.  Let me clarify for our witness.

1          Corporal, do you see that green line, and there

2   are some little marks on the screen, that's not part of the

3   exhibit that they're showing you, the photos that they're

4   showing.

5          So just be aware if you see that, what is that?

6   That's some markings from somebody touching on the screen.

7   We're going to try and get that cleared off, but otherwise,

8   that's not part of the exhibit that they're showing you just

9   for clarification.  Okay?

10         All right.  Mr. Ramirez, go ahead.

11         MR. RAMIREZ:  Thank you.

12  BY MR. RAMIREZ:

13  Q   On your screen, you should see Defendant's Exhibit

14  No. 12, which is a photograph.  Do you see that?

15  A   Yes.

16  Q   All right.  It's already been admitted into evidence.

17  Do you recognize that -- what's on that picture?

18  A   Yes.

19  Q   Were you at that -- at that scene?

20  A   Yes.

21  Q   Which depicts the building, some vehicles, officers,

22  and it looks to be like a civilian on the left side.  So at

23  about what time did you arrive at 3104 Flores Avenue?

24  A   I don't recall the time.

25  Q   Okay.  So when I say, "3104 Flores," is that the

1  address?  Is that the location?

2  A    Yes.

3  Q    So what is -- when you arrived, were you -- are you

4  with SWAT by the way?

5  A    No.

6  Q    So when you arrived, what was your -- what is the first

7  thing that you -- of note that you remember doing when you

8  were at the scene?

9  A    Assisting the other offices approaching the property.

10 Q    Did you do anything before that?

11 A    Yes.

12 Q    What did you do before that of note?

13 A    I had conducted a traffic stop.

14 Q    Only one or more than one?

15 A    Two.

16 Q    Two.  Do you remember you conducted -- did you conduct

17 a traffic stop in which you later identified a person from

18 that traffic stop?

19 A    Yes.

20 Q    Later on.  So when you conducted the first -- that

21 traffic stop with that individual, can you -- do you

22 remember where that individual was in the vehicle when you

23 conducted the traffic stop?

24 A    I don't recall.

25 Q    So the traffic stop occurred sometime before you made

1 | -- you were involved with your approach; am I correct?

2 | A    Yes.

3 | Q    All right.  So then let me show you -- do you recognize

4 | what's on Defendant's Exhibit No. 2?  Do you recognize --

5 |           THE COURT:  Let's hold on.

6 |           THE WITNESS:  Yes.

7 |           MR. RAMIREZ:  -- what's in the photo?

8 |           THE COURT:  Mr. Ramirez, let's do this.  That's

9 | getting distracting.  Can you, please, approach?  We have

10 | this IT issue.

11 |           MR. RAMIREZ:  Oh, sorry.

12 |           THE COURT:  Come here, please.  Let's approach.

13 | the IT issue.  IT, come on.  Let's go.

14 |      (Court confers with IT.)

15 |           THE COURT:  Mr. Ramirez, you can continue.

16 |           MR. RAMIREZ:  Thank you.

17 | BY MR. RAMIREZ:

18 | Q    Returning to Defendant's Exhibit No. 2, which is on

19 | your screen, do you recognize the stairwell and the balcony

20 | and that door that's showing on the photograph?

21 | A    Yes.

22 | Q    What do you recall about that stairwell?  Anything?

23 | A    The stairwell, yeah.  That's where the subject was.

24 | Q    Well, let me -- let me withdraw that and ask you more

25 | pointedly.  Whoops, sorry.  Let me remove that.  Okay.

1          THE COURT:  Counsel, what's the delay?

2          MR. RAMIREZ:  No.  I was looking for the right

3    exhibit.

4          THE COURT:  Okay.

5          MR. RAMIREZ:  I'm sorry, Your Honor.

6          THE COURT:  You need to keep moving.

7    BY MR. RAMIREZ:

8    Q    So on your screen is -- I'm just going to go straight

9    to the -- to this consent form, Defendant's Exhibit No. 11.

10   Do you recognize this form?

11   A    Yes.

12   Q    It's a consent form that has the name of Jose Alonso

13   Saldana-Alaniz -- the names of Sarquiz, Sergeant Gonzalez,

14   and Apartment 1, 3104 Flores.  At the bottom left, are two

15   signatures.  Do you recognize any of those signatures?

16   A    Yes.  The top signature is mine.

17   Q    What is your badge number?

18   A    5147.

19   Q    Is that the same number that's on that consent form?

20   A    Yes.

21   Q    Do you remember signing that form?

22   A    Yes.

23   Q    Where were you when you signed that form?

24   A    I was standing close to Corporal Sarquiz I was handed

25   that form.

1  Q    Who handed you the form?

2  A    Corporal Sarquiz.

3  Q    Okay.  Now, when you signed the form, had it been

4  signed by anyone else, or had it been filled out?

5  A    It was already filled out.

6  Q    Do you know if the signature of the second person had

7  already been there?

8  A    The bottom under the -- under my --

9  Q    Under you.

10  A    I don't recall.  I -- if I signed it, it should have

11  been the first -- the first officer --

12  Q    So since --

13  A:    -- officer signs on the top.

14  Q:    So since you -- since you see your name on top, that

15  means you suspect that you signed it first?

16  A    Yes.

17  Q    When you signed -- when you signed it, was the

18  Defendant anywhere near -- or the person -- was there anyone

19  who -- well, do you identify the Defendant in the courtroom?

20  A    Yes.  He's sitting right there.

21  Q    Wearing the orange?

22  A    Yes, the orange.

23  Q    Was he anywhere nearby when you signed that form?

24  A    Yes.

25  Q    Where was he?  About how close to you was he?

1  A    He was in front of -- that's him somewhere, like, this

2  distance.

3  Q    In what room or what --

4            THE COURT:  Hold on.  Was that you estimating two

5  or three feet or -- we need to get that on the Record.

6            THE WITNESS:  No.  I would say probably like two

7  bodies away.

8            THE COURT:  I don't know how much that is for the

9  Record of a distance just like two bodies standing between

10 you and him?

11           THE WITNESS:  I guess.

12           THE COURT:  Three feet?

13           THE WITNESS:  Three feet.

14           THE COURT:  Okay.

15           THE WITNESS:  Give or take three feet.

16           MR. RAMIREZ:  Sorry.  I lost my focus there.  I

17 apologize, Your Honor.

18 BY MR. RAMIREZ:

19 Q    So who else was -- so you -- the Defendant was about

20 three feet away.  Who else was with you and the Defendant

21 when you signed that form?

22 A    Corporal Sarquiz, Sergeant Mike Gonzalez, and I

23 remember seeing at the time was Corporal Martinez.

24 Q    Well, which Corporal Martinez?

25 A    He's a Sergeant Martinez now.

1  Q    Would that be George?

2  A    Yes.

3  Q    Did anyone -- when you were -- when you -- before you

4  signed that form, did the Defendant say anything to you?

5  A    No.

6  Q    Did the Defendant say anything to anyone about the form

7  or --

8  A    I don't recall.

9  Q    So you don't remember if he was -- what his demeanor

10 was, what his behavior was, whether -- or anything like

11 that?  Or his attitude.

12 A    No.

13 Q    After you signed the -- who handed you the form?  You

14 said it was Sarquiz?  Sarquiz.

15 A    Sarquiz, Corporal Sarquiz, yes.

16 Q    So after you signed the form, what did you do with the

17 form?

18 A    I believe I handed back to her.

19 Q    When you signed the form, what part of the apartment

20 complex were you at?

21 A    I was outside.

22 Q    I'm going to zoom in on --

23         THE COURT:  Upstairs or downstairs?  Let's get

24 specific.

25         MR. RAMIREZ:  Okay.

1      THE WITNESS:  I believe I -- we were downstairs.

2  BY MR. RAMIREZ:

3  Q    Downstairs.  Do you remember approximately where you

4  might have been?

5  A    I don't remember the exact location.

6  Q    Okay.  Are you sure?

7  A    Yes.

8  Q    Okay.  So then when you -- when you identified the

9  Defendant -- you said you identified him as part of what you

10  did there on 3104 Flores -- where did you identify him?

11  Where did you go to identify him?

12  A    Upstairs.

13  Q    So you basically walked up these stairs -- looking at

14  Defendant's Exhibit No. 2 -- and you went up those stairs,

15  and did somebody call you to go up there?

16  A    Yes.

17  Q    Who did?

18  A    I don't remember.

19  Q    And tell me about -- did you have a conversation with

20  anyone there about identifying the Defendant?

21  A    There were several officers standing outside with the

22  subject.  They asked me if I remember him or could identify

23  him, and I said, "Yes."

24  Q    And you identified him -- how did you -- how were you

25  able to identify him?

1  A    On a previous traffic stop, he had given me a name and

2  a date of birth which said he was Jose Saldana.  The DOB, I

3  don't remember, and I believe he was giving a different name

4  at the time.

5  Q    And you believe that because someone told you that?

6  A    Yes.

7          MR. RAMIREZ:  Pass the witness, Your Honor.

8          THE COURT:  All right.

9          For the Defense.

10         MR. GUERRA:  Yes, Your Honor.  May I -- may I

11  approach or --

12         THE COURT:  Yes.

13         MR. GUERRA:  -- just for right now, I mean, ask

14  the questions from over here.

15             CROSS-EXAMINATION OF ISMAEL GARCIA

16  BY MR. GUERRA:

17  Q   Corporal Garcia, I am Raul Guerra.  I'm going ask you a

18  couple of questions.  So the first question is, did you

19  actually witness the signature of the document that

20  Mr. Ramirez put up -- the consent form?

21         THE COURT:  The signature by who?

22         MR. GUERRA:  The signature by the Defendant.

23  Thank you, Your Honor.

24  BY MR. GUERRA:

25  Q   Did you actually witness the signature by the

1  Defendant?

2  A    I don't remember.

3  Q    You don't remember witnessing it.  Okay.  So you also

4  said that, when you were -- when you were next to the

5  Defendant, there were -- it was Sarquiz, Gonzalez, Sergeant

6  Martinez.  Is that all that was around him at the time, or

7  were there other officers?

8  A    There were several officers; but at the time, those

9  were the most close to the --

10 Q    Okay.  So the other officers were how far away from you

11 all?

12 A    I don't remember.

13 Q    You don't remember.  Okay.  But there other officers

14 nearby?

15 A    On the scene, yes.

16 Q    Okay.  Upstairs, you also said that, when you first

17 went up there, when they called you up, there were several

18 officers standing with -- you said, "subject."  I'm assuming

19 you're referring to Mr. Saldana.

20      So how many officers were standing with Mr. Saldana

21 when you got there?

22 A    I don't remember the exact amount of officers.

23 Q    You don't remember.  Was it -- was it more than two?

24 Three?  Four?  You said, "several."  What is "several" to

25 you?

1  A     The ones that I remember will be four officers.

2  Q     Four officers around him.

3         Did -- was Mr. Saldana handcuffed at that time?

4  A     I don't remember.

5  Q     You don't remember.  Okay.

6         Were any of the officers -- did any of the officers

7  have their weapons drawn at the time?

8  A     When I went upstairs, no.

9  Q     Okay.  Were any of those officers that you identified

10 that were next to Mr. Saldana -- were those SWAT officers

11 with long rifles?

12 A     I don't remember.

13        MR. GUERRA:  Thank you, Your Honor.  That's all

14 the questions I have.

15        THE COURT:  Okay.  Just a few clarification

16 questions.

17              EXAMINATION OF ISMAEL GARCIA

18        BY THE COURT:  Corporal, so when you arrived at

19 this premises of these apartments --

20        THE WITNESS:  Uh-huh.

21        THE COURT:  -- on Flores, you went upstairs for

22 the purpose of identifying the Defendant.  Is that -- is

23 that what you were saying?

24        THE WITNESS:  When we -- I was advised to go

25 upstairs to identify the subject.

1              THE COURT:  Okay.

2              THE WITNESS:  But that was after the fact that the

3    approach on the property was done.

4              THE COURT:  All right.  Okay.  And so you went

5    upstairs, you identified him, and then -- but then your

6    testimony was that, at the time that you signed the written

7    consent form as a witness, you were downstairs when you did

8    that?

9              THE WITNESS:  I believe so, sir.  Yeah.

10             THE COURT:  Did you -- best of your -- best of

11   your recollection.

12             THE WITNESS:  (Speakers talk at the same time),

13   yes.

14             THE COURT:  Did you -- did you witness or observe

15   the subject being brought downstairs from -- or being

16   brought out of his apartment at any time?

17             THE WITNESS:  No.

18             THE COURT:  Did you -- regarding the written

19   consent form, before you signed it as a witness, your

20   testimony was that you did not see the subject sign the

21   consent form; is that correct?

22             THE WITNESS:  Yes.  I saw him fill out the form.

23   I just didn't pay attention when he -- if he signed the form

24   at the time.

25             THE COURT:  Okay.  So you did see him writing on

1  the form?

2            THE WITNESS:  Yes.

3            THE COURT:  Okay.  You're just not sure whether or

4  not he was actually signing his name to it?

5            THE WITNESS:  No.

6            THE COURT:  Okay.  Did you see anybody talking to

7  him about the form or explaining it to him, you know,

8  talking to him about the consent form?

9            THE WITNESS:  Yes.

10            THE COURT:  Who?

11            THE WITNESS:  Corporal Sarquiz.

12            THE COURT:  Do you remember or recall anything

13  that she said to him about the form?

14            THE WITNESS:  I believe she was reading the form

15  to him.

16            THE COURT:  Okay.  You could hear what she was

17  talking to him about?

18            THE WITNESS:  At the time she was, yes.

19            THE COURT:  Okay.  And was that -- well, you don't

20  know -- you don't know exactly when he signed his name to

21  the form; is that fair?

22            THE WITNESS:  Yes.

23            THE COURT:  Okay.  Any follow up from the

24  Government?

25            MR. RAMIREZ:  No, Your Honor.  Thank you.

1          THE COURT:  Any follow up from the Defense?

2          MR. GUERRA:  Yes, Your Honor.  Just one question.

3          THE COURT:  Sure.  No.  Go ahead.

4              RECROSS-EXAMINATION OF ISMAEL GARCIA

5   BY MR. GUERRA:

6   Q    You did prepare a report, right, for this -- for this

7   particular event on June 1st, 2022?

8   A    I did do a supplement.

9   Q    Okay.  And all this information regarding the execution

10  of the consent form, none of that information is in your

11  report, correct?

12  A    Correct.

13         MR. GUERRA:  No further questions, Your Honor.

14         THE COURT:  All right, Corporal.  That's all for

15  your testimony today.  You are excused.  Please, don't talk

16  to anybody about your testimony until after this hearing is

17  concluded.  But you are excused at this time.  Thank you.

18         THE WITNESS:  Thank you.

19         THE COURT:  And -- hold on.  I'm sorry.  Let me

20  clarify.  Is there -- does anybody have any objection to him

21  leaving.  I mean, being done and leaving the building.  He

22  doesn't -- do you want him to stay around?

23         MR. RAMIREZ:  No objection from the Government.

24         MR. GUERRA:  No objection, Your Honor.

25         THE COURT:  Okay.  Then you are free to go.  All

 1  right.  Thank you, Corporal.

 2      (Witness excused.)

 3          THE COURT:  All right.  Government may call your

 4  next witness.

 5          MR. RAMIREZ:  DEA Special Agent Zachary Schlup.

 6          THE COURT:  All right.  Thank you.  We're going to

 7  have --

 8          THE CLERK:  Please raise your right hand --

 9          THE COURT:  -- you sworn in.

10          THE CLERK:  -- to be sworn in.

11           ZACHARY SCHLUP, STATE'S WITNESS, SWORN

12          THE COURT:  All right, Agent, have a seat.  Just

13  --- have you testified before in court?

14          THE WITNESS:  Yes.

15          THE COURT:  Okay.  Then you know how to do it; but

16  if you -- you know, feel free to adjust the microphone, and

17  we need you to speak into the microphone clearly, you know,

18  in a good loud volume and just, you know, try and do your

19  best to listen to the questions that are asked of you of the

20  attorneys.  You're going to be testifying here as a witness

21  in this proceeding.

22          So the Government will proceed to ask you

23  questions.

24          Mr. Ramirez.

25          THE WITNESS:  Yes, sir.

1          MR. RAMIREZ:  Thank you, Your Honor.

2               DIRECT EXAMINATION OF ZACHARY SCHLUP

3   BY MR. RAMIREZ:

4   Q    State your full name, your title, and what agency you

5   work with.

6   A    Special Agent Zachary Schlup with the Drug Enforcement

7   Administration.

8   Q    Thank you.  How long have you been with the -- how long

9   have you been with DEA?

10  A    Three years and three months.

11  Q    What did you do before that?

12  A    I was a police officer with the Springfield Police in

13  Missouri.

14  Q    How long were you with that police department?

15  A    Nine and a half years.

16  Q    During the course of your working with the Springfield

17  Police Department, did you conduct any surveillance -- any

18  surveillance?

19  A    Yes, sir.  I was in Special Investigations.  I was a

20  narcotics officer.

21  Q    What were your duties while you were a narcotics

22  officer?

23  A    Joint investigations, surveillance.  We did -- I was

24  also a part of a SWAT team, made tactical entries on

25  residence during the prosecution and the investigation of

1  those drug crimes.

2  Q    About how many narcotics arrests do you imagine you did

3  during your nine years with the police department?

4  A    It would be hard to put a number on it between minor

5  drug arrests and major, but it would several -- over a

6  hundred, maybe hundreds.

7  Q    During that time, how many times did you engage in any

8  operation as a SWAT member?

9  A    I was a SWAT member for one year during that time, and

10  we would do warrants from anywhere from one to six a week

11  for a year.

12  Q    During that time, any of those warrants execution, were

13  any of those no knock warrants?

14  A    Yes, sir, a majority, most of those were no knock

15  warrants.

16  Q    Describe what a no knock warrant is.

17  A    It's a warrant where we're not going to make our

18  presence known prior to making entry into the residence.

19  Basically, we're going to stay concealed until the last

20  moment, announcing ourselves, and busting in the door.

21  Q    And the last one relates to -- you said entry into

22  residences; were the bulk of your entries into residences

23  only?  I imagine.

24  A    That's correct.

25  Q    Did that include these no knock warrants or

1  surveillance?

2  A     No knock warrants, yes.  We did some knock and

3  announces, consents just depending on what the case gave us.

4  Q     So, what's the difference between a knock and announce,

5  knock-and-talk, and consent entry

6  A     Knock and announce is still a search warrant.  During

7  that time, you would basically announce your presence

8  requesting that the door be opened by the residents.  At

9  that time, if they did not open the door, then we would make

10 entry by breaching the door.

11     A consent search would be just doing a knock-and-talk

12 at a residence requesting that they come to the door, again,

13 to make a consensual encounter with law enforcement, and

14 then asking to search the residence, the property.

15 Q     And typically, when you would conduct, back then, or

16 generally, involving a consent, knock-and-talk approach, if

17 the person doesn't give you consent, what do you do?

18 A     We'd seek other means to -- if we wanted to get into

19 the residence, we would seek out other means to do so.

20 Q     And how many consent, knock-and-talk events have you

21 been involved with in Laredo as a DEA Agent that includes

22 the Sheriff's Department of Webb County?

23 A     Several.  I wouldn't be able to put an exact number but

24 we work with the Sheriff's Department on a regular basis.

25 Q     By several, can you hazard an estimate or a

1   guesstimate?

2   A     Probably less than 30.

3   Q     And that's over the last 3 years and 3 months?

4   A     Yes, sir.

5   Q     Do you recognize Defendant's Exhibit No. 1 that's on

6   your screen right now?

7   A     Yes, sir.

8   Q     That's a 3104 Flores Avenue apartment complex; were you

9   at that location?

10  A     Yes.

11  Q     On June 1st, 2022?

12  A     Yes, sir.

13  Q     What brought you to that complex?

14  A     Myself and several other agents were conducting

15  surveillance on a separate operation.  Sergeant Mike

16  Gonzalez with the Sheriff's Department in the Narcotics

17  Division contacted me.  We were actually working -- the case

18  we were working was in conjunction with the Sheriff's

19  Department at the time.  He advised that he received some

20  information about this address at 3401 South Flores and that

21  there was supposed to be 5,000 rounds of .50 caliber

22  ammunition at the residence, or at one of the apartments

23  along with 300 pounds of marijuana, and that he was going to

24  need to break off his guys to conduct surveillance on this

25  apartment complex while we're going to do our separate

1   operation.  I told him if he needed assistance, to let us

2   know and we would flex over to this location.  Both the

3   locations were pretty close to each other.

4   Q    So, if I understood correctly, you and several other

5   DEA Agents were at another location nearby?

6   A    That's correct.

7   Q    You weren't conducting surveillance as part of your

8   separate surveillance on this address, 3401 Flores, correct?

9   A    Correct, we were doing a separate operation.  Mike

10  received the information about this residence.  And so, we

11  told him we would come over and assist if we needed to, or

12  if he needed us.  We do that on a regular basis.  The

13  Sheriff's Department doesn't have a lot of manpower.  So,

14  they contact the DEA Office.

15  Q    Did you, in fact, receive a call to assist by Sergeant

16  Gonzalez?

17  A    That is correct.

18  Q    About what time was that?

19  A    I don't remember the exact time that he called us over.

20  He had said that some vehicles were starting to leave.  So,

21  we flexed over from our location to help follow those

22  vehicles out, and I believe that's when the first traffic

23  stop was made.

24  Q    Before going to what else he told you, tell me what

25  flex means.

1  A    It was basically switch over from our primary

2  objective, which would be our operation that DEA was out on,

3  and switching over to help out the Sheriff's Department.

4  Q    How many personnel were mustered to assist the SO,

5  Sheriff's Office?

6  A    I believe there were four, myself -- four agents at the

7  time.

8  Q    Were you one of them?

9  A    That's correct.

10 Q    Four agents and one?

11 A    Including one TFO.  So, three special agents and one

12 TFO.

13 Q    So, tell me about your conversations with Sergeant

14 Gonzalez.  When he called you and told you that he did need

15 the help, what did he tell you, other than -- because you

16 had two conversations, apparently.  The first conversation

17 was what he was going to be doing, advising you to stand by

18 in effect, you telling him you would be standing by and

19 would flex over, and then he called you to take you up on

20 your flex offer, right?

21 A    That's correct.  Basically, he had identified the

22 apartment complex and observed some vehicles leaving, and

23 requested our assistance because we have unmarked vehicles

24 that would be able to follow the vehicles without being

25 observed.  And so, civil units could make a traffic stop for

1  whatever traffic violation that they were able to --

2  Q    Did he tell you why he had a concern about those

3  vehicles leaving?

4  A    He believed they may be part of the investigation.  It

5  wasn't an exact conversation that we had, but I work

6  narcotics investigations and he does as well.  So, it was

7  one of those things that I already knew what he needed me to

8  do.

9  Q    So, in your mind, what is it that he needed?

10  A    He needed me to follow those vehicles out with my

11  members of the team that way we could follow the vehicles

12  until the marked units, so we could get the vehicles away

13  from the residence so we didn't draw attention to it and

14  also seem like a normal traffic stop that way they could do

15  the traffic stops, conduct their investigation, see if they

16  could generate information to lead back to the residence.

17  Q    At some point, there was a decision made to approach

18  the apartment complex.  I'm looking at, on your screen,

19  Defendant Exhibit No. 1, 3104 Flores.

20            At some point, a decision was made to approach?

21  A    That is correct.

22  Q    So, were you involved in that decision to make the

23  approach?

24  A    I was.  I was not present at the time because we had

25  broken off again.  This was kind of a very fluid

1  surveillance assistance, going back to our primary

2  objective, and I had to break off just myself to go take

3  care of a personal matter.

4      As I was coming back, we had followed one vehicle out.

5  The Defendant was actually in that vehicle as SO made

6  contact with them, they let that vehicle go.  Another

7  vehicle they had attempted a traffic stop on, that vehicle

8  fled and they were not able to get that traffic stop

9  conducted.  We were not a part of that surveillance, or I

10 was not a part of the surveillance.

11     And at that point, that's when Mike had called me back

12 to say, "Hey, we had a vehicle flee from us. We weren't able

13 to get it stopped. I think we're going to do the approach on

14 the residence."

15     At that time, I advised him I was heading back towards

16 their way so I could help out with that assistance, and some

17 of my agents that were already doing surveillance still had

18 already began to like migrate that way.

19 Q    In your work as a DEA Special Agent, having the tip

20 that you recited earlier, and then being told that there are

21 vehicles going in and out, and a vehicle fled after being

22 requested to stop, what crossed your mind?

23 A    I believed that there was some kind of criminal

24 activity.  If the tip was correct, there was some kind of

25 criminal activity occurring at the location.  And I was also

1  in concurrence with Mike about making an approach on the

2  residence based on the information that the officers were

3  seeing at the time who had eyes on the residence on people

4  coming out to the street, looking up and down the street.

5  It looked like they were looking for law enforcement or that

6  they were obviously aware of law enforcement.  The person

7  who did the traffic stop we assume maybe had called back to

8  the residence and we assumed maybe they were trying to get

9  whatever was illegal that they had inside the residence out

10  of the residence at that time.

11  Q    Did you personally observe any of what you just

12  mentioned, such as persons coming out looking up and down

13  the street, things like that?

14  A    I did not.  That was the only information that was

15  conveyed to me.

16  Q    So, when the decision was made and you concurred with

17  that decision to make an approach, what kind of approach was

18  decided to be made?

19  A    It was going to be a consensual walk up to the

20  residence, see what we see as we approach, and then try to

21  make contact with Apartment 1.

22  Q    Why Apartment 1?

23  A    Apartment 1 was what we believed to be the residence

24  that we needed to investigate based on information that we

25  received.

1  Q    Now, looking at the building that's in the photo in

2  front of you, which is Defendant's No. 1, where did you

3  think Apartment 1 was at?

4  A    We believed it was at this -- you can see the white --

5  Q    You can circle if you want unless it's been cleared.

6  A    This is --

7  Q    There you go.

8        So, you believed that to be --

9  A    We believed Apartment 1 was here and that there was

10  possibly other doors either over on this side and then over

11  on this side just based on (indicating) --

12  Q    So, for Record purposes, you just outlined with the

13  cursor on your monitor around the gated door that is to the

14  right of the stairway facing us in the photo, which we've

15  already identified as being the efficiency apartment.

16        And you've also then indicated that you suspected

17  -- you drew the cursor to the left of the stairs indicating

18  what?  What was behind the stairs?

19  A    That we assumed that there was possibly a door of entry

20  here on this side of the building, and then possibly also a

21  door entry on this side of the building.

22  Q    so, you believed -- it is just you, or you and the

23  other officers, if you know, but did you believe that that

24  door was also an entry or a doorway to Apartment No. 1?

25  A    I believed it was an entry or -- I can't speak for

1  everybody else but me.  Usually, there's a front door and

2  back door, especially on lower apartments.  I assumed we

3  were looking at one door that was obvious that we believed

4  maybe it was the front door and that there was another door

5  that could be made into an exit.

6  Q    I'm showing you Government's Exhibit No. 1; what is

7  that?

8  A    That is the door that we just showed with the white

9  gate in front --

10 Q    Except --

11 A    -- which would be the efficiency that we discussed.

12 Q    Except that it has the gate open and the door is open?

13 A    The gate is open and the door is open, correct.

14 Q    And you later discovered -- what did you discover about

15 this, what this door led to in reference to what later you

16 found out to be Apartment No. 1?

17 A    That this was actually a separate residence based on a

18 lease.  If you look at Apartment 1, it seemed to be a

19 bathroom that had been, just a door was closed on and then

20 they said, "We're going to lease out the separate area to

21 somebody else."

22 Q    Show you Defendant Exhibit No. 3; do you recall that

23 door with a number one on it?

24 A    I do.

25 Q    Where was that door?

1  A    The staircase that does up to the second floor, it'd be

2  just to the right in that picture.

3  Q    So, did you, at any point -- let me go in a different

4  direction.

5         So, when the decision was made to approach, were

6  you a part of the approach team, or did you do something

7  else?

8  A    I was not a part of the approach team because I was

9  still getting to the area.  So, when initial contact was

10  made, I was still driving to the scene.

11  Q    When you arrived at the scene, what did you see?

12  A    There was a couple Sheriff's Deputies' vehicles there.

13  I guess, we can go to the next photo, the one with the

14  vehicles in front.  This was kind of the scene. These

15  vehicles were all in place, the white SUV and the silver

16  car --

17  Q    This is Defendant Exhibit No. 12.

18         Keep going, please.

19  A    Okay, and then myself -- there was deputies on scene.

20  Once again, they were making contact with the individuals, a

21  shirtless man, Mr. Garza, and his friend who was the owner

22  of this silver vehicle here (indicating).  And then --

23  Q    And you were indicating the gray vehicle between the

24  two -- excuse me?

25  A    I saw that there was no, I guess, protection or, I

1  guess, nobody was watching the north side of the building,

2  which would be this side over here (indicating).  So, myself

3  and CFO Robert Arredondo, we set up on this side because we

4  weren't sure, again, if people were going to be escaping out

5  of this way or if somebody was going to try to flee.  So, we

6  set up on this side of the building.

7  Q    So, for clarification, when you say "this side" and

8  you've been talking about "on this side, the north side,"

9  you're referring to the right side of the photo above the

10  exhibit label?

11  A    That is correct.

12  Q    That's north?

13  A    Right.

14  Q    So, when you arrived, is this the scene, or was it

15  somewhat different?

16  A    It was somewhat different.  Again, you know, obviously,

17  the efficiency door was closed, the gate on it was closed,

18  the white door was closed.  There were still individuals

19  over here (indicating).  This is Mr. Garza (indicating).  He

20  did not have a shirt at the time.  And then were Deputies

21  over in this area as well (indicating).

22  Q    So, when you arrived, did you have any direct contact

23  with Sergeant Gonzalez, or the Defendant, or both of them,

24  or Mr. Anaya, who I think you mentioned was in that vehicle,

25  in the gray vehicle?

1  A    Correct, I did not have contact with any of those

2  individuals when I first made my approach.  I basically went

3  straight from the entrance of the gate straight to the right

4  side of the vehicle that's pictured on the right, which

5  would be the passenger side of that vehicle.

6  Q    So, at what point was there an actual approach made to

7  an apartment or an apartment door?

8  A    The approach was already done being made at that time

9  when I, whenever I was walking up.

10 Q    Where was Mr. Garza when the approach was being done --

11 when the approach was made to Apartment 1?

12 A    He's not where he is standing here, but over in this

13 general area (indicating).

14 Q    So, he was just on the left side of the photo, just to

15 the left of the white SUV, or right by it, near the stairs?

16 A    Yes, by the stairs.

17 Q    Was he by himself or with somebody else?

18 A    There was still Deputies there in that area as well.

19 Q    And he didn't have a T-shirt on?

20 A    That's correct.

21 Q    Was he handcuffed?

22 A    I believe he was.

23 Q    So, what is the next thing you observed while you're

24 looking at the scene?

25 A    Again, I was focusing my attention on the north side of

1  the building, which would be this side of the building, but

2  also watching this door because it was closed and this

3  window because I was not sure who would be trying to attempt

4  to escape or where they'd be coming or the exact way out of

5  the apartment on the inside (indicating).

6           The next thing I noticed was one of the Deputies

7  came out of this door, peeked out.  A couple of yelled like,

8  "Blue, blue," which in law enforcement terms means like,

9  "Hey, I'm police as well and you kind of made it to the

10 outside of the building.  Don't shoot us, please."

11 Q    Did you recognize that voice?

12 A    I did not at the time, no.

13 Q    What's the next thing that you remember seeing?

14 A    They went immediately back inside, closed the door, and

15 still, I maintained my position until we kind of got that

16 kind of all cleared and I saw the guys coming back out.  I

17 couldn't name who exactly but they were coming out, and it

18 seemed like the room wherever they had come from inside of

19 Apartment 1 had been cleared, deemed safe so we could

20 continue the investigation.

21 Q    Now, you said that they went back in; did you see one

22 person, two people, or more than one person?

23 A    I just saw one person poke their head out.

24 Q    So --

25 A    It was like a crack of the door, "Blue, blue," and it

1  was shut back.

2  Q    So, you use the word "they" as a generic "whoever it

3  was" is what you meant?

4  A    Correct.

5  Q    At any point, did you see the Defendant -- I'm sorry,

6  not the Defendant -- Mr. Garza and his wife?

7  A    I did.  His wife was not on scene initially.  After the

8  Sheriff's Deputies went inside, they discovered there was

9  two babies under the age of one and then one toddler who I

10 believe was wearing a diaper.  And mom had arrived on scene

11 shortly after Deputies had made contact with her outside on

12 the street.  I guess, she was down at a neighbor's house,

13 saw the commotion, and had come over.  And she took custody

14 of the -- I guess, she had turned over custody of the two

15 small babies to her mother and remained on scene with her

16 toddler and Mr. Garza.

17 Q    During the time that you were standing on the north

18 side, which is the right-hand side of the photo, and had a

19 view looking south on the photo, which is to the left side

20 of that photo, did you see Mr. Garza signaling in any way or

21 agitated about anything?

22 A    No.

23 Q    What did he do the whole time from when you arrived and

24 you saw Officers come out with the children?

25 A    What did I do?

1  Q    What did you see?

2  A    Oh, when they came out with the children?

3  Q    Yes.

4  A    That they came out with the kids.  Mr. Garza was still

5  talking there.  I believe the toddler came out and I believe

6  he hung out with Mr. Garza.  I don't have an exact memory of

7  -- there was nothing memorable about those events other than

8  "Hey, kids are here.  Let's get them."  The parents were,

9  you know, "At least they're comfortable with people that

10 they know when seen."

11 Q    Did you hear Mr. Garza say anything or was he issuing

12 any commands to anyone before the Officers came out with the

13 children?

14 A    Not that I'm aware of.  Not that I remember.  I don't

15 remember hearing any kind of disturbance or yelling or

16 anything of that sort.

17 Q    Defendant's Exhibit No. 2 shows a close view of that

18 apartment area.

19         So, would you say that Mr. Garza was somewhere

20 near the stairway or the door leading to the efficiency?

21 A    He was over to the left towards the fence is where I

22 remember him.

23 Q    Can you indicate with your cursor?

24 A    (Indicating).

25 Q    To the left?  You're indicating between the open gate

1  and the board or the wood fence?

2  A    That is correct.

3  Q    So, he was standing there.  Was he standing -- but as

4  he was standing there, you were able to see him or not see

5  him from your vantage point?

6  A    I don't remember.  I noticed him over there.  Again,

7  there were other Deputies with him.  I did not focus my

8  attention on that point because that would then draw my

9  attention away from my primary focus.  Tactically, I needed

10 to maintain my focus on the north side of the building

11 because there was no other eyes there besides myself and

12 (indiscernible).

13 Q    Did you ever see Mr. Garza go to an apartment or go

14 into any of the apartment building, any of the units in the

15 apartment building?

16 A    During the time of the approach?

17 Q    No, afterward.

18 A    Afterward?  Afterward, he was released from handcuffs.

19 There was a cordial scene.  I think he was maybe escorted

20 inside at one point but I couldn't say with 100 percent

21 certainty that I saw him go inside the apartment.  After the

22 investigation was continuing, if you go just past this white

23 gate right here, this is kind of where he hung out with his

24 wife and the toddler (indicating).  This whole area was

25 cluttered with a bunch of different items, and I think they

1  were sitting here and the toddler was kind of messing around

2  with some other things, kind of just being a handful.  So,

3  we were kind of joking around, just trying to keep him

4  contained.

5  Q    So, how long before you saw Mr. Garza again?

6  A    He was -- if you're talking about the time from after

7  the apartment is deemed safe?

8  Q    Yes.

9  A    I had removed myself from my position, which would be

10 the right side of the truck, and came over towards the

11 staircase, the front of the efficiency, which would be this

12 general area, just to see what I could help with, kind of

13 get my bearings of what had occurred (indicating).

14        Again, I wasn't present for the entry into

15 Apartment 1 or how that occurred.  So, I began just to make

16 myself present so Mike knew I was there and secondly, where

17 could I be of assistance, where did he need me.  And then

18 also, just to make sure my main focus -- when the babies got

19 there, mom kind of got there at the same time, and I was

20 just giving a little bit of direction to say, "Hey, let's

21 get these kids out of here so we don't have to deal with

22 kids, and then we can continue our investigation without

23 having to worry about babies and toddlers and such."

24 Q    At some point, did you ever see the Defendant,

25 Mr. Saldana-Alaniz, on the premises?

1  A    That is correct.  That was a little bit into the

2  investigation, but yes, he did come down the stairwell with

3  Deputies.

4  Q    So, tell me about that.

5  A    As we were kind of making conversation with Mr. Garza

6  and other Deputies kind of in this area, this gate that's

7  here was closed to the stairwell (indicating).  A female

8  from up top had kind of been hanging out in this general

9  area (indicating).  Like I said, that would be like the

10 balcony, which would also be the staircase that led to the

11 top of the stairwell, right there.  She was hanging out in

12 that area.  She came down to this gate that was closed --

13 Q    Okay.

14 A    -- which would be here (indicating), and she began to

15 make conversation with a couple of the Deputies, and then I

16 kind of overheard her say that she thought there was

17 somebody in her apartment that we would want to talk to.

18 Q    What did you do then?  What was your role?  What did

19 you then do, yourself?

20 A    I obviously told Sergeant Gonzalez, "Hey, this girl

21 says there's somebody that we might want to talk to."

22 Again, he was leading the investigation.  I didn't want to

23 overstep my bounds or step on anybody's toes, continue to

24 let them lead the investigation, let him know that she had

25 made those comments.  At that point -- and I couldn't tell

1  you what Deputies went upstairs, but they went upstairs to

2  make contact with her and went into her apartment.

3  Q    Did you walk upstairs with any of the Officers to make

4  contact with her?

5  A    I did not, I did not.  I maintained myself in the

6  parking lot, and then kind of back and forth between where

7  Mr. Garza was sitting and then back into the parking lot as

8  well.

9  Q    Do you have an idea about what time that was in the

10  afternoon?

11  A    I could not give you a time.

12  Q    So, after the Deputies went up the stairs, how much

13  time before you saw them come back down?

14  A    It was several moments.

15  Q    Minutes?

16  A    Yeah, several minutes.

17  Q    An hour?

18  A    No.

19  Q    Less than an hour?

20  A    I would say less than 15.

21  Q    When they came down, did they have the Defendant with

22  them?

23  A    That's correct.

24  Q    And tell the Court how the Defendant was being

25  escorted.

1  A    Escorted down the stairs, and again, it wasn't a

2  significant enough event for me to recall.  I don't remember

3  there being any kind of words exchanged or anything like

4  that.  I couldn't tell you if he was handcuffed in front or

5  back, but as soon as he came down the stairs being escorted

6  by the Deputies, they went straight, turned the corner and

7  went straight to the efficiency.  And I remember the

8  Defendant had opened the door himself with a key that he was

9  in possession of.

10 Q    So, you don't remember if he was handcuffed you said

11 front or back meaning whether he was cuffed with his hands

12 in the front or his hands in the back?

13 A    Correct.

14 Q    But are you saying that he was handcuffed?

15 A    That's what I'm saying.  I don't know if he was

16 handcuffed or not handcuffed, if they were in the front or

17 the back.  I was not paying attention.

18 Q    Where were you when you saw the Deputies and the

19 Defendant walk down the stairs?

20 A    Out here in the parking lot (indicating).

21 Q    More or less where?

22 A    Maybe in this general area (indicating).

23 Q    Let me show you a different exhibit.  That will give us

24 some better reference markers.

25 A    So, I would have been behind this white SUV

1  (indicating).

2  Q    Defendant Exhibit No. 12, you'd be behind the SUV?  Was

3  the SUV there?

4  A    Correct, all those vehicles were there the entire time.

5  Q    So, if you were behind the SUV, how could you see the

6  Defendant walk in front of the SUV and unlock the door

7  himself if you were behind the SUV?

8  A    I was not being restricted of movement.  So, I actually

9  moved myself around the vehicle so I could maintain position

10  and kind of see what was going on.  And I'm tall enough that

11  I can see over vehicles.  So, as he was coming down the

12  stairs, I could see him, saw he was coming down, saw him to

13  the efficiency, again, peeked my head around the corner just

14  to kind of see what was going on, saw him open the door, and

15  then Deputies escorted him inside.

16  Q    Did you observe anything in the way of a disturbance or

17  argument or anything like that during the time that the

18  Defendant walked down with the Deputies and then unlocked

19  the front door?

20  A    No, there was no disturbance, no hesitation seen from

21  anybody.  Again, Mr. Garza was being very cordial with us

22  speaking with him.  The Defendant, he didn't raise his

23  voice.  I didn't hear him cause any kind of disturbance at

24  all.

25  Q    After the Defendant opened the door, what do you

1    remember happening or seeing next?

2    A    I think he was -- Sergeant Gonzalez made entry into the

3    room and I believe one other -- again, it's a very small

4    room -- one other Deputy went in, and everybody else was

5    kind of hanging out beside the door, and then they basically

6    gave it an all clear and then came out.

7    Q    Let's talk about Mr. Garza.  You said that you

8    identified him earlier on Defendant's Exhibit No. 12 as

9    being the gentleman in the gray T-shirt; is he the one

10   standing by the appliance?

11   A    Correct.

12   Q    And you said he was cordial just a moment ago?

13   A    That's correct.

14   Q    Was he cordial from the time you arrived throughout the

15   whole event that you were there?

16   A    Yes, I didn't have any negative encounter with him.  He

17   was polite and respectable to me the entire time.

18   Q    Did it appear to you that he was polite and respectful

19   and so forth with the other Deputies there?

20   A    Correct, correct.

21   Q    Did you hear him complain about anything?

22   A    I did not.

23   Q    But you weren't there the whole time?  Only from the

24   time you were there?

25   A    Correct, only from the time I was there I did not hear

1  any complaints.

2  Q   At what time did you leave this location?

3  A   Again, I don't know the exact time.  It would have been

4  in the evening.

5  Q   What time -- the last traffic stop I believe was at

6  approximately 4:11 p.m., 6:11 -- sorry about that -- 6:11;

7  do you remember?

8  A   The last --

9  Q   The traffic stop, the attempted traffic stop, sorry,

10 that involved a --

11 A   White Charger.

12 Q   -- a vehicle that -- you're right.

13          So, about how long after that was the decision

14 made to make the approach?

15 A   It was minutes after.  Again, Mike was there at the

16 scene.  I was not there at the scene.  And from the time I

17 got the call was, the call was from Mike that we had a

18 vehicle -- again, we were not a part of that pursuant or a

19 part of that surveillance of that vehicle exiting that.  We

20 went back to our original location.  He had said, "This is

21 what occurred.  A pursue occurred.  We're going to make an

22 approach on the residence.  Can you get some guys over

23 here?"

24          I called my guys and let them know on the radio

25 this had occurred, "Can you guys start making your way that

1 way?"  I was one of the last ones on the scene because I was

2 dealing with a personal matter and was coming back down to

3 the scene.

4 Q   So, did you ever talk to the Defendant yourself at the

5 scene?

6 A   I did not.  It was understood to me that he spoke

7 Spanish, and I cannot speak Spanish.  So, I made no attempt

8 to speak to him.

9         BY MR. RAMIREZ:  Pass the Witness, Your Honor.

10         THE COURT:  All right, from the Defense?

11         MR. GUERRA:  Yes, Your Honor.

12         CROSS-EXAMINATION OF ZACHARY SCHLUP

13 BY MR. GUERRA:

14 Q   Agent -- and forgive me if I mispronounce your last

15 name -- Schlup.

16 A   Schlup (phonetic).

17 Q   Schlup (phonetic), I'm sorry.  And now I'm going to ask

18 you some questions.

19         BY MR. GUERRA:  Mr. Ramirez, can you put up your

20 exhibit, the Government's No. 1, please?

21 BY MR. GUERRA:

22 Q   So, Agent, while he's doing that, you did prepare a

23 written report as part of your investigation of this

24 particular event on June 1st, 2022, correct?

25 A   That is correct.

1  Q    And you listed -- I believe one of the questions was

2  how many agents were present, and you have in your report an

3  actual list of witnesses.  And I don't know if you have your

4  report with you, but --

5  A    I do.

6  Q    Okay, can you look at your report?  You listed 21

7  witnesses.  Correct me if I'm wrong.  Actually, I'm looking

8  at their titles; they're all law enforcement officers,

9  correct?

10 A    That is correct, sir.

11 Q    And so, when you listed these 21, these were the people

12 that were involved at this particular operation at 3104

13 Flores on June 1st, 2022, correct?

14 A    They are people that were present at the scene at any

15 given time during the investigation.

16 Q    Right, but they were involved to some extent?

17 A    Yes, sir.

18 Q    And so, you see there's three DEA TFOs at the bottom,

19 Rolando Arredondo, Alvarez Espinosa, and Taylor Garcia, but

20 then there's a bunch of Special Agents, including your own

21 name; who else from that list is DEA that's a Special Agent?

22 A    So, all the Special Agents listed there, myself,

23 (indiscernible), Joseph Atria, Guillermo Rodriguez, Jr.,

24 Garrett Clark, and Frank Mosely.

25 Q    Those are all DEA Special Agents.  So, actually, there

1  was one, two, three, four, five, six DEA Special Agents and

2  three TFOs; so, there's nine people from DEA that were

3  involved?

4  A    Correct.

5  Q    Okay.  So, when you said earlier four agents and one

6  TFO, without obviously the benefit of your report, you did

7  not recall that it was actually nine agents that were

8  involved at some time or another in this operation, or in

9  this?

10 A    I guess I will clarify that during the initial

11 approach, there was four.  As people came on scene, there

12 were more agents and TFOs arriving.

13 Q    I understand.

14        Looking at Government's Exhibit No. 1, do you see

15 the door?

16 A    Yes, sir.

17 Q    And what do you see towards the top of the door?

18 A    Are you referring to the M?

19 Q    The M, yes.

20 A    Yes --

21 Q    So, that door is identified as M.  It could be

22 Apartment M, it could be whatever it's meant, but it has an

23 identifier as M, correct?

24 A    It does have an M on there.

25 Q    Okay.  So, it doesn't have a number, 1, 2, 3, 4.  It

1  has a letter, but it does have an identifier of the door.

2  It says M, correct?

3  A    That is correct.

4  Q    Okay.  Now, you testified that you were taking care of

5  a personal matter, and by the time you got there, the

6  approach had already occurred.  So, you don't know what had

7  happened prior to when you got there.  You have no idea what

8  conversations, if any, were had with Mr. Garza, what, if

9  anything, occurred to get into what is in Government's

10  Exhibit No. 1 labeled as 'M'.

11          And that is, again, as you testified earlier, that

12  is the efficiency that you all actually searched, correct?

13  A    Yes, sir.

14  Q    That's the area that you all actually searched, this M

15  unit, if you will.  That is the efficiency you searched?

16  A    Yes --

17  Q    Well, not you but the Deputies like Gonzalez, right?

18  A    Correct, that's when we identified it as a separate

19  location rather than --

20  Q    And so, when the approach first happened and you said

21  that at some point when you were towards the right in the

22  exhibit -- I already forgot the number -- Exhibit 12, I

23  believe, that Mr. Ramirez showed you, Defense Exhibit 12,

24  you said you were to the right, and that your emphasis and

25  believe you said TFO Arredondo's emphasis was to make sure

1  that people were not coming out of, somebody trying to flee

2  I believe is the word that you used because you believed

3  there was another door on that side potentially, correct?

4  A    Potentially.

5  Q    So, your focus was, if I understood you correctly, is,

6  "I got to keep my eyes over there because somebody could be

7  running out of there"?

8  A    That's correct.  It would be the window, the front door

9  on this side over here on the corner.

10 Q    You're at a corner.  So, you've got to be constantly

11 looking one way and looking the other.  You can't really

12 focus too much on what -- your main focus as law enforcement

13 and based on your testimony is, "I got to make sure

14 somebody's not running out of a door over here," correct?

15 A    Correct.  Yes, basically, my safety and --

16 Q    Exactly, your safety and the safety of your fellow

17 officers.  So, that was your emphasis, that was your main

18 focus was to do that.

19       Now, you also said that you saw when the Deputies

20 brought my client, Mr. Saldana, from the upstairs, and you

21 said they brought him straight down to the efficiency door.

22 And by that, I would mean that you mean, Defendant's Exhibit

23 No. 1, that door labeled 'M'; is that what you were talking

24 about?

25 A    Yes.

1  Q    Okay.  So, they brought him straight down there and you

2  saw that he opened the door; is that correct?

3  A    That's correct.

4  Q    Okay.  So, there was no other interaction with

5  Mr. Saldana.  They came straight down, they went there, he

6  opened the door?

7  A    That --

8  Q    That is your testimony?

9  A    Correct.

10  Q    Okay.  And then, of course, after that they searched

11  the apartment; that's what you testified earlier?

12  A    Correct.

13  Q    And you don't recall whether Mr. Saldana was

14  handcuffed?  You don't recall that at all, front or back?

15  A    I don't.  I just remember that he opened the door.  The

16  only reason I remember that is that that's not something I

17  would do.  I wouldn't have the Defendant open the door.

18  Nothing stood out to me.

19  Q    Okay, I understand that, but you do recall that he was

20  led down by Deputies; do you remember how many Deputies were

21  leading him down?

22  A    I do not.

23  Q    You don't.  Was it more than one?

24  A    I don't remember.

25  Q    Okay.  And so, they took him straight to the door, he

1  opened the door, and then they searched is what you

2  testified.

3         Now, do you recall how many SWAT Team members were

4  present with long rifles that you, yourself, saw?

5  A    I don't know.  I couldn't say who was a SWAT member.  I

6  know there were several SWAT members there.  Again, Sergeant

7  Gonzalez is a member of the SWAT Team as well. I couldn't

8  say who all had long rifles and who did not.

9  Q    But you do recall seeing long rifles?

10 A    That's correct.

11 Q    You do?  Are you saying you don't remember that there

12 were long rifles, Deputies with long rifles?

13 A    There were Deputies with long rifles.  I do not know

14 how many.

15 Q    Okay, do you remember whether the Deputies that lead my

16 client to that front door, were any of those Deputies with

17 long rifles?

18 A    I do not.

19 Q    You don't remember that?  Were any of those Deputies

20 that lead him to the front door, were their weapons drawn?

21 Did any of them have their weapons drawn at the time?

22 A    No.

23 Q    You don't remember or they did not?

24 A    I did not see any weapons drawn at the time.

25 Q    Okay.  And so, even though you don't recall whether

1  Mr. Saldana was handcuffed at any time, your testimony here

2  today is that you do remember seeing Mr. Garza was

3  handcuffed and Mr. Anaya was handcuffed when you arrived?

4  They were already handcuffed?

5  A    That's correct.

6  Q    They were both in handcuffs?

7  A    Yes.

8  Q    And they were for a certain period of time until I

9  believe you said towards the end of the operation is when

10 they were --

11 A    Mr. Garza was released from handcuffs fairly quickly

12 because I remember him being over with us and talking to

13 him.  I think Mr. Anaya, I believe, the owner of the silver

14 Dodge Avenger, he was in handcuffs for a while.  He

15 consented a search of his vehicle.  We found some marijuana,

16 and then we also released him from the scene to get him out

17 of there.

18 Q    Okay, but even if you don't recall Mr. Saldana being

19 handcuffed, is it your testimony that he would not have been

20 free to leave whether he was handcuffed or not until you all

21 as Officers were done with your investigation, with your

22 operation, whatever you want to call it?

23 A    That's correct.  He would have been, as part of the

24 investigation, detained.

25 Q    And he would not have been free to leave whether he was

1  handcuffed or not, correct?

2  A    Correct.

3  Q    Now, you testified that -- I believe you said, "After

4  the apartment was deemed safe," what exactly did you mean by

5  that?

6  A    Are you talking about the efficiency, the entry into

7  the efficiency after the Defendant opened it?

8  Q    Well, you used that phrasing that -- I believe you said

9  that nobody went in until the apartment was deemed safe.

10 So --

11 A    That's what I'm talking about; are you talking about

12 the entry into Apartment 1 or the entry into the efficiency,

13 I guess, with the --

14 Q    Apartment 1.

15 A    From the first entry that I wasn't a part of.

16 Q    Right.  Well, I guess, explain to me what you meant

17 when you said that.  If you were --

18 A    Well, I think I said it twice.  I said that he made an

19 all-clear for the efficiency, and then deemed safe would be

20 the person to which entry we're talking about.  There was

21 kind of an entry into the first apartment, and it was deemed

22 safe at that time for Apartment 1.  And then, I guess, I'm

23 back down in the reentry into the efficiency with the door

24 with the 'M', it has to be recleared again, and it was

25 deemed safe again, I guess.

1  Q    Okay.  And so, did you have a debrief with Sergeant

2  Gonzalez regarding entry into the apartment, what I'm going

3  to refer to as the unit with the letter 'M' because that's

4  what we're looking at in Government's Exhibit No. 1?  It's

5  otherwise been referred to as the efficiency room.

6  A    Yes.

7  Q    You did have a conversation about that entry?

8  A    Yes.

9  Q    And exactly how did he enter that -- do you recall him

10 telling you that he had to move a sofa to get into that --

11 move a sofa that was blocking that door into this

12 efficiency?

13 A    Well, I guess, there were two conversations.  The first

14 one was as to how he got -- because I wasn't privy to the

15 conversation.  We got the Defendant to come down and open

16 the door.  So, that was based upon consent.  About the first

17 entry, about moving the sofa, I did not have a specific

18 conversation about moving a sofa or anything like that.

19 Q    You don't recall that being mentioned at all?

20 A    No, sir.

21 Q    Okay, he never told you, "We had to move a sofa to

22 enter through Apartment 1"?

23 A    No, I don't recall him mentioning that to me as well.

24         THE COURT:  Well, let's not confuse that.

25         Agent, it was your testimony you didn't have any

1  conversation with Sergeant Gonzalez about how he went from

2  Apartment No. 1 into the efficiency; did you have any

3  conversation with him about that?

4          THE WITNESS:  I did not have any conversation

5  about that.

6          THE COURT:  Okay.  So, it wasn't specifically to

7  say "moving the couch," you just had no conversation about

8  it.  Okay, all right.

9  BY MR. GUERRA:

10 Q   And so, in your report, you do have -- you do say that,

11 you note, I should say, that when Agents and Deputies step

12 through -- in your report, it says as the door to the room,

13 was opened, that Agents and Deputies noticed the strong odor

14 of raw marijuana coming from inside the room; so, are you

15 referencing the efficiency in your report where you're

16 talking about that?

17 A   Yes, sir.

18 Q   Okay.  Because you said that Sergeant Gonzalez and a

19 Deputy went in, are you including that information because

20 it was told to you by Sergeant Gonzalez or somebody else?

21 A   About the marijuana?

22 Q   The strong odor of marijuana?

23 A   No, I did also.  When I made my approach as well, you

24 could smell it as well.

25 Q   Okay, but you included Deputies in the narrative there;

1  so, was that your observation is what I'm getting at, or was

2  it the Deputies' observation?

3  A    I guess it was --

4  Q    Because you were not the first person to go in there

5  based on your testimony.  That's what I'm trying to clarify.

6  A    About the marijuana?

7  Q    Yes, the strong odor of marijuana.

8  A    Yes, I believe everybody was under the understanding

9  that there was a strong odor of marijuana.

10  Q    Everybody said the same thing?

11  A    Yes.

12  Q    Okay, including Sergeant Gonzalez?

13  A    I believe so.

14        MR. GUERRA:  I believe those are all the questions

15  I have, Your Honor.

16        THE COURT:  All right.  Agent, I have a few.  Just

17  clarification.  I want to make sure I understand your

18  testimony.

19              EXAMINATION OF ZACHARY SCHLUP

20        BY THE COURT:  When you arrived at the scene, here

21  we're talking about, of course, Flores Street building,

22  Mr. Garza was standing outside?

23        THE WITNESS:  That's correct.

24        THE COURT:  That's correct.

25        Did you see his children at some point?

1           THE WITNESS:  Yes.

2           THE COURT:  When did you first see the children?

3           THE WITNESS:  When they were brought out.

4           THE COURT:  So, they were not out when you

5   arrived?

6           THE WITNESS:  They were not out when I arrived.

7           THE COURT:  When they brought the children out --

8   before they brought the children out, Mr. Garza was standing

9   outside?

10          THE WITNESS:  Yes, he was still outside.  So, I

11  guess, when the Deputies made the initial approach, he was

12  outside.  He maintained his position outside the entire

13  time.

14          THE COURT:  Okay, but again, I really want to

15  focus on what you actually observed maybe not what you were

16  told.  So, when you arrived there -- and as you said, the

17  initial entry into Apartment No. 1 had already been made,

18  correct?

19          THE WITNESS:  Correct.

20          THE COURT:  The other Deputies, they were in

21  Apartment No. 1 by the time you arrived?

22          THE WITNESS:  Correct.

23          THE COURT:  But when you arrived -- and again,

24  tell me if this is correct; I want to make sure I understand

25  your testimony -- when you arrived Mr. Garza was standing

1    outside of the apartment?

2              THE WITNESS:  That's correct.

3              THE COURT:  Where -- again, kind of there in that

4    area, we've got -- again, this is Defendant's Exhibit No. 2;

5    does that show --

6              THE WITNESS:  He would be outside of this fenced

7    area in the general --

8              THE COURT:  Where they've got an entry gate that

9    goes to the area underneath the stairwell.

10             THE WITNESS:  Correct, he would have been in this

11   general area outside the gate when I initially saw him.

12             THE COURT:  All right, outside the gate.  All

13   right.

14             And then, as he was standing there, the children

15   are brought out?

16             THE WITNESS:  That's correct.  He did not go

17   inside.  The children came out.

18             THE COURT:  Okay, the children are brought out.

19             How long after you had arrived there was it before

20   the children were brought out?

21             THE WITNESS:  Within minutes.

22             THE COURT:  Okay, and did you ever go into

23   Apartment No. 1?

24             THE WITNESS:  I went in briefly because I remember

25   having a discussion with Mr. Garza about the uncleanliness

1   of his living conditions for his children.  We had a

2   conversation about that.

3          THE COURT:  Okay, did you ever hear him talking

4   about his relationship to the efficiency, about whether or

5   not it was part of his lease or not?

6          THE WITNESS:  Correct, he was able to kind of

7   explain that there was another gentleman that was renting

8   the -- which, to me, it was just a front bathroom.  That's

9   my interpretation of the apartment complex at the time, a

10  separate bathroom going to Apartment 1.

11         THE COURT:  He was talking to you when you heard

12  him talk about that or you overheard him talking to --

13         THE WITNESS:  No, there was a long period of time

14  where there was an investigation being conducted, and I was

15  just sitting there talking to him.  That was being explained

16  that there was another guy that lives in the front.  And

17  then based on the interviews with the landlord, that there

18  was another person that lives in that area that's deemed a

19  separate living area, not a part of Apartment 1.

20  (Indiscernible).

21         THE COURT:  In terms of the chronology, when did

22  you first hear him talking about that?

23         THE WITNESS:  That would have been well after he'd

24  decided what the babies were going to do, mom had showed up

25  on scene, babies had already left with grandma, and

1  everybody was coming back to this general area inside the

2  gate outside this apartment, and that's when he was giving

3  this explanation, so (indiscernible), because again, we were

4  trying to clarify ourselves, trying to figure out the

5  investigation, I guess, who lives where, what is what, and

6  kind of get our minds wrapped around what it was, as well.

7          THE COURT:  Okay, I think that's all the questions

8  I have.

9          Any follow-up from the Government, Mr. Ramirez?

10         MR. RAMIREZ:  No, sir, thank you.

11         THE COURT:  Any further questions from the

12 Defense?

13         MR. GUERRA:  Yes, Your Honor, just to clarify that

14 question that the Court was asking.

15             RECROSS-EXAMINATION OF ZACHARY SCHLUP

16 BY MR. GUERRA:

17 Q    So, the Court asked you about your conversations with

18 Mr. Garza about basically what was his apartment and what

19 was not his apartment; do you know whether he had that

20 conversation with any of the other officers before you ever

21 got there because you were not there, as you already

22 testify, from the inception.  Do you know if he had that

23 conversation with Sergeant Gonzalez, Sarquiz, or anybody

24 else?

25 A    No, sir, I did not know if conversations were prior to

 1   mine.

 2   Q    You did not know; so, it is possible he had a

 3   conversation with those and you are not aware of it?

 4   A    It is possible.  I cannot testify it.  I was not there.

 5             MR. GUERRA:  Thank you.

 6             THE COURT:  All right, anything else from the

 7   Government?

 8             MR. RAMIREZ:  Nothing further.

 9             THE COURT:  Okay.  From the Government's

10   perspective, can this witness be excused?

11             MR. RAMIREZ:  Actually, may I ask just one, maybe

12   two questions?

13             THE COURT:  Go ahead.

14             MR. RAMIREZ:  Thank you.

15             REDIRECT EXAMINATION OF ZACHARY SCHLUP

16   BY MR. RAMIREZ:

17   Q    When did you first hear about the children?

18   A    When did I first hear about them?

19   Q    Yeah, that there were children --

20             THE COURT:  When did you first become aware that

21   there were children?

22             MR. RAMIREZ:  Become aware, right.

23   BY MR. RAMIREZ:

24   A    As they were coming out.

25   Q    So, before that, you didn't know that there was an

1  entry --

2  A      I did not.

3          MR. RAMIREZ:  Okay, thank you.  That's all.

4          THE COURT:  All right, anything else from Defense?

5          MR. GUERRA:  No, Your Honor, thank you.

6          THE COURT:  All right.  Then Agent, thank you for

7  being here.  You are excused.  Don't talk to anybody else

8  about your testimony until after this hearing is concluded,

9  which I anticipate being today.

10         All right, thank you.  You're excused.

11      (Witness steps down.)

12         THE COURT:  All right, the Government's next

13 witness?

14         MR. RAMIREZ:  The Government's final witness,

15 Your Honor, is --

16         THE COURT:  That's a lot more.  It's about double

17 than what you estimated yesterday, but okay.

18         MR. RAMIREZ:  It was -- is Jose Morales, Task

19 Force Officer with Border Patrol who is an ATF TFO.

20         THE COURT:  Let's get Agent -- is it Officer?

21 Well, we'll find out.  Mr. Morales.

22         THE CLERK:  Please raise your right hand to be

23 sworn in.

24      (Witness sworn.)

25

1          THE COURT:  Okay.  Good afternoon, sir.  Go ahead

2    and have a seat.  You're here to give testimony in this

3    proceeding today here in court.  If you would try, you've

4    got the microphone there in front of you.  You can adjust it

5    to move up or down.  And yeah, try to move in as you need

6    to, to speak into it.  We just need you to try and speak as

7    clearly as possible, loudly if you need to.  And be sure to

8    listen carefully to the questions that are being asked, and

9    just try and answer those questions to be best of your

10   ability.

11         You're first going to be questioned by the

12   attorneys for the Government.

13         You can proceed, Mr. Ramirez.

14         MR. RAMIREZ:  Thank you, Your Honor.

15              DIRECT EXAMINATION OF JOSE MORALES

16   BY MR. RAMIREZ:

17   Q    State your full name, your title with the ATF first,

18   and who you work with.

19   A    Good afternoon, my name is Jose Morales.  I'm a Border

20   Patrol Agent with almost 22 years of service, and I'm

21   assigned to ATF close to a year.

22   Q    What was your title with ATF?

23   A    I'm a Task Force Agent.

24   Q    What is a Task Force Agent?

25   A    It's agents assigned from another agency into the

1  agency that we're working.

2  Q    So, when I referred to you as a TFO, that's not

3  accurate; it's TFA?

4  A    TFO, because with Border Patrol, we're considered

5  Agents, not Officers.  So, that's the term that they're

6  using now.

7  Q    Understood, thank you.

8         All right, how long as you been a police officer,

9  I'm sorry, a Border Patrol Agent in Laredo?

10 A    It'll be 22 next month, 22 years.

11 Q    During that time, did you ever conduct any, involved in

12 any investigations?

13 A    Not with BP.

14 Q    Not with BP?

15 A    No, before -- may I explain to the Court?

16 Q    Yes, please.

17 A    Yes, with ATF, I was assigned for almost 4 years with

18 HSI HIDTA Narcotics.  We investigated any narcotics

19 violations.

20 Q    Did any of those investigations involve conducting

21 surveillance, going into residences?

22 A    Yes, sir.

23 Q    About how many?

24 A    I don't have a number, but there were a lot.

25 Q    50, 100?  Can't guess?

1  A    More than 50 for sure.

2  Q    About what year approximately was your work with HIDTA?

3  A    From 2018 to 2020 --

4  Q    All right, let me take you to June 1st, 2022.

5  June 1st, 2022, did you have occasion -- you've been sitting

6  in the courtroom.  So, you've heard all the testimony and

7  seen the exhibits.  Let me take you directly to 3104 Flores

8  Avenue; what's the reason you went to 3104 Flores?

9  A    Because ATF Special Agent Shawn Ensley called me in.

10  Q    Do you remember what time he called you?

11  A    I would say it was probably like at 7:00.

12  Q    What did he tell you?

13  A    He told me that the County called him to let him know

14  that they had just conducted a knock-and-talk, and

15  ammunition and narcotics were recovered from that address.

16  Q    Did you and he drive together, or just you?

17  A    No, we drove separately.

18  Q    Who was lead agent there, you or him?

19  A    I would say it was him because he's the one with the

20  most experience, but since I was on that day, I decided to

21  take the case.

22  Q    So, when you arrived at 3104 Flores -- and look at

23  Defendant Exhibit No. 12 -- is that the way the scene looked

24  or not?

25  A    Not really.

1  Q    Let me show you another -- how is it different?

2  A    I believe there was a pickup truck right behind the

3  gray vehicle there.  I don't know how close it was to the

4  vehicle but the majority of the officers were around that

5  pickup truck.

6  Q    Okay, look at Defendant's Exhibit No. 19.  There's a

7  white vehicle; is that the vehicle you're referring to or

8  not?

9  A    I don't remember if it was white or gray.

10  Q    Okay, I believe this is probably -- I'm speculating,

11  but this is probably an SUV that's in this photo, but do you

12  happen -- can you confirm that or do you know?

13  A    I believe there was another vehicle that was next to

14  that one.

15  Q    Sorry, it was a pickup truck anyway.

16       So, when you arrived, was the ammunition already

17  laid out like this?

18  A    No.

19  Q    And looking at Defendant's Exhibit No. 20?

20  A    I'm sorry.  It was already on the bed of the pickup

21  truck.

22  Q    So, you didn't see the ammo spread out like this?

23  A    No.

24  Q    Okay, and when you arrived, who did you meet with?

25  A    I was waiting just for Mr. Ensley to get there.

1  Q    Were you at the parking area at the apartment complex,

2  or were you somewhere else?

3  A    I was near the parking lot of the apartment complex.

4  but I was just away from the Agents because I didn't know

5  anybody there, just one TFO that's a BP Agent.

6  Q    So, at what point did you approach the Officers and

7  others in the parking lot?

8  A    When Mr. Ensley arrived.

9  Q    Okay, talk me through that.  He arrived, what did you

10 then do?

11 A    When he arrived, he was talking to Mr. Gonzalez.  So,

12 we walk into Apartment No. 1, which is the one underneath

13 the stairs, and like I said, they were talking directly and

14 Mr. Gonzalez was explaining what had just happened there.

15 Q    And what did you hear Mr. Gonzalez explain to Special

16 Agent Ensley?

17 A    I heard Mr. Gonzalez saying that they had just gotten

18 consent to get into that apartment and they noticed a door

19 to the right, adjacent to apartment complex No. 1 and since

20 they believed that door belonged to Apartment 1, they

21 proceeded to open it, and that's when they observed -- I'm

22 talking plural -- Mr. Gonzalez talking to Mr. Ensley --

23 that's when they observed from green metal boxes.

24          Supposedly, that's when Mr. Garza told

25 Mr. Gonzalez that that was not part of Apartment No. 1, that

1  it was subleased to somebody else, a person known as

2  (indiscernible).

3  Q    And all this is what you remember overhearing Sergeant

4  Gonzalez telling Special Agent Ensley?

5  A    Yes, sir.

6  Q    That they did a knock-and-talk on the Apartment 1, but

7  Mr. Garza, who was the owner or the lessee of Apartment 1,

8  said, "You can go in but don't go into that other area

9  because it belongs to somebody else," but he went in anyway;

10 is that what you're saying?

11       BY THE COURT:  No, that's not Counselor.  You're

12 completely mistaking what he said.  You can't ask him to

13 repeat it, but that's not --

14 BY MR. RAMIREZ:

15 Q    Can you repeat your answer, please?

16 A    I don't know if it was a knock-and-talk or not.  I only

17 heard that consent was given and that while they were

18 searching Apartment 1, they observed this door to the right,

19 which is an adjacent door to Apartment 1, and thinking that

20 it was part of the same apartment, they proceeded to open

21 it, and that's when they observed the green metal cans.

22 Q    I understand.  Thank you for the clarification

23       MR. RAMIREZ:  Sorry, Your Honor.

24 BY MR. RAMIREZ:

25 Q    So, they opened the door from -- let me show you a

1  different exhibit.  This is Defendant's No. 10.  I'm going

2  to the parking lot -- this is a sketch drawn by the

3  landlord, and you have the parking lot on top, which is

4  where the efficiency door opens to the outside and you have

5  on the right-hand side is the entrance drawing to Apartment

6  No. 1 going into the living room, and then to the right is a

7  door to the efficiency room.  It's not to scale, but

8  nevertheless that is the layout or diagram that's drawn by

9  the landlord.

10         So, in effect, is that the efficiency room that

11  you're referring to?

12  A    Yes.

13  Q    Okay.  So, after Sergeant Gonzalez said that he had

14  gone in, or they had gone in, as you said, into Apartment 1,

15  taken a right, gone into the efficiency room, and saw what

16  he said he saw, what happened next?

17  A    He said that, like I said, Mr. Garza had mentioned that

18  that room had belonged to a person and then he said that

19  they had heard that a female living upstairs mentioned

20  something about a male living or being upstairs.  So, that's

21  where they found Mr. Saldana.

22  Q    And then, what --

23  A    And then, he said that they made contact with

24  Mr. Saldana, and Mr. Saldana provided consent to search his

25  apartment being, I guess, the efficiency room.

1    Q    Did he show you the consent form?

2    A    Not at that time.

3    Q    And what did he say happened next?

4    A    That they entered the -- I didn't hear anything of him

5    saying who opened the door or not, how it was opened, who

6    had the key or not, just that they had just recovered the

7    ammunition that was in the pickup truck and narcotics.

8    Q    And what was your role there in the area?  What did you

9    do specifically?

10   A    Like I said, I thought Mr. Ensley was going to take the

11   case, but I decided to take it because it sounds interesting

12   for me since I was new there in the agency.

13   Q    So, at some point later on, you participated in an

14   interview of the Defendant; that's correct?

15   A    Yes.  Yes, I thought you were meaning this specific

16   time when --

17   Q    Yes, I was going to ask what you did with respect to

18   the ammo and so forth, but I'm going to move on to something

19   else.

20   A    Okay.

21   Q    So, you participated in an interview of the Defendant,

22   but before the interview of the Defendant, did you happen to

23   see or speak to the Defendant at the scene?

24   A    No.

25   Q    And where was the interview conducted?

1   A    At the Webb County Substation.

2   Q    Who participated in that interview with the Defendant?

3   A    It was Mr. Ensley, Ms. Sarquiz, and myself.

4   Q    And you didn't transport the Defendant yourself?

5   A    No.

6   Q    ATF did not do that?

7   A    No.

8   Q    It was somebody else?

9   A    We didn't do it.

10  Q    So, about what time was it when the interview began?

11  A    I would say like probably 9:40, 9:45, close to 10:00.

12  Q    Did you have any conversations with the Defendant

13  before the interview began?

14  A    No.

15  Q    Did you see anyone having a conversation with him

16  before the interview began?

17  A    I don't know.  When we arrived to the Substation, we

18  were like in the front office, not office, but what they

19  made out to do or anything, and I guess, the Defendant was

20  already in one of the interview rooms.

21  Q    Describe the size of the interview room.

22  A    Small, probably like 4x6, I guess.

23  Q    And when the Defendant came into the room, was he

24  handcuffed?

25  A    I don't recall that, sir.

1   Q    During the interview, was he handcuffed?

2   A    No.

3   Q    How do you know that he was not handcuffed but you

4   can't remember if he had handcuffs when he came in?

5   A    At the time we started the interview, I don't remember

6   him being unhandcuffed.  Like I said, in the past interviews

7   that I've conducted, I don't need people handcuffed,

8   especially in the office.

9   Q    I just wanted to clarify if your answer was that you

10  don't remember if he was, or you don't remember that he was,

11  or he was not handcuffed.

12  A    When we started the interview, I want to say that he

13  was not handcuffed.

14  Q    What was the condition in the room, the interview room?

15  Was it comfortable, hot, cold?

16  A    It was normal.

17  Q    Before starting the interview, how long did the

18  Defendant remain waiting for you to start the interview?

19  A    I don't know.

20  Q    So, was he already there when you arrived at the

21  Substation?

22  A    I guess so, yes.

23  Q    You guess or you don't --

24  A    Well, the thing is that since we didn't transport him

25  to the Substation, I don't know what time he got there.

1  Q    So, you started the interview at about 9:45, and during

2  the course of the entire interview, I'm not going to ask you

3  what he said with respect to this charge that he has, but

4  during the interview, what was his demeanor like?

5  A    He was calm.

6  Q    Did he complain about anything?

7  A    No.

8  Q    Did he complain about anyone?

9  A    No.

10 Q    Did he complain about the consent form?

11 A    No.

12        BY MR. RAMIREZ:  That's all, Your Honor.  Thank

13 you.

14            THE COURT:  All right, Defense?

15            MR. GUERRA:  Can I have a minute, Your Honor?

16            THE COURT:  Yes.

17      (Pause in proceedings.)

18                CROSS-EXAMINATION OF JOSE MORALES

19 BY MR. GUERRA:

20 Q    Mr. Morales, or Agent Morales -- I should address you

21 by your title -- I'm Raul Guerra.  I'm going to ask you a

22 couple questions.  I know you've been here, and it's going

23 to be very brief because I just have couple questions.

24        But the information that you've testified here

25 today before the Court -- you prepared a report as part of

1  your job with the ATF, correct?

2  A    Yes, sir.

3  Q    And the information regarding the "military type, green

4  boxes" is the way you have it in your report in parenthesis,

5  that information is included in your report and that is the

6  information that you obtained when you got involved in this

7  particular operation on June 1st, 2022; is that correct?

8  A    That's the information I heard from Mr. Gonzalez.

9  Q    Yes, and thank you for the clarification.  You heard

10 it, but you reported that in your report is what I'm getting

11 at.

12 A    Yes.

13 Q    You have it in your report?

14 A    Yes.

15 Q    It's included in there that that information was

16 provided to you, and that's included in -- so, you were

17 here --

18       BY THE COURT:  I'm sorry, Counselor.  I apologize

19 for interrupting.

20       What information are we talking about that "the

21 information is in your report"?  What information?

22 BY MR. GUERRA:

23 Q    Specifically, the several -- let me give you the line.

24 "Officer stated that since they believed that room was part

25 of Apartment 1, they proceeded to open the door and observed

1  several metal boxes (military type, green boxes)"; that is

2  directly from your report, Page 1, is that correct?

3  A    Yes, sir.

4  Q    For Report No. 1, because you did several reports,

5  correct?

6  A    Yes, sir.

7  Q    Okay.  And so, this is consistent with what you

8  testified here today that that is the information you and

9  Special Agent Ensley obtained when you went and you started

10 to assist the Webb County Sheriff's Office and DEA that were

11 already on scene?

12 A    Yes, sir, that's the information I heard from

13 Mr. Gonzalez.

14 Q    And so, when you say Mr. Gonzalez, you're referring to

15 Sergeant Michael Gonzalez; is that correct?

16 A    Yes, sir.

17 Q    So, Sergeant Michael Gonzalez is the one that was

18 conveying this information specifically to you and to

19 Special Agent Ensley upon your, or actually, to Special

20 Agent Ensley and you were hearing it; is that correct?

21 A    Yes, sir.

22 Q    Okay, and he was explaining that he started to go into

23 that room and he saw those boxes, or he went into the room,

24 he saw those boxes, but apparently, at the same time, if I

25 understood you correctly, Mr. Garza, Mr. Eduardo Garza, was

1  telling him that that was not part of his lease, that that

2  was not part of Apartment 1, which is Mr. Eduardo Garza's

3  apartment; is that -- I don't want to put words in your --

4  A     No, that is what I heard.

5  Q     That's what you heard?

6  A     Yes, sir.

7  Q     Okay.  So, you heard Mr. Eduardo Garza telling, or

8  Sergeant Michael Garza telling you that Mr. Eduardo Garza --

9           BY THE COURT:  Wait, no.  No, no.  You got that --

10  Sergeant Mike Gonzalez, you said Garza.

11           MR. GUERRA:  I'm sorry.  You're right, you're

12  right.  Thank you, Your Honor.  I'm already confusing the

13  last names.

14  BY MR. GUERRA:

15  Q    So, yes, you heard Sergeant Michael Gonzalez explaining

16  to Special Agent Ensley that Mr. Eduardo Garza, who is a

17  tenant, or was a tenant at the time, of Apartment 1, 3104

18  Flores, Mr. Eduardo Garza told Sergeant Michael Garza that

19  is not --

20           BY THE COURT:  Gonzalez.  Gonzalez, Michael

21  Gonzalez.

22           MR. GUERRA:  Sergeant Michael Gonzalez.  I did it

23  again.

24           I apologize, Your Honor.

25  BY MR. GUERRA:

1  Q    -- telling Sergeant Michael Gonzalez, "That is not part

2  of my apartment, part of my lease, part of my unit"?

3  A    Yes.

4  Q    The efficiency, okay.

5        And you were here on just yesterday morning when

6  Sergeant Gonzalez testified and he did not provide that

7  information to the Court.  I mean, that's not what Sergeant

8  Gonzalez testified, that he was told that that was not part

9  of the lease, the entry into that room.  That is not the way

10 he explained it to the Court, his entry.

11        Is that your recollection of how Sergeant Gonzalez

12 testified yesterday?

13        MR. RAMIREZ:  Your Honor, I think asking him to

14 comment on the testimony --

15        MR. GUERRA:  I'll withdraw the question.  I'll

16 withdraw the question, Your Honor.

17        THE COURT:  Go ahead, proceed.

18 BY MR. GUERRA:

19 Q    So, one other question for you.  As you testified, you

20 and Special Agent Ensley, and I believe you said also

21 Investigator Sarquiz, did the interview for Mr. Saldana,

22 correct?

23 A    Yes, sir.

24 Q    And this occurred at the Webb County Sheriff's Office

25 Substation?

1  A    Yes, sir.

2  Q    But before you Mirandized and you actually started the

3  interview, the actual Mirandized interview with Mr. Saldana,

4  there was a bit of a conversation between yourself,

5  Mr. Saldana, and Special Agent Ensley, correct?  There was

6  some back and forth between, I shouldn't say between the

7  three of you, but between Mr. Saldana and the three of you,

8  I should say, correct?

9  A    What I tend to do before I start asking the questions

10 and before reading the person their Miranda Rights, I go and

11 I ask biographical questions.  That's what I do.

12 Q    I understand.  I understand that, but even, if I recall

13 correctly, even before you got to the biographical

14 questions, Mr. Saldana made a statement to you all to the

15 effect that --

16         THE COURT:  Maybe rephrase it as "Do you recall?"

17 BY MR. GUERRA:

18 Q    Do you recall if he made a statement to the effect that

19 you all, meaning US police, were different than the Mexican

20 police?

21 A    Yes.

22 Q    He did make that?

23 A    Yes, sir.

24 Q    And in Spanish, if we have the correct wording, it was

25 something to the effect, "Ya me dijeron aclararon que no som

1  como la policia Mexicana."

2  A    Yes, sir.

3        BY COURT INTERPRETER:  I've already been told,

4  it's been clarified for me that you are not like the Mexican

5  police.

6  BY MR. GUERRA:

7  A    Yes.

8  Q    Yes, okay.

9        And again, this statement was made to you, Special

10 Agent Ensley, and Investigator Sarquiz?

11 A    Yes.

12       MR. GUERRA:  No other questions, Your Honor.

13       THE COURT:  Okay.

14       Agent Morales, let me -- I want to clarify

15 something, some of your testimony here, make sure I

16 understand it.

17                 EXAMINATION OF JOSE MORALES

18       BY THE COURT:  Here, what Mr. Guerra, attorney for

19 the Defense, was asking you just a minute ago before this

20 last series of questions was you were testifying about what

21 you overheard Sergeant Gonzales telling Special Agent Ensley

22 about, you know, what occurred at the scene during the

23 operation, about how when they went into Apartment No. 1,

24 and how Sergeant Gonzalez ended up entering the efficiency

25 through a door that connected Apartment No. 1 and the

1  efficiency.

2          Is that right?  You overheard Sergeant Gonzalez

3  telling Agent Ensley about that?

4          THE WITNESS:  Yes, that is correct, sir.

5          THE COURT:  Okay.  Now, the question -- and let me

6  make sure I understand your testimony.

7          Mr. Guerra was just asking you that based on what

8  you heard, this is you listening to Sergeant Gonzalez

9  telling Agent Ensley what happened, is it your testimony

10 that Sergeant Gonzalez told Agent Ensley that before

11 Sergeant Gonzalez went through the door into the efficiency,

12 before that, that Mr. Garza told Sergeant Gonzalez that

13 "that efficiency is not part of my apartment"?  Because

14 that's what you were asked and you said that.  I want to

15 make sure -- that's what I understood you saying.

16          Is that what your testimony is?

17          THE WITNESS:  I'm going to have to clarify that.

18 I said it to the beginning that I heard Mr. Gonzalez,

19 Sergeant Gonzalez say that when they proceeded to enter the

20 room and observed the green metal cans, at that point,

21 Mr. Garza told him that it wasn't his room, and that's how I

22 have it in my report.

23          THE COURT:  That at the point that he had just

24 entered, like after they opened the door and were just

25 entering?  Like what's your best -- just tell me what is

1  your best recollection of when, of what Sergeant Gonzalez

2  said about the timing of when Mr. Garza told him, "That's

3  not part of my apartment"?

4            THE WITNESS:  I would say probably when he -- I

5  don't know how far he walked into the room.

6            THE COURT:  But your impression, your

7  understanding is it was after Sergeant Gonzalez opened the

8  door --

9            THE WITNESS:  Oh, yes, sir.

10           THE COURT:  -- that connected the two rooms?

11           THE WITNESS:  Yes.

12           THE COURT:  Okay, I just -- that's your best

13  recollection?

14           THE WITNESS:  Yes, sir.

15           THE COURT:  Okay, all right.

16           Well, with that, Counsel, first of all, let me --

17  Mr. Guerra, do you have any follow-up questions?

18           MR. GUERRA:  Yes, Your Honor, based on what the

19  Court was asking, I would just --

20              RECROSS-EXAMINATION OF JOSE MORALES

21  BY MR. GUERRA:

22  Q    You've been present, Agent.  And so, the boxes --

23           BY MR. GUERRA:  Can we put up the --

24           MR. RAMIREZ:  Do you want --

25           THE COURT:  The photos of the shower?

1          MR RAMIREZ:  The shower?

2          MR. GUERRA:  Yeah, the shower.  I'm sorry.

3          MR. RAMIREZ:  Which one would you like?

4          MR. GUERRA:  Well, you can leave that one up?

5          MR. RAMIREZ:  Okay.

6  BY MR. GUERRA:

7  Q    So, Government's Exhibit No. 2 shows the shower area,

8  and there's a lot of cushions and all kinds of stuff there.

9  And so, can you, at least from the way Government's Exhibit

10 No. 2 is shown to you right now, can you see the metal boxes

11 from there?

12 A    Not from here.

13 Q    No, right?

14 A    No.

15          MR. GUERRA:  Okay, can you put up No. 3?  I think

16 No. 3 has it.  No. 3, actually, you just passed it.  3, go

17 back.  Go back, go back.

18          MR. RAMIREZ:  Right.

19 BY MR. GUERRA:

20 Q    Yeah.  So, I'm showing you Government's Exhibit No. 3

21 now, also the shower area.  You can just see the showerhead

22 there.

23          Can you see the metal boxes right there?

24 A    Not from here.

25 Q    Okay, let's go to No. 4, Government's Exhibit No. 4;

1  can you readily see the metal boxes there?

2  A    Not from here.

3  Q    Okay.  So, presumably, something had to be moved for

4  you to see the --

5            THE COURT:  Well, do you want to get to No. 5?

6            MR. GUERRA:  Well, No. 5 is after the fact, Your

7  Honor.

8            THE COURT:  I know.  I know, but --

9  BY MR. GUERRA:

10  Q    But No. 5, let me show you Government's No. 5; and now,

11  can you see everything?

12  A    Yes.

13  Q    The boxes are there, but there's nothing covering the

14  boxes, correct?

15  A    Right now, yes.

16  Q    This is after everything, 2, 3, and whatever other

17  number, 4, I guess, with all the stuff that was on top, the

18  cushions and all the other things that I mentioned, what

19  looked like a blanket or whatever.  That is no longer

20  visible in Government's No. 5, correct?

21  A    Yes, sir.

22  Q    Okay, and now you can see the metal boxes, the green

23  metal boxes?

24  A    Yes, sir.

25

1        MR. GUERRA:  Okay, I don't have any other

2  questions.

3        THE COURT:  All right, anything else from the

4  Government?

5        MR. RAMIREZ:  No, Your Honor, thank you.

6        THE COURT:  All right.  Agent, you can step down

7  from the stand.  Thank you.

8        THE WITNESS:  Thank you.

9     (Witness steps down.)

10        THE COURT:  All right.  Government, call your

11  next witness.

12        MR. RAMIREZ:  That's it, Your Honor.

13        THE COURT:  Okay, I think we've been going what?

14  About two hours?  Yeah, I guess, we should take a break just

15  to give everybody a break.

16        First, before we do that, Defense, do you have

17  witnesses to call, and if so, how many?

18        MS. MARTINEZ:  Your Honor, we'll be calling the

19  Defendant, Mr. Saldana-Alaniz to the stand.

20        THE COURT:  All right, just for everybody's

21  heads-up, including the Court.

22        Let's take a 10-minute break before we start

23  that.

24        MR. GUERRA:  And Your Honor, and just because

25  Ms. Sarquiz has been waiting --

1          THE COURT:  Oh, yes.

2          MR. GUERRA:  So, I just want to make sure she's

3  not waiting --

4          THE COURT:  Well, did you -- so, is Defense going

5  to re-urge the motion?

6          MS. MARTINEZ:  No.

7          MR. GUERRA:  No, Your Honor.  No, we're satisfied

8  that Agent Morales --

9          MS. MARTINEZ:  Clarified.

10          MR. GUERRA:  -- clarified that for the Court, and

11  again, my concern was for the Court not to believe that I

12  was trying to inject facts that were not in evidence.

13          THE COURT:  And I appreciate that.  That's on the

14  Record.

15          Okay.  So, then with the understanding that there

16  is no intention to call Investigator Sarquiz back to stand,

17  then she is released as a witness.

18          Again, I don't know if any of them are hanging

19  around, but anybody who's testified and released as a

20  witness, I guess it's fine if they want to just sit in and

21  observe.  I don't know but you don't talk about that anyway.

22  But I don't know if anybody's here to watch or anything but

23  if they've testified, they're done, they're excused,

24  including Investigator Sarquiz.

25          MR. RAMIREZ:  Thank you, Your Honor.  I'll let

1  them know.

2        THE COURT:  All right, okay.  Let's take a

3  10-minute break.

4        COURT SECURITY OFFICER:  All rise.

5     (Recess taken from 3:35 p.m. to 3:51 p.m.)

6                      AFTER RECESS

7        THE COURT:  Are we on the Record?

8        THE CLERK:  Yes, Your Honor.

9        THE COURT:  Okay.  Defense, do you have questions?

10     (Indiscernible)

11        THE COURT:  They're going to call the next

12  witness.

13        So Defense, you can proceed.  The Government has

14  rested all of its evidence, Mr. Ramirez?

15        MR. RAMIREZ:  Yes, Your Honor.

16        THE COURT:  Okay.  Defense, you can call your

17  first witness.

18        MS. MARTINEZ:  Defense calls Jose Alonso

19  Saldana-Alaniz.

20        THE CLERK:  Please raise your right hand.

21     (Witness sworn.)

22        DEFENDANT SALDANA-ALANIZ:  Yes, I do swear.

23        THE COURT:  Mr. Saldana, have a seat.

24        You've been sitting through a day and a half in

25  these proceedings.  You've seen how we've done it with

1  witnesses testifying from the stand.  Please, you can move

2  the microphone up and down so that you can speak into it

3  clearly.

4          Please listen carefully to the questions that are

5  being asked and try and answer those questions to the best

6  of your ability.  You can -- either Ms. Martinez or

7  Mr. Guerra, you can proceed with your questioning.

8          MS. MARTINEZ:  Thank you, Your Honor.

9          Is the mic picking me up?  Okay.

10      DIRECT EXAMINATION OF JOSE ALONSO SALDANA-ALANIZ

11  BY MS. MARTINEZ:

12  Q    Good afternoon.  Will you please state your name for

13  the Record?

14  A    Jose Alonso Saldana-Alaniz.

15  Q    Mr. Saldana, can you see me from where you're at?

16  A    Yes.

17  Q    How old are you?

18  A    37 years old.

19  Q    Where were you born?

20  A    In Nuevo Laredo, Tamaulipas.

21  Q    Where did you grow up?

22  A    In Nuevo Laredo.

23  Q    Did you go to school there?

24  A    Yes, I did.

25  Q    Up to what grade?

1  A    Up to cover school, college.

2  Q    Okay.  Did you have any -- have you ever lived in the

3  United States?

4  A    Only when I was a teenager.  I went to high school for

5  one year.

6  Q    What grade was that?

7  A    9th.

8  Q    Okay.  Are you married?

9  A    Separated.

10  Q    Do you have any kids?

11  A    Two children.

12  Q    I'm going to just -- as you know, you've been present,

13  so you know why we're here.  We're going to talk about what

14  happened on June 1st, 2022.  Okay?

15  A    Okay.

16  Q    So I want to begin by when was the first time you had

17  any contact with law enforcement on that day?

18  A    When I was coming out of the store, the Stripe.

19  Q    The Stripes?

20  A    Stripes.  I don't remember the exact address.  It's

21  about five blocks away from where I was staying.

22            On the way back, we stopped at a stop sign and I

23  had a friend with me.  I don't remember his name too well.

24            We did our stop, and then we continued and we saw

25  there was a Sheriff in front of us.

1           As we turned onto Laird Street, we were two blocks

2   away from the apartment.

3           The patrol car stopped us right away.

4   Q    And how many officers were in the patrol car?

5   A    Just one.

6   Q    And to your recollection was that Corporal Garcia who

7   testified here today?

8   A    Yes.  It was him.

9   Q    Okay.  And what happened when he stopped you?

10  A    He stopped us.  He asked us for some IDs, we didn't

11  have any IDs.

12          He asked for my name, I gave it to him.

13  Q    Let me stop you there.  What name did you give?

14  A    Jose Saldana.

15  Q    And what is your full name?

16  A    Jose Alonso Saldana-Alaniz.

17  Q    Okay.  And then what happened after you gave him the

18  name Jose Saldana?

19  A    He went back to check on the computer, I guess, inside

20  the patrol car.

21  Q    And what happened next?

22  A    After about maybe five minutes, he came out of the

23  patrol car and asked us if we had anything that could be --

24  that would get us in trouble.

25          And we asked, could you tell us what was the

1  reason for you stopping us?  And he told us it was because

2  we had run the stop sign -- we had ran the stop sign.

3          So he continued with his check and we thought,

4  well, it's okay.  He's the authority.

5  Q    So you allowed him to search?

6  A    He told us I'm going to check your vehicle.  Is there a

7  problem with that?  And we said no.

8          And he said, "Where are you coming from?"  And I

9  said, "From the Stripes.  We just came back from buying

10  Cokes."

11          And he went ahead and checked and he didn't find

12  anything except the boxes of Coke.

13  Q    So what happened next?

14  A    My friend, who was the one driving, just got a little

15  piece of paper saying that next time he would get a ticket

16  because he didn't have a license and because of the traffic

17  violation that he had made.

18          So he asked me where I live.  And I told him,

19  3104 Flores in the apartments.

20          And he said, "Are you sure that's where you live?"

21          He asked me and I said, "Yes."

22          If you'd like, we can go there so you can verify

23  it.

24          If I go there and I ask, I said, "Go ahead, ask."

25  Q    So let me -- let's -- okay, so let's keep going.

1        Did he eventually let you go?

2   A    Except that he said to us, all right, you can go.

3   Q    So did you go home after all?

4   A    I went on my way, two blocks away down the same street.

5   We went into the apartments.  And the officer just stood

6   there looking to see where I was going into.

7        And as I know anyone would, I went inside my

8   apartment with my Cokes.

9   Q    Okay.  Let me stop you there.

10        MS. MARTINEZ:  Can I get these next, please?

11  BY MS. MARTINEZ:

12  Q    I'm showing you Defendant's Exhibit No. 1.  Is this the

13  apartment complex?

14  A    Yes.

15  Q    And can you identify which one is the door to your

16  apartment?

17  A    The one that's in front over here.

18  Q    The one in the right -- facing the one with the white

19  metal door?

20  A    Yes.

21  Q    Facing the street.  Okay.  So once you got home, what

22  happened?  What did you do?

23  A    My friend left after a brief minutes.  I put away the

24  Cokes.  There were like seven boxes of them.

25  Q    But Mr. Saldana, I'm going to try to go into question

1    and answer.  Don't do a long narrative, okay?  Just wait for

2    my next question, all right?  I'm going to try to do better

3    in my questions with you, okay?

4              Did you ever go upstairs?

5    A    Yes --

6    Q    Yes or no?

7    A    Yes, that's where I was going.  Yes.  Yes, I did go

8    upstairs.

9    Q    And where did you go upstairs?

10   A    To a friend's house at her apartment.

11   Q    Which apartment was that?

12   A    I don't remember, but it's the one that's way at the

13   end.

14   Q    So if you're looking at this -- Defendant's Exhibit

15   No. 1 -- well, you've heard the testimony of Mr. Resendez,

16   the landlord, and there's two units, correct, on the top

17   floor?

18   A    There are two, yes.

19   Q    So were you in the unit directly above Mr. Garza's

20   apartment, or were you towards the back?

21   A    The one that's way in the back.

22   Q    Okay.  So then I believe the testimony has been that on

23   the first floor we had Mr. Garza's apartment, which is

24   Apartment No. 1, and then in the back was Mr. Resendez's

25   apartment, correct?

1  A    Yes.

2  Q    So the apartment that you were located at was directly

3  on top of Mr. Resendez's apartment, correct?

4  A    That's right.

5  Q    And who did that apartment belong to?

6  A    It belongs to a friend.  Her name is Brisa, B-R-I-S-A.

7  Q    Now, just before I forget to ask you, did you have an

8  agreement with Mr. Resendez, the landlord of this property,

9  to rent what we've been calling the "efficiency" at

10  3104 Flores?

11  A    Yes.

12  Q    Okay.  Now going back to you being up there with Brisa,

13  at what point did you realize that law enforcement was

14  present?

15  A    Approximately about 15-20 minutes later.  They were

16  already downstairs.

17  Q    When you say 15-20 minutes later, are you saying once

18  you were up into her apartment, 15 minutes later?  Or

19  explain that, please.

20  A    Yes.  By the time I got out of my apartment, 10 minutes

21  had gone by, so 10 minutes after that, they were already

22  downstairs.

23  Q    And how do you know they were downstairs?

24  A    Because I was sitting down in the living room of my

25  friend's apartment.  And she was standing at the door.

1          She was the one that told me there's quite a

2    number of officers downstairs.

3          And I took a look and she was right.  There were

4    quite a number of officers downstairs.

5    Q    So what -- now let's focus about when the officers

6    showed up, okay?  What happened when they showed up to the

7    upstairs apartments that you were at?

8    A    They talked to me.  They said, "Hey, you, come over

9    here."

10   Q    And how many officers were there?

11   A    When I stood at the door, there were approximately

12   eight or nine.

13   Q    And can you describe if they were Sheriffs or SWAT

14   members?  Would you know?

15   A    Yes.  I could tell them apart.  The ones who were in

16   front of me were Sheriffs.

17          They're the ones who handcuffed me right away.

18   Q    Sir -- Mr. Saldana, take a puff.

19          How do you know they were Sheriffs?

20   A    Because the patrolman who stopped me had the same

21   uniform and his patrol car said, "Sheriff."

22   Q    Okay.  So you said that they put you in handcuffs?

23   A    Yes.

24   Q    Do you recall where you were handcuffed?  Were your

25   hands in the front of the back?

1  A     They handcuffed me with my hands to my back.

2  Q     And again, how many Sheriffs would you say were there?

3  A     Approximately eight upstairs.

4  Q     Again, Sheriffs or SWAT members, or both?  Who are you

5  referring to?

6  A     No.  There were eight Sheriffs that were in front of me

7  and then I'm going into the room where I was in with my

8  friend, there were another four or five dressed in black

9  with long weapons and caps -- or face covers.

10  Q     And what did those people with the long weapons do?

11  A     They started to check insider.

12  Q     And what were the Sheriffs doing?

13  A     They were asking me for my name and my date of birth.

14  Q     Okay.  So Mr. Saldana, I'm sure you've heard them

15  testify that about consent -- they asked you for permission

16  to go look inside your efficiency.

17           Do you remember that testimony?

18  A     (Speaks in Spanish - not interpreted).

19  Q     I'm asking you, do you remember the agents and the

20  Sheriffs testifying at your hearing about that?  Do you

21  remember that, yes or no?

22  A     They showed me a piece of paper, yes.

23  Q     That's not my question, Mr. Saldana.

24           Let me rephrase it:  You've been present

25  throughout this setting, correct?  Yesterday you were here

1  all day?

2  A    Yes.

3  Q    And you heard the agents take the stand where you're

4  at, correct?

5  A    Yes.

6  Q    You were listening to their testimony, right?

7  A    Yes.

8  Q    Okay.  And you heard them testify that when they were

9  upstairs talking to you, that you gave them consent, which

10 is permission, to go look into your efficiency.

11         Do you remember them saying that on the stand?

12 Yes or no?

13 A    Yes.  They did say that.

14 Q    Okay.  Now let me ask you this:  Did you give them

15 permission to look into your apartment?

16 A    An officer approached me and said, "Hey, I stopped

17 you," pointing at me.

18         And I said, "Yes."  In fact, "Yes, you just

19 stopped me.  I gave you my name.  You checked.  You didn't

20 find anything."

21         He said, "You're the one who lives here in the

22 apartment downstairs?  Bring the keys because you can open

23 it for us, can't you?  Those were his words.

24         MR. GUERRA:  Your Honor, we would just object to

25 the translation, and I understand that it's subject to

1  interpretation, but the translator said, "Bring the keys,"

2  and I believe the context -- we can clarify with

3  Mr. Saldana, but the context was, "Do you have the keys?"

4           I believe the Spanish is do you -- I believe it's

5  meant as "We do have the key" not "bring the key."

6           THE INTERPRETER:  Your Honor, may we clarify

7  because it could be interpreted either way, "Do you have

8  them" or "bring them."

9  BY MS. MARTINEZ:

10 Q   When you testified the word -- when you said (speaks

11 Spanish)?

12          THE COURT:  Well, just ask him to repeat.  When

13 you say that this officer told you to do something, repeat

14 what the officer said.

15 BY MS. MARTINEZ:

16 Q   Okay.  Can you repeat what the officer told you again,

17 about the keys, please?

18 A   The officer said, "You live downstairs.  Do you have

19 the keys?"  It was a question.

20          He was ordering me.  He was ordering me, saying,

21 "Because you can open for us, can't you?"

22 Q   And what did you say?

23 A   Well, I was around there and had no alternative, so I

24 said to him, "Well, yes."

25 Q   So then what happened right after that?  That when you

1  came downstairs?

2  A    I went downstairs with my hands behind me and they were

3  holding me by the arm.

4  Q    Now let me stop you there.

5          How many agents escorted you down the stairs?

6  A    Well, all the stairs were full of them, all the

7  officers that I just mentioned to you.

8  Q    You have heard the testimony from the other agents that

9  there was around 21 agents involved in this event, correct?

10 A    That's right.

11 Q    So when you were going down the stairs, did you happen

12 to see any other agents?

13 A    Well, there were the agents who were in front of me,

14 the Sheriffs, and then the other ones in black were also

15 going down already.

16 Q    What about the parking lot?  What did you see there?

17 A    And there was still more downstairs -- more officers.

18          There were others waiting for me at the bottom

19 step.  There was a blond guy with the hair up like this.

20 Q    And that would be Agent Schlup, who just testified a

21 while ago, correct?

22 A    That one.  I remembered him.

23 Q    And then so as soon as you came downstairs, what did

24 you do?

25 A    One of the agents said, "Hey, hey, take off one of his

1   handcuffs so he can open the door for us."

2          They never asked me.  They never asked me if I

3   wanted to or if I had a right to do this.  They just said,

4   "So you can open the door for us."

5   Q    So then what happened?  Did you open the door?

6   A    I opened the door --

7   Q    No, no.  Let me stop you there.

8   A    -- and when you open the door, it opens out towards the

9   street.

10  Q    You opened the white -- Mr. Saldana, wait a minute.

11         Which door did you open?  Well, first of all, let

12  me ask you this:  Are there two doors or is there just one

13  door?  Because to me it looks like there's like a metal door

14  and then another door.

15         Am I correct on that?

16  A    That's correct.  Yes, of course.

17  Q    So which door did you -- which door did you open?

18  A    The one in the front.

19  Q    And then?

20  A    And then I tried to open the other one and it was

21  already open.

22  Q    Now when you say, "open," let's clarify this.

23         The front gate -- the first door, you mean to say

24  you unlocked it, correct?

25  A    That's right.

1   Q    It was -- to be clear, it was closed, but you had to --

2   and you had to unlock it to open it, correct?

3   A    That's right.

4   Q    Okay.  Now the interior door, that one did not require

5   you to unlock it with your key because you're saying it was

6   already unlocked?

7   A    It was no longer locked and all I had to do was turn it

8   and it opened towards the inside.

9          And it looked like there had been a tornado going

10  through the inside.

11  Q    Let me stop you -- let me stop you there.

12         THE COURT:  Wait.  We need to translate what he

13  said.

14         THE WITNESS:  And I looked at the door and I saw

15  the door that was there --

16         THE COURT:  Okay, now.

17  BY MS. MARTINEZ:

18  Q    And what did you see?  What were you saying?

19  A    I saw the door right in front, like this.  It was open.

20  The mirror was down.  In fact, everything was scattered

21  around, the cushions.

22  Q    Okay.  I'm showing you Defendant's Exhibit No. 15.

23  A    That door.

24  Q    So you're saying that -- now can you explain what this

25  door is, the one that I have the cursor, to the brown one?

1  A    That's right.

2  Q    What is that door?

3  A    That door leads to Garza's apartment.

4  Q    And to be clear, that's Apartment No. 1?

5  A    That's right.

6  Q    Okay.  What is this on the floor right here that I'm

7  pointing to that's on the ground?

8  A    That's a full length mirror.

9  Q    And where did you have this mirror?

10 A    Leaning against the door.

11 Q    Now what is this that I'm pointing to now, this black

12 thing?

13 A    It's a small refrigerator.

14 Q    Is that where you had the refrigerator?

15 A    That's right.

16 Q    That's where you --

17 A    No, no.  The refrigerator was back -- it was back.  I

18 had it there all the time.

19 Q    So let's just be clear.  The way the refrigerator or

20 where the refrigerator is located in this picture, that's

21 now how you had it, correct?

22 A    No.

23 Q    Okay.  What else did you see?  You said -- you said you

24 saw things all messed.  What else did you notice that was

25 different?

1   A    Everything from the shower was scattered around.  The

2   cushions were on the floor.

3         I had some shirts that I had hung up as if they

4   were a curtain and they were all thrown around.

5   Q    Okay.  What happened after you unlocked and opened the

6   door, what happened after that?  What did you do or where

7   did you go?

8   A    They said right away, "Put the other handcuff on him

9   and put him behind the white truck."

10  Q    Okay.  I'm going to show you Defendant's Exhibit

11  No. 12.

12  A    That truck.

13  Q    You're referring to this truck right here that's

14  directly in front of the door?

15  A    That's right.  They were holding me there.

16  Q    Okay.  And you -- another issue we've been talking

17  about is this form that you signed.  I'm going to be showing

18  you Defendant's Exhibit No. 11.

19         Do you remember signing this form?

20  A    I remember that piece of paper.  I remember it.

21  Q    Okay.  Where were you when this form was first shown to

22  you?

23  A    They showed it to me for the first time when I was

24  behind the white truck.  From the time I opened the door, it

25  was like maybe 10 minutes after that.

1    Q    And this was after they had already started taking

2    stuff out of your apartment, correct?

3    A    That's right.

4    Q    Now do you recall who brought you the form?

5    A    It was brought to me by some of the Sheriff's Deputies,

6    three of the Deputies.  And the others with the black vests,

7    they were a little far away.

8    Q    Okay.  And was this form explained to you by anybody?

9    A    No.  Not at all.

10   Q    So let me stop you there.  If you see in the top, is

11   that -- what does it say on the top, the name.  Is that your

12   name on the top?

13   A    That is my name.

14   Q    And who wrote that?

15   A    In fact, I can write very well.  I can write perfectly

16   well and you can see there how nervous I am.  I made a

17   mistake here.

18   Q    So who -- how did you know how to fill out this form?

19   A    I don't know.  They would just tell me, "Put your name

20   here.  Put it here."

21          And I had made a mistake.  I was going to write it

22   with a K and they said, "No, no, no.  With a Q."  So I --

23   they were telling me what to do.  I didn't know what to do.

24   I was really very intimidated.

25   Q    Were you handcuffed at the time you filled out this

1  form?

2  A     I was handcuffed.

3  Q     And how were you handcuffed?

4  A     They shifted the handcuffs to the front.  I had my

5  hands behind me, they shifted them to the front so that I

6  could write well.

7  Q     Okay.  Okay.  That's fine.

8         Did you feel that at any time during this event

9  that you were free to leave?

10  A     No.  How could I leave?  They had me in handcuffs.  How

11  could I leave?

12  Q     Were you at any time ever told that you could say, "I

13  don't want to give consent"?

14  A     No.  They didn't say that to me.

15  Q     Did you ever find out what it is that Defendant's

16  Exhibit No. 11 is?

17  A     No.  They didn't tell me that when I filled it out,

18  they took the piece of paper away.

19         When they took it away from me, one of the agents

20  said to me, "Hey, this is the permission you just gave to

21  us."  And I went like, "okay?"

22         MS. MARTINEZ:  Okay.  No more questions.

23         THE COURT:  All right.  From the Government?

24         MR. RAMIREZ:  Can we leave this exhibit up?

25         THE COURT:  Yes, sir.

1          CROSS-EXAMINATION OF JOSE ALONSO SALDANA-ALANIZ

2    BY MR. RAMIREZ:

3    Q    Looking at the consent form, which is Defendant's

4    Exhibit No. 11, so you had the paper for a while because you

5    filled it out?

6    A    No.  I was handcuffed.  I couldn't even hold it, just

7    the pen.

8    Q    Well, you said you were -- you wrote on it and you

9    wrote in different places there.  One, two, three, four,

10   five, six different places.

11          Did you write everything that's on there,

12   including your signature?

13   A    They told me how to do it because they had a board with

14   them where you could pieces of paper and I would use that

15   for support.  I would write everything they would tell me.

16   Q    You read and write Spanish; is that correct?

17   A    That's right.

18   Q    So while you were writing that, you read -- you also

19   had a chance to read that?

20   A    I never had that chance because they were just giving

21   me instructions on what to do.  And that was very quickly --

22   went very quick.  I didn't have time for anything.

23          If I had known what it was, I wouldn't have given

24   them any consent or any signature.

25   Q    You also said --

1          MR. RAMIREZ:  Oh, can we go to the lease

2   agreement?

3        (No audible response.)

4          MR. RAMIREZ:  Thank you.

5   BY MR. RAMIREZ:

6   Q    This is Defendant's Exhibit No. 9.

7          In front of the screen you see first page of a

8   lease agreement, Defendant's Exhibit No. 9, and it's between

9   Ramirez Resendez and Jose Cardena.  I don't see the name

10  Jose Saldana, Jose Alaniz, or any variation of your name.  I

11  see Jose Cardena.

12  A    I had to get an agreement with him and we had an

13  agreement.

14  Q    Is this the agreement?

15  A    That's right.  It's a human that said he would give it

16  to me, I still didn't have it in my hands.  But he was in

17  agreement, but to be in his apartment, there was an

18  agreement.

19          He still had not given it to me because I still

20  had some money to pay him and I still didn't have my ID.

21          That means we only had one more.

22  Q    So did you write the words "Jose Cardena" on this

23  document?

24  A    No, I did not write that.

25  Q    And did you read this document?

1    A    I read it, but he told me he was going to give me a

2    document, that there was already a document.  Maybe --

3            MS. MARTINEZ:  Your Honor, I believe that -- if I

4    may?  Mr. Resendez testified that he never gave him that.

5            MR. RAMIREZ:  Your Honor, it doesn't matter what

6    Mr. Resendez said.

7            THE COURT:  I know, it's okay.  I don't know if

8    he's -- I don't know if that's an objection to the line of

9    questioning, but continue with the questions.

10           Any objection is overruled.  You can ask him.

11   BY MR. RAMIREZ:

12   Q    So you saw this document is what you just said.  This

13   is the document he was going to give you.

14   A    The document he was going to give me, that he had

15   already told me that he had the document.

16   Q    So you're saying you -- so you have seen it or you have

17   not seen this before?

18   A    I couldn't have the document because I had not finished

19   paying him, but we did have a mutual agreement.

20   Q    Was the use of this document part of the agreement?

21   A    He would tell me something like that, like he was going

22   to hand me the document as long as I finished paying him.

23   Q    What did you tell him your name was?

24   A    Well, I don't know.  He must have gotten confused or he

25   has way too many things on his mind or he forgets things, I

1  don't know, but the one that he did not forget was Jose.

2  Q    What name did you tell Mr. Resendez that -- what did

3  you say your name was to Mr. Resendez?

4  A    Jose Saldana on the first day, the second day, the

5  third day, and the rest of those things he must have

6  forgotten.

7         So then he would forget about his son, but I don't

8  want to get into personal things.

9         But as far as there being an agreement, there was

10 an agreement.

11        MR. RAMIREZ:  I'll pass the witness, Your Honor.

12 Thank you.

13        MS. MARTINEZ:  We rest, Your Honor.

14        THE COURT:  Okay.  I have a few questions of this

15 witness.

16        Can we put up on the overhead screen, Defendant's

17 Exhibit 11, the written consent form?

18     (Pause in the proceedings.)

19        THE COURT:  That's it there.  Okay.

20        EXAMINATION OF JOSE ALONSO SALDANA-ALANIZ

21        BY THE COURT:  Mr. Saldana, can you -- are you

22 able to read that document there on your screen that's in

23 front of you?

24        THE WITNESS:  Everything?

25        THE COURT:  Yeah, I'm just asking is it big enough

1  that you -- are the letters big enough that you can read it?

2           THE WITNESS:  Oh, yes, yes.

3           THE COURT:  Okay.  Now my next question is:  Are

4  you able to read that language of that form?

5           THE WITNESS:  That's right.

6           THE COURT:  Okay.  I think it was asked earlier,

7  you are able to read Spanish; is that correct?

8           THE WITNESS:  That is correct.

9           THE COURT:  You said -- what was your testimony

10  about how far you went in school?

11           THE WITNESS:  College school -- college.

12           THE COURT:  Okay.  That's college level school in

13  Mexico?

14           THE WITNESS:  That's right.

15           THE COURT:  Okay.  So look at the language down

16  towards the bottom of the form, like the sentence that

17  starts with "Lo tiendo que."  Do you see that sentence?

18           THE WITNESS:  That's right.

19           THE COURT:  Okay.  I don't know if you've already

20  read this form before now, but I want you to just tell me,

21  do you understand that language?  Do you understand what

22  that means?

23           THE WITNESS:  As I read it right now.  It says, "I

24  understand I have a right to refuse to give my consent to

25  the search, as described above, and to refuse to sign this

1    form.  And I further declare that no promises, threats,

2    force or coercion, physical or mental, of any sort has been

3    used against me to make me give my consent to search what

4    has been described above or to sign this form."

5            THE COURT:  Okay.  So again, two separate

6    questions.  First of all, do you understand what the

7    language that you just read, do you understand what that

8    means?

9            THE WITNESS:  Now I do understand it.

10           THE COURT:  Okay.  Separate question:  Did you

11   read that language before you signed this form on June 1st

12   of 2022?

13           THE WITNESS:  No, Your Honor.

14           THE COURT:  Okay.  Was -- at any time before you

15   signed the form, was the form read to you by anybody?

16           THE WITNESS:  No, Your Honor.

17           THE COURT:  Before you signed that form, the

18   consent form, did anybody explain the form to you?

19           THE WITNESS:  No, Your Honor.

20           THE COURT:  Okay.  Your testimony is they just

21   handed you the form and told you to fill out some of it and

22   just to sign it, and that's all they told you, that's your

23   testimony?

24           THE WITNESS:  That's right, Your Honor.

25           THE COURT:  All right.  So with that, any

1   follow-up questions from the Government?

2          MR. RAMIREZ:  No, Your Honor.

3          THE COURT:  Any follow-up questions from the

4   Defense?

5          MS. MARTINEZ:  No, Your Honor.

6          THE COURT:  All right.  Then you may step down

7   from the stand, Mr. Saldana.  Thank you.

8          THE WITNESS:  Thank you very much, Your Honor.

9       (Witness steps down.)

10          THE COURT:  All right.  So the Defense does rest

11  then?

12          MS. MARTINEZ:  Yes, Your Honor.

13          THE COURT:  Okay.  I don't know, does the

14  Government have any other evidence?  Any rebuttal, or

15  otherwise, I don't know if you're entitled to it, but just

16  let me know if you have any other evidence, Mr. Ramirez?

17          MR. RAMIREZ:  No, sir.  That's it.

18          THE COURT:  Okay.  So that will then -- any other

19  exhibits that you-all -- I don't know if there was reference

20  to any other documents or recordings, anything else you're

21  thinking about that you want to introduce at this time

22  before I close the evidence for this hearing?

23          Anything from the Government, Mr. Ramirez, that

24  you're thinking about?

25          MR. RAMIREZ:  The only things, Your Honor, would

1  be --

2         THE COURT:  There was not -- I'm not suggesting

3  anything for one side or the other, but there was a

4  reference to some language from one of the law enforcement

5  agents or officers report.  I don't know that that means you

6  want to introduce the report, but there was a reference to a

7  report.  But I just wanted to make sure because this is it.

8         MR. RAMIREZ:  There is an incident report by

9  Ismael Garcia that I would like to introduce, Your Honor,

10  and was made reference to not only during this testimony,

11  but other testimony with other individuals, that also

12  provides a bearing on the time.  And also, the Defendant

13  testified that he was stopped by Corporal Garcia and it's in

14  this report --

15         THE COURT:  Well, you have not offered that

16  document as an exhibit already?

17         MR. RAMIREZ:  No, Your Honor.

18         THE COURT:  Do you have a copy of it?

19         MR. RAMIREZ:  I'd like to do it now, yes.

20         THE COURT:  Can you show it to the other side and

21  make sure they understand what document you're talking

22  about?

23      (Pause in the proceedings.)

24         MR. RAMIREZ:  It provides a timeline, Your Honor.

25  May I just stamp it?

1          THE COURT:  Is there any objection to the

2    admission of this additional exhibit?

3          MS. MARTINEZ:  Well, Your Honor, I think there was

4    a timeline to show the initial stop of my client, but I

5    don't think it has any timeline as to what happened

6    afterwards, so I don't see how it's relevant to the issues

7    here.

8          THE COURT:  So it's a report about the initial

9    traffic stop?

10         MR. RAMIREZ:  It's a report about the different

11   matters that were -- about a different traffic stops, and

12   also, the -- Garcia going to the apartment and he recognized

13   Mr. Alaniz, the Defendant from the previous traffic stop,

14   who identified himself as "Jose Saldana."

15         And it also provides a timeline of when the

16   traffic stops occurred, which may be helpful.  Unless the

17   Court is comfortable with the time frames that have been

18   presented during examinations.

19         THE COURT:  Well, I mean, you can only -- I mean,

20   if the only real -- you know, in terms of time frame, the

21   only real thing that it adds is the timing of the traffic

22   stops that occurred before the officers approached the

23   property or the scene, I don't know, what is this -- is this

24   -- I just happened to flip open this page here, but is this

25   a document -- my question was going to be:  Is this a

1  document that has already been attached to any of the

2  Government's briefing that's been filed in this case?

3      MR. RAMIREZ:  Not in the briefing, Your Honor, but

4  I believe it was attached to --

5      THE COURT:  I thought I'm seeing here, I just

6  happened to flip open, and it's --

7      MR. RAMIREZ:  And it's sealed.

8      THE COURT:  -- a page of -- looked like it was

9  maybe part of Sarquiz's report.  I don't know if it's the

10  same one, but Webb County Sheriff's Office incident number,

11  and then it has the name, Garcia, Ismael.  Is that --

12      MR. RAMIREZ:  Yes.

13      THE COURT:  -- and it has a case number of 2022

14  0009041, 4?

15      MR. RAMIREZ:  That's correct, Your Honor.  It's a

16  one-page document, six paragraphs.  The last paragraph is a

17  single sentence which reads:  "The following events

18  described on Investigator Sarquiz's report," and it is

19  supplied by Defense as Defendant's Exhibit -- Sealed

20  Exhibit C to their Supplemental briefing.

21      THE COURT:  Yeah, so -- I mean, my only point

22  about that is, is that it was previously produced.  I mean,

23  you-all have seen it.  I don't know -- is -- Ms. Martinez,

24  if you -- are you objecting based on relevance?

25      MR. RAMIREZ:  May I just add something, Your

 1   Honor?

 2              THE COURT:  Yes.

 3              MR. RAMIREZ:  If the Court is going to be looking

 4   at the sealed exhibits, then I'll withdraw my request.

 5              THE COURT:  No, I wanted -- I mean, to the extent

 6   -- I only intend to refer to the evidence that is presented

 7   during this hearing was my intention.  So if you-all intend

 8   for the Court to consider any evidence, it would be -- this

 9   is the evidentiary hearing, so it would need to be

10   introduced during this hearing.

11              MS. MARTINEZ:  Your Honor, if the Government wants

12   to introduce that, we have no objection to it.  I mean, I

13   don't think it's relevant.

14              THE COURT:  Okay.  I don't know that it's, you

15   know, anything in particular -- does anything one way or the

16   other, but to the extent you want -- you're offering it,

17   Mr. Ramirez?

18              MR. RAMIREZ:  Yes, Your Honor.  Offer it so we're

19   not --

20              THE COURT:  Okay.  So mark it, tell me the number,

21   and --

22              MR. RAMIREZ:  It would be Government's No. 9, Your

23   Honor.

24              THE COURT:  Okay.  Any objection by Defense?

25              MS. MARTINEZ:  No, Your Honor.

1    THE COURT:  Okay.  Government's Exhibit No. 9 will

2  be admitted.

3       Anything else, Mr. Ramirez?

4       MR. RAMIREZ:  No, sir.  That's it.

5       THE COURT:  Okay.  Defense, anything you have?

6       MS. MARTINEZ:  Yes, Your Honor.  We would like to

7  offer and admit as Defendant's Exhibit No. 27.

8       THE COURT:  Just being your next number?  Oh, what

9  is that?  What's your --

10       MS. MARTINEZ:  We would like to submit TFO

11  Morales's report investigation, Report No. 1.

12       And by the way, Your Honor, it's -- Report No. 1

13  is covered up, but anyhow, Report No. 1 is covered up, but

14  this is his report of investigation.  He did testify to it

15  today.  And we believe this is relevant.  It shows the

16  information that he overheard Gonzalez giving to Agent

17  Ensley regarding the statements of what happened when

18  Gonzalez entered and did, in fact, find the ammunition

19  boxes.

20       THE COURT:  Okay.  Mr. Ramirez, any objection?  In

21  this looks similar to, are you referring to actually looks

22  like maybe again, this was something that the Government --

23       MS. MARTINEZ:  It's our exhibit, Your Honor, the

24  sealed Exhibit E.  It was filed with our supplemental

25  briefing and we sealed it.

1    THE COURT:  Okay.  So I mean, my only point about

2 that is Mr. Ramirez, you should have seen it before.  Are

3 you familiar with it?

4    MR. RAMIREZ:  I'm familiar with it.

5    THE COURT:  Any objection?

6    MR. RAMIREZ:  No.  I have no objection, Your

7 Honor, and the only thing I'd like to point out to the Court

8 is it doesn't bother me, but there are three attachments

9 that make this a complete report, which would be a report

10 from Webb County, Sheriff's Office, a written consent form

11 signed by the Defendant Saldana and the witness statement

12 from Eduardo Garza.

13    The witness statement is already -- well, actually

14 it's not in evidence.  It's one of the exhibits.  The

15 consent form is already in evidence, and the entire report

16 from -- that was prepared by Investigator Sarquiz, is not --

17 has not been offered or admitted.  I don't intend to,

18 either.  But it is part of the official report --

19    THE COURT:  Okay.

20    MR. RAMIREZ:  -- that they are referring to.

21    THE COURT:  I understand that, but I mean, it

22 sounded like you were saying under the Rule of Optional

23 Completeness, you were saying that the complete part of this

24 report of Agent Morales' report, it looks like -- I'm

25 looking at a --

1        MR. RAMIREZ:  So I think the whole -- her whole

2   report should be included because the Court already has the

3   other attachments.  So I request that what has been provided

4   as the complete report be introduced as their exhibit, and I

5   would have no objection.

6        And I have a copy of it here.

7        THE COURT:  Well, okay.  So you're -- you-all just

8   need to understand I guess what you're saying then the

9   entire report of Investigator Sarquiz should be introduced

10  is what you're saying?

11       MR. GUERRA:  Your Honor, I think what he --

12       MR. RAMIREZ:  That's what I'm saying.

13       MR. GUERRA:  I think what he's referring to -- and

14  part of it is already in evidence, Your Honor, because we

15  introduced -- if I'm not mistaken, we introduced Sergeant

16  Gonzalez' report, which is part of the package that

17  Mr. Ramirez is referring to, the Webb County report.  All of

18  it is -- it's a series of reports, including the one that he

19  was going to offer, Corporal Ismael Garcia's report,

20  Sergeant Gonzalez's report, and then there's a couple of

21  other officers who wrote reports, and so.

22       MR. RAMIREZ:  That's not entirely correct.

23       MR. GUERRA:  That's not the whole report?

24       MR. RAMIREZ:  As part of this report, as part of

25  the ATF report, number one, the ORI, it's only the pages

1   that were submitted because the other reports were submitted

2   later.  They're part of their other reports.

3           MR. GUERRA:  That's not correct.

4           MR. RAMIREZ:  That's fine.

5           MR. GUERRA:  That's not correct then.  I thought

6   you were referring to the whole Webb County report.

7           THE COURT:  Well, okay, so look.  Ms. Martinez,

8   when you say we want to introduce, we're offering as an

9   exhibit, the report of Agent Morales, who many pages is

10  that?

11          MS. MARTINEZ:  It's two pages.

12          THE COURT:  Just that, and I think I'm looking at

13  that.  That's prepared by Agent Morales and it's two pages.

14          And it says -- it has page -- at the bottom it

15  says, "Page 1 of 2, and page 2 of 2."

16          MS. MARTINEZ:  That's correct, Your Honor.

17          THE COURT:  Mr. Ramirez, as part of that report,

18  are you saying that there are any other documents that were

19  attached to that report that were incorporated in that

20  report or whatever you say should be included under the Rule

21  of Optional Completeness?

22          MR. RAMIREZ:  Yes, Your Honor.

23          THE COURT:  Being what?

24          MR. RAMIREZ:  Being the offense incident report

25  that has the name at the bottom, "Victor Ninke (phonetic),"

1  which is one of six and there are six pages and six page are

2  -- the first is the offense --

3          THE COURT:  Okay.  Well, I haven't seen that.

4  Well, wait, if you're going to refer to that, because I'm

5  referring to what's marked as "Defendant's Exhibit A,"

6  sealed exhibit that was attached -- that's marked in the

7  Record as the CM/ECF Docket No. 48-1, and it's CM/ECF pages

8  1 and 2, but I don't know, what you're referring to, I don't

9  think is part of what I'm looking at here.

10          MR. RAMIREZ:  May we have just a moment?

11          THE COURT:  Yes.  You-all look and confer.

12      (Pause in the proceedings.)

13          THE COURT:  And Counsel, let me just say this

14  while you're looking at it.  Look, part of my point was if

15  this information had already been exchanged or attached to

16  the briefing that had been filed in the case, well then, as

17  a general rule I most likely would say I don't have a

18  problem with it being introduced because, you know, you-all

19  should have had time to look at it and anticipate that the

20  other side is maybe going to rely on it here in the hearing,

21  or talk about it.

22          If it's a new document that hasn't been talked

23  about and we close the evidence with the witnesses who can't

24  testify about it, I'd be a little concerned about that if

25  there was any objection to it.

1        But anyway with that comment, you-all continue

2   because I don't think -- yeah, and so, anyway, continue.

3        (Pause in the proceedings.)

4        MR. RAMIREZ:  I'm going to go ahead and concede

5   what they're asking for, Your Honor, just the two pages.

6        THE COURT:  Okay.  Well, in other words, you're

7   not going to object then to the --

8        MR. RAMIREZ:  I'm not going to object.

9        THE COURT:  -- two-page report.

10       MR. RAMIREZ:  Just quickly add just as long as

11  it's clear that the only thing missing is the Webb County

12  report that was provided at the time, but then I'm thinking

13  about it, it's not the complete report.  It's only a portion

14  of the report that was submitted to the Agent when he

15  prepared the report, but it really has no -- you've already

16  heard substantially everything else.

17       So I don't think there's a point -- thank you.

18       THE COURT:  Okay.  So Defendants are offering

19  Defendant's Exhibit --

20       MS. MARTINEZ:  27, that's I've lost already.

21       THE COURT:  It's two pages that need to be stapled

22  together -- or I'll be able to scan it.

23       And then any objection from the Government to

24  Defendant's Exhibit 27?

25       MR. RAMIREZ:  No, Your Honor.

1          THE COURT:  All right.  Defendant's Exhibit 27 is

2    admitted without objection.

3        (Defendant's Exhibit No. 27 received in evidence.)

4          THE COURT:  I don't know if I have Government's

5    Exhibit 9 that you just been admitted.

6          Now all this will be under seal.  Gabby, make sure

7    that all of the exhibits from yesterday and today are under

8    seal.

9          THE CLERK:  Yes, sir.

10        (Pause in the proceedings.)

11          THE COURT:  We're missing Exhibit No. --

12          MR. RAMIREZ:  No, I have it, I have it.  The only

13    thing is I can't find my exhibit stickers, Your Honor.

14          THE COURT:  Hold on.  We'll see if we can get you

15    one.

16          MR. RAMIREZ:  Sorry.

17        (Pause in the proceedings.)

18          THE COURT:  Okay.  While Mr. Ramirez is doing

19    that, anything else from Defense?

20          MS. MARTINEZ:  No, Your Honor.

21          THE COURT:  Okay.  Anything else from the

22    Government?

23          MR. RAMIREZ:  No, sir.  Thank you.

24          THE COURT:  All right.  Then that closes the

25    evidence in this case in this hearing in this matter.

1        (Pause in the proceedings.)

2            THE COURT:  All right.  So now, argument --

3    closing argument -- well, let's start.  I guess Defense,

4    it's your motion, I'll -- unless you prefer for the

5    Government to go first, I can let you start with your

6    argument and give you some rebuttal time.

7            MS. MARTINEZ:  Thank you, Your Honor.

8            THE COURT:  So go ahead and start.  We'll see how

9    much time you feel like you need.  Let's say 15 minutes to

10   start with and then we'll go from there to see how we're

11   doing.

12           MS. MARTINEZ:  Okay, Your Honor.

13           THE COURT:  Wait, hold on a second.

14           MS. MARTINEZ:  Uh-huh.

15       (Pause in the proceedings.)

16           THE COURT:  All right.  Ms. Martinez, do you want

17   to proceed?

18           MS. MARTINEZ:  Thank you, Your Honor.

19            CLOSING ARGUMENT ON BEHALF OF DEFENDANT

20           BY MS. MARTINEZ:  Well, there are several layers

21   that we have at issue here.  First, Your Honor, we have the

22   initial and the entry through the adjoining door from

23   Apartment 1 into my client's efficiency and the issue is

24   whether that was justified as an exception to the warrant

25   requirement.

1       The other issue is whether my client's subsequent

2  alleged consent, whether that's consent to search, whether

3  that dissipated the taint of the -- what we say is the

4  violation, the initial entry.

5       So as far as the initial entry is concerned, Your

6  Honor, whether or not this warrant -- this entry was

7  justified as an exception to the warrant requirement, we

8  submit that it was not justified and it is not found under

9  any of the exceptions.  There are many facts that are in

10 dispute here, but the few things that are not in dispute is

11 that the day when this operation took place, June 1st, 2022,

12 the focus was what was behind the door facing the street,

13 the white metal door.  That was the operation.  They want to

14 get to see what was behind that front door.

15      That was their intention and they were going to

16 try any way they could to get into that door, and what

17 better way to do that was by going in through Apartment

18 No. 1.

19      One of the Government's witnesses, and I forget

20 which one, did testify that they suspected that Mr. Garza,

21 the shirtless man, the tenant of Apartment No. 1, that he

22 was involved based on his suspicious behavior.  And so it's

23 our position that what they did was they decided to do this

24 supposed consensual knock-and-talk with a SWAT team in full

25 gear, minus their helmets.  And they used the excuse of

1  conducting this child welfare check with the SWAT team to
2  get into Gus's apartment.

3          SWAT is meant to break down doors, not conduct
4  consensual knock-and-talks and much less meant to terrorize
5  children by doing simple welfare checks on them.

6          The intentions were clear that day, Your Honor.
7  The intention was to get into that efficiency.  The
8  Government or the Agents here, they used the excuse of
9  securing the children as a reason to move the sofa and go
10 inside, but yet, through the testimony of Sergeant George
11 Martinez, he confirmed that he had already found the
12 children instantaneously.  He got in there and as soon as --
13 he could see the little feet and they were secured and he
14 announced that they were secure, but then he waited inside
15 until the operation was clear.

16          Sergeant Gonzalez, saying that he was looking for
17 the children and it was really important to search for them,
18 I mean, that's his -- I'll say his credibility is in
19 question, Your Honor, because based on what Sergeant -- TFO
20 Morales has said in court today, he confirmed that, you
21 know, Gonzalez found the ammunition and Gonzalez on the
22 stand denied finding anything.

23          And so that is all very suspect here.

24          THE COURT:  Well, let me ask you about that.  I
25 don't know if it's better to interject my questions while

1   you're talking or wait till the end, so wait, is it your

2   assertion or argument that there's two ways to interpret

3   that, that Sergeant Gonzalez either really didn't see the

4   ammunition and just said that later and made that up, or

5   that he really did go around and dig through everything upon

6   that first entry into the efficiency from Apartment No. 1,

7   that he really did dig around and discovered the ammunition,

8   but just didn't say anything until just --

9           MS. MARTINEZ:  Never said anything.

10          THE COURT:  -- never said anything.

11          MS. MARTINEZ:  That's correct, Your Honor.

12          THE COURT:  Okay.

13          MS. MARTINEZ:  It's our position that Gonzalez

14  went in there and did a search.  It's our position that he

15  went in there, moved stuff around, and as TFO -- I'm sorry,

16  TFO, if I'm getting your -- TFO?

17          MALE SPEAKER:  Yes.

18          MS. MARTINEZ:  TFO Morales testified he found the

19  ammunition and to find the ammunition, you have to move

20  stuff around.  You have to move cushions, blankets and he

21  found it.

22          THE COURT:  Okay.

23          MS. MARTINEZ:  And that's confirmed -- I mean,

24  well, when my client testified, he told the Court that when

25  he opened the door, it was like a tornado.  He could see

1  everything on the floor.

2          And so -- and to add to that, when Sarquiz

3  testified when Mr. Guerra asked her this question, he asked

4  her, "Did you take pictures?"

5          "Yes, I did."

6          "Do you remember if you took them before or after

7  the search?"

8          And at first her answer was like, "I don't

9  remember."

10         And so Mr. Ramirez cleared that up and you know,

11  she then said, "I took them step-by-step," but you know, to

12  his credit, I believe Mr. Morales was, you know, very

13  credible today on the stand and then he said that I believe

14  in what he heard.  He heard what he heard and it's our

15  position that Gonzalez did go in there and it's our position

16  that Gonzalez did search and find something.

17         And to add to that, Your Honor, if the Court will

18  recall Ayala's testimony -- now Ayala is the person who says

19  that he was strong enough to move the couch with one arm,

20  this heavy couch, and he says that when he went inside, as

21  they were leaving, Gonzalez tells him, "We're going to need

22  a warrant."

23         Why would he need a warrant?  He would need a

24  warrant because he saw the contraband and now he developed a

25  PC, a probable cause, to secure this warrant.  And so that's

1   why it's our position that he did that.

2          So as far as there being a good faith exception or

3   an exigency, there is no exigency.  Gonzalez had -- Garza

4   had already told them, "I've got three kids."  They were

5   found immediately.  The timing doesn't make any sense, Your

6   Honor, for them to -- you know, you have one coming to this

7   over here, seeing the kids, moving the couch takes longer

8   than that.  So it's our position that the couch was moved

9   after the kids were secured and then the entry was made.

10         We would also add that, you know, not only did

11  that happen, but Garza was present and Garza said, "Hey, you

12  can't do that.  That's not my room."

13         And we believe -- if we believe what Mr. Morales

14  said on the stand, when Gonzalez was searching and found the

15  ammunition, that places Garza in the apartment.  For Garza

16  to tell Gonzalez, "That's not mine."  That means he was in

17  there as he testified.  He was there and he saw him moving

18  stuff around.

19         And so we know -- again, we don't think that there

20  was any good faith in that.  We don't think that there is

21  any -- if I can just look at my notes real quick and see?

22      (Pause in the proceedings.)

23         MS. MARTINEZ:  Also, Your Honor, I find it suspect

24  that -- it doesn't make any sense that Gonzalez would go

25  into the room until he opens the room facing the street to

1  realize I'm in someone else's apartment.  That just -- it

2  just makes no sense.  It makes no sense at all.

3       He knew what he was there to look into.  They got

4  there.  I think Sarquiz even said that, you know, they

5  assumed everything was connected.  Agent Schlup also

6  testified that to his understanding, it was all connected.

7  There was an entrance on the left, entrance on the right,

8  and then the front entrance.

9       And so going in through Apartment No. 1, it's our

10  position that law enforcement knew that that door leading

11  into the efficient was the target door.  It wasn't just an

12  accident that they stumbled into there, Your Honor.  It was

13  intentional, it was deliberate.  They knew what they were

14  doing, and what was also suspect is that they did not

15  document any of that in their reports, as far as the sofa is

16  concerned.

17       If they really did have a good faith reason for

18  doing so, why not include it in the report?  Why not cover

19  their tracks and say, you know, we did move a sofa, but

20  there was an exigency.  We were looking for the kids.  It

21  was an emergency situation.  We couldn't find them, but they

22  excluded that, Your Honor.  They did not talk about that,

23  and so, again it's our position that it was not done in good

24  faith and there was no exigency to enter and therefore, the

25  search was not justified -- the initial search was not

1  justified.

2        Now if I could just look at my notes real quick?

3     (Pause in the proceedings.)

4        MS. MARTINEZ:  Now as far as consent, Your Honor,

5  that's the second issue here.  The next determination that

6  the Court has to make is whether or not the consent was

7  voluntary.  So we have two consents here -- two alleged

8  consents:  One, the oral consent and then the written

9  consent.  And it's our position that both of those consents

10  were not valid and therefore did not remove the taint of the

11  initial violation.

12        The case law is clear, there's these elements that

13  we have to go by and if I can just read from this real

14  quick?

15        So there's a two-pronged inquiry on this, whether

16  the consent was voluntarily given, and whether the consent

17  was an independent act of free will.

18        And so as far as to determine whether the consent

19  was voluntarily given, the Court has to consider these

20  factors:  The voluntariness of his custodial status.  So was

21  he voluntarily in custody?  No, he was not, Your Honor.  He

22  was detained.  He was handcuffed.

23        The presence of coercive police procedures, I

24  would say they were pretty coercive here.  I mean, he was

25  surrounded, some of them with large rifles.  There was -- I

1  mean, that's intimidating.

2         The extent and level of his cooperation, well, he

3  was cooperative, but as the Record shows, he had already

4  made a prior statement that he was afraid of the police.  He

5  had a bad experience with Mexican police and so he had been

6  afraid.

7         As far as his awareness of his right to refuse

8  consent, there -- as he testified to Your Honor, he did not

9  know he could refuse consent.  As he stated, he never read

10  the form.  No one read him that form, that's our position.

11  He didn't know he could say no.

12         And just to talk about that a little bit more, so

13  what's in dispute, I think, was the -- is when was this

14  written consent given?  I think, based on the testimony of

15  all the -- most of the Sheriff's Deputies, it is agreed upon

16  them now or I think that the consent or the written consent

17  form was signed downstairs -- outside and downstairs.

18         And so my client testified, Your Honor, that as

19  soon as, you know, when they were upstairs, they came

20  straight down and they took him to the door.  Agent Schlup

21  confirms that.  Agent Schlup confirmed that, yeah, they

22  brought him down.  He went straight to the door and he found

23  it kind of weird that they actually un-cuffed him to allow

24  him to open the door.

25         So what does that tell us?  That written consent

1  was not signed prior to the search.  It wasn't signed until

2  after they already started their operation, they already

3  took out all the boxes and that's when they ended up getting

4  this consent.

5          I would argue, too, Your Honor, even if we were to

6  assume this consent is good, within the four corners of this

7  document, it's not.  Why?  Because the consent was for

8  Apartment No. 1, and we've established, my client was not a

9  tenant of Apartment No. 1.

10          THE COURT:  Excuse me, technically, I think the

11  terminology of that is it goes to the scope of the consent,

12  that the scope of at least the written consent that he gave

13  was not for the efficiency.

14          MS. MARTINEZ:  Thank you, Your Honor.  Thank you.

15          But that --

16          THE COURT:  That's your position?

17          MS. MARTINEZ:  -- the scope of it, yes.

18          But we still have the position, Your Honor, that

19  this consent was not voluntarily given.  I mean, it wasn't

20  informed.  It -- you know, it wasn't explained to him.  All

21  that happened was, they go up to him, here, put your name

22  here.  Sarquiz, Gonzalez, do this, do that, do that, sign

23  right here.  Okay.

24          And then what happens is, "Hey, Gonzalez, come

25  over here" -- or no, "Martinez, come over here.  Garcia,

1  come over here.  Sign right here.  You're witnesses."  And

2  that was it.

3       That's what happened because neither Garcia or --

4  well, Garcia doesn't remember.  Martinez -- that's my

5  impression -- Martinez just showed up and he was asked to

6  sign it.  He didn't even -- I don't think the evidence shows

7  that he even witnessed my client signing it.  Now I might be

8  wrong, but that's my recollection, am I right?  Uh-huh.

9       Yeah, I don't know, Your Honor, but that's my

10  recollection, so.

11       THE COURT:  There were a lot of witnesses and a

12  lot of testimony.

13       MS. MARTINEZ:  A lot of testimony, Your Honor, but

14  I don't think -- again, this consent form is not valid and

15  even if it was, I think Agent Schlup's testimony confirms,

16  it was given after.  So this written consent really -- like

17  it's nothing.  It doesn't have any -- it's not valid at all.

18       Now, another thing, just to -- I know there's been

19  some talk about the statements that he gave later on, hours

20  later.  And again, I don't think those are really an issue,

21  Your Honor, because it's our position that it's all the

22  fruit of the poisonous tree.  Even though he was Mirandized

23  and even though he was comfortable at that point, it doesn't

24  remove what happened before.  And so those statements should

25  also be suppressed.

1          THE COURT:  Okay.  I guess the thought occurred to

2     me, I mean there's -- and I understand your sensitivity

3     about this, but it was not introduced into evidence what his

4     statements were -- what the incriminating statements might

5     be, but I mean, without going into the details of it, is

6     there agreed or stipulated that during this interview that

7     occurred at the Webb County Sheriff's Station or Substation,

8     during that interview after he gave his Miranda Statement,

9     that he made incriminating statements or admissions?

10          MR. RAMIREZ:  Yes, Your Honor.

11          THE COURT:  So I mean, there's an understanding

12    that he made incriminating statements that it's Defendant's

13    position should be excluded as fruit of the poisonous tree?

14          MS. MARTINEZ:  Yes, Your Honor.

15          THE COURT:  I mean, so -- but whatever he said

16    during his interview, that should be excluded?

17          MS. MARTINEZ:  Again, and regardless of how

18    comfortable he was with them, regardless of him being

19    Mirandized, that is a result of a -- it is the fruit of the

20    poisonous tree of what occurred earlier, Your Honor.

21          So again, we believe that the search, the

22    warrantless search was unjustified, does not meet any of the

23    exceptions to the warrant requirement, and that the

24    subsequent alleged consent was not valid, not voluntary at

25    all.

1    THE COURT:  All right.  Okay.  Anything else,

2  Ms. Martinez?

3    MS. MARTINEZ:  That's all I can think of right

4  now.  But if I can have some time for rebuttal?

5    THE COURT:  I'll give you a chance to rebut.

6    MS. MARTINEZ:  Yes, Your Honor.  Thank you.

7    THE COURT:  Mr. Ramirez, can I -- well --

8    MR. RAMIREZ:  Sure.

9    THE COURT:  -- go ahead and start, Mr. Ramirez,

10 and I'll tell the questions.

11   MR. RAMIREZ:  No, that's --

12   THE COURT:  I have questions, but go ahead, start

13 and let's -- start -- well, I know, as an introductory

14 issue, Mr. Ramirez, is the Government contesting that -- or

15 agreeing that Mr. Saldana has standing to challenge the

16 constitutionality of the search of the efficiency?

17   MR. RAMIREZ:  Yes.  The Government does not

18 contest -- conceding -- does admit that and in fact, in our

19 briefing I said that there was plenty of evidence that

20 pointed that he had standing because of the testimony we

21 also heard, but that we had beforehand about a lease.  The

22 landlord's testimony, which we also had, and Mr. Garza

23 telling us about -- telling the Agents that someone else

24 lived there, and so because there's a lease of some kind,

25 that he has standing as a --

1    THE COURT:  Okay.

2    MR. RAMIREZ:  -- not because of a privacy

3 interest, but he has a legal right to that area.

4    THE COURT:  Right.  And as I understand the

5 landlord's testimony seemed to be that he understood that he

6 had an agreement with Mr. Saldana to rent that efficiency.

7 That was my understanding of his testimony.  I asked him,

8 "Do you know who you're dealing with here," because despite

9 whatever name was on that written lease document, he said he

10 asked what that meant.  I understood that I had a lease

11 agreement.

12    So whether written or oral or whatever, that was

13 my understanding of the testimony from Mr. Resendez -- yeah,

14 I think.

15    MR. RAMIREZ:  Yes.

16    THE COURT:  And then, of course, Mr. Garza aka

17 shirtless man, you know, also seemed to be his understanding

18 that that is a separate area that belongs to -- for lack of

19 a better technical term -- belongs to this Mr. Saldana.

20 That's not -- certainly he said, "That's not part of my

21 lease agreement."

22    So okay, but anyway, but regards my impression of

23 the evidence is the Government, so you're not challenging

24 his standing to raise the Fourth Amendment violation issue

25 as to the efficiency?

1          MR. RAMIREZ:  That's correct, Your Honor.

2          THE COURT:  Okay.  All right.  So that's that

3    issue.

4          MR. RAMIREZ:  That's right.

5          THE COURT:  So then you can continue with, you

6    know, the circumstances under which the officers, the

7    Agents, law enforcement enter -- I guess starting -- what --

8    however you want to proceed with your argument.

9          MR. RAMIREZ:  Thank you, Your Honor.

10          CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

11          BY MR. RAMIREZ:  I'm not going to be as detailed

12    or eloquent as Ms. Martinez, but nevertheless, the reason

13    the officers were there were because of a tip.  The tip

14    involved ammunition and drugs.  And as law enforcement --

15    and I think Agent Schlup testified, another testified that

16    any time you have that kind of a concern, that you need to

17    have a standby SWAT presence, which was not the intent at

18    the beginning.

19          I think Sergeant Gonzalez said that.  The -- Agent

20    Schlup said that, and several others.  The intent was to

21    conduct surveillance.  And that was not disputed whatsoever.

22          The later circumstances are called into suspicion

23    by Defense, but ultimately the reason for being out there to

24    conduct surveillance is because of this tip about ammunition

25    and about drugs, which is a bad combination.

1    So they're conducting surveillance.  In the course

2  of the surveillance, they see certain behavior, and I don't

3  think that behavior was contradicted or that those

4  observations were contradicted by any witness, that

5  essentially there was a person.  Two witnesses said it was a

6  shirtless man who was -- who kept going out to the street

7  area on his phone, looking around, and I think that he also

8  -- there's also testimony that at some point there was --

9  there were vehicles -- multiple vehicles coming and going

10  from the apartment and the suspicion was that that traffic

11  was due to persons or couriers or others leaving with the

12  evidence, that perhaps somebody might have already

13  identified surveillance because of an initial traffic stop

14  or for whatever other reason.

15    And so as a result of that, the officers decided

16  to do -- not a breach, but a -- to attempt a knock-and-talk.

17  And as Agent Schlup told us the difference between a

18  knock-and-talk and a knock-and-announce, the idea was to go

19  and knock on the door.  And several witnesses -- yes, sir?

20    THE COURT:  Go ahead.  Finish that though.

21    MR. RAMIREZ:  -- at least two from the Sheriff's

22  Office, and stated that if they were going to attempt to

23  knock on that door, that metal door, the efficiency of which

24  they had no -- they thought was just another entrance to the

25  apartment, Apartment 1 I guess is what they're saying --

1     that if there had been no consent given that they would be

2     -- that they would just seek other means.

3         So there was no intent -- at least at that point,

4     to go into the apartment without a warrant.

5         THE COURT:  So my question there is:  I mean, so

6     is it the Government's position that at that point, they

7     approached the premises, the property, to do a knock-and-

8     talk that they did not have probable cause to search the

9     premises?

10         MR. RAMIREZ:  That's absolutely right.

11         THE COURT:  All right.  And I think even at least

12     one of the witnesses of law enforcement testified to that

13     and said, "No, that didn't have probable cause."

14         MR. RAMIREZ:  That's right.

15         THE COURT:  Because to hear the facts as you just

16     summarized are the types of facts you might hear sometimes

17     of law enforcement, Government taking the position that,

18     "Oh, this, plus this, plus this, plus this, equals that we

19     had probable cause to go into the property."  But that's not

20     the Government's position.  That whatever about that there

21     was a tip, that people were acting suspicious out and about

22     the property and vehicles coming and going, that that is not

23     the Government's position that that rose to the level of

24     probable cause?"

25         MR. RAMIREZ:  That's our position.

1          THE COURT:  Yeah, that's clear.

2          Okay.  So without probable cause, the Government

3  goes to -- now, okay.  Goes to the property, yes.

4          MR. RAMIREZ:  Because the only crime that had been

5  observed at that point occurred during the approach --

6          THE COURT:  Correct.

7          MR. RAMIREZ:  -- with these two other individuals.

8  At that point there's a crime and that's the only thing they

9  have probable cause because a crime had been committed in

10 their presence, which was smoking marijuana, although it's a

11 Class B misdemeanor, that's the only thing they have.

12         THE COURT:  Right.  At that point for Mr. Garza,

13 the shirtless man, and Mr. Anaya, I think was the person

14 that he was with outside of the parking lot.

15         Okay.  So then continue from there.

16         MR. RAMIREZ:  So the shirtless man, Garza, who is

17 the tenant of Unit 1 with his wife and three children, was

18 smoking marijuana with an individual who had marijuana and

19 Mr. Garza by his own testimony said, yes, I was smoking

20 marijuana.  I'll admit it.  And he's aware that it's a

21 crime.

22         Officers could have detained him, arrested him,

23 and taken him somewhere else.  So that would have led to an

24 inevitable discovery situation anyway because we would find

25 out that he lives in Unit 1.  And unless the wife would have

1  arrived to contest that, there's nobody there to take care
2  of the children.

3         So when that occurred, you have an individual
4  who's under arrest for violating a state law.  You have the
5  combination of the possibility of drugs and firearms, so the
6  officers acted appropriately when they found out that the
7  individual -- and again, this is not -- it kind of hooks
8  between arguing about standing into the apartment, Unit 1,
9  which there is no -- he has -- the Defendant has no claim
10 to, but it is how the officers got into the apartment in
11 order to eventually search the two bedrooms -- what they
12 thought were the two bedrooms.

13        So when Mr. Garza said that the children were
14 alone -- and there's no dispute about that -- that's when
15 the officers said they were going to conduct a welfare
16 check.  And I think the cases are clear that under certain
17 circumstances, and this is one of them, you had -- and he
18 described the children as being -- I think Mr. Schlup said
19 they were described as babies or infants, and I think
20 Mr. Garza testified that his children were --

21             THE COURT:  Yeah, almost a year.

22             MR. RAMIREZ:  -- one was almost a year, but they
23 were infants --

24             THE COURT:  Yeah, young children.

25             MR. RAMIREZ:  -- two were infants and the other

one was a little older than that. And another officer

testified they were in diapers.

I'm not suggesting that we knew that beforehand,

but for what Mr. Garza had said.

So Mr. Garza said that and he was handcuffed. A

decision had to be made about whether he was going to be

booked and arrested and so forth, but because there were

children there, the officer said, "Well, let's just go and

conduct a welfare check on the children, make sure that

because this shirtless man is out here doing all these

suspect things, that the children aren't -- well, one that

there's really children, and these are for the SWAT. But we

need to go and check on the welfare of the children.

THE COURT: Right. I mean, that's actually -- I

think that's undisputed. That I mean, both Garza and I

think Gonzalez both testified Garza said, "Hey, I told them

I had -- my kids were in there. I thought I might get

arrested. I told them my young children are in there and

that Gonzalez told him" -- well, he made it sound like Garza

actually used the words welfare check -- "We're going to do

a welfare check on your kids."

Factually, I think that's undisputed, but do you

agree with that, Ms. Martinez? Just factually, whether or

not you think legally that stands for whatever. I mean,

factually do you agree that's what the evidence shows?

1          MS. MARTINEZ:  Factually, yes, Your Honor.  They

2     were going to do a welfare check on the kids.

3          THE COURT:  Yeah, to go in -- to enter.  What

4     happened after that, I understand as you've already

5     articulated, that you have an opinion about what was

6     necessary in the scope of the welfare check, but okay.

7          So then Mr. Ramirez?

8          MR. RAMIREZ:  So they go -- Thank you.

9          So they do their approach to Unit 1 and the SWAT

10    group was because they were short manpower and some of the

11    officers in SWAT double as SWAT members, but because of the

12    concern that they had over the firearms and the marijuana

13    and the suspicious behavior, one of the vehicles having

14    eluded the officers that had just left the area and didn't

15    stop for -- after a traffic stop or something.

16         The officers then had a heightened sense of

17    suspicion about what might be happening, at the same time

18    having a concern for the children.  So those are the two

19    reasons --

20         THE COURT:  So Mr. Ramirez, I mean, you're saying

21    it's your position that -- the Government's position that

22    it's just to do a welfare check seems like somebody could

23    construe it as overkill to have a SWAT team go in to check

24    the welfare of three -- what was told to them to be three

25    small kids.

1    You're saying that well, there was a heightened

2  sense of safety concerns because at that point law

3  enforcement officers thought maybe they were entering the

4  apartment that was reported to have ammunition and drugs in

5  it?

6    MR. RAMIREZ:  Yes, Your Honor.

7    THE COURT:  That they didn't know that there was a

8  distinction between that it was a separate premises?

9    MR. RAMIREZ:  Yes, there were several officers who

10  testified and the Agent I believe thought it was an

11  apartment -- that all this was Unit 1, Apartment 1.  And

12  since the tip was about the door, there was no marking on

13  the door.  They thought maybe it was an entrance or exit,

14  that's why Agent Schlup was covering the backside or the

15  south side of the apartment -- or north, I don't remember

16  what he said -- the other side of the apartment is because

17  there might have been a back door.

18    So there are these factors that are all coming

19  into play.

20    You also have the concern that if they're going in

21  to look for children, maybe there are children, maybe there

22  aren't children.  The only person who said that there was

23  someone crying -- hear the children crying was in an

24  interview that was provided by the Defendant to Mr. Morales,

25  that's not in evidence, but ultimately that is the only

1  person who had made that comment about children crying.

2  THE COURT:  So but as far as what is in evidence

3  during this hearing --

4  MR. RAMIREZ:  I'll go back to it.

5  THE COURT:  -- is you're saying nobody said that

6  the children were crying, just that Mr. Garza said, "My

7  three children are in there?"

8  MR. RAMIREZ:  That's correct.

9  THE COURT:  All right.  I want to make sure.

10  MR. RAMIREZ:  No, no, sorry.  No, no.  I'm not

11  saying that.  I'm saying that this is outside of the Record

12  because I want to clarify --

13  THE COURT:  And that's not off the Record.

14  MR. RAMIREZ:  -- a point I made in my brief.  In

15  my brief I said that --

16  THE COURT:  I know, but hold on.  What the brief

17  is talking about is anticipated that the evidence will be,

18  it is anticipated that the evidence will be, so now when

19  you're talking about what the evidence was during this

20  hearing.

21  Mr. Guerra, what did you want to say?

22  MR. GUERRA:  I was just a little confused, Your

23  Honor, because I think he said the Defendant said that the

24  children were crying.  I don't think --

25  MR. RAMIREZ:  Not the Defendant.

1          THE COURT:  No, no, no.

2          MR. GUERRA:  I think he said Mr. Garza.

3          MR. RAMIREZ:  Mr. Garza, oh, I'm sorry.

4          MR. GUERRA:  He said the Defendant and I think he

5  meant --

6          THE COURT:  Oh, oh, certainly.

7          MR. GUERRA:  -- because he was pointing to the

8  witness chair.

9          THE COURT:  I understood we were talking about

10  Mr. Garza, but fair clarification.

11          MR. RAMIREZ:  So I'll move on.

12          So yes, so then I'm not going to worry about

13  things that are different from what was in my brief.  I just

14  wanted to advise the Court --

15          THE COURT:  Yeah, that's right.  I was confused.

16          MR. RAMIREZ:  -- that things turned out different.

17          Okay.  So then it's our position that what

18  occurred is when as the officers went and I think Agent

19  Schlup who has been -- was an officer for nine years and

20  involved with SWAT and did a lot of narcotics, and others,

21  he concurred with the decision to go do the welfare check

22  and to also have a SWAT presence.

23          And the SWAT presence was not a full SWAT,

24  everyone in their full SWAT regalia, some of them were, but

25  not all of them.  But the idea was, "We have only one person

1  telling us that there are children there.  We don't know

2  what we're walking into."

3          So in effect, they go and welfare check, but at

4  the same time, they have to guard themselves about the

5  possibility of there being ammunition, drugs, possibly other

6  things, and perhaps other -- some bad guys in there.

7          So that's why they were going with that kind of a

8  presence; otherwise, --

9          THE COURT:  I understand.  I understand your

10 argument on that.

11         MR. RAMIREZ:  Okay.  So --

12         THE COURT:  So they go in, there's Georgy Martinez

13 goes forward and finds the children in the bedroom.

14 Sergeant Gonzalez says he takes an immediate right, goes

15 into the door, he and/or Corporal Ayala moved the couch out

16 of the way and go into the -- Sergeant Gonzalez certainly

17 enters the efficiency?

18         MR. RAMIREZ:  Yes.  There's no question about

19 that.

20         THE COURT:  Of course, right.  But he --

21         MR. RAMIREZ:  The door --

22         THE COURT:  -- one way or the other, he does enter

23 the efficiency.

24         MR. RAMIREZ:  He enters the efficiency and

25 which --

1    THE COURT:  And look, I don't know how much we

2  need to -- he says, "Hey, I was" -- you know, "We were doing

3  what we were doing.  I went through the door because I had

4  to check it."  He says he shortly thereafter realized that

5  he was in a separate residence for whatever word we want to

6  use for that, premises, and told Sergeant Ayala to turn

7  around and leave.

8    MR. RAMIREZ:  That's correct.

9    THE COURT:  Now Defense says, "Hey, but what does

10  it have to do with anything?"  Then he says, "Oh, here's a

11  door."  That makes me realize this is a separate premise.

12    MR. RAMIREZ:  When he walked out, I think the

13  exhibits will show -- or the exhibits have been tendered,

14  especially one of the later ones, 20 -- one of them shows a

15  sofa.  You see the sofa fully extended and you see the

16  refrigerator with the TV on top.

17    Defense disputes that that is the way that the

18  Defendant was living.

19    THE COURT:  Right.

20    MR. RAMIREZ:  But that is what the officers

21  testified -- or at least Gonzalez testified is the way that

22  it was set up and that the photograph that is an exhibit is

23  -- you saw an air conditioning unit, you saw the door

24  leading out, you saw the other things that gave him the

25  impression that perhaps somebody else lives here.

1        I think the most telling one is the comment from

2    Defendant -- not Defendant -- from Witness Garza, who said

3    that he had the couch there to barricade the door.  And in

4    the officer's mind it's unclear whether that door is

5    barricading the firearms, weapons -- I'm sorry, the

6    ammunition and drugs as part of the bedroom that belongs to

7    the apartment, or whether the children might be there or

8    other children might be there.

9        Now, what came out of the testimony is that

10   Georgy, or Sergeant Martinez, found the children -- found

11   three children in that one bedroom, but we don't know -- and

12   the officers have no idea what -- if there are other

13   children or other things in that bedroom.  Nevertheless,

14   they could have searched anyway because they have an

15   obligation as part of the welfare check to open all the

16   doors.  That is what they testified.  "We were going to open

17   all the doors."

18       Whether there's a sofa or not, is sort of -- kind

19   of like a distraction.  Because whether there was a sofa or

20   not, it doesn't matter to the officer on where they were

21   going to check because they were looking for the children,

22   and they also had some concerns.

23            THE COURT:  Okay.

24            MR. RAMIREZ:  But primarily, the children.

25            THE COURT:  And there is, of course, factual

1  dispute about the timing of when Mr. Garza told them, "Hey,

2  that's not part of my premises."  And that's just, I think,

3  a factual dispute the Court has to parse through very

4  carefully the evidence that's been developed during this

5  hearing.

6          The burning question -- what were you going to

7  say?

8          MR. RAMIREZ:  I was going to say that it's been

9  eight months and the officers have been doing a lot of other

10  things, so their testimony is rife with inconsistencies

11  regarding certain details -- some important details, some

12  not as important, but nevertheless, I was just going to

13  point that out that --

14          THE COURT:  I mean, that is what it is in any

15  circumstance.

16          If Sergeant Gonzalez saw what he thought was

17  marijuana in a jar in the efficiency upon him that his

18  testimony was that he enters the efficiency.  I think it's

19  in the written report.  He enters the efficiency, goes to

20  the front door, realizes that he's in a separate premises.

21  He turns around to exist and he sees a jar that's down by

22  the couch.  There's some photos of it.  And says,

23  articulates, that he -- it was a green or a brown substance

24  or something that looked like marijuana.  That was his

25  testimony, right?

1          MR. RAMIREZ:  Correct.

2          THE COURT:  Why did he need -- why didn't that

3   give him probable cause to stay in the room?  I mean, if

4   there was a crime, if there was what he thought was

5   narcotics in plain view?

6          MR. RAMIREZ:  Because there were other factors in

7   this case.  One is I think that's when he realized that his

8   entry -- he began to question whether he had authority to be

9   in that room because he saw a sofa with a recliner facing a

10  television on a refrigerator.  He saw a separate shower

11  facility that was -- that had cushions and so forth, which

12  is disputed, and he saw --

13         THE COURT:  That computer game.

14         MR. RAMIREZ:  -- those arcade games, all kinds of

15  other things --

16         THE COURT:  Pac Man or whatever they were.

17         MR. RAMIREZ:  -- that are incompletely

18  inconsistent with what you would have if you have toddlers,

19  children, infants.

20         It makes sense you would want to barricade it from

21  the children because the door opens into the apartment, but

22  ultimately he questioned whether it was or was not.  He had

23  probably cause at that point, but he wanted to speak -- what

24  is consistent, he goes to speak to Garza to clarify.  He

25  doesn't tell him about the marijuana.  He just tells him, is

1   that your place?  I'm paraphrasing drastically.  Is that

2   your place or someone else's?

3            The idea, obviously, if it's your place now I've

4   got you on more marijuana if it's your bedroom, but Garza

5   said, no, it's not.  At that point -- and I think that was a

6   good decision on the part of Gonzalez, to go and confirm

7   that.  And that's when he also confirmed the separate lease

8   with the landlord and these other things.

9            THE COURT:  Okay.  What's your response to

10  Defendant's position that there is an inconsistency in

11  Gonzalez's testimony and between that and other evidence,

12  where Gonzalez's testimony is:  That's all.  On the way out,

13  I saw this jar of what might have had marijuana in it and

14  that's all I saw and I'm on my way out -- versus that the

15  evidence is that he told Agent Morales that he saw green

16  cans of -- you know, purportedly ammunition.

17           MR. RAMIREZ:  Well, I asked Sergeant Gonzalez

18  that.  He said that's not what I said.  So that is a --

19  there are two different recollections.

20           THE COURT:  And just they're -- that's is a --

21  that it was an inaccuracy that Agent Morales put in his

22  report.  That that was an inaccuracy that he misheard and

23  misunderstood and that was just an inaccuracy?

24           MR. RAMIREZ:  That's what Gonzalez is saying.

25           THE COURT:  I understand.  I mean, that Gonzalez

1  said I never said that. So that it was just an inaccurate,

2  according to Gonzalez anyway, that it would have been an

3  inaccuracy or misstatement of what was in Morales' report.

4         MR. RAMIREZ: The thing is that Detective Sarquiz

5  testified that she took photos before, during and after the

6  whole search after the consent search was -- consent was

7  given.

8         And when I showed her the exhibits, which are 2,

9  3, 4, and 5, I believe, which are photos of the shower

10 stall, she said when I walked in, that's how it was and so

11 we have that to bolster the statement that it was covered

12 and he couldn't have seen the boxes, but --

13        THE COURT: Right. But there's the other

14 alternative that Sergeant Gonzalez was just saying it later

15 to bolster or beef up that they had, you know, a better

16 reason to be in the apartment or to know what was in there

17 or something -- I don't know. But I mean, of what he was

18 communicating to Federal Agents at that point.

19        MR. RAMIREZ: At that point -- and I think that if

20 we look at the exhibit that was admitted by Defense is

21 No. 29, the last one, the Officer Martinez's -- Martinez,

22 I'm sorry -- Morales' report, as well as the two-page

23 report, as well as his testimony is that it's very clear

24 that Gonzalez was not thinking anymore about the exigency,

25 the -- or the -- in reporting this to the Agents because the

1  way Agents communicate and that's what Schlup -- Agent

2  Schlup said, they communicate certain things and he said

3  because of my experience, I already know what that meant.

4  And so I concurred with them and so they have that

5  communication that they're not very wordy.

6        So when he was communicating that to the ATF

7  Agents, it's very likely that he was only focused on the

8  consent.  And so it's troublesome because --

9        THE COURT:  It's an inconsistency.

10        MR. RAMIREZ:  -- it's an inconsistent statement.

11        THE COURT:  And I'll have to deal with.

12        MR. RAMIREZ:  And I can't -- other than the Agent

13  says something, said that he heard it, Gonzalez said he

14  didn't say it, but ultimately we have Sarquiz saying that

15  that's not the condition of the apartment when she took --

16  of the efficiency when she took the photographs.

17        THE COURT:  Okay.  Let me rewind a second before

18  we go forward from there chronologically.  Let me just

19  confirm one thing I forgot to ask you a minute ago.

20        It is the Government's position, as I understand

21  it, that the only exigent circumstances that justify their

22  entry to Apartment No. 1 was a welfare check for the kids;

23  is that correct?

24        MR. RAMIREZ:  That's correct.

25        THE COURT:  It's the only -- you know, because I

don't know in the briefing, in the previous briefing, that I

think it was referred to as "exigent circumstances." I

don't remember if it was specified as the category of

exigent circumstances was specifically a welfare check for

the children, but that is the only type of exigent --

category of exigent circumstances that the Government is

claiming justified their warrantless entry into Apartment

No. 1.

MR. RAMIREZ: It couldn't be anything else, Your

Honor, because we didn't -- we had no confirmation of any

ammunition, or any kind of drugs, or anything else, so.

THE COURT: Okay. Fair enough.

Okay. Now, anything else you want to jump to? So

from there, they go into the room. The efficiency comes

out. Anything you want to talk about leading up to them

locating Mr. Saldana upstairs? And you know, whatever

consent discussion from there about locating him?

MR. RAMIREZ: Sergeant Gonzalez testified that --

as well as, I think several office persons, including

Special Agent Schlup, testified that the lady who occupied

Apartment No. 3 came down at some point and said there's

someone upstairs.

THE COURT: Right. They go get -- they go find

him.

MR. RAMIREZ: And they go find him, and then they

1  go up and one officer said -- Ayala said that there were two

2  occasions where he went upstairs.  Initially because the

3  tenant said, "There's someone here.  Come up."

4         And there was a concern about whether or not she

5  was wanting him out and he wouldn't leave.  I think that was

6  one person said that.

7         THE COURT:  Okay.  But regardless, I don't know if

8  that's -- let's focus on --

9         MR. RAMIREZ:  Do you want me to move on --

10        THE COURT:  -- I don't know if you think that's

11  relevant to anything, but let's just focus on facts that you

12  think make a different.

13        MR. RAMIREZ:  Oh, okay.

14        THE COURT:  I don't know that that -- I heard

15  that, too.  I don't know that that makes a difference in

16  anything of the main issues of consent and so they -- you

17  know, they go into his apartment.  The question is, okay,

18  now, the next issue is they did a warrantless entry into his

19  apartment.  I think the next issue is:  Did he give consent?

20        MR. RAMIREZ:  We're saying -- the Government's

21  position is he gave consent.  He gave voluntary -- he freely

22  gave voluntary consent.

23        THE COURT:  And is it's just the Court just has to

24  resolve the factual dispute between him saying, no, I

25  didn't, and here are the circumstances under which they did

1  it, and the various officers' versions and Agents' versions

2  of, you know, they say who was around and applying the facts

3  that the Court determines, you know, are more credible and

4  applying that to the factors test?

5          MR. RAMIREZ:  I think unfortunately that's what it

6  comes down to.

7          THE COURT:  Yeah.

8          MR. RAMIREZ:  The only -- the little things that

9  might serve as a guide or helpful is the testimony from

10 Investigator Sarquiz, who said that Defendant felt very

11 comfortable.  There was a statement about the -- that Agent

12 Morales testified about that the Defendant felt comfortable

13 and said, well, at least now I know that you're not like the

14 -- I think the Mexican police, or something like that,

15 Mexican police.  And so --

16         THE COURT:  Now we're talking about -- you're

17 talking about things that he was saying still at the

18 apartment building?  Or --

19         MR. RAMIREZ:  No, this was after.

20         THE COURT:  -- later in his interview?

21         MR. RAMIREZ:  Which can relate back to his -- to

22 what we say was his real present state of mind because you

23 have Gonzalez saying -- Gonzalez testified that from the

24 very beginning -- and so did Investigator Sarquiz, said no,

25 you go ahead and check.  Go and check.  I'm not -- you know,

1　I'm not -- you can check, you know, whatever you want and in

2　fact, gave verbal consent before they went to check.

3　Whether he gave -- then the written consent came after.

4　　　　So I think the initial reliance is on the verbal

5　consent, then the written consent form was the additional

6　cover that the officers wanted -- and I use that word

7　intentionally because you always want to have that

8　documented, especially since there's a whole body-cam,

9　dash-cam storage issue, so they obtained his consent.

10　　　　And you have Dana Sarquiz, who I think was very

11　credible, stated that she was the one who got the form, gave

12　it to him, spent time with him, read it to him, make sure he

13　understood it, corrected his -- or her own name, and did not

14　ever say that he was forced or compelled in any way to do

15　that.

16　　　　You also had -- I can't remember who else it was,

17　but there was another officer who testified about the --

18　well, Gonzalez who said that immediately he started saying,

19　"Go ahead and check.  You can check."  And I think Dana

20　Sarquiz also said that he kept saying, "You can check."

21　　　　When the last -- and one of the last witnesses,

22　Ismael Garcia testified, said that even during the traffic

23　stop, the Defendant said, "Yeah, that's my name."

24　　　　"Are you sure you live there?"

25　　　　And he said, "Yes.  You can go check.  You can go

1　check."  So that's kind of an ambiguous, but a generic, "I

2　have" -- you know, you can go and -- we can go and check.

3　　　　　So that -- all those things add together to

4　suggest that the Defendant was not -- was of a frame of mind

5　that he was going to be free and comply.

6　　　　　THE COURT:  Thank you.  Anything else?  Any other

7　thoughts, issues you want to mention?  I'm trying to think.

8　Anything about the subsequent interview?  I don't have any

9　particular questions about that.

10　　　　　MR. RAMIREZ:  The interview -- I purposely chose

11　not to get into the details of the interview because

12　ultimately that's going to be suppressed or not suppressed,

13　but which is an issue for the Court.

14　　　　　THE COURT:  And I don't know that it matters --

15　　　　　MR. RAMIREZ:  But it doesn't matter.

16　　　　　THE COURT:  -- exactly what he said or not.

17　　　　　MR. RAMIREZ:  It doesn't.  Correct.  It doesn't

18　matter what he said, but ultimately he did give a -- he

19　signed a --

20　　　　　THE COURT:  But it is relevant that the Miranda --

21　the content --

22　　　　　MR. RAMIREZ:  I was going to mention that.

23　　　　　THE COURT:  -- the context of him --

24　　　　　MR. RAMIREZ:  The Miranda form that the Agent

25　testified about, he freely gave -- waived his rights and

agreed to give a statement.  And the context and the manner

in which the whole interview occurred according to the

investigator the Agent Morales suggests that that was also

done freely

So the Miranda -- if he was upset about the way he

had been treated, he never complained about that.  If he was

upset about being compelled about the search or to give a

consent to search his efficiency and has seen everything

that was brought out of the apartment, he never mentioned

that either.

So according to the testimony of Agent Morales, it

as a very -- mostly pleasant, comfortable conversation.

THE COURT:  I was going to say conversation.

MR. RAMIREZ:  Uh-huh.  And the final one is

Investigator Sarquiz saying that not only that, after the

button was turned off and two of the gentlemen left, he

stayed around to tell me his life story.

THE COURT:  All right.

MR. RAMIREZ:  So if she's the one that gave him

the -- if the Defendant says that she gave me this consent

form, why isn't he complaining about her at the interview?

Why isn't he saying, I don't want you here?  I don't want to

talk to you?  You mistreated me, whatever.  It just doesn't

make any sense.

THE COURT:  All right.  Okay.  Thank you,

1 Mr. Ramirez.

2          Ms. Martinez, any rebuttal argument?

3          REBUTTAL ARGUMENT ON BEHALF OF DEFENDANT

4          BY MS. MARTINEZ:  Yes, Your Honor.

5          As far as our -- I'm going to try to go backwards.

6 It's our position that whatever level of comfort the

7 Defendant had during this subsequent interview that was

8 taken that the police station is irrelevant to his state of

9 mind at the time that these events took place.

10          He was calmed down at the station and that's where

11 he felt better once he was at the station and that is where

12 he made that statement -- I'll say in English, "Now I know

13 that you guys aren't the same as the Mexican police."

14 Something to that extent.

15          THE COURT:  Right.

16          MS. MARTINEZ:  So that goes to show that his frame

17 of mind at 3104 Flores was to the contrary.  He was afraid.

18 He was afraid and his fear did not go away up until he was

19 at the station.

20          So anything that happened there we think is

21 irrelevant.

22          Now Sarquiz in our opinion was not credible here.

23 She is the lead agent to this case, but yet she had no

24 facts.  She was not aware that Gonzalez ever made any entry

25 into the room.  She claimed not to know anything about that,

1  which I found kind of odd.

2       Now, she could not recall a lot of things, Your

3  Honor.

4       THE COURT:  Or I think her testimony was perhaps

5  that a lot of things had not been communicated to her by --

6  you know, for example, Sergeant Gonzalez.

7       MS. MARTINEZ:  Yeah.  Well, Your Honor,

8  Mr. Ramirez was talking about our client being very

9  cooperative at his initial encounter with Corporal Garcia

10 and his cooperativeness upstairs saying, yes, go ahead, go

11 and open it.  I just want to make clear that cooperativeness

12 does not equate to voluntary consent.  There are -- there's

13 more to it than just cooperativeness and I had already gone

14 over those factors.

15      Now, and just to go back, it's a two-prong test.

16 Not only was the consent voluntary, but whether the consent

17 was an independent act of free will.  And those are other

18 factors that the Court needs to consider.

19      And the three factors would be the temporal

20 proximity of the illegal conduct and the consent, the

21 presence of intervening circumstances, and the purpose and

22 flagrancy of the initial misconduct.  As far as the temporal

23 proximity of illegal conduct and consent, it happened right

24 away, Your Honor.  As soon as the illegal conduct of

25 entering his -- this warrantless entry and we submit

1  "search" of his efficient, that was a misconduct and minutes

2  later, that's when this alleged consent occurred.

3         So it happened right away.  There wasn't an hour

4  later that he gave his consent to open, it was right away.

5         The presence of intervening circumstances, there

6  were none.  Again, just right away.  It happened very

7  quickly.  And in the purpose and flagrancy of the initial

8  misconduct.  Again, we think that -- it's our position that

9  they entered -- this was all just -- they wanted to get in

10 there, Your Honor, one way or another.  And again, there is

11 no exception to this at all.

12        Let me see.

13        THE COURT:  Let me say this and maybe this will --

14 well, anyway, any other thoughts, Ms. Martinez?  I'm going

15 to -- what I'm going to say is I'm going to give you-all an

16 opportunity.  We're going to discuss how much time you think

17 you need to provide any briefing on this issue.  I don't

18 need briefing just to make arguments, but perhaps to see if

19 you think you can find or have cases that you think are on

20 point more to the facts as have been actually presented in

21 this -- during the course of the hearing.

22        But Ms. Martinez, and so we'll talk about that in

23 a minute.

24        MS. MARTINEZ:  Okay.

25        THE COURT:  But so you'll have an opportunity to

1  say, look, here's cases as under these types of

2  circumstances, you know, this are how these factors apply.

3          MS. MARTINEZ:  Okay.

4          THE COURT:  But anyway, Ms. Martinez, anything

5  else you want to say?

6          MS. MARTINEZ:  Well, again, Your Honor, going back

7  to the consent, he -- even if he was up there and he was

8  like being cooperative, no one ever told -- and certainly

9  the evidence was never -- there was never any testimony

10 telling him, "You don't have to say yes.  Are you sure you

11 want to?"  No one ever told him up there that he could

12 refuse consent.

13          No one ever told him, "You can change your mind."

14 Certainly he was cuffed and you know, if -- again, none of

15 the Government witnesses were able to recall whether or not

16 he was handcuffed the whole time, but you know, given the

17 circumstances, they testified that, you know, they put cuffs

18 on Garza and Anaya for a Class B misdemeanor.  Certainly

19 they're going to cuff the man who is a tenant of this room

20 with all this dangerous contraband in it.

21          So certainly he was handcuffed, and so I find it

22 hard to believe that no one would remember that point.  And

23 so he was handcuffed.  He was not free to leave ever.  That

24 is a very good factor that we ask the Court to keep in mind,

25 not free to leave, handcuffed, surrounded at all times.

1          THE COURT:  Yeah, I think that even I understand

2    handcuffing would be a different -- another level, but I

3    think the undisputed evidence from a lot of witnesses was

4    that he was not free to leave.

5          MS. MARTINEZ:  Exactly.

6          THE COURT:  He was detained.

7          MS. MARTINEZ:  Yes, and so --

8          THE COURT:  Regardless.

9          MS. MARTINEZ:  -- and again, regardless of him

10    being handcuffed or not, that is undisputed.  He was not

11    free to leave and that's the bigger -- that's a big factor

12    here.

13          So I don't -- it's our position that the

14    Government has not met their burden of proving that this

15    search -- this warrantless search was an exception to the

16    warrant requirement and the Government has not proven that

17    the consent was voluntarily given, Your Honor.

18          THE COURT:  All right.  Thank you, Ms. Martinez.

19          Okay.  So questions, of course, we're on shorter

20    deadlines for this Court to issue a report and

21    recommendation.  The question is -- but I think it's fair

22    and it's helpful to the Court to give you-all an

23    opportunity.  We do it in chambers, just to say, hey, let's

24    see what cases we think maybe, if they're out there, that

25    applied to these types of factual scenarios.  Maybe from

1  Defense's perspective of here's another case where there

2  were multiple officers at the scene, and you know,

3  circumstances of giving consent under that type of scenario.

4        But so I don't know if a week -- because we're

5  going to be working on it in the interim.  I'm tempted to

6  maybe give you-all till Tuesday to do some research and to

7  submit, you know, something brief to the Court, even if you

8  just like, "Look, Judge, here's some cases we think are

9  relevant."

10        MS. MARTINEZ:  Tuesday of next week, Your Honor?

11        THE COURT:  Of next week.  I mean, today is

12  Thursday.  Well, anyway what are your thoughts on it?

13        MS. MARTINEZ:  If I can have some more time.  I

14  have like seven or eight final pre-trials I have not

15  prepared them, and they're all set for Tuesday and

16  Wednesday.  I've been focusing on this hearing, so if I can

17  have at least till Friday just to give me some more business

18  days to work on that, because I'm really behind right now.

19        THE COURT:  Well, are you --

20        MS. MARTINEZ:  I want to say I have six final

21  pre-trials on Wednesday, one on Tuesday, and I hate to admit

22  I have not been able to speak to any of those clients yet.

23  I mean, I have, but not to prepare them for this.

24        THE COURT:  I understand.  I think those are my

25  pre-trials maybe that are -- or you may have some pre-trials

1 │ set with me for next Wednesday and Thursday.

2 │ So -- well, obviously I mean, my concern is, I

3 │ think we have approximately 30 days to get an Order out and

4 │ we will be working on it, so but I think if I give you-all

5 │ till Friday of next week to provide us any additional cases

6 │ you want us to look at, I think that's probably okay.

7 │ So Mr. Ramirez, are you okay with that?  I mean, I

8 │ know it's always tight.  You like to have 30 days to maybe

9 │ submit some additional briefing.

10 │ MR. RAMIREZ:  Or 60.

11 │ (Laughter.)

12 │ THE COURT:  Yeah, or 60, but yeah, none of us have

13 │ that kind of time, so.

14 │ MR. RAMIREZ:  No, I understand.  I'm finding

15 │ myself in the same situation as Ms. Martinez.  I know we all

16 │ are.  The Court has its own, also.  Things pile up and we're

17 │ taking the Court's time doing this, but I'll work with the

18 │ Court, also.

19 │ Friday will be fine.

20 │ THE COURT:  Okay.  Well, see what you can get.

21 │ You know, look, what I haven't heard or seen in the briefing

22 │ is, Judge, here's a case.  I mean, yes, we have -- I have

23 │ cases from you-all that you cite that are the general

24 │ factors and rules, but I haven't seen like here's a case

25 │ where we think the facts are similar to the facts that have

1  been established in this case and, you know, we think this

2  case leans in our favor on this factor or that factor, on

3  consent, or the initial whatever it is, you know, exigent

4  circumstances or the written consent or the verbal consent

5  or the waiver of Miranda or not, you know, whatever.

6          Whatever issues you want to present briefing on,

7  but anyway, I'll give you another -- I will give you until

8  Friday at 5:00 o'clock.  We'll say Friday, February 10th, at

9  5:00 o'clock to provide that additional briefing.

10          MS. MARTINEZ:  Thank you.

11          THE COURT:  So okay.  Anything else on behalf of

12  the Government before we conclude this hearing?

13          MR. RAMIREZ:  No, Your Honor, just one thing.  I

14  just wanted to express my gratitude to Defense Counsel for

15  being open to discuss the exhibits and so forth and working

16  so cordially.

17          THE COURT:  Yeah, as far as I can tell from how

18  you-all have communicated to me, you've dealt with each

19  other professionally and with appropriate professional

20  courtesy and I appreciate that because it does -- I think

21  it's proper anyway, but you know, it does help I think

22  facilitate things with the Court, so I do appreciate that on

23  behalf of all Counsel here.

24          All right.  Thank you, Mr. Ramirez.

25          Anything else on behalf of Defense, Ms. Martinez,

1  Mr. Guerra?

2          MR. GUERRA:  No, Your Honor.  I don't think so.

3          MS. MARTINEZ:  No, Your Honor.

4          THE COURT:  Okay.  All right.  Then thank you-all.

5  That concludes this hearing and I'll look for your briefing

6  by 5:00 o'clock on February 10th, 5:00 p.m.

7          MR. RAMIREZ:  Thank you, Your Honor.

8          THE COURT:  All right.  Thank you-all.

9          COURT SECURITY OFFICER:  All rise.

10      (Proceedings concluded at 5:50 p.m.)

11                      * * * * *

12       *I certify that the foregoing is a correct*

13  *transcript to the best of my ability produced from the*

14  *electronic sound recording of the proceedings in the above-*

15  *entitled matter.*

16  */S/ MARY D. HENRY*

17  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

18  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

19  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

20  *JTT TRANSCRIPT #66817*

21  *DATE FILED:  FEBRUARY 13, 2023*

22

23

24

25